UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
KDH CONSULTING GROUP LLC, directly and
derivatively on behalf of ITERATIVE CAPITAL, L.P.,

                                                       **20 Civ.        (     )**

                                  Plaintiff,

                                                       **ECF Case**

                 – against –

ITERATIVE CAPITAL MANAGEMENT L.P.,
ITERATIVE CAPITAL GP, LLC,
ITERATIVE OTC, LLC (D/B/A "I2 TRADING" AND
"ESCHER"), ITERATIVE MINING, LLC, BRANDON
BUCHANAN, CHRISTOPHER DANNEN,

                                     Defendants.

-------------------------------------------------------------------- X


### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER

Rika Khurdayan, Esq.
Dilendorf Khurdayan PLLC
*Counsel for the Plaintiff*
60 Broad Street, 24th Floor
New York, NY 10004
(646) 764-1630

April 27, 2020

## TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………………...1

STATEMENT OF FACTS ………………………………………………………………...4

*KDH Invested in the "Hedge-Fund-Like" Crypto Investment Fund Based on Individual Defendants' Representations of Liquidity Features and Successful Prior Performance History*…………………….. ..5

*After KDH's Expressed Concerns and Redemption Request, Defendants' Improperly Deviated from the Fund's Purpose and Substance and Engaged in Self-Dealing*……………………………………..7

*Defendants Are Improperly Attempting to Effectuate the Restructuring of the Fund into Defendants' Operating Business upon an Ultimatum to KDH*……………………………………………....10

*Additional Relevant Terms and Conditions of the Proposed Restructuring*…………………………....12

*Defendants Denied KDH Access to Books and Records*………………………………………...…14

ARGUMENT………………………………………………………………………...…15

I.    KDH IS ENTITLED TO A TRO AND A PRELIMINARY INJUNCTION ……………..

A.   KDH Will Suffer Irreparable Harm Absent a TRO and a Preliminary Injunction………………………………………………………………………..16

B.   KDH Has Demonstrated a Likelihood of Success on the Merits………………………22

C.   The Balance of the Equities Tips in Favor of KDH…………………………………27

CONCLUSION……………………………………………………………………...28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AIM Int'l Trading LLC v. Valcucine SpA,*
    188 F. Supp. 2d 385 (S.D.N.Y. 2002)……………………………………………………... 15

*Alcatel Space, S.A. v. Loral Space & Communications Ltd.,*
    154 F. Supp. 2d 570 (S.D.N.Y. 2001)………………………………………………. …….18, 22

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.,*
    881 F. Supp. 860 (W.D.N.Y. 1994),
    *decision supplemented*, No. CIV. A. 94-6454L, 1995 WL 215307 (W.D.N.Y. Mar. 6, 1995)……..16

*Brenntag Int'l Chemicals, Inc. v. Bank of India,*
    175 F.3d 245 (2d Cir. 1999)……………………………………………………..…….... 20

*Castle Creek Tech. Partners, LLC v. CellPoint Inc.,*
    2002 WL 31958696, at *3 (S.D.N.Y. Dec. 9, 2002)……………………………………… 20

*Consol. Gold Fields PLC v. Minorco, S.A.,*
    871 F.2d 252 (2d Cir.), *amended*, 890 F.2d 569 (2d Cir. 1989)…………………….......16, 18

*Curley v. Brignoli Curley & Roberts Assocs.,*
    746 F. Supp. 1208 (S.D.N.Y. 1989), *aff'd* 915 F.2d 81 (*1990*)……………………..…21, 27

*Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.,*
    No. 99 CIV 10517 HB, 1999 WL 993648, at *8 (S.D.N.Y. Nov. 2, 1999)………………... 18

*In re Adelphia Commc'ns Corp.,*
    322 B.R. 509 (Bankr. S.D.N.Y. 2005)……………………………………………...24

*In re Netia Holdings S.A.,*
    278 B.R. 344 (Bankr.S.D.N.Y.2002)…………………………………………………… 28

*In re Feit & Drexler, Inc.,*
    760 F.2d 406 (2d Cir. 1985)…………………………………………………………… 18

*In re Sanofi-Aventis Sec. Litig.,*
    774 F. Supp. 2d 549 (S.D.N.Y. 2011)…………………………………………………….. 23

*Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd.,*
    441 F. Supp. 2d 552 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007)………………..20

*Keogh v. Connolly,*
  602 N.Y.S.2d 607 (1st Dep't 1993)……………………………………………………… 22

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.,*
  75 F. Supp. 3d 592 (S.D.N.Y. 2014) …………………………………………………....15

*Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei,*
  312 F.3d 94 (2d Cir. 2002)…………………………………………………………....15

*Miltland Raleigh-Durham v. Myers,*
  807 F. Supp. 1025 (S.D.N.Y. 1992)……………………………………………………...21

*Mgmt. Techs., Inc. v. Morris,*
  961 F. Supp. 640 (S.D.N.Y. 1997) ……………………………………………………... 22

*Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC,*
  582 F. Supp. 2d 616 (S.D.N.Y. 2008) ……………………………………………………...20

*Owens v. Gaffken & Barriger Fund LLC,*
  No. 08 CIV. 8414WCC, 2009 WL 773517, at *3 (S.D.N.Y. Mar. 24, 2009)……………… 18

*Pan Am. World Airways, Inc. v. Flight Eng. Int'l Ass'n,*
  306 F.2d 840 (2d Cir. 1962)……………………………………………………………… 15

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.,*
  741 F. Supp. 2d 474 (S.D.N.Y. 2010), *as corrected* (Sept. 30, 2010)………………………… 23

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.,*
  144 F. Supp. 2d 241 (S.D.N.Y. 2001) ……………………………………………………20, 28

*Rinaolo v. Berke,*
  590 N.Y.S.2d 490 (1st Dep't 1992)……………………………………………………… 22

*S.E.C. v. First Jersey Sec., Inc.,*
  101 F.3d 1450 (2d Cir. 1996)……………………………………………………………… 23

*S.E.C. v. Moran,*
  922 F. Supp. 867 (S.D.N.Y. 1996)…………………………………………………...…… 24

*Solar Cells, Inc. v. True N. Partners LLC.,*
  No. Civ. A. 19477, 2002 WL 749163, at * 7 (Del. Ch. Apr. 25, 2002)…………………… 26

*Street v. Vitti,*
    685 F. Supp. 379 (S.D.N.Y. 1988)………………………………………………... 22

*Tang Capital Partners, LP v. Cell Therapeutics, Inc.,*
    591 F. Supp. 2d 666 (S.D.N.Y. 2008)………………………………………....…..18, 19

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995)……………………………………………………………15
    .

