# BARNES & THORNBURG LLP

445 Park Avenue, Suite 700
New York, NY 10022-8634 U.S.A.
(646) 746-2000
Fax (646) 746-2001

www.btlaw.com

Robert Boller
Partner
(646) 746-2020
rboller@btlaw.com

Lawrence Gerschwer
Partner
(646) 746-2022
lawrence.gerschwer@btlaw.com

May 1, 2020

VIA ELECTRONIC COURT FILING

Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl St., Suite 1610
New York, NY 10007

  Re: *KDH Consulting Group, LLC v. Iterative Capital Management L.P., et al.,*
    20 CV 3274

Dear Judge Marrero:

  Defendants in the above-referenced action seek emergency relief pursuant to Rule 60 of the Federal Rules of Civil Procedure from the Court's April 27, 2020, Order granting Plaintiff's *ex parte* request for a Temporary Restraining Order. Critically, the TRO does not merely maintain the status quo pending the upcoming May 11 preliminary-injunction hearing; instead, it imposes affirmative obligations on Defendants—the production of scores of information and documents to Plaintiff—that must be fulfilled *before Defendants even have an opportunity to present their position during the upcoming hearing*. Had Defendants been given notice and an opportunity to be heard on the TRO, they would have been able to immediately correct the material misrepresentations and glaring omissions in Plaintiff's application and would have been able to stop what has now become irreparable harm to themselves and to other investors and businesses impacted by the *ex parte* submission. The TRO as entered, without any such notice or opportunity to be heard, is unnecessary to protect any interest Plaintiff may have in the litigation, irrespective of the merits or lack of merits of its claims.

  Defendants respectfully request that the Court promptly schedule a telephonic hearing with counsel for the Parties to address the need for immediate relief from the TRO. We are available at the Court's convenience.

  In December 2019, Iterative Capital L.P. (the "Fund") provided a written "Investor Update" to limited partners, including Plaintiff, disclosing that it intended to enter into a transaction (the "Transaction") that would voluntarily dissolve and liquidate the Fund and continue in the form of an operating company, and that the investors would be given the opportunity to withdraw from the Fund and receive either (a) cash distribution, (b) in-kind distribution, or (c) in-kind contribution to

the newly formed operating company. (*See* Hatami Decl., Ex. K). Defendants previewed the Transaction with investors in December 2019 and January and February of 2020, and in March 2020 Defendants provided investors with 100+ pages of disclosures. (*Id.*, Ex. L). Following the March 2020 disclosures and request for investor consent, the Fund sent regular updates to all investors regarding the Transaction. Despite having months of advance notice and extensive disclosures, Plaintiff waited until hours before the Transaction's scheduled April 28 closing to seek a TRO *ex parte* and without notice to Defendants.

We respectfully submit that, had Plaintiffs been candid with the Court about the structure of the Transaction, the timing of the relevant disclosures, the law governing this dispute, and the balance of harms that would result from a TRO being entered, the Court would not have granted the TRO in the first place. Those harms are mounting by the day, and will increase meaningfully if the Order's May 2 deadline to produce documents to Plaintiff is enforced.

The need for immediate relief from the TRO and the problems with Plaintiff's submission are myriad but include the following:

1. **The TRO is causing irreparable harm**. The TRO in place is causing irreparable harm to other limited partners and other, non-related businesses. As alluded to above, the Transaction contemplated permitting investors either to exit or convert their Fund investment into an investment in the newly organized entity. While approximately 2/3 of the Fund's investors have chosen to convert to an interest in the new entity, about 1/3 of investors have opted to liquidate their investments. By freezing the liquidation and conversion, the TRO has precluded these limited partners from liquidating their investments. It has also locked up the Fund, which is invested in an extremely volatile asset class, from transacting any business, which puts investor assets in further peril.

The TRO is also damaging uninvolved entities by naming numerous Iterative entities as defendants, despite their tenuous relation to the issues being litigated. While all of the inessential parties dragged into this litigation have been damaged thereby, the most egregious example is Iterative OTC, LLC. Iterative OTC is a separate, FinCen-regulated money services business that acts as a wholesale principal trading firm specializing in cryptocurrencies.

