# DILENDORF KHURDAYAN

| | |
|---|---|
| 60 Broad Street, 24th Floor<br>New York, New York 10004<br>Tel. 212.457.9797 | Rika Khurdayan, Esq.<br>Partner<br>Cel. 646.764.1630 |
| Dilendorf.com | rk@dilendorf.com |

**May 1, 2020**

TO:    HONORABLE VICTOR MARRERO
        UNITED STATES DISTRICT JUDGE
        SOUTHERN DISTRICT OF NEW YORK
        500 PEARL ST., SUITE 1610
        NEW YORK, NY 10007

*VIA ECF AND EMAIL TO CHAMBERS*

RE:    KDH CONSULTING GROUP LLC v. ITERATIVE CAPITAL MANAGEMENT L.P. ("ITERATIVE") ET AL.
        <u>20-CV-03274 | RESPONSE TO DEFENDANTS' LETTER MOTION UNDER RULE 60</u>

Dear Honorable Judge Marrero:

    Plaintiff KDH Consulting Group LLC ("KDH" or "Plaintiff") submits this letter in response to Defendants' letter submission, dated May 1, 2020 asking to lift the temporary restraining order issued on April 27, 2020 ("TRO") pursuant to Rule 60 of the Federal Rules of Civil Procedure ("Letter").

    Rule 60 provides for relief from an order based on the conduct falling within a specific category. Fed. R. Civ. P. 60. Defendants do not specify the applicable provision of Rule 60 but their submission claims to correct "the material misrepresentations and glaring omissions in Plaintiff's application," (Letter at p. 1), which is guided by Rule 60(b)(3). "However, a Rule 60(b)(3) motion cannot be granted absent clear and convincing evidence of material misrepresentations and cannot serve as an attempt to relitigate the merits." *Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir. 1989).

    Contrary to Defendants' arguments in the Letter, improperly disguised in serious accusations, KDH made no misrepresentations to the Court and was candid with the Court. Conversely, Defendants misrepresent to the Court throughout their Letter that KDH did not give notice to Defendants prior to submitting the TRO papers. This could not be further from the truth. This office notified Defendants' prior counsel, William F. Mongan, Esq. of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 ("Prior Counsel") by email and a follow-up call on the morning of the emergency TRO application, before filing any papers. Then, after receiving a call back

from Prior Counsel, this office discussed the TRO with Prior Counsel, including the grounds for proceeding with the TRO, the basis for Plaintiff's claims, and also conferred the availability of Prior Counsel to participate in the teleconference with the Court pursuant to Judge Marrero's Special Individual Rules and Practice in light of COVID-19 - once again, before filing the TRO papers. Once the TRO papers were accepted by the District's *ex-parte* clerk, a copy was forwarded to Prior Counsel.

Likewise, contrary to Defendants' submission, KDH did not conceal from the Court the minor mining strategy of Iterative Capital, L.P. (together with affiliates, "Fund") and clearly alleged in the Complaint: "[a]s a minor side strategy, the Fund Complex was also to invest up to 30% of the assets in 'mining' operations, including equipment relating to the generation of the similar digital assets via the Mining Master Fund." Compl. ¶ 41. (*See also* Compl at ¶ ¶ 45, 103; Ex. C to Hatami Decl. at p. 10.). KDH provided references to the complete language in the Verified Complaint and the supporting TRO papers, and also filed the full version of the PPM under seal in anticipation of Defendants' objections to publicizing the offering document.

KDH never claimed that mining-related investments were not disclosed to KDH, but that the mining-related investments were supposed to be only a minor strategy accounting for not more than 30%. However, as stated in the Verified Complaint and supporting documents, Defendants craftily turned the liquid investment fund into a full-blown mining operation over the course of the past two years. Defendants suddenly expended nearly half of the Fund's assets on mining equipment and locked KDH in an illiquid investment vehicle that kept losing money but, at the same time, promising immediate withdrawal rights and profiting from such new arrangements via affiliated trading entity, Defendant Iterative OTC, LLC ("Iterative OTC").

