UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

KDH CONSULTING GROUP LLC, directly and
derivatively on behalf of ITERATIVE CAPITAL, L.P.,

**1:20-cv-3274**

**ECF Case**

Plaintiff,

– against –

**VERIFIED COMPLAINT**

ITERATIVE CAPITAL MANAGEMENT L.P.,
ITERATIVE CAPITAL GP, LLC, ITERATIVE OTC,
LLC (D/B/A "I2 TRADING" AND "ESCHER"),
ITERATIVE MINING, LLC, BRANDON BUCHANAN
and CHRISTOPHER DANNEN,

**JURY TRIAL DEMANDED**

Defendants.

------------------------------------------------------------------------ X

Plaintiff KDH CONSULTING GROUP LLC   ("Plaintiff" or "KDH"), by its attorneys, Dilendorf Khurdayan PLLC, as for the Complaint against Defendants ITERATIVE CAPITAL MANAGEMENT L.P, ITERATIVE CAPITAL GP, LLC, BRANDON BUCHANAN AND CHRISTOPHER DANNEN (together Brandon Buchanan, "Individual Defendants") (collectively, "Defendants"), alleges as follows, upon knowledge as to Defendants and their conduct, and upon information and belief as to all other matters:

### NATURE AND SUMMARY OF THE ACTION

1.      This action for injunction, fraud and breach of fiduciary duties, among other things, arises out of Defendants' brazen conduct, where they first rushed Plaintiff into subscribing to a "hedge fund-like" cryptocurrency investment and trading fund by misrepresenting prior performance history and liquidity options; then, intentionally diverted from the fund's stated investment objective and utilized the fund and its resources as their personal piggybank to build out mining operations and, separately, profit from a related over-the-counter cryptocurrency trading business.

2.      Defendant Christopher Dannen ("Dannen") first met with KDH's principals in late 2017 touting their prior performance and success of two previous investment funds managed by Defendant Iterative Capital Management, L.P. ("Iterative") and offering to invest in a highly liquid new fund with quarterly withdrawal rights focusing primarily on trading cryptocurrencies and network tokens.

3.      Unfortunately for Plaintiff, when raising funds and rushing Plaintiff to invest ASAP in December of 2017, Individual Defendants and Iterative already knew that cryptocurrency trading was no longer a viable investment strategy and planned to use Plaintiff's funds for highly illiquid mining operations.

4.      Moreover, Individual Defendants failed to mention that, for the same very reason, they returned funds to investors from the previous fund. To the contrary, they praised their prior success and concealed true performance history and investment intentions.

5.      Defendants' offering documents were similarly misleading and failed to disclose primary investment objective and strategy, properly describe the conflict of interest with affiliated entities, or reflect Iterative's actual prior performance.

6.      Plaintiff reasonably relied on Defendants' representations when they agreed to tender a $1,000,000 investment and become a limited partner in the Individual Defendants' new fund, managed by Iterative.

7.      Shortly after Plaintiff delivered their investment to Defendants, the cryptocurrency market experienced a crash. Plaintiff immediately reached out to Individual Defendants to request withdrawal.

8.      Buchanan assured Plaintiff that the investment was safe because (a) Defendants had not yet invested Plaintiff's funds, (b) the fund was not going to invest heavily in Bitcoin, which experienced drastic decline in value, and (c) Plaintiff would be able to withdraw its investment later at any time as the fund would maintain the liquidity of its assets investing in and trading other cryptocurrencies. Individual Defendants also offered to meet Plaintiff's principals to provide additional details and ensure they felt comfortable about staying in the fund.

9.      However, Individual Defendants never provided any definitive information about operations of the fund, cancelled several meetings with Plaintiff last minute and left New York.

10.      From then on, Defendants employed tactics of delay, misrepresentations and self-dealing in order to build out a mining operation at Plaintiff's expense.

11.      Once Defendants realized that Plaintiff and, most likely many other investors, would want to withdraw funds, they quickly turned the whole portfolio illiquid by intentionally and substantially deviating from investment strategy, including spending additional $6,500,000 out of the fund's remaining assets on rapidly depreciating mining equipment.

12.      While continuing to make promises of immediate liquidity and opportunity to withdraw funds, Defendants locked most of the funds in the mining "side-pocket" not subject to withdrawal.

13.      But Plaintiff never invested or was interested in investing in mining business. Plaintiff invested in a liquid cryptocurrency trading fund with quarterly withdrawals and stellar trading team. Now, Defendants claim that the main strategy was mining to begin with and hold themselves out to the public as mining experts. That is very far from what was promised to investors when Individual Defendants were raising capital for their fund.

14.     In the meantime, while locking investors in a highly illiquid fund that was rapidly running out of money, Defendants engaged in additional flagrant breaches of their fiduciary duties, duties of good care and loyalty and, upon information and belief, engaged in self-dealing with affiliated entities, including Iterative OTC, LLC (previously doing business as i2 Trading and currently doing business as Escher) ("Escher") and Iterative Mining LLC  (Individual Defendants' separate mining company).

15.     Eventually, in December of 2019, Defendants notified KDH and other investors that Defendants decided "to convert the Fund from an investment fund structure to a corporate structure and consolidate it with [Defendant's] other flagship business, [Escher]".  The fund is supposed to become an operating "company with mining as the core tenet" and "[a]fter combining the entities, [Defendants] will look to raise a Series A financing to recapitalize the business."

16.     Defendants sought restructuring "consent" from Plaintiff and other investors offering an illiquid stake in the new venture or a refund – all based on an undisclosed residual value of the initial investment, less pro rata share of the significant restructuring and auditing expenses. Alternatively, if the consent was not signed, Defendants promised to ship Plaintiff's share of the outdated mining hardware, at Plaintiff's expense.

17.     Upon Plaintiff's attempt to clarify the terms of the restructuring, timeline and amount of the refund, Defendant Buchanan stated in an e-mail: "*This opportunity to liquidate is not a negotiation. We can keep the assets in a side pocket* [locked and depreciating rapidly]".

18.     Plaintiff attempted to obtain relevant material information about the current state of affairs of the Fund Complex, historic operations and the proposed restructuring by serving a formal demand for books and records.

19.     However, Defendants refuse to provide key information and records.

20.     As the Defendants' ultimatum was set to expire on April 28, 2020 at midnight, Plaintiff had no other choice but to bring this action by emergency order to show cause to freeze the restructuring and complete dissipation of Plaintiff's investment with a request for a temporary restraining order to preserve the status quo.

21.     Plaintiff also brings this action for various false and misleading representations and material omissions that induced Plaintiff to subscribe to Defendant's fund and to forebear redemption rights. The misrepresentations and material omissions were made in the Defendants' verbal statements to Plaintiff, in the fund's Private Placement Memorandum ("PPM") and quarterly summaries, on which Plaintiff relied, and concerned the fund's investment strategy, disclosure of the magnitude and nature of the fund's risks, its investments, and its risk management controls as related to the fund's dealings with affiliated entities.

