UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X

| | |
|---|---|
| KDH CONSULTING GROUP LLC, directly and derivatively on behalf of ITERATIVE CAPITAL, L.P.,<br><br>Plaintiff,<br><br>– against –<br><br>ITERATIVE CAPITAL MANAGEMENT L.P., ITERATIVE CAPITAL GP, LLC, ITERATIVE OTC, LLC (D/B/A "I2 TRADING" AND "ESCHER"), ITERATIVE MINING, LLC, BRANDON BUCHANAN and CHRISTOPHER DANNEN,<br><br>Defendants. | 20 Civ.     (    )<br><br>ECF Case<br><br>**DECLARATION OF WAYNE HATAMI IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |

------------------------------------------------------------------------- X

I, Wayne Hatami, declare as follows:

1. I am a member and principal of KDH Consulting Group LLC ("Plaintiff" or "KDH"). I have personal knowledge of the facts set forth herein, and if called to testify, could and would testify competently thereto.

2. In late 2017, I and my partners at KDH were introduced to Defendants Brandon Buchanan ("Buchanan") and Christopher Dannen ("Dannen") through a mutual acquaintance.

3. Dannen personally visited our office in Manhattan in December of 2017 touting prior performance and success of two previous investment funds managed by his and Defendant Brandon Buchanan's ("Buchanan") company - Iterative Capital Management, L.P. ("Iterative").

4. Dannen offered us to invest in a highly liquid new fund with quarterly withdrawal rights similar to those of a hedge-fund, focusing primarily on trading cryptocurrencies and network tokens.

5. Dannen rushed us to invest ASAP before the opportunity for the investment was going to close at the end of 2017 - beginning of 2018.

6. Iterative provided to KDH a subscription agreement, limited partnership agreement ("LPA") and a private placement memorandum ("PPM") for KDH to invest in Iterative Capital L.P. ("U.S. Feeder Fund" or "Partnership") in exchange for the limited partnership interest, which would in turn invest into the main fund.

7. Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Partnership subscription agreement signed by KDH on or about January 5, 2018.

8. Attached hereto as <u>Exhibit B</u> is a true and correct copy of the LPA signed by Iterative on or about January 12, 2018.

9. Among other things, the PPM provided (exact language, if in quotes):

   a. "The Fund is being formed for the purpose of investing all of its investible assets in the Master Funds, which will, directly or indirectly, acquire, generate, manage and hold investments in cryptocurrencies and network tokens (collectively, "Coins" or "Investments")." [p. 9]

   b. "The primary investment strategy of each Master Fund is to purchase and hold Coins." [p. 43]

   c. The Fund Complex's goals were to invest 70% of the assets in purchasing and trading liquid digital assets, namely cryptocurrencies and network tokens, via the Main Master Fund. As a minor side strategy, the Fund Complex was also to invest up to 30% of the assets in "mining" operations, including equipment relating to the generation of the similar digital assets via the Mining Master Fund. [pp. 10-11]

   d. "In exchange for Iterative OTC's right of first refusal to purchase the Mining Master Fund's Coins, the Mining Master Fund will be entitled to more favorable pricing terms than those offered to other buyers and sellers of Coins. The Mining Master Fund may also receive additional consideration from Iterative OTC, to potentially include a percentage of Iterative OTC's profits on the sale of Coins purchased from the Mining Master Fund should Iterative OTC's sale price exceed the price it purchased the Coins from the Mining Master Fund by more than a specific amount." [p. 11]

   e. "Investment Manager is expected to focus on meeting the demand for specific Coins from Iterative OTC. Therefore, the Mining Master Fund's portfolio will differ from

the portfolio of the Strategic Master Fund, which will focus solely on investment strategies that seek to generate the highest level of profits through direct investments in such Coins." [p. 11]

10. Attached hereto as Exhibit C is a true and correct copy of the PPM, as provided by Iterative to KDH.

11. Defendants never disclosed to KDH such "more favorable pricing terms," "additional consideration" or any information on dealings with "other buyers and sellers of Coins," as stated in the PPM.

12. As the Mining Master Fund's investment activities were supposed to involve only up to 30% of the total assets that was expected to generate additional income for the fund, we agreed to subscribe to the fund.

13. On or about January 5, 2018, we formed KDH and KDH signed the subscription documents investing $1,000,000 in exchange for limited partner interest in the Partnership. I personally delivered the check for the full amount to Iterative's Manhattan office as Dannen constantly rushed us to invest.

14. Once Defendants received the $1,000,000 check, their attitude changed drastically. Defendants adopted a tactic of unresponsiveness, delays and promises of personal meetings, liquidity and buyouts that never materialized.

15. Coinciding with our investment into the Iterative's cryptocurrency investment fund, in early 2018, cryptocurrency market began to plummet. I immediately contacted Iterative to request accounting and withdraw KDH's funds.