*Transamerica Mortgage Advisors, Inc. v. Lewis,*
    444 U.S. 11 (1979) …………………………………………………………………… 24

*Tucker Anthony Realty Corp. v. Schlesinger,*
    888 F.2d 969 (2d Cir. 1989)…………………………………………………………15

*Unicon Mgmt. Corp. v. Koppers Co.,*
    366 F.2d 199 (2d Cir. 1966)…………………………………………………... 20, 22

*United States v. First Nat'l City Bank,*
    379 U.S. 378 (1965) …………………………………………………………………18

*Wallace v. Wood,*
    752 A.2d 1175 (Del.Ch.1999) …………………………………………………..24

*Warner Bros. v. Dae Rim Trading, Inc.,*
    877 F.2d 1120 (2d Cir. 1989)……………………………………………………... 15

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.,*
    2000 WL 1610790, at *2 (S.D.N.Y. Oct. 27, 2000)……………………………….. 21

**Statutes**

Fed. R. Civ. P. 65…………………………………………………..…………………....1, 15

Fed. R. Civ. P. 65(b)…………………………………………………………………….15

Rule 10b-5 (17 CFR § 240.10b-5) ……………………………………………………..23

Section 10(b) of the Securities Exchange Act of 1934………………………………....23

Section 206 of the Investment Advisers Act of 1940…………………………………..25

Section 206(2) of the Investment Advisers Act of 1940………………………………..24

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff KDH Consulting Group LLC ("KDH" or "Plaintiff"), a limited partner in Iterative Capital, L.P. ("Partnership"), submits this Memorandum of Law in support of KDH's emergency application, by order to show cause, for a temporary restraining order ("TRO") and a preliminary injunction to enjoin Defendants Iterative Capital Management, L.P. ("Iterative"), Iterative Capital GP, L.L.C. ("General Partner"), Iterative OTC, LLC, Iterative Mining, LLC, Brandon Buchanan ("Buchanan") and Christopher Dannen ("Dannen") from (1) proceeding, either directly or indirectly, with converting the Partnership, Iterative Capital Master, L.P. ("Main Master Fund") and Iterative Mining Master, L.P. ("Mining Master Fund") (collectively with the Partnership, "Crypto Investment Fund") into an operating limited liability company ("Mining NewCo") (collectively, as a series of transactions, "Restructuring"); (2) acting on their offer currently set to expire on April 28, 2020, including distributing assets in kind, if KDH does not consent to the Restructuring; (3) removing or destroying the Defendants' books and records (including related to Defendants' finances and affiliated businesses); (4) preventing KDH from access to the same and refusing to produce books and records in response to KDH's demand dated April 14, 2020; (5) preventing KDH from redeeming its portion of the Crypto Investment Fund's liquid portfolio or charging any Restructuring expenses against it; (6) acting as the general partner of the Partnership; (7) paying any cost or expense of Defendants in connection with this action from the Crypto Investment Fund's assets; and (8) taking any action that would impair the value of the Crypto Investment Fund or its assets.

KDH requests a ruling on its application as soon as practicable since Defendant's ultimatum for KDH to consent to the Restructuring is set to expire on April 28, 2020. Also, it is unclear when Defendants will begin the Restructuring – on April 21, 2020, Defendants stated they had received 75% of the investor consents allowing to proceed with the Restructuring.

## PRELIMINARY STATEMENT

This emergency application seeks to stop Individual Defendants, Iterative and General Partner from dissipating the remaining assets of a failing cryptocurrency investment fund via the so-called Restructuring and forcing Plaintiff to consent to Restructuring and pay for Defendants' expenses.

Together with this emergency application and in support of it, Plaintiff submits Verified Complaint for fraudulent representations and various flagrant breaches in violation of the Securities and Exchange Act of 1934 and Investment Advisers Act of 1940, among other things. The action and this emergency application to the Court arise out of Defendants' brazen conduct, where they first rushed Plaintiff into subscribing to a cryptocurrency investment and trading fund by misrepresenting prior performance history and liquidity options; then, intentionally deviated from the main investment objective changing the nature of the fund, and utilized the fund and its resources as their personal piggybank to build out mining operations and profit from a related over-the-counter cryptocurrency trading business.

Now, Defendants force the drastic Restructuring of the "hedge fund-like" cryptocurrency fund into an operating mining business, where "the rights of investors will be significantly different," the ownership interest – substantially lower (including as compared to Defendants'), but which is going to be done at Plaintiff's and other investors' expense. Hatami Decl. ¶ 45; Ex. L at 27.

Initially, based on Individual Defendants' misrepresentation about the nature of the fund, the liquidity options and prior performance, all of which were also reflected in the offering documents, Plaintiff agreed to invest into the Fund Complex. Concurrently with the initial investment, the cryptocurrency market crashed sending Bitcoin from about $17,000 to about $7,600 over the matter of just one month. Compl. ¶ 50. Plaintiff immediately contacted Individual Defendants and requested withdrawal of funds. Hatami Decl. ¶ 15.

Instead, by continuing misrepresenting their true intentions and liquidity options, Individual Defendants convinced Plaintiff to remain in the fund. Hatami Decl. ¶ 16-17.

Once Defendants realized that Plaintiff and, most likely many other investors, would want to withdraw their funds, Defendants quickly turned the whole portfolio illiquid by intentionally and substantially deviating from investment strategy, including spending half of fund's total assets on rapidly depreciating mining equipment. Hatami Decl. ¶ 21; Ex. F.; Ex. G.

Eventually, Defendants notified KDH and other investors that Defendants decided "to convert the Fund from an investment fund structure to a corporate structure" to focus on mining. Ex. K to Hatami Decl. Defendants sought restructuring "consent" from Plaintiff and other investors offering an illiquid stake in the new venture or a refund – all based on an undisclosed residual value of the initial investment, less pro rata share of the significant restructuring and auditing expenses. Alternatively, if the consent was not signed, Defendants promised to ship Plaintiff's share of the outdated mining hardware, at Plaintiff's expense.

But Plaintiff never invested or was interested in investing in mining business. Plaintiff invested in a liquid cryptocurrency trading fund with quarterly withdrawals and stellar trading team. In the meantime, while locking investors in a highly illiquid fund that was rapidly running out of money, Defendants engaged in additional flagrant breaches of their fiduciary duties, duties of good care and loyalty and, upon information and belief, engaged in self-dealing with affiliated entities.

Upon Plaintiff's attempt to clarify the terms of the restructuring, timeline and amount of the refund, Defendant Buchanan stated in an e-mail: "*This opportunity to liquidate is not a negotiation. We can keep the assets in a side pocket* [locked and depreciating rapidly]." Hatami Decl. ¶ 46; Ex. M.

Emergency relief is critical and necessary. Even if KDH retains its respective claims against the Mining NewCo, and Iterative and the General Partner are permitted to complete their newly-proposed Restructuring, the Mining NewCo, as the successor of the Crypto Investment Fund, which has never been profitable, will lack sufficient capital to pay out even the fair value of KDH's remaining capital account in the Crypto Investment Fund. At the moment, Defendants' have frozen any redemptions from the Crypto Investment Fund, until Plaintiff and other investors agree to sponsor the Restructuring. Ex. K to Hatami Decl. at p. 2.