The Complaint contains absolutely no allegations of misconduct by Iterative OTC, yet Iterative OTC is grouped in with all defendants and identified as a defendant in Counts 1, 7, 8, 10, 11, and 12, which are asserted generally against all Defendants. In many instances, this results in preposterous claims. For example, the First claim alleges securities fraud against Iterative OTC, but Iterative OTC was not involved in attracting Plaintiff to invest in the fund and the Complaint does not contain a single allegation of a representation made by that entity. Likewise, the Seventh claim asserts a claim for breach of the duty of good faith, fair dealing, and loyalty arising out of agreements between Plaintiff and all Defendants, including Iterative OTC. (Compl., ¶¶ 153-157). ***But the Complaint does not identify any agreements between Iterative OTC and Plaintiff, nor could it, as there were no such agreements.*** If Plaintiffs had the opportunity to be heard prior to entry of the TRO, they could have provided the Court with this critical information omitted from Plaintiff's *ex parte* submission

As a result of Plaintiff's gamesmanship in filing and naming Iterative OTC as a defendant and being subjected to the instant TRO, Iterative OTC's account has been flagged by multiple trading partners, thereby limiting its liquidity pool, access to markets and ability to offer competitive pricing. Iterative OTC's business has thus been effectively suspended, and this damage will continue for as long as the TRO remains in place and Iterative OTC remains frivolously named as a defendant.

2. **Plaintiff is not entitled to a mandatory TRO.** Plaintiff presented its application to the Court as if it were merely asking the Court to maintain the status quo until a hearing could be set. But the Order submitted by Plaintiff was actually a mandatory injunction requiring affirmative conduct by Defendants. Section (e) of the Order requires Defendants to comply with Plaintiff's previous demand under Section 17-305 of the Delaware Revised Uniform Limited Partnership ACT (the "DRULPA") to produce 17 different categories of books and records within five days. The effort required to satisfy that affirmative obligation is enormous. And the vast majority of the requested documents are well beyond the narrow scope permissible under the LPA and DRULPA § 17-305 itself.

Mandatory injunctions are extraordinary relief, and a movant seeking a mandatory injunction must "meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from a denial of the injunction." *Herrick v. Grindr, LLC*, No. 17-CV-932 (VEC), 2017 WL 744605, at *2 (S.D.N.Y. Feb. 24, 2017) (quotations omitted). Plaintiff's submissions did not even acknowledge the relevant standard, let alone argue that the standard had been met. In fact, Plaintiff essentially disguised a request for a mandatory injunction as a status quo TRO more typically filed in this Court.

The mandatory relief afforded in the Order also effectively resolved this issue in Plaintiff's favor by requiring Defendants to produce all of the disputed categories of documents, even though ***the Complaint does not contain a claim for books and records***. (The Complaint's failure to even state a claim for books and records is likely the result of Plaintiff recognizing that DRULPA § 17-305 claims may only be litigated in Delaware Chancery Court, as discussed below.)

3. **Plaintiffs have been aware of these transactions for months but chose to seek *ex parte* relief without notice on the eve of the transaction closing.** There was no emergency here, except of Plaintiff's own making. In fact, Plaintiff's own supporting papers make clear that they have been aware of the impending liquidation of Iterative Partners since at least December 2019, but sat on their hands. Specifically:

   a. On December 20, 2019, Plaintiff received a letter from Iterative Capital Management, L.P. (the "General Partner"), explaining management's assessment of the challenges associated with a limited partnership structure and its plan to restructure. (Hatami Decl., Ex. K);

   b. On March 1, 2020, the General Partner provided Plaintiff with 100+ pages of disclosures regarding the "Conversion and Consolidation of Iterative Capital Fund Structure." These disclosures included an Offering Memorandum, a Consent and Disclosure Letter, and 15-page "Q&A" regarding the transaction. (Hatami Decl., Ex. L);

**BARNES & THORNBURG** LLP

    c. On March 18, 2020, the General Partner extended the tender in order to provide more time for investors to review and respond;

    d. On April 14, 2020, the General Partner provided limited partners with updated offer pricing information based on more recent third party valuation numbers from the fund's administrator and advised that the Transaction remained on track and the structure would remain the same. (Hatami Decl., Ex. M).