The substance of Defendants' Letter constitutes an impermissible attempt to relitigate the merits of the TRO, which is not appealable. "[C]ourts in this district have repeatedly held that a party may not use Rule 60(b) as a substitute for appeal or to relitigate matters resolved by the court adversely to that party." *Midamines SPRL Ltd. v. KBC Bank NV*, No. 12-CV-8089 (RJS), 2015 WL 13746705, at *1 (S.D.N.Y. Feb. 3, 2015) (internal quotations and citations omitted); *Schildhaus v. Moe*, 335 F.2d 529, 531 (2d Cir. 1964) ("Rule 60(b) was not intended as a substitute for a direct appeal from an erroneous judgment.")

Irrespectively of any additional categories of the Rule 60 Defendants are alluding to, none are applicable here. *See In re Rebeor*, 89 B.R. 314, 323–24 (Bankr. N.D.N.Y. 1988) (denying Rule 60 motion "due to the absence in the instant matter of 'mistake' by a party, his representatives or the court, 'fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party' or 'any other reason justifying relief from the operation of the judgment' not recognized by the preceding clauses and either stemming from extraordinary circumstances or the existence of a judgment which may work an extreme and undue hardship.'") (citing *Montco, Inc. v. Barr (In re Emergency Beacon Corp.),* 666 F.2d 754 (2d.Cir.1981)).

### I. Necessity of the TRO application and the actual timeline of Defendants' proposed restructuring.

In an attempt to set aside the TRO, Defendants mischaracterize the timeline and factual background of the proposed restructuring:

> "In December 2019, Iterative Capital L.P. (the "Fund") provided a written "Investor Update" to limited partners, including Plaintiff, disclosing that it intended to enter into a transaction (the "Transaction") that would voluntarily dissolve and liquidate the Fund and continue in the form of an operating company, and that the investors would

be given the opportunity to withdraw from the Fund and receive either (a) cash distribution, (b) in-kind distribution, or (c) in-kind contribution to the newly formed operating company. (*See* Hatami Decl., Ex. K). Defendants previewed the Transaction with investors in December 2019 and January and February of 2020, and in March 2020 Defendants provided investors with 100+ pages of disclosures. (*Id.*, Ex. L). Following the March 2020 disclosures and request for investor consent, the Fund sent regular updates to all investors regarding the Transaction. Despite having months of advance notice and extensive disclosures, Plaintiff waited until hours before the Transaction's scheduled April 28 closing to seek a TRO *ex parte* and without notice to Defendants."

Defendants' Letter at pp. 1-2.

The actual timeline of events and the extent of Defendants' "disclosures" in connection with the proposed restructuring can be easily confirmed based on documents submitted by KDH in support of the TRO.

### A. *December of 2019*

On December 20, 2019, Iterative sent an update to all investors advising them of a vague plan to restructure the Fund and suspending any rights to withdraw or redeem. Contrary to Defendants' Letter, Defendants did not even mention the three options offered to the consenting and non-consenting investors. There was absolutely no information provided about the upcoming restructuring, except for saying that the Fund will be consolidated with Iterative OTC, that additional funds will be raised, and that the existing investors would be provided with liquidity opportunities. Ex. K to Hatami Decl. at p. 1

### B. *February of 2020*

The next update about the proposed restructuring was provided on February 18, 2020 via another short letter to investors, in which Iterative reminded about the expected restructuring, once again, providing no information about the transaction or the three options for investors to proceed beyond Defendants' general vision, including:

> "We decided in late 2019 and early this year that it would be in the best interest of investors to form a new investment vehicle for those that have a longer time horizon for their investment and liquidate those investors that no longer wish to remain in the Fund but have been stuck due to the placement of assets in a side pocket. It is through this lens, of reducing costs and providing an opportunity for liquidity, that we plan to propose a plan of reorganization for the Fund." Ex. G to Hatami Decl. at p. 3.

It is worth noting that the total assets of the Fund at that point, according to Iterative, were as follows: (a) main trading master fund at $1.09M, (b) mining fund at $1.48M of cryptocurrency and $2.06M of mining equipment, with the total expenses of $4.5M accumulated by the mining fund due to hardware depreciation and some hosting fees. *Id.* at p.2.

### C. *March of 2020*

It was only in March of 2020 that Defendants first presented investors with the "consent" options. Ex. L to Hatami Decl. at pp. 1-2. When KDH asked Defendants about the timeline for

receiving distributions if consent is provided, the amount of distributions and the upper-floor estimate on restructuring expenses that KDH would need to cover –Buchanan responded on March 19, 2020 that "[t]his opportunity to liquidate is not a negotiation. We can keep the assets in a side pocket." Hatami Decl. ¶ 46; Ex. M.