## PARTIES

22.     Plaintiff KDH Consulting Group LLC is a New York limited liability company with a principal place of business in the state of New York, New York county and a limited partner in Iterative Capital L.P. ("U.S. Feeder Fund" or "Partnership") through which Plaintiff invested in Iterative Capital Master, L.P. ("Main Master Fund") and Iterative Mining Master, L.P. ("Mining Master Fund") (collectively with the Partnership, "Fund Complex"). The Fund Complex also includes an offshore feeder fund, Iterative Capital, Ltd. ("Cayman Feeder").

23.     Defendant Iterative Capital Management L.P. is a Delaware limited partnership with a principal place of business in the state of New York, New York county. Iterative is the investment manager of the Partnership, managing member of Escher and, upon information and belief, managing member of Iterative Mining LLC, and an unregistered investment adviser.

24.     Defendant Iterative Capital GP, LLC is a Delaware limited liability company with a principal place of business in the state of New York, New York county. Iterative GP is the general partner of the Partnership.

25.     Upon information and belief, Defendant Iterative OTC, LLC (d/b/a "i2 Trading" and "Escher") is a Delaware limited liability company with a principal place of business in the state of New York, New York county.

26.     Upon information and belief, Defendant Iterative Mining, LLC, is a Delaware limited liability company with a principal place of business in the state of New York, New York county.

27.     Defendant Brandon Buchanan is a principal of Iterative, upon information and belief, residing in New York.

28.     Defendant Christopher Dannen is a principal of Iterative, upon information and belief, residing in New York.

29.     Upon information and belief, at all relevant times and until present, Individual Defendants owned, managed and controlled both Iterative Capital GP, LLC and Iterative Capital Management L.P.

30.     Upon information and belief, at all relevant times and until present, Individual Defendants also owned, managed and/or controlled Escher and Iterative Mining LLC.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78aa), Section 214 of the of the Investment Advisers Act of 1940 ("Advisers Act") (15 U.S.C. §80b-14), 28 U.S.C. § 1391(b) and principles of supplementary jurisdiction (28 U.S.C. §1367).

32.     The venue is proper in this District by virtue of 28 U.S.C. § 1391(b), 28 U.S.C. § 1401 and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The Defendants, directly and indirectly, made use of the means and instrumentalities on interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. A substantial portion of the acts and omissions giving rise to this Verified Complaint took place in this district. The Partnership, General Partner and Iterative maintained an office in Manhattan, where Dannen and Buchanan conducted business, made telephone calls to solicit investments, promote fictitious profits, and received and transferred investor monies on behalf of the Partnership and the Fund Complex. Defendants purposely availed themselves of the privilege of conducting activities within this district and, therefore, invoked the benefits and protection of its laws and its courts. Certain of the defendants are headquartered here, are residents of New York, reside here or have frequently traveled here on the Fund Complex's business and otherwise.

### FACTUAL BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

33.     Individual Defendants and Iterative organized a series of transactions raising $14,885,444 from several investors, through the Partnership and Cayman Feeder, to invest into the Main Master Fund and the Mining Master Fund (the Fund Complex).

34.     Plaintiff, among several other U.S. investors, invested in the Partnership as a limited partner. The Partnership is controlled and managed by Iterative Capital GP, LLC as the general partner ("General Partner") and Iterative Capital Management L.P. as the investment manager ("Iterative"). The Fund Complex also conduct business with affiliated entities – Escher and, upon information and belief, Iterative Mining LLC. The General Partner, Iterative, Escher and Iterative Mining LLC are owned and controlled by the same individuals – Buchanan and Dannen.

I.   **Defendants Made Several Material Misrepresentations to Induce Plaintiff to Invest in the Fund Complex and Stalled Early Withdrawal Requests**

35.    In late 2017, Plaintiff's principals were first introduced to Buchanan and Dannen through a mutual acquaintance. Dannen personally visited Plaintiff's office in Manhattan to solicit the investment and rushed Plaintiff to invest ASAP before, according to Dannen, the opportunity for the investment into the Fund Complex closed at the end of 2017 - beginning of 2018.

36.    Dannen touted Defendants' prior performance history and success of two previous funds - Iterative Instinct Fund I, L.P. and i2 Storj SPV, LP.

37.    Dannen personally represented to Plaintiff's principals in December of 2017 that the Fund Complex was a highly liquid investment opportunity with quarterly liquidity and immediate opportunity to withdraw. Dannen further represented that the Fund Complex would be focusing on investing in liquid digital assets, such as cryptocurrencies and network tokens.

38.    In reality, at the time when they were making these representations to KDH, Defendants already knew that such investment strategy was unsound.

39.    On or about December 10, 2019, Leo Zhang, a principal at Iterative, made the following public statement referring to Defendants' investment strategy shaped in 2016-2017, before Plaintiff made its investment in 2018:

> "So it Iterative started in 2016. So the first fund was a venture fund. And so the first fund generated about 13x return from 2016 to 2017. And, obviously, there was ICOs wave. **And so in mid-2017 we quickly realized that there's something wrong with this much money going on in this space. And so we made the conclusion at that time that this token mania is likely not going to continue. So we closed the fund, returned the capital to investors, everyone's happy, and we started a second fund that's dedicated to mining, which is the fund we're operating now**. So Iterative Capital, the investment center--the reason people, you know, our peers,

other investors in the cryptocurrency space, don't hear much from us or about us is because we only focus on mining."[1] (Emphasis added.)

40.     Dannen's verbal misrepresentations were supported by the PPM and limited partnership agreement ("LPA") provided to Plaintiff, which, among other things, set forth the Fund Complex's main investment strategy - "[t]he primary investment strategy of each Master Fund is to purchase and hold Coins [cryptocurrencies and digital tokens]."

41.     Specifically, the Fund Complex's goals were to invest 70% of the assets in purchasing and trading liquid digital assets, namely cryptocurrencies and network tokens, via the Main Master Fund. As a minor side strategy, the Fund Complex was also to invest up to 30% of the assets in "mining" operations, including equipment relating to the generation of the similar digital assets via the Mining Master Fund.

42.     At the time of raising investments for the Fund Complex, on December 6, 2017, Individual Defendants set up Escher, owned and managed by Iterative and Individual Defendants. Escher is an "over-the-counter" cryptocurrency dealer and exchange platform for trading digital tokens, including the cryptocurrencies and other digital assets generated and owned by the Partnership through Mining Master Fund.

43.     Defendants stated in the PPM that Escher would have an exclusive right to purchase all the digital assets produced and owned by the Mining Master Fund in exchange for more favorable pricing terms as compared to other clients, as well as a percentage of profits:

---

[1] The Block Crypto, *Leo Zhang, Principal at Iterative Capital Management discusses the unseen impact Bitcoin miners have on the overall market* (interview transcript, December 10, 2019) available at https://www.theblockcrypto.com/post/49789/leo-zhang-principal-at-iterative-capital-management-discusses-the-unseen-impact-bitcoin-miners-have-on-the-overall-market (last accessed on April 24, 2020).