16. During a phone call with of me, Buchanan reassured me that Iterative kept the situation under control and had not yet made substantial investments in the volatile market using KDH's funds, nor planned to invest heavily into Bitcoin, which crashed tremendously. Buchanan also

convinced us not to withdraw the funds, once again, touting Iterative's experience in trading cryptocurrencies and promising liquidity.

17. Buchanan and Dannen proposed to meet personally in New York to provide full accounting on the fund's activities, use of KDH's investment and investment strategy in the changing market that would keep the KDH's expected liquidity, so that we would not withdraw the funds from their fund. Having no experience in cryptocurrencies, we relied on Buchanan's and Dannen's expertise and agreed to postpone the withdrawal.

18. Attached hereto as Exhibit D is a true and correct copy of my email to Iterative, dated April 7, 2018

19. However, Buchanan cancelled two scheduled meetings on with him and Dannen via text messages to me last minute on April 11th and 12th, 2018. After Buchanan proposed to set the third meeting "in stone" for the next week, Buchanan stopped responding, left New York and, after another week, on April 27, 2018, Buchanan informed me that he had "no immediate plans" to be back in New York.

20. Attached hereto as Exhibit E is a true and correct copy of my text message string with Buchanan ranging from April 11, 2018 to April 27, 2018.

21. At some point between April and June of 2018, KDH found out that sometime after our last communications in April of 2018 mentioned above, Iterative spent a substantial amount of funds on highly illiquid mining equipment subject to rapid depreciation. As Iterative disclosed to KDH in the Q1 2019 investor update in May 2019, as of March 31, 2019, Defendants spent $6,500,000 on the mining equipment, which already accumulated $1,800,000 in depreciation.

22. Attached hereto as Exhibit F is a true and correct copy of Iterative's email to KDH with Q1 2019 Ivestor Update, dated May 13, 2019.

23. And on February 18, 2020, Defendants reported that, as of the end of 2019, a loss of "approximately $3.4M came in the form of depreciation to the [mining equipment];" and the Fund Complex's activities related to the illiquid mining investments "absorbed approximately $4.5M in expenses in 2019."

24. Attached hereto as Exhibit G is a true and correct copy of Iterative's letter to the fiund's investors, dated February 18, 2020.

25. To fund this major deviation from the fund's investment strategy, Iterative set aside a substantial amount of the Partnership's funds in what they referred to as a "side pocket" and locked these funds, so that KDH and other investors could not redeem them.

26. Iterative never informed KDH in advance, nor updated the PPM and disclosures to investors to reflect this drastic change as to the way our money was being invested. Defendants proceeded concealing their investment activities and kept changing fund auditors and administrators while undergoing audits, the details of which Iterative also withheld.

27. Iterative's reporting consisted for the most part of 3-line emails with unsubstantiated valuation numbers, each time showing a steep decline in value of the Partnership's assets.

28. On or about June 12, 2018, after finding out about exorbitant expenditures on mining equipment, I called Buchanan asking about the effect on such expenditure on KDH's withdrawal rights and liquidity options. Being on the speakerphone with me and two other KDH's principals, Buchanan represented to KDH that, if necessary, Iterative would raise additional funds and buy out our share, once again promising to maintain liquidity.

29. KDH never invested or was interested in investing in mining business. KDH invested in a liquid cryptocurrency trading fund with quarterly withdrawals and stellar trading team. But for

Defendants' initial and continuing representations of liquidity and stellar prior performance, we would not have invested in the fund or kept our investment in the fund.

30. Iterative's promises never materialized. The fund continued to lose money and Iterative continued to withhold from us material information about the business.

31. On February 26, 2019, in an attempt to make sense of the fund's current operations, we sent a list of specific basic questions to Iterative relating to the status of the mining strategy and financial condition of the Partnership. On the same date, Iterative promised to provide Plaintiff with a "detailed model showing most of what you've asked (and probably the only detail we're willing to share), so please standby for that document which will be delivered in a week or so."

32. Attached hereto as Exhibit H is a true and correct copy of an email string between KDH and Buchanan, dated February 26, 2019.

33. On March 7, 2019, having received no answers, KDH sent Iterative another notice to withdraw the remaining funds. In response, Iterative advised KDH that the promised "detailed model" was not ready and that "all of the Fund's mining assets are in a side pocket and so won't be distributed until the Fund has liquidated those assets," which Defendants "estimated" to be in 18 months.

34. Attached hereto as Exhibit I is a true and correct copy of an email string between Iterative and Buchanan dated March 7, 2019.

35. On March 31, 2019, instead of a promised "detailed model" answering our questions, Iterative sent out an investor update containing a market overview with their general projections. Iterative provided no details about their mining business or the Partnership's financial transactions.

36. Attached hereto as Exhibit J is a true and correct copy of the Iterative's email with March 2019 investor update, dated March 31, 2019.