The Restructuring is being attempted (a) in complete deviation of the Crypto Investment Fund's goals as set of in the offering documents; (b) while being paid for by KDH and other investors; (c) in violation of KDH's right to an informed consent, without disclosure of material information about the Restructuring and Defendant's related business; (d) in violation of KDH's right to receive the fair value of its investment; and (e) under the threat of dissipation of the fund's remaining assets and of what is left of KDH's investment into the Crypto Investment Fund.

If allowed to proceed, the Restructuring and the Defendants' actions as per their ultimatum to KDH, will cause irreparable harm to KDH.

## STATEMENT OF FACTS

The relevant facts and Plaintiffs' activities are detailed in the accompanying Verified Complaint dated April 24, 2020, Declaration of Wayne Hatami dated April 26, 2020, Declaration of Rika Khurdayan dated April 27, 2020, which are incorporated here by reference, and are outlined below.

*KDH Invested in the "Hedge-Fund-Like" Crypto Investment Fund Based on Individual Defendants' Representations of Liquidity Features and Successful Prior Performance History*

In late 2017 Dannen personally visited Plaintiff's office in Manhattan to solicit the investment and rushed Plaintiff to invest ASAP before, according to Dannen, the opportunity for the investment into the Fund Complex closed at the end of 2017 - beginning of 2018. Hatami Decl. ¶ 3-5. Dannen touted Defendants' prior performance history and success of two previous funds - Iterative Instinct Fund I, L.P. and i2 Storj SPV, LP. Hatami Decl. ¶ 2. Dannen personally represented to Plaintiff's principals that the Fund Complex was a highly liquid investment opportunity with quarterly liquidity and immediate opportunity to withdraw. Buchanan and Dannen further represented that the Crypto Investment Fund would be focusing on investing in liquid digital assets, such as cryptocurrencies and network tokens. Hatami Decl. ¶ 4. Dannen's verbal misrepresentations were supported by the private placement memorandum ("PPM") (Ex. C to Hatami Decl.) and the limited partnership agreement ("LPA") (Ex. B to Hatami Decl.) provided to KDH, which, among other things, set forth the fund's primary investment strategy: to purchase and hold digital assets, namely cryptocurrencies and network tokens. Hatami Decl. ¶ 9; See e.g., Ex. C. at pp. 9-11, 43.

Pursuant to the PPM, the Crypto Investment Fund's goals were to invest 70% of the assets in purchasing liquid cryptocurrencies and network tokens, via the Main Master Fund. As a minor side strategy, the Fund Complex was also to invest up to 30% of the assets in "mining" operations and equipment relating to the generation of the similar digital assets via the Mining Master Fund. Hatami Decl. ¶ 9; Ex. C. at p. 10.

At the time of raising investments for the Crypto Investment Fund, on December 6, 2017, individual Defendants set up Iterative OTC, LLC (d/b/a i2 Trading and Escher) ("Escher"), owned and managed by Iterative and individual Defendants. Compl. ¶ 14, 34, 42. Escher is an "over-the-counter" cryptocurrency dealer and exchange platform for trading digital tokens, including the

cryptocurrencies and other digital assets generated and owned by the Partnership through Mining Master Fund. Compl. ¶ 42.

Defendants stated in the PPM that Escher would have an exclusive right to purchase all the digital assets produced and owned by the Mining Master Fund in exchange for more favorable pricing terms as compared to other clients, as well as a percentage of profits. However, Defendants never disclosed to KDH such "more favorable pricing terms," "additional consideration," and any information on dealings with "other buyers and sellers of Coins." Ex. C to Hatami Decl. at p. 10.

Notably, at the time when Defendants were making these representations to KDH, Defendants already knew that the represented investment strategy was unsound. On or about December 10, 2019, Leo Zhang, a principal at Iterative, made the following public statement referring to Defendants' investment strategy shaped in 2016-2017, <u>before</u> Plaintiff made its investment in 2018:

> 'So it Iterative started in 2016. So the first fund was a venture fund. And so the first fund generated about 13x return from 2016 to 2017. And, obviously, there was ICOs wave. **And so in mid-2017 we quickly realized that there's something wrong with this much money going on in this space. And so we made the conclusion at that time that this token mania is likely not going to continue. So we closed the fund, returned the capital to investors, everyone's happy, and we started a second fund that's dedicated to mining, which is the fund we're operating now**. So Iterative Capital, the investment center--the reason people, you know, our peers, other investors in the cryptocurrency space, don't hear much from us or about us is because we only focus on mining.'[1] (Emphasis added.)

Compl. ¶ 38-39; Ex A to Khurdayan Decl. at p.5.

---

[1] The Block Crypto, *Leo Zhang, Principal at Iterative Capital Management discusses the unseen impact Bitcoin miners have on the overall market* (podcast) available at <u>https://www.theblockcrypto.com/post/49789/leo-zhang-principal-at-iterative-capital-management-discusses-the-unseen-impact-bitcoin-miners-have-on-the-overall-market</u> (last accessed on April 4, 2020).

On or about January 5, 2018, due to constant and increasing pressure from individual Defendants to subscribe ASAP not to forego a promising investment opportunity, principals formed KDH and signed the subscription agreement investing $1,000,000 in exchange for limited partner interest in the Partnership. Ex. A to Hatami Decl. Under pressure, KDH's principal rushed to personally deliver the investment check for the full amount to Defendants' Manhattan office. Hatami Decl. ¶ 13.

Coinciding with KDH's investment into the Crypto Investment Fund, in early 2018, cryptocurrency market began to plummet. KDH immediately contacted Individual Defendants to request accounting and withdraw the funds. Hatami Decl. ¶ 15. Defendants' first dodged KDH's requests, then reassured KDH over the phone that Defendants kept the situation under control and had not yet made substantial investments in the volatile market using Plaintiff's invested funds, nor planned to invest into BTC that crashed. Buchanan personally convinced Plaintiff not to withdraw the funds promising future liquidity and offered to meet personally with KDH principals to make them feel comfortable about staying in the fund as limited partners.  However, Dannen and Buchanan cancelled two scheduled meetings via text messages last minute on April 11th and 12th, 2018, stopped responding and left New York with "no immediate plans" to be back. Hatami Decl. ¶ 16-17; Compl. ¶ 8.

Defendants' reporting to KDH consisted for the most part of emailing Plaintiff 3 lines with unsubstantiated valuation numbers. Hatami Decl. ¶ 27.

**_After KDH's Expressed Concerns and Redemption Request, Defendants' Improperly Deviated from the Fund's Purpose and Substance and Engaged in Self-Dealing_**

At some point between April and June 2018, instead of returning the investment to KDH, and in contradiction to the Defendants' promises of maintained liquidity and KDH's immediate redemption rights, Defendants intentionally materially deviated from their disclosed investment

strategy for the Crypto Investment Fund as indicated in the PPM, and assumed risks far greater and different in nature than disclosed in the PPM, rendering a large portion of the assets illiquid and haltering KDH's requested withdrawal rights. Hatami Decl. ¶ 21; Compl. ¶ 12.