Nevertheless, Plaintiff waited until April 27, the literal eve of the transaction closing, to commence this action and seek a TRO *ex parte*. This was despite the fact that the Complaint was drafted and Plaintiff's verification had been finalized and notarized on April 24, **three days earlier**. (*See Compl.*, 40, Verification). Even on the day of filing, Plaintiff provided Defendants with copies of the papers only after they had been filed, leaving Defendants with no opportunity to respond.

    4. **Money damages would be a sufficient remedy for Plaintiff.** Neither the TRO nor a preliminary injunction are appropriate because it is well established that monetary damages—the only type of damages that Plaintiff alleges it will suffer—do not constitute irreparable harm. *See Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (holding that, as a general matter, monetary injury does not constitute irreparable harm). Even if KDH were to prevail on its claims in its Complaint (and it won't), Defendants could make KDH whole through money damages. To state the obvious, Plaintiff does not want to remain a limited partner in the Fund, so Plaintiff's ardent objection to the Transaction is motivated solely by money.

Plaintiff argues that market fluctuations and potential legal expenses associated with the Transaction put the Fund "at risk of dissipation of all of its funds" (Plaintiff's Br., 16), and that Plaintiff believes the Fund or its successor "will have insufficient funds to honor a final judgment if the proposed Restructuring is permitted to occur." (*Id.* at 18.) This is a legally dubious basis for the imposition of even a pure "status quo" TRO, given that Plaintiff fails to allege—much less establish—that the risk of insolvency is "likely and imminent." *See CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 782 (2d Cir. 2010) (stating that, to satisfy irreparable harm prong, movant must show that the risk of insolvency is likely and imminent.)

But more importantly, Plaintiff's argument assumes that, if there were such a final judgment, the Fund would be liable for it. This is wrong. The Fund itself is a collection of assets jointly owned by the limited partners. Plaintiff has no right to recover from the Fund any amount greater than the value of its capital account. Moreover, neither the Fund nor its proposed successor is even a defendant in this case; in fact, the Fund is a nominal plaintiff. So, neither the Fund nor its successor will ever be paying a judgment to Plaintiff, and using the TRO to freeze the Fund in its current state of reorganization makes no sense.

    5. **The Court lacks jurisdiction to hear most of the claims**. By failing to set forth clearly and candidly what it was asking the Court to do, Plaintiff also caused the Court to decide issues over which it lacks jurisdiction. For example, the Court lacks jurisdiction to resolve a Delaware books and records dispute, which can only be resolved in Delaware Chancery Court. Section 17-305(e) of the DRULPA states that "[a]ny action to enforce any right arising under this section shall be brought in the Court of Chancery" and that "[t]he Court of Chancery is hereby vested with exclusive jurisdiction to determine whether or not the person seeking such information

is entitled to the information sought." This Court has repeatedly enforced this exclusive venue provision. *See Giudice v. Harlan*, No. 15 CV 7330-LTS-JCF, 2016 WL 6496255, at *5 (S.D.N.Y. Nov. 2, 2016) (finding court lacked jurisdiction to entertain books and records claim because Section 17-305(e) confers exclusive jurisdiction upon the Delaware Chancery Court); *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 405 (S.D.N.Y. 2013) (reaching identical conclusion regarding claim arising under analogous Delaware books and records statute).

But even though Plaintiff cited DRULPA § 17-305 in its April 14 demand letter (Khurdayan Decl., Ex. B), and so was undoubtedly aware of the statute's exclusive venue provision, the Complaint does not state a claim for books and records and omits any mention of the statute.

Additionally, Section 8.5 of the LPA includes an exclusive venue provision pursuant to which Plaintiff consented to "the exclusive jurisdiction and venue for any action arising out of this Agreement in the Delaware Court of Chancery." (Hatami Decl., Ex. B). Each of the twelve claims in the Complaint relate to Plaintiff's investment in the funds, and while the first four claims purport to arise under federal law, the remaining eight claims all unquestionably arise under the LPA. Accordingly, these claims may only be litigated in Delaware.