On March 18th, Defendants extended the deadline for consents by one month.

D. *April of 2020*

Unable to obtain any material information from Defendants, KDH demanded access to books and records on April 14, 2020. The same day, on April 14, 2020, Defendants sent out an updated disclosure package giving investors merely two weeks to make the decision.

On April 20, 2020, (a week before the Defendants-set deadline for consent), Defendants' Prior Counsel objected to KDH's formal demand for books and records agreeing to provide only a few documents in the future on the condition of signing an additional confidentiality agreement and covering the limited production expenses. Ex. D to Khurdayan Decl. As the Defendants' ultimatum was set to expire in a week, KDH had no other choice but to bring this action with emergency application asking to suspend the restructuring and provide access to relevant material information about such restructuring.

A. *TRO and Preliminary Injunction are critical to preserve the status quo, especially in light of Defendants' recent updates.*

The TRO and a preliminary injunction are warranted to preserve the status quo and prevent dissipation of the remaining assets of the failing cryptocurrency investment Fund via the so-called restructuring, as well as forcing KDH to consent to the restructuring with no material information but still covering Defendants' related expenses.

On April 28, 2020, the next day after this Court granted the TRO and enjoined Defendants from (a) proceeding with the restructuring and (b) "acting on their offer currently set to expire on April 28, 2020, including distributing assets in kind, if Plaintiff does not consent to the Restructuring", Defendants sent investors a new update reiterating that the "deadline for investor responses remains *tonight* [April 28] *at midnight EST*," and Defendants will move forward with the restructuring "based on the current offering terms and responses received as of the deadline tonight as soon as we are legally permitted to do so." *See* Exhibit A attached hereto – Iterative's Letter Dated April 28, 2020.

This means that the following terms are now applied to KDH, as a non-consenting investor, and will be implemented once the TRO is lifted if preliminary injunction is not granted:

> "Investors who do not timely respond or who do not elect to be either an Exiting Investor or Continuing Investor will be mandatorily redeemed prior to the effectiveness of the Proposed Transactions through an in-kind distribution of their pro rata share of the Master Funds' assets (and bear any cost and tax liability associated with such in-kind distribution). Following such redemption, the consent of such Investors with respect to the Proposed Transactions will no longer be required, as they will no longer be Investors."

*See* Ex. L to Hatami Decl. at pp. 24-25.

This is an exact type of Defendants' injurious conduct the TRO was entered to prevent, and the conduct from which Defendants should be enjoined pending the adjudication of this matter. Otherwise, the harm to KDH will be irreparable.

## II.     No irreparable harm to Defendants or other limited partners.

Defendants, unlike KDH, will not experience any irreparable harm because of the TRO.

First, none of the Defendants can possibly be harmed from postponing the restructuring until this Court's hearing on the preliminary injunction, scheduled to take place on May 11, 2020.

Defendants in the Letter once again grossly mischaracterize the facts by claiming several times that Plaintiff waited until "the literal eve of the transaction closing, to commence this action and seek a TRO ex parte." *See* Letter at pp. 2, 3 and 4. There was no transaction scheduled by close on April 28th or at any set date thereafter. In fact, Defendants refused to set deadlines for the restructuring and have already postponed the deadline for obtaining "consents" once by a month.

On March 19, Buchanan responded to KDH's question about the timeline of the proposed restructuring and exit:

> "The earliest funds would be remitted would be May. But, it may be longer than that if we have to get a new valuation report and re-confirm with investors desiring to liquidate that have sent in their consent forms. And, that's not taking into account if market conditions during that interim period."

Ex. M to Hatami Decl. at p. 1.

In the "FAQ" section of their disclosures, Iterative stated:

> "**Q: When do you expect the Proposed Transactions to be completed?**
>
> A: Iterative expects the Proposed Transactions to be consummated as promptly as practicable following the deadline for responses (after giving effect to any extensions), ideally prior the conclusion of the first quarter of 2020, although there is no guarantee this will be feasible."

Ex. L to Hatami Decl. at p. 31 (emphasis in original).

This vague timeline and estimate were provided before Defendants actually extended the initial consent deadline from March to April 28, 2020.