"In exchange for [Escher's] right of first refusal to purchase the Mining Master Fund's Coins, the Mining Master Fund will be entitled to more favorable pricing terms than those offered to other buyers and sellers of Coins. The Mining Master Fund may also receive additional consideration from [Escher], to potentially include a percentage of [Escher's] profits on the sale of Coins purchased from the Mining Master Fund should [Escher's] sale price exceed the price it purchased the Coins from the Mining Master Fund by more than a specific amount" [PPM at p.7].

44.      Moreover, the "Investment Manager [was] expected to focus on meeting the demand for specific Coins from [Escher]." [PPM at p.4].

45.      As the Mining Master Fund's investment activities were supposed to involve only up to 30% of the total assets that was expected to generate additional income for the fund, and Plaintiff was promised the information rights, Plaintiff agreed to subscribe to the Fund Complex.

46.      However, Defendants never disclosed to Plaintiff such "more favorable pricing terms," "additional consideration," and any information on dealings with "other buyers and sellers of Coins."

47.      On or about January 5, 2018, due to constant and increasing pressure from Individual Defendants to subscribe ASAP not to forego a promising investment opportunity, principals formed KDH and signed the subscription documents investing $1,000,000 in exchange for limited partner interest in the Partnership. Plaintiff's principal personally delivered the investment check for the full amount to Defendants' Manhattan office as Plaintiff was constantly rushed to invest.

48.      Little did Plaintiff know that Defendants would intentionally make most of Plaintiff's investment illiquid, without notice, any additional disclosures or amendment to the PPM, and use the funds to build and grow Individual Defendants' mining operations.

49.      Once Defendants received the $1,000,000 check, their attitude towards Plaintiff changed drastically. Defendants adopted a tactic of unresponsiveness, delays and promises of personal meetings, liquidity and buyouts that never materialized.

50.     Coinciding with the Plaintiff's investment into the Defendants' cryptocurrency investment fund, in early 2018, cryptocurrency market began to plummet. For example, price of one of the most popular cryptocurrencies, Bitcoin ("BTC"), dropped more than twice from about $17,000 per BTC on January 5, 2018, when Plaintiff made the investment to about $7,600 per BTC a month later on February 6, 2018 (and to less than $4,000 in the end of 2018).

51.     Plaintiff immediately contacted Individual Defendants to request accounting and withdraw the funds.

52.     During a phone call with one of KDH principals, Buchanan reassured Plaintiff that Defendants kept the situation under control and had not yet made substantial investments in the volatile market using Plaintiff's funds, nor planned to invest into BTC that crashed. Buchanan also convinced Plaintiff not to withdraw the funds, once again, touting their experience in trading cryptocurrencies and promising fund's liquidity. Buchanan and Dannen proposed to meet with Plaintiff's principals personally in New York to provide full accounting on the fund's activities, use of Plaintiff's investment and investment strategy in the changing market that would keep the Plaintiff's expected liquidity, so that Plaintiff would not withdraw the funds from the Fund Complex. Having no experience in cryptocurrencies, Plaintiff relied on Buchanan's and Dannen's expertise and agreed to postpone the withdrawal.

53.     From then on, Individual Defendants took every opportunity to delay the promised meeting, which never materialized.

54.     Buchanan cancelled two scheduled meetings on behalf of Individual Defendants via text messages last minute on April 11th and 12th, 2018. After Buchanan proposed to set the third meeting "in stone" for the next week, Individual Defendants stopped responding, left New York and,

after another week, on April 27, 2018, Buchanan informed Plaintiff that Individual Defendants had "no immediate plans" to be back in New York.

## II.  Defendants Substantially Deviated from Stated Investment Strategy Changing the Nature of the Fund and Engaged in Destructive Self-Dealing

55.     Realizing that Plaintiff, and most likely other investors, would request withdrawals, Defendants intentionally changed the investment strategy.

56.     Upon information and belief, at some point between April and June 2018, Defendants materially deviated from their disclosed investment strategy for the Fund Complex, as indicated in the PPM, and assumed risks far greater and different in nature than disclosed in the PPM, rendering a large portion of the assets illiquid and haltering Plaintiff's requested withdrawal rights.

57.     Upon information and belief, at some point between April and June 2018, Defendants spent additional $6,500,000 on highly illiquid mining equipment subject to rapid depreciation. As disclosed to Plaintiff in the May 2019 investor update, as of March 31, 2019, the mining equipment already accumulated $1,800,000 in depreciation. And as of the end of 2019, a loss of "approximately $3.4M came in the form of depreciation to the [mining equipment]." On February 18, 2020, Defendants reported that the Fund Complex's activities related to the illiquid mining investments "absorbed approximately $4.5M in expenses in 2019."

58.     Importantly, to fund this major deviation from the Fund Complex's investment strategy, Defendants set aside a substantial amount of the Partnership's funds in what Defendants referred to as a "side pocket" and locked these funds, so that Plaintiff and other investors could not redeem them.

59.     Based on the fundamental change in its investment strategy and fund's liquidity, Defendants had a duty to update the PPM and disclosures to investors, so that they could become aware of the drastic change as to the way their money was being invested.

60.     Defendants proceeded concealing their investment activities from Plaintiff and kept changing fund auditors and administrators while undergoing audits, the details of which Defendant also withheld.

61.     Instead, Defendants' reporting consisted for the most part of emailing Plaintiff 3 lines with unsubstantiated valuation numbers, each time showing a steep decline in value of the Partnership's assets.

62.     On or about June 12, 2018, after finding out about exorbitant expenditures on mining equipment, Plaintiff's principals called Buchanan asking about the effect on such expenditure on their withdrawal rights and liquidity options. Being on the speakerphone with KDH's principals, Buchanan represented to KDH that, if necessary, Defendants would raise additional funds and buy out Plaintiff's share as an alternative guaranteed option for Plaintiff's exit from the fund, thus, again promising to maintain liquidity of KDH's investment.

63.     Defendants' promises never materialized. The fund continued to lose money and Defendants continued to withhold material information about the business.

64.     On February 26, 2019, in an attempt to make sense of the fund's current operations, Plaintiff sent Defendants a list of specific basic questions relating to the status of the mining strategy and financial condition of the Partnership, specifically:

1.  what are our assets and liabilities to this date;
2.  what is the life span for the mining cycle? can we get a detailed lay-out for 6 mo, 12 mo and etc.?
3.  the state where the mining farms are located;

4. do we have our own actual miners you are buying the hash power from third parties?
5. the electricity price per KW you are using;
6. the amount of miners and the exact models;
7. what crypto-currencies they are mining and at what rate per date;
8. how much have been mined so far
9. where these crypto-currencies are located,  on cold wallet,  on crypto exchanges?
10. As per portfolio - who makes the executive decision when and where to relocate the funds...etc.
11. what is the real picture of what we can return at today's date;
12. Provide us with a detailed report on how our invested money were spent;

65.    On the same date, Defendants promised to provide Plaintiff with a "detailed model showing most of what you've asked (and probably the only detail we're willing to share), so please standby for that document which will be delivered in a week or so."

66.    On March 7, 2019, having received no answers, Plaintiff sent Defendants another notice to withdraw the remaining funds.