37. In June 2019 iterative announced they were moving to quarterly communications about the fund's activities and performance as that there was not much to share in the way of operational updates.

38. At the end of summer of 2019, Defendants' time estimate about the side-pocketed funds not to be released to Plaintiff stayed the same as 5 months before in March of 2019 – yet another 18 months.

39. Had I and my partners at KDH known that the Iterative fund was not a liquid hedge fund-like vehicle but, instead, an largely illiquid fund that had over-loaded on mining equipment and dealings with Iterative's, Buchanan's and Dannen's affiliates, and that the fund lacked the investment restrictions and risk controls stated in the PPM, KDH would not have invested in the fund or would have immediately sought to withdraw and/or redeem the investment.

40. On December 20, 2019, Iterative wrote to KDH: "[t]he current Fund structure has handcuffed us and prevented us from being able to scale our mining operation. As such, during Q1 2020, we will embark on an effort to convert the Fund from an investment fund structure to a corporate structure and consolidate it with our other flagship business, the OTC desk." Iterative also stated that "one of the key features" desired by the fund's investors – "quarterly liquidity ended up being infeasible" and "suspend[ed] the right of all investors to withdraw or redeem from the Fund in accordance with the applicable governing documents of the Fund."

41. Attached hereto as Exhibit K is a true and correct copy of Iterative's letter to investors dated December 20, 2019.

42. On February 18, 2020, Iterative reported that the fund's activities related to the illiquid mining investments "absorbed approximately $4.5M in expenses in 2019." Iterative also stated that "[o]ur focus, since Iterative's inception, has been on cryptocurrency mining and optimizing around

that operation," which apparently was Defendants' original strategy, yet they failed to disclose it to KDH and other investors while raising capital for the fund. To the contrary, Iterative's new statements contradicted Defendants' initial representations and disclosures. See Exhibit G.

43. On March 1, 2020, Iterative have presented a take-it-or-leave-it offer ("Take-It-Or-Leave-It Offer") to KDH and other investors outlining three options in connection with the contemplated restructuring of the fund into an operating mining business.

44. Attached hereto as Exhibit L is a true and correct copy of the letter from Iterative titled "Conversion and Consolidation of Iterative Capital Fund Structure," dated March 1, 2020, containing the Take-It-Or-Leave-It Offer and all exhibits, as received by KDH.

45. Essentially, Iterative offered KDH to accept "as is" the terms "substantially and materially" different from those contained in the LPA, or receive outdated mining hardware, which KDH would never use or sell, and pay for its shipping costs. See Exhibit L.

46. However, after KDH sent Iterative very basic questions about the restructuring, such as the timeline for receiving distributions if consent is provided, the amount of distributions and the upper-floor estimate on restructuring expenses that Plaintiff would need to cover – Defendant Buchanan responded on March 19, 2020 that "This opportunity to liquidate is not a negotiation. We can keep the assets in a side pocket."

47. Attached hereto as Exhibit M is a true and correct copy of an email string between KDH and dated between March 13 and March 19, 2020.

48. Iterative's "current understanding" of the "anticipated" KDH's refund amount went from $318,522.32 (as of December 31, 2019) which Iterative reported on March 19, 2020 (see Exhibit M), to $225,120.18 (as of March 31, 2020) which Iterative reported on April 31, 2020 – without

accounting for the contemplated Restructuring expenses, which Iterative admits may deplete the Partnership's assets and KDH's capital account.

49. Attached hereto as <u>Exhibit N</u> is a true and correct copy of a statement of KDH's capital account statement as of March 31, 2020, as received from Iterative on or about April 14, 2020.

50. On April 14, 2020, Iterative updated their March 1 restructuring offer (Exhibit L) further decrease their offer and now base it on KDH's capital account as of March 31, 2020, which is almost $100,000 lesser than their March estimate.

51. Attached hereto as <u>Exhibit O</u> is a true and correct copy of letter from Iterative titled "Updated Terms -- Conversion and Consolidation of Iterative Capital Fund Structure," dated and received by KDH on April 14, 2020.

52. As a result, KDH essentially lost over 80% of their investments.

53. As we were unable to receive any material information about the actual status of the fund and historic operations, or the proposed restructuring, we asked our counsel to prepare a formal demand for books and records.

54. As Iterative set the deadline to "consent" to proposed restructuring of the fund to April 28, 2020 at midnight, KDH had to make an emergency application to this Court requesting a preliminary injunction and a temporary restraining order against Iterative and its affiliates.

55. Also, KDH believes that the contemplated operating company will have insufficient capital to honor KDH's redemption rights, if the proposed restructuring is permitted to occur.

56. Our firm belief is based on the fund's historical performance (lack of it), expected restructuring expenses and the recent additional rapid decrease of KDH's capital account in the fund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 26, 2020 at New York, New York.

_____
Wayne Hatami