In particular, Defendants spent $6,500,000 on highly illiquid mining equipment subject to rapid depreciation. As disclosed to Plaintiff later in the May 2019 investor update, as of March 31, 2019, the mining equipment already accumulated $1,800,000 in depreciation. As of the end of 2019, a loss of "approximately $3.4M came in the form of depreciation to the [mining equipment]." (Ex. F to Hatami Decl.) On February 18, 2020, Defendants reported that the Fund Complex's activities related to the illiquid mining investments "absorbed approximately $4.5M in expenses in 2019." Ex. G to Hatami Decl. at p. 2.

To fund this major deviation from the fund's investment strategy, Defendants set aside a substantial amount of the Partnership's funds in what Defendants referred to as a "side pocket" and locked these funds, so that KDH and other investors could not redeem them. Hatami Decl. ¶ 25; *See e.g.*, Ex. F to Hatami Decl.

On or about June 12, 2018, after finding out about the major deviation and substantial loss of liquidity and promised redemption rights, Plaintiff's principals called Buchanan. Being on the speakerphone with KDH's principals, Buchanan represented to KDH that, if necessary, Defendants would raise additional funds and buy out Plaintiff's share as an alternative guaranteed option for Plaintiff's exit from the fund. Hatami Decl. ¶ 28. Defendants' promises never materialized. The fund continued to lose money and Defendants continued to withhold material information about the business. Hatami Decl. ¶ 30.

On February 26, 2019, in an attempt to make sense of the fund's current operations, Plaintiff sent Defendants a list of specific basic questions relating to the status of this new mining business and

financial condition of the Partnership. Defendants promised to provide Plaintiff with a "detailed model" responding to most of the questions but never did. Hatami Decl. ¶ 31; Ex. H.

As a result of the information vacuum, on March 7, 2019, Plaintiff sent Defendants a notice to withdraw the remaining funds. Hatami Decl. ¶ 28; Ex. I. Defendants advised Plaintiff that "all of the Fund's mining assets are in a side pocket and so won't be distributed until the Fund has liquidated those assets," which Defendants "estimated" to be in 18 months. Ex. I to Hatami Decl. In June of 2019 Defendants advised that they would be moving to quarterly communications about the fund's activities and performance, as there would not be much to share in the way of operational updates. Hatami Decl. ¶ 37.

While Defendants' new investment strategy and investments in the rapidly depreciating mining equipment left the Fund Complex on the brink of "dissolution and liquidation," Defendants' related over-the-counter trading and mining businesses thrived. Compl. ¶ 73.  Due to insurmountable conflict of interest between the Crypto Investment Fund and Defendants' affiliated entities, Defendants engaged in flagrant breaches of their fiduciary duties, duties of good care and loyalty and, upon information and belief, engaged in self-dealing with their affiliated entities, including Escher and Iterative Mining LLC to the detriment of Plaintiff and the Partnership. Compl. ¶ 14. In contracting with Escher, continuing to do business with Escher on behalf of the Crypto Investment Fund and, ultimately, attempting to retrofit the whole fund's operations to servicing Escher, Defendants breached duty of good faith and fair dealing.  Iterative, the General Partner, Bannon and Buchanan breached the utmost duty of loyalty to the Partnership and Plaintiff in that Iterative put its own interest to sell digital assets mined by the Mining Master Fund through Escher, and profit from such transactions, before the interests of the Partnership and the limited partners, including KDH. Compl. ¶ 81. Bannon and Buchanan personally profited from trades through Escher at the expense of KDH and other investors in the Crypto Investment Fund. Compl. ¶ 82.

Thus, Defendants materially deviated from the investment strategy by turning most of the investment illiquid and, instead, started building an operating mining business at the expense of KDH and the Partnership. KDH believes that such mining business is trading through various entities affiliated with Defendants.

**Defendants Are Improperly Attempting to Effectuate the Restructuring of the Fund into Defendants' Operating Business upon an Ultimatum to KDH**

On December 20, 2019, Defendants wrote to Plaintiff: "The current Fund structure has handcuffed us and prevented us from being able to scale our mining operation. As such, during Q1 2020, we will embark on an effort to convert the Fund from an investment fund structure to a corporate structure and consolidate it with our other flagship business, [Escher]." Defendants also stated that "one of the key features" desired by the Fund Complex's investors – "quarterly liquidity ended up being infeasible" and "suspend[ed] the right of all investors to withdraw or redeem from the Fund in accordance with the applicable governing documents of the Fund [Complex]." Ex. K to Hatami Decl. at p.2.

On February 18, 2020, Defendants reported that the Fund Complex's activities related to the illiquid mining investments "absorbed approximately $4.5M in expenses in 2019." Ex. G to Hatami Decl. Defendants also stated that "[o]ur focus, since Iterative's inception, has been on cryptocurrency mining and optimizing around that operation," which apparently was Defendants' original strategy, yet, they failed to disclose it to KDH and other investors while raising the funds for the Crypto Investment Fund, contradicting their initial representations and disclosures. Ex. G to Hatami Decl.

On March 1, 2020, Defendants have presented a take-it-or-leave-it offer ("Take-It-Or-Leave-It Offer") to Plaintiff and other investors outlining three options in connection with the contemplated Restructuring:

(a) sign an "exiting investor" consent approving the Restructuring and withdrawing from the Crypto Investment Fund in exchange for a minor portion of KDH's investment based on the undisclosed value of the remaining assets with the deduction of significant restructuring expenses;

(b) sign a "continuing investor" consent approving the restructuring receiving a minor illiquid stake in the Defendants' new company based on KDH's drained share in the Crypto Investment Fund, also with the deduction of the Restructuring expenses; or

(c) receive a pro rata share of the Crypto Investment Fund's assets in-kind (consisting mostly of outdated mining equipment) minus shipping expenses and be forcefully redeemed from the fund prior to the proposed Restructuring.

Ex. L to Hatami Decl. at pp. 1-2 *et seq.*

Defendants offered no definitive figure of the proposed refund, did not provide any information on two businesses the Crypto Investment Fund was to consolidate and operate with (Escher and the existing Iterative Mining LLC), yet required the investors to acknowledge that they had "sufficient opportunity to (i) review and understand the materials relating to … risk factors, conflicts of interest, expenses (including, but not limited to, associated transaction expenses), and tax consequences of the [restructuring], (ii) ask questions of, and receive answers … relating to all materials provided in connection with the [restructuring], and (iii) obtain any additional information." Ex. L to Hatami Decl. at p. 9; Hatami Decl. ¶ 43.

However, when presented with very basic questions about the restructuring, like the timeline for receiving distributions if consent is provided, the amount of distributions and the upper-floor estimate on restructuring expenses that Plaintiff would need to cover – Defendants Buchanan

responded on March 19, 2020 that "**This opportunity to liquidate is not a negotiation**. We can keep the assets in a side pocket." Hatami Decl. ¶ 46; Ex. M.