6. **Plaintiffs are not likely to succeed on the merits.** The remainder of the Complaint is a mélange of misstatements, intentional misquotations, and unreliable pleadings. For example, Plaintiffs assert that they were misled by the Fund's investment strategy and did not realize that cryptocurrency mining would play such a large part of the Fund's investment activities. However, on page 1 of the Private Placement Memorandum (the "PPM"), the Executive Summary describes the Fund's Investment Strategy as: "The Fund seeks to maximize capital appreciation by investing all of its investible assets in the Master Funds, which invest, directly or indirectly, in cryptocurrencies and network tokens, ***as well as in mining operations and equipment relating to the generation thereof. . . .***" (PPM, Hatami Decl., Ex. C, p. 3) (emphasis added). In fact, the term "mining" appears 68 times in the Private Placement Memorandum alone. (*See id.*)

The Complaint and Plaintiff's supporting papers also repeatedly and intentionally misquote the fund's offering documents and exclude key phrases from each in a clumsy attempt to read right out of key documents references to mining, risk, and illiquidity. Below are just a few instances of this behavior. Portions in bold and italics appear in the original documents but are intentionally excluded from the quotes used by Plaintiff in its TRO papers.

| **Language Quoted By Plaintiff** | **Actual Language** |
|---|---|
| "The three out of four components of the Fund Complex's investment strategy would be '(i) cryptocurrency and network token accumulation (i.e., buy-and-hold); (ii) algorithmic and human initiated trading based on research, fundamental analysis and technical trends; … ; and (iv) strategic acquisition and disposition activity involving crypto-networks.'" Compl., ¶ 103(f) (citing PPM) | "The Master Funds' investment strategies will be implemented using four main approaches: (i) cryptocurrency and network token accumulation (i.e., buy-and-hold); (ii) algorithmic and human-initiated trading based on research, fundamental analysis and technical trends; ***(iii) mining operations and equipment;*** and (iv) strategic acquisition and disposition activity involving crypto-networks." (PPM, Hatami Decl., Ex. C, p. 3) |

| | |
|---|---|
| "The Fund is being formed for the purpose of investing all of its investible assets in the Master Funds, which will, directly or indirectly, acquire, generate, manage and hold investments in cryptocurrencies and network tokens (collectively, "Coins" or "Investments")." (Hatami Decl., ¶ 9(a), quoting PPM). | "The Fund is being formed for the purpose of investing all of its investible assets in the Master Funds, which will, directly or indirectly, acquire, generate, manage and hold investments in cryptocurrencies and network tokens (collectively, "*Coins*" or "*Investments*"), **which Investments will be made through (i) trading on established cryptocurrency exchanges or in "over the counter" or other markets, (ii) structuring, designing and participating in "Token Generation Events," or (iii) "mining" new Coins using computing hardware configured for that purpose.**" (PPM, Hatami Decl., Ex. C, p. 3) |
| "The primary investment strategy of each Master Fund is to purchase and hold Coins." (Hatami Decl., ¶ 9(b), quoting PPM). | "The primary investment strategy of each Master Fund is to purchase and hold Coins. **Thus, each Master Fund may be subject to more rapid changes in value than would be the case if the Master Funds were required to maintain a diversification among various assets. No assurance can be given that the Master Funds' investments will appreciate in value or that the Master Funds will ever be able to achieve liquidity on, or otherwise to recover, its investment in Coins.**" (PPM, Hatami Decl., Ex. C, p. 43) |

\* \* \* \* \* \*

  For the foregoing reasons, Defendants respectfully request, pursuant to Rule 60, that the Court lift the TRO that is currently in place or promptly schedule a telephonic hearing with counsel for the Parties to address the need for immediate relief from the TRO. We are available at the Court's convenience.

              Respectfully Submitted,

              /s/ Robert J. Boller

              Robert J. Boller
              Lawrence Gerschwer