On March 18, 2020, Iterative extended the investor consent deadline until April 27. The updated disclosure documents and the current April 28 deadline were provided to investors on April 14, 2020, after KDH requested books and records material to the restructuring from Iterative. Ex. O to Hatami Decl.

KDH filed its emergency application after Defendants refused to provide the majority of the requested documents necessary to evaluate the proposed securities exchange offer, including Defendants' inherent conflict of interest, and insisted on the April 28th deadline for consent. What Defendants agreed to provide was conditioned on KDH signing an additional NDA and covering the production expenses. Ex. D to Khurdayan Decl.

Further, Defendants Iterative OTC and Iterative Mining, LLC were included in this action as entities controlled by Buchanan and Dannen (as well as the rest of Defendants) and benefitting from

Defendants' illegal conduct, as alleged in the Verified Complaint. Such entities are not affected by the TRO, which only concerns the restructuring and access to material information about such restructuring. Moreover, contrary to Defendants' contention, Iterative OTC has a direct relation to the Fund's restructuring, as Defendants intended to consolidate the Fund with Iterative OTC. *See* Ex. K to Hatami Decl. at p. 1. Defendants in their very limited disclosures admit that "[t]here are inherent conflicts of interest in this offering…" and "affiliates of Iterative will benefit from extending the existence of the Domestic Fund in the form of Mining NewCo, with the possibility that Iterative or its affiliates will earn additional performance compensation in the future." *See* Ex. L to Hatami Decl. at p. 6. Exiting or continuing investor "approval will also serve as a consent to the conflicts and risks associated with the Proposed Transactions and the adoption of the Mining NewCo LLCA." Id. at p. 4. And "material terms of the Mining NewCo LLCA are substantially similar to those of the Investment Manager's separate mining operating company." Id. at p. 26. It is the overall pattern of Defendants' fraudulent activities, including written and oral material misrepresentations and omissions, that comprise KDH's claim for the securities fraud in this action, along with other claims.

Setting aside the overall alleged fraudulent scheme, now, in the final accord of Defendants' plan, KDH is being expelled from the Fund and offered a pile of outdated hardware in lieu of any meaningful document disclosures related to the offered securities in the New MiningCo, including operations of the Defendants' related businesses, Iterative OTC and Iterative Mining, LLC. Other investors, similarly, had no right to oppose the restructuring and were forced to consent to the Defendants' self-interested transaction under the threat of losing what was left from their liquid portions of the Fund. There is no other compelling reason for Defendants to rush with the restructuring. And there is no compelling reason for the TRO to be set aside pursuant to Rule 60.

**Plaintiff's request to inspect books and records**

Contrary to Defendants' contentions, KDH specifically asked this Court to "enjoin Defendants from interfering with KDH's right to inspect books and records" in the Verified Complaint. Compl. ¶ 186, p. 40. KDH has the right to do so not only under the Delaware statute but also under the LPA, as stated in KDH's demand for inspection. Ex. B to Khurdayan Decl. at p.1.

Moreover, Defendants' proposed restructuring is an offering of securities, and Defendants should provide material information about such offering to the investors. Except, unlike in a typical offering of securities, here KDH cannot merely decline to invest without being excluded as an investor of the Fund and sustaining other substantial damages, as alleged in the Verified Complaint and demonstrated in the documents in support of the TRO and a preliminary injunction..

Defendants also required investors to acknowledge the following:

> "The Investor agrees that he/she has had sufficient opportunity to (i) review and understand the materials relating to the Proposed Transactions, including, but not limited to, those sections of the attached Consent and Disclosure Letter dealing with risk factors, conflicts of interest, expenses (including, but not limited to, associated transaction expenses), and tax consequences of the Proposed Transactions, (ii) ask questions of, and receive answers from, the Investment Manager or its affiliates relating to all materials provided in connection with the Proposed Transactions, and (iii) obtain any additional information that the Investment Manager can acquire without unreasonable effort or expense…"

Ex. L to Hatami Decl. at p. 9.