67.    In response, Defendants advised Plaintiff that the promised "detailed model" was not ready and that "all of the Fund's mining assets are in a side pocket and so won't be distributed until the Fund has liquidated those assets," which Defendants "estimated" to be in 18 months.

68.    On March 31, 2019, instead of a promised "detailed model" answering Plaintiff's questions, Defendants sent out an investor update containing a market overview with Defendants' general projections. Defendants provided no details about their mining business or the Partnership's financial transactions.

69.    On May 9, 2019, Defendants again emphasized to Plaintiff that the amount of Plaintiff's refund would not include "the mining assets [which] were side-pocketed last year."

70.     In June 2019 Defendants stated that they would be moving to quarterly communications about the Fund Complex's activities and performance as there was not much to share in the way of operational updates.

71.     At the end of summer of 2019, Defendants' time estimate about the side-pocketed funds not to be released to Plaintiff stayed the same as 5 months before in March of 2019 – yet another 18 months.

72.     Had Plaintiff and other investors known that the Fund Complex was not a cryptocurrency investment hedge fund but, instead, was a fund that had over-loaded on mining equipment and dealings with Defendants' affiliates, and that it lacked the investment restrictions and risk controls stated in the PPM, or that the Fund Complex had risks and liabilities far beyond the level disclosed and expected, they would have refrained from investing in the Fund Complex or immediately sought to withdraw and/or redeem the investment. Defendants also failed to provide Plaintiff and other investors with the information that they needed in order to determine the Fund Complex's true investment strategy, objectives, risks and risk level. As a result, Plaintiff and the other investors essentially lost over 80% of their investments.

**III.    Conflict of Interest and Self-Dealing with Affiliated Businesses**

73.     While Defendants' new investment strategy and investments in the rapidly depreciating mining equipment left the Fund Complex on the brink of "dissolution and liquidation," upon information and belief, the Defendants' related over-the-counter trading and mining businesses thrived.

74.     Due to insurmountable conflict of interest within the Fund Complex and Defendants' affiliated entities, Defendants engaged in flagrant breaches of their fiduciary duties, duties of good

care and loyalty and, upon information and belief, engaged in self-dealing with their affiliated entities, including Escher and Iterative Mining LLC to the detriment of Plaintiff and the Partnership.

75.     According to the PPM that (1) Iterative would focus on the demand from Escher in deciding which digital assets to mine through the Mining Master Fund; (2) Escher would be entitled to buy all digital assets mined through the Mining Master Fund in exchange for providing "more favorable terms" as compared to other clients of Escher; and (3) the Mining Master Fund may generate additional profit through Escher transactions.

76.     Upon information and belief, since the inception, Escher facilitated transactions in both virtual currencies and digital securities in exchange for transaction-based compensation, both on behalf of the Fund Complex and other clients.

77.     However, to-date, Defendants kept any information about Escher's operations and regulatory compliance vague at best.

78.     Upon information and belief, Defendants on behalf of the Fund Complex, agreed to supply digital assets to Defendants' separate business without ensuring Escher's full regulatory compliance with applicable regulations.

79.     Moreover, upon information and belief, no profits were ever distributed to the Fund Complex, nor any of the "more favorable pricing terms than those offered to other buyers and sellers" disclosed or explained.

80.     By virtue of owning, managing and/or controlling Escher, Iterative Capital and Individual Defendants knew all the details about Escher's ingoing operations and necessary compliance measures. In contracting with Escher, continuing to do business with Escher on behalf

of the Fund Complex and, ultimately, attempting to retrofit the whole Fund Complex's operations to servicing Escher, Defendants breached duty of good faith and fair dealing.

81.     In addition, Iterative, the General Partner, Dannen and Buchanan breached the utmost duty of loyalty to the Partnership and Plaintiff in that the Defendants put their own interest to sell digital assets mined by the Mining Master Fund through Escher, and profit from such transactions, before the interests of the Partnership and the limited partners, including Plaintiff.

82.     Upon information and belief, Individual Defendants personally profited from trades through Escher at the expense of Plaintiff and other investors in the Fund Complex.

83.     Moreover, as alleged in detail herein, Defendants materially deviated from the investment strategy by turning most of the investment illiquid and instead started building an operating mining business at the expense of Plaintiff and the investors in the Fund Complex. Such mining business, upon information and belief, is trading through various entities affiliated with Defendants.

84.     Now, Defendants openly admit that the Fund Complex will be in fact integrated with the Defendants' affiliated flagship OTC trading and mining business.  Yet, Defendants refuse to provide Plaintiff with material information about such business.

85.     Defendants' conduct left the Partnership and its limited partners invested in a distressed illiquid fund, all while Individual Defendants and Iterative were successfully growing their over-the-counter crypto trading business.

## IV.     Defendants' Notice of Restructuring and Coercive Demand for Consent

86.     On December 20, 2019, Defendants wrote to Plaintiff: "[t]he current Fund structure has handcuffed us and prevented us from being able to scale our mining operation. As such, during Q1 2020, we will embark on an effort to convert the Fund [Complex] from an investment fund

structure to a corporate structure and consolidate it with our other flagship business, [Escher]." Defendants also stated that "one of the key features" desired by the Fund Complex's investors – "quarterly liquidity ended up being infeasible" and  "suspend[ed] the right of all investors to withdraw or redeem from the Fund in accordance with the applicable governing documents of the Fund."

87.     On February 18, 2020, Defendants reported that the Fund Complex's activities related to the illiquid mining investments "absorbed approximately $4.5M in expenses in 2019." Defendants also stated that "[o]ur focus, since Iterative's inception, has been on cryptocurrency mining and optimizing around that operation," which apparently was Defendants' original strategy, yet they failed to disclose it to Plaintiff and other investors while raising the funds for the Fund Complex. To the contrary, Defendants contradicted their initial representations and disclosures.

88.     On March 1, 2020, Defendants have presented a take-it-or-leave-it offer ("Take-It-Or-Leave-It Offer") to Plaintiff and other investors outlining three options in connection with the contemplated restructuring of the Fund Complex into an operating mining business:

(a)   sign an "exiting investor" consent approving the restructuring and withdrawing from the Fund Complex in exchange for a minor portion of Plaintiff's investment based on the undisclosed value of the remaining assets with the deduction of significant restructuring expenses;

(b)   sign a "continuing investor" consent approving the restructuring and receiving a de minimis illiquid stake in the Defendants' new company based on Plaintiff's drained share in the Fund Complex; or

(c)   receive pro rata share of the Fund Complex's assets in-kind (consisting of digital assets and outdated mining equipment) minus shipping expenses and be forcefully redeemed from the Fund Complex prior to the proposed restructuring.

89.     Essentially, Defendants offered Plaintiff to accept "as is" the terms "substantially and materially" different from those contained in the LPA, or receive outdated mining hardware and pay for shipping costs.

90.     Either option left Plaintiff with pennies on a dollar and required an uninformed consent to either receiving an uncertain minor refund or becoming a minor stakeholder in a mining that Plaintiff never invested in.