Iterative's "current understanding" of the "anticipated" KDH's refund amount went from $312,022.32 as of March 19, 2020 (Hatami Decl. ¶ 48; Ex M.), to $225,120.18 as of April 14, 2020 – without accounting for the contemplated Restructuring expenses, which Iterative admits, depending on actual expenses, may deplete the Partnership's assets and KDH's capital account. Hatami Decl. ¶ 48-49; Ex. N, Ex. O.

### *Additional Relevant Terms and Conditions of the Proposed Restructuring*

Also, in the in the Restructuring Consent and Disclosure Letter Defendants, dated March 1, 2020 ("Restructuring Letter"), Defendants stated that:

(a) "[M]aterial terms of the Mining NewCo LLCA are substantially similar to those of the Investment Manager's separate mining operating company." Ex. L to Hatami Decl. at p. 26

(b) "The Mining NewCo LLCA is designed for its strategy as a true operating business – not a hedge fund (or investment fund of any type). The differences from the .. LPA … are material and significant." Id. at p. 27.

(c) Distributions to non-contesting "[i]nvestors are expected to consist of both crypto assets (in the form of a hardware wallet) and mining equipment (disconnected from the internet and packaged in a shipping container at the expense of the receiving Investor), which may be difficult or impossible for such Investors to liquidate for a price equal to their contribution to the net asset value of the Master Funds' assets, if at all." Id. at pp. 25, 28.

(d) "All Investors, including Exiting Investors, will also bear the costs and expenses (including legal fees and expenses) associated with the conversion of the Domestic Fund into Mining NewCo." Id. at p. 26.

(e) There is "no guarantee that Mining NewCo will have sufficient mining assets to operate efficiently at its inception." Id. at p. 33.

(f) "[T]here is no guarantee that such [refund for consenting exiting investors] estimate will be accurate. For example, winding up and dissolving legal entities in the Cayman Islands may involve unknown additional costs, and the reserves the Investment Manager intends to create could prove to be insufficient to cover such unknown costs." Id.

(g) "[T]here is an equal risk that the actual value could be lower" than the valuation on which the refund to exiting investors is based. Id. at p. 46.

On April 14, 2020 (after receiving KDH's demand for books and records), Defendants updated the Restructuring Letter stating, among other things:

(h) "Iterative has determined to base the [Restructuring] on an updated valuation of the Fund Complex' assets, instead of the Original Valuation." Ex. O to Hatami Decl. at p. 1.

(a) "Investors should note that the New Valuation [as of March 31, 2020] reflects a significant decline in the value of the Master Funds' assets (approximately 30%) compared to the Original Valuation [as of December 31, 2019]." Id.

(b) "Iterative communicated to you via email that it had determined to extend the deadline to receive Investor Written Consents until April 27, 2020" … "and further extend[s] the deadline for receiving Investor Written Consents as required

13

by applicable regulations until midnight, New York, New York time on April 28, 2020." Id.

***Defendants Denied KDH Access to Books and Records***

Unable to receive any material information about the actual status of the Fund Complex and historic operations, proposed restructuring, on April 14, 2020, Plaintiff served Defendants with a formal demand to inspect books and records for the proper purposes, including to investigate Defendants' self-dealing, mismanagement and deviation from the investment goals as described above; and to exercise KDH's rights related to the contemplated restructuring in an informed manner. Ex. B to Khurdayan Decl.

Defendants objected to the demand, refused to provide the majority of the requested records and stated that some records pertaining to properly minuted corporate decisions are non-existent. Buchanan, in an e-mail dated April 14, 2020, maintained that "insinuation about activities deviating from the Partnership's investment goals is also one that is incorrect, as the Fund has been fully deployed for two years now. Offering materials made reference to cryptocurrency mining being the core activity of the Fund, which it continues to be." Ex. C to Khurdayan Decl.

On April 20, 2020, Defendants' counsel also objected to Plaintiff's demand but agreed to provide certain documents – on the condition of additional confidentiality agreement and charging Plaintiff for the limited production expenses. Ex. D to Khurdayan Decl.

Finally, while Defendants have increased their reports within the last days before their offer to consent to the proposed Restructuring is set to expire, Defendants refused to provide books and records with material information concerning, among other things, (a) the Partnership's financial reporting in 2018, when Defendants substantially deviated from the fund's investment strategy, including spending additional $6,500,000 out of the fund's remaining assets on rapidly depreciating

mining equipment; and (b) information about Defendant's flagship business, including Escher, which is going to consolidate the Crypto Investment Fund as a newly established operating company under the common ownership and control of Defendants. Compl. ¶ 100.

## ARGUMENT

### KDH IS ENTITLED TO A TRO AND A PRELIMINARY INJUNCTION

A temporary restraining order should issue where the harm threatened is immediate and will be suffered even before a hearing can be held. Fed. R. Civ. P. 65(b); *Warner Bros. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1124 (2d Cir. 1989). A court may grant a temporary restraining order to preserve the status quo before a hearing can occur on the merits of a party's preliminary injunction motion. *Warner Bros.*, 877 F.2d at 1124; *see also AIM Int'l Trading LLC v. Valcucine SpA*, 188 F. Supp. 2d 385, 387 (S.D.N.Y. 2002) (*sine qua non* "of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction") (citing *Pan Am. World Airways, Inc. v. Flight Eng. Int'l Ass'n*, 306 F.2d 840, 842 (2d Cir. 1962)).

A court may grant a preliminary injunction under Rule 65 where the movant has shown "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei*, 312 F.3d 94, 97 (2d Cir. 2002); *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 603–04 (S.D.N.Y. 2014). The purpose of the injunction is to preserve the status quo pending a trial on the merits. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir. 1989).

"Doubts as to the necessity of issuing a preliminary injunction should be resolved in favor of granting the injunction." *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 878 (W.D.N.Y. 1994), *decision supplemented*, No. CIV. A. 94-6454L, 1995 WL 215307 (W.D.N.Y. Mar. 6, 1995) (citing *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir.), *amended*, 890 F.2d 569 (2d Cir. 1989))

## A. KDH Will Suffer Irreparable Harm Absent a TRO and a Preliminary Injunction

A TRO to stop Iterative and its affiliates from effectuating the Restructuring is necessary to prevent irreparable harm to KDH and the Partnership. In this case, KDH faces at least three types of irreparable injury, each of which warrants a TRO and a preliminary injunction: (1) irreparable injury arising from the proposed Restructuring and forced consent negating KDH's right to properly calculate and redeem its investment; (2) irreparable injury arising from the proposed Restructuring, if effected, materially changing Plaintiff's position, including distribution rights and interest in the Mining NewCo, as opposed to the existing hedge fund; and (3) irreparable injury if Defendants refuse to hand over the books and records relating to their prior conduct making the hedge fund illiquid, as well as to Defendants current operating business, which the Partnership is going to be consolidated with.

Under the Partnership's limited partnership agreement ("LPA"), a consent of the majority of limited partners is required to approve the Restructuring, which the General Partner and Iterative are trying to improperly compel under the threat of loss of all of the investment by disagreeing limited partners. Ex. B to Hatami Decl. ¶ 8.8. Even if Defendants succeed in obtaining such consent, the Partnership will be at risk of dissipation of all of its funds.