However, Defendants repeatedly refused to provide information requested by KDH. Notably, Defendants contradicted themselves within the same set of documents stating that "[t]he information in this letter and the attached Consent and Disclosure Letter comprise all of the material information that will be provided by Iterative." Ex. L to Hatami Decl. at p. 4. KDH's demand for inspection of additional documents was reasonable and warranted not only under Delaware Revised Uniform Limited Partnership Act § 17-305. *See Stern v. S. Chester Tube Co.*, 390 U.S. 606, 610, 88 S. Ct. 1332, 1334, 20 L. Ed. 2d 177 (1968) ("District Court here does have power to issue the proper orders to enforce petitioner's state-granted right to inspect the corporate records."); *MONY Grp., Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138, 147 (2d Cir. 2004) ("It is well-established that a transaction—particularly a change-of-control transaction—that is influenced by noncompliance with the disclosure provisions of the various federal securities laws can constitute irreparable harm.")

The District court's reasoning in the case cited by Defendants also supports KDH's position stating: "[t]he 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Herrick v. Grindr, LLC*, No. 17-CV-932 (VEC), 2017 WL 744605, at *3 (S.D.N.Y. Feb. 24, 2017).

Here, without additional disclosures from Defendants, KDH is forced to consent to the palpably inadequate Defendants' offering of securities. And if the requested documents are not provided and KDH does not consent to the offering, KDH will be is expelled from the Fund with no proper liquid refund equal to the value of KDH's remaining investment in the Fund, and likely with no possibility of monetary recovery from the successor operating company.

**The Court has jurisdiction over the Matter**

Finally, KDH's Verified Complaint properly stated this Court's jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78aa) providing for the exclusive district courts' jurisdiction over the securities fraud claim under § 10(b) of the Exchange Act. Venue in this District is also proper because almost all the acts and omissions giving rise to this Verified Complaint took place in this District. Compl. ¶ 31-32. As alleged, the Fund and Iterative maintained an office in Manhattan, where Dannen and Buchanan conducted business, made telephone calls to solicit investments, and received and transferred investor monies on behalf of Fund. Id. *See e.g., Lawrence v. Cohn*, 932 F. Supp. 564 (S.D.N.Y. 1996) ("Abstaining from exercising jurisdiction over securities fraud claim under § 10(b) of the Securities Exchange Act of 1934, by will beneficiaries against executor, would be improper given that federal courts have exclusive jurisdiction over 1934 Act claims."); *Palm Bay Int'l, Inc. v. Winebow Grp., LLC*, No. 18CV1094JMASIL, 2018 WL 5776266, at *4 (E.D.N.Y. Nov. 1, 2018) ("the Court's 'focus [is] on the source of the rights or duties sought to be enforced by the complaining party," irrespective of the source of the parties' business relationship.") (citing *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 393 (2d Cir. 2007).

The principles of supplementary jurisdiction and exigent circumstances support this Court's jurisdiction over all other claims as well, including KDH's access to Defendants' books and records related to the proposed restructuring and offering of securities in the new mining company. Compl. ¶ 31-32; *SST Glob. Tech., LLC v. Chapman*, 270 F. Supp. 2d 444, 452 (S.D.N.Y. 2003) ("Venue with regard to securities law claims under the Securities Exchange Act is controlled exclusively by 15 U.S.C. § 78aa, without regard to the general venue provisions of 28 U.S.C. § 1391. Where there are state claims asserted in addition to securities law claims governed by the venue provisions of § 78aa, a finding that

venue is appropriate with regard to the securities law claims is sufficient to establish venue with regard to all claims.")

KDH alleges that Defendants fraudulently induced KDH into signing the agreement with Iterative. Even if KDH's claims were arising out of the agreement, LPA's forum selection clause did not provide any district court to have jurisdiction or venue over the federal securities fraud claims. Moreover, the Subscription Agreement, under which KDH acquired the limited partnership interest in the Fund, did not contain a forum-selection provision. See Ex. A to Hatami Decl.; *Credit Suisse Sec. (USA) LLC v. Hilliard*, 469 F. Supp. 2d 103, 107–08 (S.D.N.Y. 2007) ("the argument that a forum selection clause in one contract should be applied to a different, separately negotiated contract lacking such a clause requires a much broader reading of 'arising out of' and 'related to' than those cases support.")

The rest of Defendants' arguments also pertain to arguing on the merits and, as such, are outside of the scope of a Rule 60 submission and should be properly included in Defendants' opposition, as directed by the signed order.

Plaintiff respectfully request that the Court deny Defendants' letter motion.

Sincerely,

*Rika Khurdayan*
Rika Khurdayan