91.     Defendants offered no definitive figure of the proposed refund, did not provide any information on two businesses the Fund Complex was to consolidate and/or continue doing business with (Escher and Iterative Mining LLC), yet required the investors to acknowledge that they had "sufficient opportunity to (i) review and understand the materials relating to … risk factors, conflicts of interest, expenses (including, but not limited to, associated transaction expenses), and tax consequences of the [restructuring], (ii) ask questions of, and receive answers … relating to all materials provided in connection with the [restructuring], and (iii) obtain any additional information."

92.     However, when presented with very basic questions about the restructuring, like the timeline for receiving distributions if consent is provided, the amount of distributions and the upper-floor estimate on restructuring expenses that Plaintiff would need to cover – Defendant Buchanan responded on March 19, 2020 that "This opportunity to liquidate is not a negotiation. We can keep the assets in a side pocket."

93.     Iterative's "current understanding" of the "anticipated" KDH's refund amount went from $318,522.32 as of March 19, 2020, to $225,120.18 as of April 14, 2020 – without accounting for the contemplated Restructuring expenses, which Iterative admits may deplete the Partnership's assets and KDH's capital account.

94.     Defendants' Take-It-Or-Leave-It Offer is, in fact, an ultimatum to Plaintiff and other investors to make an uninformed consent to restructuring, or be left with a pile of hardware after paying for its shipment.

95.     In fact, in the new "disclosure" documents for the proposed restructuring, Defendants admit that investing in mining is very different and much riskier than the stated investment objective in the PPM, on which Plaintiff relied when subscribing to the Fund Complex: "[a]s a result, Continuing Investors will be more heavily invested in mining equipment through Mining NewCo, which is a less liquid investment than cryptocurrency and subject to even greater risks than the cryptocurrency that is produced from the mining operations".

96.     Defendants also admit that the rights of the "continuing investors" will be significantly different from those in the Partnership under the new operating company.

97.     Unable to receive any material information about the actual status of the Fund Complex and historic operations, proposed restructuring, on April 14, 2020, Plaintiff served Defendants with a formal demand to inspect books and records for the proper purposes, including to investigate Defendants' self-dealing, mismanagement and deviation from the investment goals as described above; and to exercise Plaintiff's consent related to the contemplated restructuring in an informed manner.

98.     Defendants objected to the demand, refused to provide the majority of the requested records and stated that some records pertaining to properly minuted corporate decisions are non-existent.   Buchanan, in an e-mail dated April 14, 2020, maintained that "insinuation about activities deviating from the Partnership's investment goals is also one that is incorrect, as the Fund has been fully deployed for two years now. Offering materials made reference to cryptocurrency mining being the core activity of the Fund, which it continues to be".

99.     On April 20, 2020, Defendants' counsel objected to Plaintiff's demand but agreed to provide just a few documents – on the condition of additional confidentiality agreement and charging Plaintiff for the limited production expenses.

100.     While Defendants have increased their reports within the last days before their offer to consent to the proposed Restructuring is set to expire, Defendants refused to provide books and records with material information concerning, among other things, (a) the Partnership's financial reporting in 2018, when Defendants substantially deviated from the fund's investment strategy, including spending additional $6,500,000 out of the fund's remaining assets on rapidly depreciating mining equipment; and (2) material information about Defendant's flagship business, Escher.

101.     Defendants set the deadline to "consent" to proposed restructuring of the Fund Complex to April 28, 2020 at midnight.

### FIRST CLAIM FOR RELIEF

### (for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder)

102.     Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

103.     Among other misrepresentations and omissions alleged herein, Defendants made the following oral and written representations regarding the management, performance, nature and value of the Fund Complex to Plaintiff:

> a.     The Fund Complex will be a cryptocurrency trading investment fund with certain features of a hedge fund, such as quarterly liquidity and indefinite life. (As represented by Dannen at personal meetings with KDH in late 2017 – early 2018.)

b.  Iterative had a continuous successful history managing similar investments in different similar funds, including x12 returns. (As represented by Dannen at personal meetings with KDH in late 2017 – early 2018.)

c.  The Defendants will provide investors with ability to redeem their investment in the Fund Complex on a quarterly basis. (As represented by Dannen at personal meetings with KDH in late 2017 – early 2018 and by Buchanan during phone calls between January and April of 2018.)

d.  Despite the cryptocurrency market crash, Plaintiff will be able to withdraw all the value of its investment in the Fund Complex, including in the Mining Master Fund; and, if necessary, Defendants will buy out Plaintiff's investment. (As represented by Buchanan during phone calls in April and June of 2018.)

e.  The Fund Complex will not substantially invest in BTC. (As represented by Buchanan during phone calls in April of 2018.)

f.  The three out of four components of the Fund Complex's investment strategy would be "(i) cryptocurrency and network token accumulation (i.e., buy-and-hold); (ii) algorithmic and human initiated trading based on research, fundamental analysis and technical trends; … ; and (iv) strategic acquisition and disposition activity involving crypto-networks." (As represented by Defendants in the PPM.)

g.  "The primary investment strategy of each Master Fund is to purchase and hold Coins." (As represented by Defendants in the PPM.)

h.  The Fund Complex would invest 70% of the assets in purchasing liquid digital assets, namely cryptocurrencies and network tokens, via the Main Master Fund and only invest up to 30% of the assets in "mining" operations and equipment via the Mining Master Fund. (As represented by Defendants in the PPM.)

i. "In exchange for [Escher's] right of first refusal to purchase the Mining Master Fund's Coins, the Mining Master Fund will be entitled to more favorable pricing terms than those offered to other buyers and sellers." (As represented by Defendants in the PPM.)

j. "The Mining Master Fund may also receive additional consideration from [Escher], to potentially include a percentage of [Escher's] profits on the sale of Coins purchased from the Mining Master Fund should [Escher's] sale price exceed the price it purchased the Coins from the Mining Master Fund by more than a specific amount." (As represented by Defendants in the PPM.)

k. The proposed restructuring of the Fund Complex into an operating company consolidated with Defendants separate mining-related business is "in the best interests of all stakeholders." (As represented by Defendants in a letter dated December 20, 2020.)

l. That Defendants will "provide opportunities for liquidity to current investors that have either requested to be withdrawn (but remain in the Fund due to the side pocket) or would like to withdraw." (As represented by Defendants in a letter dated December 20, 2020.)

m. "Investors have the choice to redeem and withdraw at a market value of their capital account" in the Fund Complex. (As represented by Buchanan in an email dated April 14, 2020.)

n. Defendants were unable to provide proper accounting and reliable reports because Defendants had to hire additional service providers for the fund (auditors, tax team, etc.). (As represented by Defendants in the Q4 Investor Update, dated February 18, 2020.)

o. Defendants will provide Plaintiff with a "detailed model" answering most of Plaintiff's questions about the Fund Complex's substantial unsolicited investment into the digital-asset mining equipment and operations. (As represented by Defendants in an email, dated February 26, 2019.)

p. "There is no relation, overlap, or otherwise connection between the proposed new entity and the OTC business other than the management team being the same." (As represented by Buchanan in an email, dated April 14, 2020.)