Defendants have frozen KDH's right to redeem the balance of its investment. Ex. K to Hatami Decl. at p. 2. Yet, Defendants state on a cover letter of their Restructuring "proposal" that

the exiting investors are provided with "immediate liquidity in the form of cash (rather than an in-kind distribution of Master Fund assets) at a reasonable price based on the current net asset value of the Master Funds' assets (without regard to the current side pocket and other liquidity restrictions)." Ex. L to Hatami Decl. However, in reality, Defendants want KDH to consent by April 28, 2020, to "bear[ing] the costs and expenses (including legal fees and expenses) associated with [the Restructuring]" with no definitive redemption amount and "no guarantee that [redemption] estimate will be accurate." Id. at pp. 25-26. "For example, winding up and dissolving legal entities in the Cayman Islands may involve unknown additional costs, and the reserves [Iterative] intends to create could prove to be insufficient to cover such unknown costs." Id at 33.

Such ultimatum and the Restructuring itself are the latest instances of Defendants' violations of their fiduciary obligations to KDH and the Partnership, as well as in violation of the LPA (, including the PPM  incorporated therein by reference (*see e.g.*, Ex. B to Hatami Decl. at p.5 (definition of "Investments"), Sec. 2.5), which do not allow for the Crypto Investment Fund to be consolidated with Defendants' operating business, let alone for KDH having to pay for such Restructuring. To date, Defendants have not honored any of KDH's redemption demands. Based on the fund's performance, even in the partially disclosed documents, KDH reasonably believes that the Partnership or the contemplated Mining NewCo will have insufficient capital to honor KDH's redemption rights, if the proposed Restructuring is permitted to occur. Hatami Decl. ¶ 25-26.

In the meantime, just within the past month, Iterative's "current understanding" of the "anticipated" KDH's refund amount went from $312,022.32 (Hatami Decl. ¶ 48; Ex M.) as of March 19, 2020 [email], to $225,120.18 as of April 14, 2020 – <u>without</u> accounting for the contemplated Restructuring expenses, which Iterative admits, depending on actual expenses, may deplete the Partnership's assets and KDH's capital account. Hatami Decl. ¶ 48-49; Ex. N, Ex. O.

It is for this reason that the Partnership or its successor will have insufficient funds to honor a final judgment if the proposed Restructuring is permitted to occur. Hatami Decl. ¶ 25-26. *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) (irreparable injury found when judgment that may ultimately be obtained would be "uncollectible"); *see also United States v. First Nat'l City Bank*, 379 U.S. 378, 385 (1965); *Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, No. 99 CIV 10517 HB, 1999 WL 993648, at *8 (S.D.N.Y. Nov. 2, 1999) ("preliminary injunctive relief may be necessary because, while monetary damages may be theoretically available, as a practical matter, the defendant would not or could not respond fully for those damages.")

Defendants' conduct threatens precisely the type of "irreparable injury" that warrants the grant of emergency relief. *Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1988) (enjoining board member from approving transactions benefiting defendant to plaintiffs' detriment); *Consolidated Gold Fields*, 871 F.2d at 261 ("once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to unscramble the eggs. A preliminary injunction is therefore the remedy of choice for preventing an unlawful merger.") (internal citations and quotations omitted); *Alcatel Space, S.A. v. Loral Space & Communications Ltd.*, 154 F. Supp. 2d 570, 584 (S.D.N.Y. 2001) (finding loss of contractual rights constitute irreparable injury); *Tang Capital Partners, LP v. Cell Therapeutics, Inc.*, 591 F. Supp. 2d 666, 667 (S.D.N.Y. 2008) ("If [the defendant] is permitted to complete its newly-proposed transaction, [the defendant], which has never been profitable, will lack sufficient capital to pay [the plaintiff] under the redemption procedure of the parties' contract.")

*Owens v. Gaffken & Barriger Fund LLC*, No. 08 CIV. 8414WCC, 2009 WL 773517, at *3 (S.D.N.Y. Mar. 24, 2009), summarized *Tang Capital Partners*, 591 F. Supp. 2d 666, as "granting preliminary equitable relief to prevent defendant from consummating a transaction that would violate plaintiff's alleged contractual rights so that the preliminary relief served to 'prevent defendant from

becoming liable to [plaintiff] for money damages,' while taking care to note that plaintiff was 'not trying to secure assets in order to satisfy a judgment for money damages.'" (citing *Tang Capital Partners,* 591 F.Supp.2d at 672.)

This is similar to what is happening in this case. Crypto Investment Fund has never been profitable. KDH previously requested redemption of its investment, including in 2018 (after which Defendants side-pocketed substantial amount of funds blocking them from withdrawal and invested into illiquid mining equipment) (Hatami Decl. ¶ 15; Ex. D) and in 2019, when Defendants refused to provide information related to their mining activities. Hatami Decl. ¶ 33; Ex. I. On February 18, 2020, Defendants reported that the Crypto Investment Fund's activities related to Defendants' fraud, deviation from their fiduciary duties and the fund's stated purpose "absorbed approximately $4.5M in expenses in 2019." Hatami Decl. ¶ 23; Ex. G at p. 2. As of December 20, 2019, Iterative "suspend[ed] the right of all investors to withdraw or redeem from the [Crypto Investment] Fund." Ex. K to Hatami Decl. at p.2. On March 19, 2020, during the last withdrawal negotiations, Iterative's most optimistic estimate of KDH's refund amount (before Restructuring expenses) was $ 318,522.32. Ex. M to Hatami Decl. A month later, as of April 14, 2020, it went down to $225,120.18. Iterative admitted that "the New Valuation reflects a significant decline in the value of the Master Funds' assets (approximately 30%)." Ex. O, Ex. N to Hatami Decl. Iterative further admitted that there is "there is no guarantee that such estimate will be accurate" and that there is "no guarantee that Mining NewCo will have sufficient mining assets to operate efficiently at its inception." Ex. L to Hatami Decl. at p. 33.

By effectuating the Restructuring, Defendants attempt to avoid liability for their past securities fraud and breaches of fiduciary and contractual duties by forcing all limited partners to consent to their conduct. KDH reasonably believes the Partnership or the contemplated Mining NewCo will have insufficient capital to honor KDH's redemption rights, if the proposed Restructuring is permitted

to occur. Hatami Decl. ¶ 25-26. *See Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249–50 (2d Cir. 1999) ("courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents.); *Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 626 (S.D.N.Y. 2008) ("a defendant's imminent insolvency can constitute irreparable harm.") (citing *Brenntag Int'l Chemicals,* 175 F.3d at 249); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d 241, 248 (S.D.N.Y. 2001) ("Preliminary injunctions are … appropriate to thwart a defendant from making a judgment uncollectible.")