104.    The acts, misrepresentations, and intentional material omissions made by or on behalf of Defendants were committed in connection with the purchase and sale of securities within the meaning of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, namely, the partnership interests in the Partnership.

105.    As alleged above, each of these representations were false when made because, among other things, from at least as early as mid-2017, half a year before Plaintiff made its investment, Defendants already knew that cryptocurrency trading was no longer a viable investment strategy and planned to use Plaintiff's funds for highly illiquid mining operations, which were also related to Defendants' separate business; Defendants had returned funds to investors in Defendants' prior cryptocurrency investment fund; and Defendants knew they would not be providing the promised liquidity and withdrawals to Plaintiff and other investors in the Fund Complex. These misrepresentations and omissions were repeated in the PPM, marketing materials, e-mails, numerous meetings, telephone calls, and other communications.

106.    Defendants made such misrepresentations knowing they were false and/or with the intent not to perform or honor them, and to deceive and defraud Plaintiff, and to induce Plaintiff to agree to make the above-described investments.

107.    Defendants also failed to disclose properly to Plaintiff the material details of Defendants' self-dealing and grave conflict of interest involving Defendants' side businesses, Escher and Iterative Mining LLC, or that, upon information and belief, Defendants took no due diligence or compliance measures dealing with Escher on behalf of the Fund Complex.

108.    Defendants made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing Plaintiff to purchase and retain securities in reliance thereon, and Plaintiff did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said securities.

109.    Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon Plaintiff, all in connection with the purchase or sale of a security.

110.    Plaintiff has been damaged by these Defendants' wrongful conduct in that the Defendants' wrongful conduct caused Plaintiff to purchase and hold limited partnership interests in the Partnership investing in the Fund Complex, and to retain those partnership interests until present day, causing Plaintiff to lose a substantial portion of its investment in the Fund Complex.

111.    Defendants' fraudulent conduct, as alleged herein, was done purposefully, maliciously, and without regard for the rights and interests of Plaintiff.

112.    Plaintiff would not have agreed to invest said monies had it known the true facts about the Fund Complex, its purpose, extent of dealings with Defendants' affiliates, Defendant's prior performance, and other material misrepresentations and omissions alleged herein.

113.     By reason of the foregoing, Plaintiff is entitled to judgment against Defendants, jointly and severally, awarding Plaintiff compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SECOND CLAIM FOR RELIEF

### (against Individual Defendants for Violation of Securities Exchange Act § 20(a))

114.     Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

115.     At all relevant times, Individual Defendants controlled Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P.

116.     Individual Defendants, directly and through their affiliated entities, provided the Fund Complex with marketing and distribution services, risk management services, strategic planning and administration services, and back-office support and systems services. Individual Defendants also allowed Escher to use Iterative's website, participated in the audits of the Fund Complex, monitored the Fund Complex's portfolio, and met with Plaintiff to discuss all aspects of Fund Complex's business.

117.     Individual Defendants could hire and fire any Fund Complex's administrators and service providers.

118.     Individual Defendants culpably participated in Iterative Capital Management L.P.'s and Iterative Capital GP, LLC's violations of Section 10(b) and Rule 10b-5. Individual Defendants received all the information from the Fund Complex's administrators, auditors and other service providers. Based on the information they had, Individual Defendants knew or should have known that the Iterative Capital Management L.P.'s and Iterative Capital GP, LLC were deviating from the

Fund Complex's stated investment objectives and were providing scarce and insufficient accounting to Plaintiff and other investors.

119.    Obviously, Individual Defendants had the knowledge, opportunity, and power to quash the fraud at its inception and return Plaintiff's investment upon Plaintiff's timely request. Individual Defendants had a duty to disclose any shift in the Funds Complex's investment strategy made in lieu of honoring Plaintiff's withdrawal requests.

120.    By virtue of the foregoing, at the time of the wrongs alleged herein, Individual Defendants had the ability to supervise and control the activities of Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P., did in fact exercise such control, culpably participated in the primary violations of Section 10(b) and Rule 10-b5 alleged herein, and were therefore controlling persons of Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P. within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)).

121.    Plaintiff has been damaged by the wrongful conduct of Individual Defendants through their control of Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P., in that Individual Defendant's wrongful conduct caused each of Plaintiff to purchase limited partner interest in the Partnership as a part of the Fund Complex and to remain invested in the Fund Complex upon fraudulent and other material misrepresentations and omissions.

122.    Individual Defendant's fraudulent conduct, through their control of Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P., as alleged herein, was done purposefully, maliciously, and without regard for the rights and interests of Plaintiff.

123.     By reason of the foregoing, Plaintiffs is entitled to a judgment against Individual Defendants awarding Plaintiff compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### THIRD CLAIM FOR RELIEF

**(against Iterative for Violation of Fiduciary Duties of the Investment Manager and its Officers under Section 206 of the Investment Advisers Act)**

124.     Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

125.     By reason of their positions as investment advisers to the Partnership and its limited partners, Iterative and its principals stood in a fiduciary relationship with the Partnership and its limited partners, including Plaintiff, and owe the Partnership and Plaintiff a duty of highest loyalty, good faith and fair dealing.

126.     The Investment Advisers Act requires every investment adviser to act in good faith, in the best interests of clients, to fully and fairly disclose all material facts to clients, to eliminate or expose any conflicts of interest which may cause the investment adviser to render advice which was not disinterested, and to affirmatively employ reasonable care to avoid misleading clients. In accordance with the Investment Advisers Act, Iterative and its officers (Dannen and Buchanan) are obligated to refrain from:

- employing any device, scheme, or artifice to defraud any client or prospective client;

- engaging in any transaction, practice, or course of business that operates as a fraud or deceit upon any client or prospective client; and/or

- engaging in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

28

127.    Iterative and its officers, separately and together, in connection with the Partnership and the Fund Complex, violated the duties owed to the Partnership and its partners under the Advisers Act in that they designed and implemented the Fund Complex's operations and investments on terms injurious to the Partnership and Plaintiff and engaged in an exploitative mining operations to the detriment of the Partnership - all for the primary purpose of enriching the Individual Defendants and their affiliates and securing personal benefits for themselves and their associates.

128.    Because of the conduct described in this Verified Complaint, said Defendants violated and are violating Sections 206(1) and 206(2) of the Advisers Act by engaging in transactions, practices or courses of business which operated as a fraud or deceit upon Plaintiff and Partnership.

129.    Iterative and its officers knew, or were reckless in not knowing, that the representations made to Plaintiff were false and misleading.

130.    Because of the conduct described above, said Defendants willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, which prohibit fraudulent conduct by advisers to "pooled investment vehicles" and specifically prohibit misleading statements to investors or prospective investors in those pools. Scienter is not required to establish a violation of Section 206(4) and Rule 206(4)-8.

131.    Defendants' violative conduct proximately caused damage to Plaintiff as purchaser of securities and limited partner in the Partnership. Accordingly, Plaintiff seeks rescission of the contract between the Fund Complex and Iterative and restitution of the consideration given pursuant to the terms of such contract.