If the planned Restructuring is executed, KDH will not be able to receive proper redemption from the Partnership, as Defendant's are forcing KDH out of the Partnership without proper redemption now, later there will be no Partnership, KDH will not be a shareholder of the Mining NewCo, and the Mining NewCo will have no assets to pay for any KDH's damages. *See Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 626 (S.D.N.Y. 2008) ("district court found irreparable harm in the substantial possibility that any remedy available … would meaningless by the end of litigation) (citing *Castle Creek Tech. Partners, LLC v. CellPoint Inc.*, 2002 WL 31958696, at *3 (S.D.N.Y. Dec. 9, 2002); *Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966) ("we need only find that the injunction serves to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began.") (Internal quotations and citations omitted.)

"Irreparable injury has been found also in the dilution of a party's stake in … a business." *Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 563 (S.D.N.Y. 2006), *aff'd,* 246 F. App'x 73 (2d Cir. 2007) (internal citations and quotations omitted). Here, Iterative and General Partner admit that the Mining NewCo's limited liability agreement contains "differences from the [LPA] [which] are material and significant" (Hatami Decl. ¶ 45; Ex. L at 27), including that

Iterative will receive 20% interest in the Mining NewCo and its profit distributions (Ex. L to Hatami Decl. at pp. 27, 29, 47) (as opposed to the minor partnership interest in the Partnership). By the proposed Restructuring, Defendants are diluting and minimizing KDH's potential stake in the Mining NewCo; and by freezing of KDH's account until the Restructuring expenses are deducted from it, Defendants are dissipating KDH's capital account in the existing Partnership. *See also Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, 2000 WL 1610790, at *2 (S.D.N.Y. Oct. 27, 2000) ("courts have traditionally had the power to enjoin defendants from dissipating funds that are the subject of the underlying suit.")

The requested injunction will also prevent Defendants from completing their self-dealing transaction in utter violation of their fiduciary obligations to the Partnership and KDH, from which they should be prevented, and for which they should be removed from the Partnership. *See, e.g., Curley v. Brignoli Curley & Roberts Assocs.,* 746 F. Supp. 1208, 1221 (S.D.N.Y. 1989) (removing general partner under Delaware law for breach of fiduciary duties) *aff'd* 915 F.2d 81 (1990); *Miltland Raleigh-Durham v. Myers,* 807 F. Supp. 1025, 1059-60 (S.D.N.Y. 1992) (removing general partner under New York law, noting the court's "power to remove [defendants] as general partners").

Finally, while Defendants have increased their reports within the last days before their offer to consent to the proposed Restructuring is set to expire, Defendants refused to provide books and records with material information concerning, among other things, (a) the Partnership's financial reporting in 2018, when Defendants substantially deviated from the fund's investment strategy, including spending additional $6,500,000 out of the fund's remaining assets on rapidly depreciating mining equipment; and (2) information about Defendant's flagship business, Escher, which is going to consolidate the Crypto Investment Fund as a newly established operating company under the common ownership and control of Defendants. Compl. ¶ 100. The continuing denial of access to the

2018 financials and books and records related to the Defendants' current operating business to be related to the Mining NewCo's operations, ownership and management, would irreparably injure KDH. *See, e.g., Mgmt. Techs., Inc. v. Morris*, 961 F. Supp. 640, 650 (S.D.N.Y. 1997) ("There can be little doubt that the loss of corporate records quite possibly would constitute irreparable harm."); *Street,* 685 F. Supp. at 384 (loss of right to inspect corporate records is itself irreparable harm); *Keogh v. Connolly,* 602 N.Y.S.2d 607, 608 (1st Dep't 1993) (irreparable harm where defendants sought to deny plaintiffs access to corporate documents).

And without access to the corporate books and records, KDH will have incomplete knowledge of the proposed Restructuring, as well as Defendants' past and continuing self-dealing and breaches of their duties owed to the Partnership and KDH. *See Unicon Mgmt. Corp.,* 366 F.2d at 203 (granting injunction where plaintiff "could not make informed judgments regarding the status of the work or of the problems involved" without access to corporate books); *Alcatel Space, S.A.,* 154 F. Supp. 2d at 584 (denial of "right to receive information" constituted irreparable harm); *Rinaolo v. Berke,* 590 N.Y.S.2d 490, 491 (1st Dep't 1992) (blocking access to corporate accounts deemed irreparable harm.)

Thus, the types of irreparable harm that KDH will suffer in relation to the contemplated Restructuring and the forced offer to consent to it on or before April 28, 2020, warrant a TRO and injunction.

### B.  KDH Has Demonstrated a Likelihood of Success on the Merits

*Securities Fraud and Violations of the Securities Exchange Act of 1934 and Investment Advisers Act of 1940*

Defendant's proposed Restructuring is a logical culmination of a number of Defendants illegal actions, which started with their securities fraud alleged in detail in the Verified Complaint. In

particular, KDH is likely to succeed on the merits of its claim for Defendants' fraudulent material misrepresentations and omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

"In order to establish primary liability under § 10(b) and Rule 10b–5, a plaintiff is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device. Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud; or at least knowing misconduct." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (internal quotations and citations omitted). The materiality of an omitted fact depends upon whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 560 (S.D.N.Y. 2011) (internal quotations and citations omitted). "Even an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it … materially misleading. *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 483 (S.D.N.Y. 2010), *as corrected* (Sept. 30, 2010) (internal quotations and citations omitted). "[D]uty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 562 (S.D.N.Y. 2011).

After Defendants were first introduced to KDH, Dannen personally visited KDH's office and represented to KDH's principals that the Crypto Investment Fund was a highly liquid investment opportunity, similar to a hedge fund, with quarterly liquidity and immediate opportunity to withdraw investment. Hatami Decl. ¶ 4; Ex. L at 27. Dannen also represented that the fund would be focusing

on investing in liquid digital assets, such as cryptocurrencies and network tokens. Id. Dannen also touted Defendants' prior performance history and success of two previous funds - Iterative Instinct Fund I, L.P. and i2 Storj SPV, LP. Hatami Decl. ¶ 3; Compl. ¶ 36. The Crypto Investment Fund's offering memorandum (PPM, Ex. C to Hatami Decl.) contained similar misrepresentations and omissions. Hatami Decl. ¶ 9; Compl. ¶ 40; *see e.g.*, Ex. C. at pp. 9-11, 43. In reality, as shown by the Defendants' further conduct and Iterative's public statement, at the time when Defendants were making these representations to KDH, Defendants already knew that such investment strategy was unsound. Compl. ¶ 38-39; Ex. A to Khurdayan Decl. at p.5. Defendants also omitted the fact that they "closed a [previous] fund [and] returned the capital to investors." Id. Indeed, Defendants manipulated KDH to invest in their venture to pursue a totally different investment strategy. They utilized the fund and its resources as their personal piggybank to build out mining operations and, separately, profit from a related over-the-counter cryptocurrency trading business. Compl. ¶ 1. It follows from KDH's allegations that Defendants' misconduct was intentional.