### FOURTH CLAIM FOR RELIEF

**(against Dannen and Buchanan for Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act)**

132.    Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

133.    From at least December of 2017 through the present, Dannen and Buchanan, directly and indirectly, singly or in concert, aided and abetted Iterative's violations of Sections 206(1) and 206(2) of the Advisers Act. Specifically, Dannen and Buchanan knowingly provided substantial assistance to Iterative in making the materially false and misleading representations and omissions and misappropriations related to Plaintiff's and other Fund Complex investors' assets as alleged herein.

134.    Dannen and Buchanan knew, or were reckless in not knowing, that the representations were false and misleading.

135.    By reason of the activities described in detail in this Verified Complaint, Dannen and Buchanan aided and abetted Iterative's violations of Sections 206(1) and 206(2) of the Advisers Act.

136.    Defendants' violative conduct proximately caused damage to Plaintiff as purchaser of securities and limited partner in the Partnership. Accordingly, Plaintiff seeks rescission of the contract between the Fund Complex, and Iterative and restitution of the consideration given pursuant to the terms of such contract.

### *FIFTH CLAIM FOR RELIEF*

### (for Common Law Fraud and Fraudulent Inducement)

137.    Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

138.    As more fully set forth above, Defendants Iterative, Buchanan and Dannen each knowingly or recklessly made numerous false and misleading statements of material fact and omitted to state material facts regarding the liquidity, investment strategy, management, performance, and value of the Fund Complex, as well as Plaintiff's opportunity to withdraw the investment and Buchanan and Dannen's self-dealing, to Plaintiff.

139.    Each of these Defendants knew, or was reckless in not knowing, that his conduct constituted a fraud on Plaintiff and would result in, and did result in, the purchase of securities by Plaintiff and the retention of such securities, and the subsequent loss of a substantial portion of the Plaintiff's investments.

140.    These Defendants made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing Plaintiff to purchase and retain securities in reliance thereon, and Plaintiff did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said securities.

141.    Plaintiff has been damaged by these Defendants' wrongful conduct in that the Defendants' wrongful conduct caused Plaintiff to purchase and hold limited partnership interests in the Partnership, which in turn invested in the Fund Complex, and to retain those limited partnership interests until present day, causing Plaintiff to lose a substantial portion of its investment in the Fund Complex.

142.     Defendants' fraudulent conduct, as alleged herein, was done purposefully, maliciously, and without regard for the rights and interests of Plaintiff.

143.     By reason of the foregoing, the plaintiffs are entitled to judgment against Defendants, jointly and severally, awarding Plaintiff compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### SIXTH CLAIM FOR RELIEF

### (for Breach of Fiduciary Duty)

144.     Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

145.     The General Partner, Iterative, Dannen and Buchanan owed the highest obligations and fiduciary duties to the Partnership and Plaintiff. Said Defendants were duty bound to act in a responsible and lawful manner, in utmost good faith, and in accordance with the representations on which Plaintiff and other limited partners relied on in entrusting their monies to Defendants, so as not to cause injury to the Partnership and Plaintiff.

146.     Said Defendants each owed directly to Plaintiff, as a limited partner of the Partnership, the duty to exercise due care and diligence in the management and administration of the Fund Complex, and in the use and preservation of Plaintiff's property and assets. Defendants also owed directly to Plaintiff duties of full and candid disclosure of all material facts relevant to the Fund Complex and duties to deal fairly and honestly with Plaintiff. Defendants were obligated to ensure that they did not engage in any fraudulent, unsafe, or unsound investment practices.

147.     Iterative, as an investment adviser, also owed fiduciary duties to the Partnership.

148.     As alleged in herein, Defendants breached their fiduciary duties by, among other things:

     a.     In contracting with Escher, continuing to do business with Escher on behalf of the Fund Complex and, ultimately, retrofitting the whole Fund Complex's operations to servicing Escher at Plaintiff's and Partnership's expense;

     b.     Putting Defendants' own interest to sell digital assets mined by the Mining Master Fund through Escher, and profit from such transactions, before the interests of the Partnership and the limited partners, including Plaintiff;

     c.     Failing to provide books and records.

149.     In engaging in the conduct alleged herein, including, but not limited to, misrepresenting prior performance, deviating from the stated investment strategy, engaging in self-dealing with affiliated entities, failing to ensure proper regulatory compliance of Escher,  Defendants repeatedly breached their fiduciary and related obligations to Plaintiff and the Partnership.

150.     Plaintiff has been damaged by these Defendants' wrongful conduct in that the Defendants' wrongful conduct caused Plaintiff to purchase and hold limited partnership interests in the Partnership investing in the Fund Complex, and to retain those partnership interests until present day, causing Plaintiff to lose a substantial portion of its investment in the Fund Complex.

151.     Defendants' wrongful conduct, as alleged herein, was done purposefully, maliciously, and without regard for the rights and interests of Plaintiff. Such conduct departed in the extreme from the norms expected of Defendants as investment managers, advisors and fiduciaries.

152.    By reason of the foregoing, Plaintiff is entitled to judgment against Defendants awarding Plaintiff compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SEVENTH CLAIM FOR RELIEF

### (for Breach of Duty of Good Faith, Fair Dealing and Loyalty)

153.    Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

154.    Plaintiff has performed all conditions, covenants, and promises required to be performed by Plaintiff in accordance with the terms of Plaintiff's agreements with Defendants.

155.    Defendants have breached the covenant of good faith and fair dealing implied in the partnership and subscription agreements with Plaintiff by unfairly and substantially benefitting from the agreements with Plaintiff while misrepresenting that Defendants would enter into and perform such agreements in good faith, failing to perform Defendants' duties under the agreements and, instead of following the agreements for the Fund Complex, building Defendants' operating business putting Plaintiff and the Partnership at significant risk, which logically concluded with Defendants' plan of consolidating the Fund Structure into Defendants' separate operating business under the same ownership.

156.    As a direct and proximate result of Defendants' breaches, Plaintiff has suffered losses, damages, costs and expenses, including a substantial loss of Plaintiff's investment.

157.    By reason of the foregoing, Plaintiff is entitled to judgment against Defendants awarding Plaintiff compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### EIGHTH CLAIM FOR RELIEF

**(For Negligence and Negligent Misrepresentation)**

158.    Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

159.    Each of Defendants had a duty to Plaintiff to, among other things, accurately describe the Fund Complex's investment strategy and conflict of interest, manage Plaintiff's funds competently and consistently with Defendants' verbal and written statements as to how these funds would be managed.

160.    Even if there was no intent to defraud, Defendants acted negligently and carelessly in making material representations and omitting to disclose material facts to Plaintiff and in managing the Fund Complex's portfolios in the incompetent and inappropriate manner alleged herein.

161.    Defendants consistently supplied misrepresentations to Plaintiff without exercising reasonable care or competence in obtaining and communicating such information.

162.    Defendants made the material misrepresentations and omissions alleged above with the intention of inducing Plaintiff to purchase and retain their investments in reliance thereon.