Had KDH, or any reasonable investor, known the Defendants' misrepresented or omitted facts, it would have significantly altered the total mix of information Defendants made available and KDH's decision to invest in the Crypto Investment Fund. Hatami Decl. ¶ 29, 39. Defendants misrepresentations and omissions would be material to any reasonable investor. By substantially deviating from the stated investment strategy, Defendants completely changed the nature of the funds and KDH investment.

By the same actions, Iterative and its officers, including Buchanan and Dannen, acting as investment advisors to KDH, violated Section 206(2) of the Investment Advisers Act of 1940 by engaging in transactions, practices or courses of business which operated as a fraud or deceit upon the Partnership and limited partners, including KDH.

24

*Breaches of Fiduciary and Contractual Obligations*

In light of Defendants' continuous blatant breaches of fiduciary duties and inherent self-dealing, KDH's success on the merits of holding Defendants accountable is very likely. Defendants factually turned a hedge fund into an illiquid business that invested into rapidly depreciating mining hardware and focused on the mining operations exclusively benefitting Defendants separate over-the-counter digital-asset trading business, Escher.

"Under Delaware law, '[u]nquestionably, the general partner of a limited partnership owes direct fiduciary duties to the partnership and to its limited partners ... under certain circumstances, directors of a corporate general partner likewise may owe fiduciary duties to the partnership and to the limited partners [including] the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership ...'" *In re Adelphia Commc'ns Corp.*, 322 B.R. 509, 530 (Bankr. S.D.N.Y. 2005) (quoting *Wallace v. Wood,* 752 A.2d 1175, 1180–81 (Del.Ch.1999)).

"Section 206 of the Advisers Act establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." *S.E.C. v. Moran*, 922 F. Supp. 867, 895–96 (S.D.N.Y. 1996) (citing *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 17, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979)).

Pursuing strictly their self-interest, Defendants did not return KDH's investment upon KDH's early requests, instead, Defendants intentionally materially deviated from their Crypto Investment Fund's goals and assumed risks far greater and different in nature than disclosed, rendering a large portion of the assets illiquid and haltering KDH's requested withdrawal rights. In particular, Defendants spent additional $6,500,000 on highly illiquid mining equipment subject to rapid depreciation. Ex. G to Hatami Decl. at p. 2.

Further, the facts surrounding the proposed Restructuring demonstrate that it is nothing more than another attempt by Defendants to benefit themselves at KDH's and Partnership's expense. The Restructuring's impropriety is confirmed by the manner in which Defendants have proceeded. Defendants presented the Restructuring shortly before the consent was set to expire, by way of the Take-It-Or-Leave-It offer. KDH has to speedily consent to the transaction which drastically changes the Crypto Investment Fund's business and ownership structure. Hatami Decl. ¶ 45; Ex. L at 27. KDH had to consent to the Restructuring without any information about (a) Defendants' prior self-dealings involving their OTC business Escher or the related mining business. Compl. ¶ 100. Even the exiting investors are required to pay for the Restructuring expenses to turn the Partnership into Defendants' operating business. Ex. L to Hatami Decl. at pp. 1-2.

When presented with very basic questions about the restructuring, like the timeline for receiving distributions if consent is provided, the amount of distributions and the upper-floor estimate on restructuring expenses that Plaintiff would need to cover – Defendants responded that "[t]his opportunity to liquidate is not a negotiation. We can keep the assets in a side pocket." Hatami Decl. ¶ 46; Ex. M. *Solar Cells, Inc. v. True N. Partners LLC.*, No. Civ. A. 19477, 2002 WL 749163, at * 7 (Del. Ch. Apr. 25, 2002) (defendants' actions in notifying plaintiff of proposed merger "as a fait accompli" did "not appear to be those of fiduciaries acting in good faith").

Further, Defendants' attempted retrofitting of the Crypto Investment Fund into their operating business, and making KDH and other limited partners pay for such Restructuring, is in violation of the LPA (Ex. B to Hatami Decl.), which (a) sets forth the Partnership's purpose, as described in the offering memorandum (LPA, Sec. 2.5(a)); (b) obligates the General Partner to achieve the Partnership's purpose (LPA, Sec. 4.1(a)); (c) mandates that the General Partner should act in accordance with the implied covenant of good faith and fair dealing (LPA, Sec.4.5(a)); (d) provides

for any amendments affecting any partner's liabilities or rights with respect to distributions and withdrawals – to be made only with such adversely affected partner's consent (LPA, Sec. 8.1(b)); but nowhere provides that KDH or other limited partners must pay for the Restructuring. Defendants' attempted restructuring is likely to be in violation of the LPA, which incorporates the Partnership's offering memorandum (PPM, Ex. B to Hatami Decl.) by reference. *See e.g.*, LPA at p.5 (definition of "Investments"), Sec. 2.5.

Finally, the refusal by Defendants to provide to KDH access to the Fund's books and records is a further violation of its contractual and fiduciary obligations. Compl. ¶ 99-100; ¶ LPA, Sec. 7.5; Ex. D to Khurdayan Decl.; *Curley*, 746 F. Supp. at 1211, 1215 (noting "glaring misconduct" by general partner and its CEO and denying limited partner access to books and records).

## C. The Balance of the Equities Tips in Favor of KDH

A movant does not need to show that the balance of hardships tips decidedly in its favor if, as here, it has already demonstrated both a showing of irreparable harm and a likelihood of success on the merits. Nonetheless, the balance of hardships tips decidedly in KDH's favor.

KDH will suffer irreparable injury absent injunctive relief. If Defendants forceful offer to make an uninformed consent expires and the Restructuring is launched, KDH will lose its position as a limited partner and is likely to lose what is left of its investment without possibility of redress out of the dissipated Crypto Investment Fund's assets or the Mining NewCo.

To the contrary, there is no risk to Defendants and their business if they postpone this self-dealing transaction, at the very least while the preliminary injunction application is being decided, or while Defendants are interfering with KDH's redemption and inspection rights. *Street,* 685 F. Supp. at 385 (balancing plaintiffs' irreparable injury of losing *inter alia* "their right to manage the company,

review corporate books and records, and protect their ownership interests" with defendant's failure "to present[] [any] countervailing interests"); *In re Netia Holdings S.A.,* 278 B.R. 344, 357 (Bankr.S.D.N.Y.2002) (granting a preliminary injunction against the disbursement of funds from a bankrupt estate where there was no evidence that keeping the funds in place "would cause anyone any injury whatever"); *Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va.,* 144 F.Supp.2d 241, 248–49 (S.D.N.Y.2001) (finding a balance of hardships tipping in plaintiff's favor where there was "a continuing pattern of bad-faith by [defendant] in evading creditor claims" and no serious risk to defendant's business).

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiff's motion for a Temporary Restraining Order and a Preliminary Injunction.

Dated: April 27, 2017
New York, New York

DILENDORF KHURDAYAN, PLLC

*Rika Khurdayan*

by: Rika Khurdayan, Esq.\
federal bar number AK9122

*Counsel for the Plaintiff*
60 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 457-9797
rk@dilendorf.com