163.    Plaintiff did reasonably and justifiably rely on these Defendants' misrepresentations and omissions, and the false information supplied by these Defendants, in purchasing and retaining the securities. Plaintiff also reasonably relied on Defendants to manage the funds competently and in keeping up with their representations.

164.    Plaintiff was damaged by Defendants' negligent and/or grossly negligent conduct. Plaintiff would not have purchased limited partnership interests in the Partnership that invested in the

Fund Complex had Plaintiff known that Defendants engaged in the negligent and/or grossly negligent conduct alleged herein.

165.     By reason of the foregoing, Plaintiff is entitled to a judgment against Defendants, awarding compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## NINTH CLAIM FOR RELIEF

**(for Breach of Contract against Defendant Iterative Capital GP, LLC, and Iterative Capital Management, L.P.)**

166.     Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

167.     Pursuant to the LPA and Investment Management Agreement incorporated by reference therein, General Partner and Iterative were vested with exclusive responsibility to manage all of the affairs of the Partnership. General Partner's and Iterative's responsibilities included making all investment decisions for the Partnership, selecting third parties provide services to the Partnership and execute reports to the partners.

168.     The LPA also:

   a.   set forth the Partnership's purpose, as described in the PPM (LPA, Sec. 2.5(a));

   b.   obligated the General Partner to achieve the Partnership's purpose (LPA, Sec. 4.1(a));

   c.   mandated that the General Partner should act in accordance with the implied covenant of good faith and fair dealing (LPA, Sec.4.5(a)); and

     d.   provided for any amendments affecting any partner's liabilities or rights with respect to distributions and withdrawals – to be made only with such adversely affected partner's consent (LPA, Sec. 8.1(b))

169.    Iterative and General Partner breached their obligations under the LPA and Investment Management Agreement by:

     a.   deviating from the partnership goals set forth in the LPA;

     b.   misrepresenting that the Fund Complex's portfolio would be invested in good faith, at market value and in accordance with the Fund Complex's investment strategy, when instead, these Defendants deviated from the agreements to benefit their affiliated business; and

     c.   adversely changing Plaintiff's liabilities or rights and position in the Partnership, including with respect to distributions and withdrawals from the Partnership.

170.    Plaintiff has fully performed all of its obligations under the agreements.

171.    By reason of the foregoing, Plaintiff is entitled to a judgment against Iterative and General Partner, jointly and severally, awarding Plaintiff compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### TENTH CLAIM FOR RELIEF
### (for Unjust Enrichment)

172.    Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

173.    Defendants have been enriched by the receipt of funds in the amount of $1,000,000 from Plaintiff.

174.    Defendants have failed to repay the funds or offer any value in exchange to Plaintiff.

175.    Equity and good conscience demand that Defendants compensate Plaintiff in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION
### (for Attorney Fees)

176.    Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

177.    As a result of Defendants' bad faith conduct alleged herein, and their intentional and wanton disregard of their representations and obligations to Plaintiff, Defendants are liable to Plaintiff for Plaintiff attorneys' fees in connection with this matter.

178.    Wherefore, Plaintiff demands judgment in an amount to be determined by the Plaintiff's legal fees in this matter.

### TWELFTH CAUSE OF ACTION
### (for Injunctive Relief)

179.    Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

180.     Defendants' wholesale disregard of their obligations to the Partnership and to Plaintiff, an unremitting pattern of illegal conduct, will, if Defendants are permitted to restructure the Fund Complex into an operating business at Plaintiff's and Partnership's expense, proceed unchecked and will reduce the remaining Partnership assets to zero.

181.    Potentially, all of Partnership's funds are going to be applied to restructure the Partnership into an operating company for Defendant's benefit.

182.    Indeed, in the last month, Defendant's estimate of Plaintiff's remaining funds went from $312,022.32 as of March 19, 2020, to $225,120.18 as of April 14, 2020 – <u>without</u> accounting for the contemplated Restructuring expenses.

183.    Defendants admit that such contemplated structure is significantly different from the Fund Complex's structure and restructuring expenses may be significantly higher than estimated, as the Fund Complex has a very intricate multi-fund multi-jurisdictional structure.

184.    Defendants have continued to refuse to acknowledge their responsibilities to Plaintiff and the Partnership, instead adopting an approach of righteous entitlement.

185.    It is also likely that Defendants will seek to apply the remaining Partnership's assets to their own defense in this matter.

186.    By reason of the foregoing, the Court invoke its equitable powers to (a) enjoin Defendants from executing the contemplated restructuring of the Fund Complex or any other transactions which would violate Plaintiff's compensation, redemption and informed decision rights; (b) enjoin Defendants from interfering with KDH's right to inspect books and records; (c) enjoin Defendants from charging any restructuring expenses on KDH and from withholding KDH's portion of the fund's liquid portfolio (d) enjoin Defendants from paying any cost or expense of Defendants in connection with this action from the fund's assets; (e) enjoin Defendants from taking any action that would impair the value of the Fund Complex or its assets; and (f) enjoin Iterative Capital GP, LLC from acting as the general partner of the Partnership.

**WHEREFORE**, Plaintiff demands a judgment as follows:

a) For compensatory and punitive damages to Plaintiff against Defendants, jointly and severally, in an amount to be determined at the trial of this action, but no less than the entire consideration paid Plaintiff for its interest in the Fund Complex;

b) For and order (1) enjoining Defendants from executing the contemplated restructuring of the Fund Complex or any other transactions which would violate Plaintiff's compensation, redemption and informed decision rights; (2) enjoining Defendants from interfering with KDH's right to inspect books and records; (3) enjoining Defendants from charging any restructuring expenses on KDH and from withholding KDH's portion of the fund's liquid portfolio (4) enjoining Defendants from paying any cost or expense of Defendants in connection with this action from the fund's assets; (5) enjoining Defendants from taking any action that would impair the value of the Fund Complex or its assets; (6) enjoin Iterative Capital GP, LLC from acting as the general partner of the Partnership; and (7) rescinding the contract between the Fund Complex and Iterative.

c) For the costs, expenses, and disbursements incurred in the prosecution of this action, including attorneys' fees;

d) For interest on any award at the appropriate statutory or other rate; and

e) For such other and further relief as this Court deems just and proper.

Plaintiffs further demands a trial by jury of all claims set forth in this Verified Complaint.


DILENDORF KHURDAYAN PLLC

Dated:  April 24, 2019
New York, New York

*Rika Khurdayan*
_____

by: Rika Khurdayan, Esq.
federal bar number AK9122

*Attorneys for Plaintiff*
60 Broad Street, 24th Floor
New York, NY 10004 Tel:
(646) 764-1630
rk@dilendorf.com

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )


    FELIKS KOGAN, being duly sworn, deposes and says that deponent is the Member and Manager of Plaintiff, the limited liability company described in the within action; that he has duly read the foregoing Verified Complaint and knows the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true. This verification is made by deponent because Plaintiff is a New York limited liability company and deponent is the Member and Manager thereof.

_____
Feliks Kogan

Sworn to before me this

24th day of April, 20 20

_____
Notary Public

MASHA BAIKOFF
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BA6146626
Qualified in Kings County
My Commission Expires May 22, 20 22