# ITERATIVE CAPITAL, L.P.

## SUBSCRIPTION AGREEMENT

Iterative Capital, L.P.
226 East 54th Street, 2nd Floor
New York, NY 10022

Ladies and Gentlemen:

**1.    Documents Received**

(a)    The undersigned (the "*Subscriber*") hereby acknowledges having (i) received, read and understood the current Confidential Private Placement Memorandum, as supplemented (the "*Private Placement Memorandum*"), of Iterative Capital, L.P., a limited partnership organized under the laws of the State of Delaware (the "*Fund*"), including but not limited to those sections dealing with risk factors, conflicts of interest, fees and tax consequences of an investment in the Fund, and the Limited Partnership Agreement of the Fund, as amended to date (the "*Partnership Agreement*"), and (ii) been given the opportunity to (A) ask questions of, and receive answers from, Iterative Capital GP, L.L.C., the general partner of the Fund (the "*General Partner*") or one of its affiliates, including Iterative Capital Management, L.P., the investment manager of the Fund (the "*Investment Manager*"), concerning the terms and conditions of the offering and other matters pertaining to an investment in the Fund and (B) obtain any additional information that the General Partner and/or the Investment Manager can acquire without unreasonable effort or expense that is necessary to evaluate the merits and risks of an investment in the Fund, including, without limitation, a copy of the amended and restated exempted limited partnership agreement of Iterative Capital Master, L.P. (the "*Strategic Master Fund*"), as may be amended and restated from time to time (the "*Strategic Master Fund Partnership Agreement*"), and the amended and restated limited partnership agreement of Iterative Mining Master, L.P. (the "*Mining Master Fund*"), as may be amended and restated from time to time (the "*Mining Master Fund Partnership Agreement*").

(b)    Appendix A hereto contains the definitions of certain capitalized terms used but not otherwise defined herein and should be read by the Subscriber prior to entering into this subscription agreement (this "*Subscription Agreement*").

**2.    Subscription Commitment**

(a)    The Subscriber hereby irrevocably subscribes for a limited partner interest in the Fund (the "*Interest*"), subject to the Partnership Agreement, and agrees to contribute in cash (unless otherwise agreed by the General Partner) to the capital of the Fund, the amount set forth on the signature page of this Subscription Agreement. Such amount will be payable in full in readily available funds by wire transfer to the bank account of the Fund on or before the business day prior to the proposed date of subscription.

(b)    The Subscriber understands that this subscription is not binding on the Fund until accepted by the General Partner, and it may be rejected, in whole or in part, by the General Partner in its absolute discretion. If and to the extent rejected, the Fund will, to the extent

permitted by law, return to the Subscriber, without interest or deduction, any payment tendered by the Subscriber, and the Fund and the Subscriber will have no further obligation to each other hereunder. The Subscriber acknowledges and accepts that none of the Fund, the General Partner, the Investment Manager, MG Stover & Co., the Fund's administrator (the *"Administrator,"* which term will be construed to include any sub-administrator of the Fund unless the context otherwise requires) or their respective agents, affiliates or representatives will be responsible for any lost profit, revenue or damages of any kind due to a delayed acceptance or a rejection of the subscription.

## 3.   Representations, Warranties and Covenants – All Subscribers

To induce the Fund to accept this subscription, the Subscriber hereby makes the following representations, warranties and covenants to the Fund and the Fund's general and limited partners:

(a)   The information set forth in the subscriber information form attached hereto (the *"Subscriber Information Form"*), which will be considered an integral part of this Subscription Agreement, is true, correct, accurate and complete as of the date hereof, and will be relied upon by the Fund and the General Partner for the purpose of determining the eligibility of the Subscriber to purchase and own Interests in the Fund.

(b)   The Subscriber hereby agrees to notify the General Partner or the Administrator immediately if any representation, warranty or tax certification contained in this Subscription Agreement, or any information provided pursuant to the Subscriber Information Form or otherwise (including, without limitation, information in any Internal Revenue Service (*"IRS"*) Form(s) W-8 or W-9) becomes untrue, misleading, or otherwise requires updating at any time. For so long as the Subscriber is a limited partner of the Fund, the Subscriber further agrees to provide any revised or updated information necessary to cause the Subscriber Information Form to remain true and correct as soon as practicable upon the Subscriber becoming aware that any such change or revision is necessary. The Subscriber agrees to provide, if requested, any additional information and representations that may reasonably be required to substantiate the Subscriber's status as an "accredited investor" or to otherwise determine the eligibility of the Subscriber to purchase Interests and reconfirm the persons' tax status, including but not limited to (i) financial statements, tax returns, bank and brokerage statements and similar documentation, or (ii) a verification of accredited investor status by a third party verification agent that is acceptable to the General Partner. If the Subscriber's interest is or will at any time in the future constitute more than 15 percent in interest of the Fund's voting securities, the Subscriber agrees to complete a separate questionnaire regarding any convictions, judgments, suspensions, bars or orders relating to securities offerings, commodity futures business or certain other businesses. Such questionnaire and the information and representations otherwise provided under this Section shall form a part of this document and shall be subject to, among other things, the indemnification provisions and the duty to update information contained in this Subscription Agreement. The Subscriber agrees to provide any additional information and execute any additional documents as may reasonably be required in connection with any subscription, credit facility or other similar borrowing arrangement by the Fund or any lender named in the credit facility or similar lending arrangement.

(c)     The Subscriber consents to the disclosure of any such information by the Fund, the General Partner, the Administrator and the Investment Manager, and any other information furnished to the Fund, to each other, to any affiliate, to any other service provider, to any governmental authority or self-regulatory organization or, to the extent required by law or deemed (subject to applicable law) by the General Partner to be in the best interest of the Fund, to any other person or as required by any laws, rules, regulations and ordinances to which the Fund, the General Partner or the Investment Manager is subject.

(d)     Except as disclosed in the accompanying Subscriber Information Form, the Subscriber is acquiring the Interest for the Subscriber's own account; does not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of the Interest; and is not acquiring the Interest with a view to or for sale in connection with any distribution of the Interest.

(e)     The Subscriber or an advisor or consultant relied upon by the Subscriber in reaching a decision to subscribe has such knowledge and experience in financial, tax, regulatory and business matters as to enable the Subscriber or such advisor or consultant to evaluate the merits and risks of an investment in the Interest (including the risks set forth in the Private Placement Memorandum) and to make an informed investment decision with respect thereto and has made its own investment decision, including decisions regarding suitability based on its own judgment or upon the advice from such advisors as it deemed necessary and not upon the views or advice of the Fund, the General Partner, the Investment Manager, or their affiliates or representatives.

(f)     The Subscriber understands that the Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the *"Securities Act"*), or any state law and that the Fund is not registered under the U.S. Investment Company Act of 1940, as amended (the *"Investment Company Act"*).  The Subscriber agrees to notify the Fund prior to any proposed sale, transfer, distribution or other disposition of the Interest or any beneficial interest therein, and will not sell, transfer, distribute or otherwise dispose of the Interest (including, without limitation, by pledge, option, swap or nominee or similar relationship, and further including, without limitation, the offering or listing of any Interest on or through any placement agent, intermediary, online service, site, agent or other similar person, service or entity) without the consent of the General Partner, which may be granted or withheld in its sole discretion, and unless the Interests are registered or such sale, transfer, distribution or other disposition is exempt from registration.  The Subscriber understands that any such transfers without the consent of the General Partner are void *ab initio*.  The Subscriber also understands that the Fund has no intention to register the Fund or the Interests with the Securities and Exchange Commission or any state and is under no obligation to assist the Subscriber in obtaining or complying with any exemption from registration.  The Fund may require that a proposed transferee meet appropriate financial and other suitability standards and that the transferor furnish a legal opinion satisfactory to the Fund and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws.  An appropriate legend evidencing such restrictions may be placed on any certificates issued representing the Interests and appropriate stop-transfer instructions may be placed with respect to the Interests.

(g)     In formulating a decision to invest in the Fund, the Subscriber has not relied or acted on the basis of any representations or other information purported to be given on behalf of the Fund, the Investment Manager or the General Partner, except as set forth in the Private Placement Memorandum or the Partnership Agreement (it being understood that no person has been authorized by the Fund, the Investment Manager or the General Partner to furnish any such representations or other information).

(h)     The Subscriber recognizes that there is not now any secondary market for Interests and that such a market is not expected to develop; accordingly, it may not be possible for the Subscriber to readily liquidate the Subscriber's investment in the Fund other than through a withdrawal from the Fund as provided in the Partnership Agreement and the Subscriber may be holding such Interests for an indefinite period of time.

(i)     The Subscriber did not become interested in subscribing for an Interest due to (1) any advertisement, article, notice or other communication published in any newspaper, magazine, internet website or similar media or broadcast over television or radio or (2) any seminar or meeting whose attendees have been invited through general solicitation or general advertising.

(j)     The Subscriber understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Fund, generally through the Strategic Master Fund and the Mining Master Fund.  The Subscriber's investment is consistent with the investment purposes and objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

(k)     The Subscriber has the financial ability to bear the economic risk of this investment, has adequate means to provide for its current needs and contingencies, can afford a complete loss of its investment in the Fund and can afford to hold its investment in the Fund for an indefinite period of time.

(l)     If the Subscriber is a natural person, the Subscriber is qualified to become a limited partner in the Fund and has the legal capacity to execute, deliver and perform this Subscription Agreement and the Partnership Agreement.

(m)     If the Subscriber is a corporation, partnership, limited liability company, trust or other entity, it is authorized and qualified to become a limited partner in, and authorized to make its capital contribution to, the Fund and otherwise to comply with its obligations under the Partnership Agreement; the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so; and this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms.  In addition, such Subscriber will, upon request of the General Partner, deliver any documents, including an opinion of counsel to the Subscriber, evidencing the existence of the Subscriber, the legality of an investment in the Fund and the authority of the person executing this Subscription Agreement on behalf of the Subscriber.

(n)     The purchase of the Interests hereunder and the compliance by such Subscriber with all of the provisions of this Subscription Agreement and the Partnership Agreement

applicable to such Subscriber and the consummation by such Subscriber of the transactions herein and therein contemplated will not (x) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any statute, indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Subscriber is a party or by which such Subscriber is bound or to which any of the property or assets of such Subscriber is subject, or (y) result in any violation of (i), if such Subscriber is an entity, the provisions of the organizational documents of such Subscriber or (ii) any statute applicable to such Subscriber or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Subscriber or the property of such Subscriber.

(o)     The Subscriber has carefully reviewed and understands the various risks of an investment in the Fund, as well as the fees and other compensation and the conflicts of interest to which the Fund is subject, as set forth in the Private Placement Memorandum. The Subscriber hereby consents and agrees to the payment of the fees and other compensation so described to the parties identified as the recipients thereof, and to such conflicts of interest.

(p)     The Subscriber believes that the compensation terms of the Partnership Agreement, the Strategic Master Fund Partnership Agreement and the Mining Master Fund Partnership Agreement represent an "arm's-length" arrangement and the Subscriber is satisfied that it has received adequate disclosure from the General Partner to enable it to understand and evaluate the compensation and other terms of the Partnership Agreement, the Strategic Master Fund Partnership Agreement and the Mining Master Fund Partnership Agreement and the risks associated therewith.

(q)     The Subscriber represents and warrants that neither it nor any direct or indirect holder of any beneficial interest in the Subscriber's Interest (each a "***Beneficial Interest Holder***") and, in the case of a Subscriber which is an entity, no Related Person is:

> (1)     A person or entity whose name appears on the List of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Asset Control from time to time;
>
> (2)     A Foreign Shell Bank; or
>
> (3)     A person or entity resident in or whose subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction.

The Subscriber agrees to promptly notify the General Partner or the person appointed by the General Partner to administer the Fund's anti-money laundering program of any change in information affecting this representation and covenant.

(r)     The Subscriber represents that (except as otherwise disclosed to the General Partner in writing):

> (1)     neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is a Senior Foreign Political Figure, any member of a Senior Foreign Political Figure's Immediate Family or any Close Associate of a Senior Foreign Political Figure;

(2) neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is resident in, or organized or chartered under the laws of, a jurisdiction that has been designated by the Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;[12] and

(3) its subscription funds do not originate from, nor will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a Non-Cooperative Jurisdiction.

(s) The Subscriber acknowledges and agrees that any amounts paid to it will be paid to the same account from which its subscription funds were originally remitted, or, if the General Partner agrees otherwise, to another account in the name of the Subscriber.

(t) If the Subscriber is purchasing the Interest as agent, representative or intermediary/nominee, or in any similar capacity for any other person, or is otherwise requested to do so by the General Partner, it will provide a copy of its anti-money laundering policies ("*AML Policies*") to the General Partner. The Subscriber represents that (i) it is in compliance with its AML Policies, (ii) its AML Policies have been approved by counsel or internal compliance personnel who have been reasonably informed of the legal requirements and best practices for anti-money laundering policies and their implementation, and (iii) it has not received a deficiency letter, negative report or any similar determination regarding its AML Policies from independent accountants, internal auditors or some other person responsible for reviewing compliance with its AML Policies.

(u) The Subscriber represents and warrants that as a result of its acquisition and holding of an Interest: (i) the assets of the Fund will not constitute the assets of any employee benefit plan subject to any U.S. federal, state, local or non-U.S. law, rule or regulations ("*Similar Law*") that is similar to, but is not, (A) the U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), or (B) Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*"); (ii) neither the General Partner nor the Investment Manager will be considered to be a fiduciary of the Subscriber under any Similar Law; and (iii) no activity of the Fund contemplated in the Private Placement Memorandum or the Partnership Agreement will violate any Similar Law.

(v) The Subscriber will promptly provide any additional documentation the General Partner or the Administrator may request in the future to the extent that the General Partner or the Administrator determines necessary in order to comply with applicable anti-money laundering laws or policies or any other applicable law.

(w) The Subscriber acknowledges that due to anti-money laundering requirements operating within their respective jurisdictions, the Fund, the General Partner, the Investment Manager and/or the Administrator (as the case may be) may require additional documentation

---

[12] The Treasury Department's Financial Crimes Enforcement Network ("*FinCEN*") issues advisories regarding countries of primary money laundering concern. FinCEN's advisories are posted at http://www.fincen.gov/pub_main.html.

before a subscription application or withdrawal request can be processed.  Please be aware that the Subscriber's failure to provide or a delay in providing any such documentation may result in a delay of the Subscriber's acceptance to the Fund, cause the Subscriber's subscription to be rejected entirely or delay the satisfaction of the Subscriber's withdrawal request, as applicable. The Fund, the General Partner, the Administrator and the Investment Manager will be held harmless and indemnified against any loss arising as a result of any such delay or rejection due to the Subscriber's failure to provide or delay in providing any such requested information.

(x)     The Subscriber acknowledges and agrees that Interests in the Fund will not be issued until such time as the General Partner and/or the Administrator has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity. Where at the sole discretion of the Fund, Interests are issued prior to the General Partner and/or Administrator having received all the information and documentation required to verify the Subscriber's identity, the Subscriber will be prohibited from withdrawing any Interests so issued, and the Fund, and the Administrator on its behalf, reserves the right to refuse to make any withdrawal payment or distribution to the Subscriber, until such time as the General Partner and/or the Administrator, as applicable, has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity.

(y)     The Subscriber agrees to provide the Fund, the General Partner and/or the Administrator, in a timely manner, any additional tax information or documentation that the General Partner or Administrator believes is required or will enable it, the Fund or any affiliate of the foregoing to comply with or mitigate any of their respective tax reporting, tax withholding, and/or tax compliance obligations, or which may arise as a result of a change in law or in the interpretation thereof.

(z)     The Subscriber agrees that the tax certifications, representations, warranties or covenants required to be provided and agreements required to be entered into hereunder will survive the acceptance and closing of this subscription and the dissolution of the Fund, without limitation as to time.  Without limiting the foregoing, the Subscriber agrees (i) to give the Fund prompt written notice in the event that any tax statement, certification, representation, warranty or other information provided by the Subscriber herein or in any document required to be provided under this Subscription Agreement (including, without limitation, any Forms W-9 and/or W-8) ceases to be true at any time following the date hereof, and (ii) from time to time to provide an updated tax statement, certification, representation, warranty or other information, as applicable.

(aa)    The Subscriber agrees that the Fund intends to be classified and taxed as a partnership for U.S. federal income tax purposes and not as a publicly-traded partnership for such purposes, and that it will not transfer any Interest in the Fund, or cause any such Interest to be marketed, on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code or a "secondary market (or the substantial equivalent thereof)" within the meaning of Section 7704(b)(2) of the Code or the U.S. Treasury regulations thereunder, including, without limitation, an over-the-counter market or an interdealer quotation system that regularly disseminates firm buy or sell quotations.

(bb)    The Subscriber understands that Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") acts as U.S. counsel to the Fund, the Strategic Master Fund, the Mining Master Fund,

the General Partner, the Investment Manager and their affiliates. The Subscriber also understands that, in connection with this offering of Interests and ongoing advice to the Fund, the Strategic Master Fund, the Mining Master Fund, the General Partner, the Investment Manager and their affiliates, Akin Gump will not be representing investors in the Fund, including the Subscriber, and no independent counsel has been retained to represent investors in the Fund. In addition, Akin Gump does not undertake to monitor the compliance of the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth in the Private Placement Memorandum, nor does Akin Gump monitor compliance with applicable laws. In preparing the Private Placement Memorandum, Akin Gump relied on information furnished to it by the Fund and/or the Investment Manager, and did not investigate or verify the accuracy or completeness of the information set forth therein concerning the Fund, the Strategic Master Fund, the Mining Master Fund, the General Partner, the Investment Manager and their affiliates and personnel.

(cc)    The Subscriber acknowledges and agrees that a number of obligations may be imposed on the Fund (or any of its affiliates) under (i) legislation known as the U.S. Foreign Account Tax Compliance Act ("*FATCA*"), Sections 1471 through 1474 of the Code and the U.S. Treasury regulations thereunder (whether proposed, temporary or final), (ii) the Common Reporting Standard issued by the Organisation for Economic Cooperation and Development, (iii) any similar automatic exchange of financial, account or tax information agreements or arrangements, and (iv) in each case, including any successor provisions, subsequent amendments, and administrative guidance promulgated thereunder (or which may be promulgated in the future), any applicable intergovernmental agreement and related statutes, regulations or rules, and other guidance thereunder, any governmental authority pursuant to the foregoing authorities, and any agreement entered into by or with respect to the Fund (or any of its affiliates) ("*AEOI*"), impose or may impose a number of obligations on the Fund (or any of its affiliates). In this regard:

(1)    The Subscriber acknowledges and agrees that the Fund and its affiliates are required to comply with the provisions of the AEOI.

(2)    The Subscriber acknowledges that, in order to comply with the AEOI and/or to avoid the imposition of U.S. federal withholding tax, the General Partner and the Fund's agents and their affiliates, including, but not limited to, the Investment Manager and the Administrator, may, from time to time, (A) require further information and/or documentation from the Subscriber, which information and/or documentation may (1) include, but will not be limited to, information and/or documentation relating to or concerning the Subscriber, the Subscriber's direct and indirect beneficial owners and/or controlling persons (if any), any such person's identity, residence (or jurisdiction of formation or tax residence) and income tax status, and (2) need to be certified by the Subscriber, and, where applicable, under penalties of perjury, and (B) provide or disclose any such information and documentation to the IRS, the Cayman Islands Tax Information Authority (or any other Cayman Islands governmental body which collects information in accordance with the relevant legislation) or other governmental authorities or agencies, or to any applicable jurisdiction in respect of the AEOI, and to certain withholding agents.

(3)     The Subscriber agrees that it will provide and/or update such information and/or documentation concerning itself and its direct and indirect beneficial owners and/or controlling persons (if any), as and when requested by the General Partner, any of the Fund's agents, as the General Partner or any of the Fund's other agents, as any such person, in its sole discretion, determine is necessary or advisable for the Fund (or any of its affiliates) to comply with its obligations under the AEOI.

(4)     The Subscriber agrees to waive any provision of law of any jurisdiction that would, absent a waiver, prevent compliance with the AEOI by the Fund or any affiliate thereof, including, but not limited to, the Subscriber's provision of any requested information and/or documentation.

(5)     The Subscriber acknowledges that, if the Subscriber provides information or documentation that is in any way misleading, or does not timely provide and/or update the requested information and/or documentation or waiver (each, a *"Tax Information Compliance Failure"*), as applicable, the General Partner may, at its sole discretion and in addition to all other remedies available at law or in equity, immediately or at such other time or times redeem or withdraw all or a portion of the Subscriber's investment, prohibit in whole or part the Subscriber from participating in additional investments and/or deduct from the Subscriber's account and retain amounts sufficient to indemnify and hold harmless the General Partner, Fund and any of the Fund's other agents (including, but not limited to, the Investment Manager and the Administrator) or any other subscriber/investor, or any partner, member, shareholder, director, manager, officer, employee, delegate, agent, affiliate, executor, heir, assign, successor or other legal representative of any of the foregoing persons, from any and all withholding taxes, interest, penalties, costs, expenses and other losses or liabilities suffered by any such person or persons on account of a Tax Information Compliance Failure; provided that the foregoing indemnity will be in addition to and supplement any other indemnity provided under this Subscription Agreement.

(6)     The Subscriber agrees to indemnify and keep indemnified the General Partner, the Fund and each of its agents and delegates and each of their respective principals, members, managers, officers, directors, stockholders, employees and agents, from and against any AEOI related liability, action, proceeding, claim, demand, costs, damages, expenses (including legal expenses) penalties or taxes whatsoever which the Fund may incur under the provisions of the AEOI as a result of any representation, action or inaction (directly or indirectly) of the Subscriber. This indemnification shall survive the Subscriber's death or disposition of its Interest.  Without prejudice to the generality of the foregoing, to the extent that the General Partner and any of the Fund's agents (including, but not limited to, the Investment Manager), or any other subscriber/investor, or any partner, member, shareholder, director, manager, officer, employee, delegate, agent, affiliate, executor, heir,

assign, successor or other legal representative of any of the foregoing persons suffers any withholding taxes, interest, penalties and/or other expenses and costs on account of the Subscriber's Tax Information Compliance Failure, (a) the Subscriber will promptly pay upon demand by or on behalf of the General Partner to the Fund or, at the General Partner's direction, to any of the foregoing persons, an amount equal to such withholding taxes, interest, penalties and other expenses and costs or (b) the General Partner may reduce the amount of the next distribution or distributions which would otherwise have been made to the Subscriber or, if such distributions are not sufficient for that purpose, reduce the proceeds of liquidation otherwise payable to the Subscriber by an amount equal to such withholding taxes, interest, penalties and other expenses and costs.

(7)     The Subscriber acknowledges that the General Partner, in consultation with the Investment Manager, will determine in its sole discretion, whether and how to comply with the AEOI, and any such determinations will include, but not be limited to, an assessment of the possible burden to Subscribers, the General Partner and the Administrator of timely collecting information and/or documentation.

(8)     The Subscriber acknowledges and agrees that it will have no claim against the General Partner, the Fund and any of the Fund's other agents (including, but not limited to, the Investment Manager and the Administrator), or any other subscriber/investor, or any partner, member, shareholder, director, manager, officer, employee, delegate, agent, affiliate, executor, heir, assign, successor or other legal representative of any of the foregoing persons, for any damages or liabilities attributable to any AEOI-related determinations pursuant to paragraph (cc)(7) above; provided that the foregoing indemnity will be in addition to and supplement any other indemnity provided under this Subscription Agreement.

(dd)     None of the Subscriber's subscription funds consist of "Proceeds of Municipal Securities" or "Municipal Escrow Investments."

(ee)     Subscriber is either (i) not a partnership, grantor trust or S corporation (or a limited liability company treated as a pass-through entity) for U.S. federal income tax purposes or, (ii) if the Subscriber is an entity referred to in clause (i), then either (x) it was not formed for the purpose of acquiring all or part of Subscriber's Interest and not more than 50% of the value of the interest of each of its beneficial owners will be attributable to the Subscriber's Interest so acquired, or (y) its principal purpose is not to permit the Fund to satisfy the 100-partner limitation in U.S. Treasury Regulations Section 1.7704-1(h)(1)(ii).

## 4.     Representations, Warranties and Covenants – ERISA Subscribers

If the Subscriber is, or is acting on behalf of, an employee benefit plan (a *"Plan"*) which is subject to ERISA or Section 4975 of the Code, to induce the Fund to accept this subscription,

the Subscriber hereby makes the following additional representations, warranties and covenants to the Fund and to the Fund's general and limited partners:

(a)    The person executing this Subscription Agreement on behalf of the Subscriber either is a "named fiduciary" (within the meaning of ERISA) of the Subscriber, or is acting on behalf of a named fiduciary of the Subscriber pursuant to a proper delegation of authority.

(b)    The person executing this Subscription Agreement on behalf of the Subscriber represents and warrants on behalf of such person or the Subscriber, as applicable, as follows:

(1)    The Subscriber is (A) an employee benefit plan subject to the fiduciary provisions of ERISA, (B) a "plan" subject to Section 4975 of the Code, (C) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA (a party described in (A), (B) or (C) a "*Plan*") or (D) any entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "*Plan Asset Entity*" and together with a Plan, an "*ERISA Investor*").

(2)    The execution and delivery of this Subscription Agreement and the consummation of the transactions contemplated hereunder, and in the Private Placement Memorandum and the Partnership Agreement will not result in a breach or violation of any charter or organizational documents pursuant to which the Subscriber was formed, or any statute, rule, regulation or order of any court or governmental agency or body having jurisdiction over the Subscriber or any of its assets, or in any material respect, any mortgage, indenture, contract, agreement or instrument to which the Subscriber is a party or otherwise subject.

(3)    The investment in the Fund is permitted by the documents of the Subscriber and such documents permit the Subscriber to invest in private investment funds that will engage in the investment program described in the Private Placement Memorandum.  The execution and delivery of this Subscription Agreement and the acquisition, holding and withdrawal of an Interest is exempt from the prohibited transaction rules of Section 406 of ERISA and Section 4975 of the Code.

(4)    This Subscription Agreement is the indicia of ownership of an Interest for purposes of Section 403(a) of ERISA, and a copy of this Subscription Agreement will be held in trust by the Subscriber's trustees.

(5)    The Subscriber through appropriate fiduciaries has carefully reviewed and understands the various risks of an investment in the Fund, as well as the fees and conflicts of interest to which the Fund is subject, including those set forth in the Private Placement Memorandum.  The Subscriber hereby consents and agrees to the payment of the fees so described to the parties identified as the recipients thereof, and to such conflicts of interest.

(c)     The Subscriber is not in any way affiliated with (*i.e.*, does not own or control, is not owned or controlled by, nor is under common ownership or control with) any person or entity which will receive compensation, directly or indirectly, from the Fund, as specifically identified and described in the Private Placement Memorandum.

(d)     The Subscriber acknowledges and agrees that the decision to invest in the Fund and the review of the terms of the Fund must be made solely and independently by a fiduciary of the Subscriber who has no affiliation with the General Partner or any of its affiliates or employees, without relying on any recommendation of the General Partner or any of its affiliates or employees as a primary basis for its decision. In addition, any ongoing evaluation of the Fund as an investment in the Subscriber's overall portfolio (including any decision to remain invested in the Fund or to make additions to or withdrawal of Interests from the Fund) must be made solely and independently by such a fiduciary, without relying on any recommendation of the Fund (or any of its affiliates or employees) as a primary basis for such fiduciary decision.

(e)     The appropriate fiduciaries of the Subscriber have considered the investment in light of the risks relating thereto and fiduciary responsibility provisions of ERISA applicable to the Subscriber and have determined that, in view of such considerations, the investment is appropriate for the Subscriber and is consistent with such fiduciaries' responsibilities under ERISA, and the appropriate fiduciaries: (i) are responsible for the Subscriber's decision to invest in the Fund, including the determination that such investment is consistent with the requirement imposed by Section 404 of ERISA that employee benefit plan investments be diversified so as to minimize the risk of large losses; (ii) are independent of the General Partner, the Investment Manager or the Fund and any of their affiliates and employees and of any person or entity that will receive compensation, whether directly or indirectly, from the Fund, as specifically identified and described in the Private Placement Memorandum; (iii) are qualified and authorized to make such investment decision; and (iv) in making such decision, have not relied on the recommendation of the General Partner or any of its affiliates or employees.

(f)     The Subscriber through the appropriate fiduciaries has been given the opportunity to discuss the Subscriber's investment in the Fund, and the structure and operation of the Fund with the General Partner and has been given all information that the Subscriber or the appropriate fiduciaries have requested and which the Subscriber or the appropriate fiduciaries deemed relevant to the Subscriber's decision to participate in the Fund.

(g)     The Subscriber is aware that if the Subscriber is an ERISA Investor or other tax-exempt entity, it may be subject to federal income tax on any unrelated business taxable income from its investment in the Fund. The Subscriber has consulted counsel to the extent it deems necessary concerning the propriety of making an investment in the Fund and the appropriateness of such an investment under ERISA and the Code, including, without limitation, with respect to an IRA, the possible risk of loss of the IRA's tax-exempt status if an investment in the Fund is found to violate the requirements of Code section 408(a)(5).

(h)     The Subscriber represents that in connection with its decision to invest in the Fund, the Subscriber is and will remain represented by a party independent of the General Partner, the Investment Manager or any of their affiliates or employees and such party (A) is described in 29 CFR §2510.3-21(c)(1)(i); (B) is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment

strategies; (C) acknowledges that none of the General Partner, Investment Manager or any of their affiliates or employees is undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the Subscriber's investment in the Fund; and (D) is acting as a fiduciary under ERISA with respect to the Subscriber's investment in the Fund and is responsible for exercising independent judgment in evaluating such investment. If the Subscriber cannot make the representations set forth above, the Subscriber must contact the Investment Manager and the subscription will not be accepted unless specifically agreed to by the Investment Manager.

5.   **Representations, Warranties and Covenants – Insurance Company General Account and Plan Asset Entity Subscribers**

(a)   If the Subscriber is acquiring an Interest with the assets of the general account of an insurance company (a "*General Account*"), the Subscriber represents, warrants and covenants that, on each day the Subscriber owns an Interest, either (i) the assets of such General Account are not considered to be plan assets within the meaning of Section 3(42) of ERISA, Department of Labor Regulations Section 2510.3-101 or Department of Labor regulations issued pursuant to Section 401(c)(1)(A) of ERISA, or (ii) the execution and delivery of this Subscription Agreement, and the acquisition and withdrawal of the Interest, is exempt from the prohibited transaction rules of Section 406(a) of ERISA and Section 4975(c)(1)(A) - (D) of the Code by virtue of Department of Labor Prohibited Transaction Class Exemption 95-60 or some other exemption of such rules.

(b)   By signing this Subscription Agreement, each Subscriber that is either a Plan Asset Entity or using the assets of a General Account hereby covenants that if, after its initial acquisition of the Interest, at any time during any calendar month the percentage of the assets of such General Account (as reasonably determined by the Subscriber) or Plan Asset Entity, as applicable, that constitute "plan assets" for purposes of Title I of ERISA or Section 4975 of the Code exceeds the maximum percentage limit specified by the Subscriber in Question 2(d) of Section III of the Subscriber Information Form, then such Subscriber will promptly notify the Fund of such occurrence and the General Partner may require the Subscriber to withdraw or dispose of all or a portion of the Interests held in such General Account or by such Plan Asset Entity, as applicable, as specified in the Partnership Agreement by the end of the next following calendar month or such other time as may be determined by the General Partner.

6.   **Indemnification**

(a)   The Subscriber understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that the subscription made hereby, if accepted by the General Partner, will be accepted in reliance thereon. The Subscriber agrees to indemnify and hold harmless the Fund, the General Partner, the Investment Manager and their affiliates, and the partners, members, managers, stockholders, other beneficial owners, officers, directors and employees of any of the foregoing (together, the "*Indemnified Persons*") from and against any and all loss, damage, liability or expense, including reasonable costs, attorneys' fees and disbursements, which an Indemnified Person may incur by reason of, or in connection with, any representation or warranty made herein (or in the accompanying Subscriber Information Form) not having been true, correct and complete when made, any misrepresentation made by the Subscriber or any failure by the

Subscriber to fulfill any of the covenants or agreements set forth herein, in the Subscriber Information Form or in any other document provided by the Subscriber to the Fund.

(b)    The Subscriber expressly consents to the General Partner, the Investment Manager or the Administrator accepting and executing any instructions transmitted in written or facsimile form (or by other electronic means) in respect of an investment in the Fund to which this application relates (including, without limitation, withdrawal requests).  If instructions are given by the Subscriber in facsimile form (or by other electronic means), the Subscriber undertakes to send the original letter of instructions to the Fund and the Administrator and hereby agrees to hold harmless and indemnify each of the Indemnified Persons, the Administrator and any of its employees and agents against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means.  Each Indemnified Person and each of the Administrator and any of its employees and agents may rely conclusively upon and will incur no liability (i) for any loss arising from the non-receipt of any instructions relating to the interests of the Subscriber delivered by facsimile or other electronic means or (ii) in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber.  Each Indemnified Person and each of the Administrator and any of its employees and agents will be allowed such amount of time to act on and implement any instructions as may be reasonable having regard to their systems and operations and any other circumstances then prevailing and will not be liable for any loss arising from any delay in acting on any instruction.

## 7.    Miscellaneous

(a)    The Subscriber agrees that neither this Subscription Agreement, nor any of the Subscriber's rights, interest or obligations hereunder, is transferable or assignable by the Subscriber, and further agrees that the transfer or assignment of any Interest acquired pursuant hereto will be made only in accordance with the provisions hereof, the Partnership Agreement and all applicable law.  Any assignment in violation of this Section 7(a) will be null and void *ab initio*.

(b)    The Subscriber agrees that, except as permitted by applicable law, it may not cancel, terminate or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder, and that this Subscription Agreement will survive the death or legal disability of the Subscriber and will be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(c)    All of the representations, warranties, tax certifications, covenants, agreements, indemnities and confirmations set out above and in the Subscriber Information Form will survive the acceptance of the subscription made herein and the issuance of any Interest and the dissolution of the Fund with no limitation as to time.

(d)    This Subscription Agreement together with the Subscriber Information Form, the Partnership Agreement and any applicable side letter agreement (a "*Side Letter*"), if any, constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.

(e)     The Subscriber hereby agrees that any representation, warranty, agreement, covenant or confirmation made hereunder will be deemed to be reaffirmed by the Subscriber at any time it makes an additional capital contribution to the Fund and the act of making such additional contribution will be evidence of such reaffirmation.

(f)     Within 10 days after receipt of a written request therefor from the Fund, the Subscriber agrees to provide such information and to execute and deliver such documents as the Fund may deem reasonably necessary to comply with any and all laws, rules, regulations, orders and ordinances to which the Fund is or may be subject.

(g)     The Subscriber agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its investment in the Fund) or disclose to any person, any information or matter relating to the Fund and its affairs and any information or matter related to any investment of the Fund (other than disclosure to the Subscriber's authorized representatives); provided that (i) the Subscriber may make such disclosure to the extent that (x) the information to be disclosed is publicly known, through no breach of confidentiality on the part of the Subscriber or any of the Subscriber's agents, at the time of proposed disclosure by the Subscriber, (y) the information otherwise is or becomes legally known to the Subscriber other than through disclosure by the Fund, or (z) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) the Subscriber may make such disclosure to its Beneficial Interest Holders to the extent required under the terms of its arrangements with such persons; and (iii) the Subscriber will be permitted, after written notice to the General Partner, to correct any false or misleading information that becomes public concerning the Subscriber's relationship to the Fund.   Prior to making any disclosure required by law, the Subscriber will use its best efforts to notify the General Partner of such disclosure.  Prior to any disclosure to any authorized representative or Beneficial Interest Holder, the Subscriber will advise such persons of the confidentiality obligations set forth herein and each such person will agree to be bound by such obligations.   Notwithstanding the foregoing, the Subscriber may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided in connection with this Subscription Agreement to the Subscriber relating to such tax treatment or tax structure; provided, however, that such disclosure shall not include the name (or other identifying information not relevant to the tax structure or tax treatment) of any person and shall not include information for which nondisclosure is reasonably necessary in order to comply with applicable securities laws.  The Subscriber acknowledges and agrees that the Fund and the General Partner would be damaged irreparably and would not have an adequate remedy at law if this Section 7(g) is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, in addition to any other remedy to which it may be entitled at law or in equity, each party will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Section 7(g) and to enforce specifically this Section 7(g), without bond or other security being required.  The rights and remedies in this Section 7(g) are cumulative and in addition to any other rights and remedies otherwise available at law or in equity.  Nothing herein will be considered an election of remedies or a waiver of the right to pursue any other right or remedy to which party may be entitled.

(h)     Except as otherwise indicated in Question 4 of Section I in Part A of the Subscriber Information Form, the Subscriber has agreed to receive and accept reports and communications indefinitely from the Fund, the Administrator and the General Partner exclusively via e-mail to the e-mail address set forth in the Subscriber Information Form or via a website for which the Fund, the Investment Manager or the Administrator will give the Subscriber a password, unless the Subscriber notifies the General Partner or the Administrator in writing that the Subscriber wishes to receive reports to either another e-mail address or alternatively, via regular mail in lieu of electronic mail. *If instructions are given by the Subscriber via e-mail, the Subscriber agrees to indemnify each Indemnified Person and each of the Administrator and any of its employees and agents against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by e-mail. Each Indemnified Person and the Administrator may rely conclusively upon and will incur no liability in respect of any loss arising from (i) the non-receipt of any instructions relating to the Interests of the Subscriber delivered via e-mail or (ii) any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber.*

(i)     If the Subscriber is subscribing for Interests as a record owner in its capacity as agent, representative or nominee on behalf of one or more Beneficial Owners, it agrees that the representations, warranties and covenants made in this Subscription Agreement are made by it on behalf of itself and the Beneficial Owner(s).

**8.**   Agreement to be a Limited Partner

Subject only to the acceptance of this Subscription Agreement by the General Partner, the Subscriber hereby joins in and agrees to be bound by the Partnership Agreement as a limited partner.

**9.**   Power of Attorney

Subject only to the acceptance of this Subscription Agreement by the General Partner, the Subscriber does hereby appoint the General Partner, acting through any of its authorized partners, members or officers, as the Subscriber's true and lawful attorney-in-fact with full power of substitution and re-substitution, to have full power and authority to act in the Subscriber's name, place and stead and on the Subscriber's behalf to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish all such instruments, documents and certificates that the General Partner considers necessary to or appropriate or advisable for the operation of the Fund as contemplated in the Partnership Agreement (the *"Power of Attorney"*).   The Power of Attorney granted hereby is a special power of attorney coupled with an interest and will be irrevocable to the fullest extent permitted by law.

The Subscriber is aware that the terms of the Partnership Agreement permit certain amendments to the Partnership Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Fund without the Subscriber's consent.

If an amendment of the Certificate of Limited Partnership of the Fund or the Partnership Agreement or any action by or with respect to the Fund is taken by the General Partner in the manner contemplated by the Partnership Agreement, the Subscriber agrees that, notwithstanding any objection that the Subscriber may assert with respect to such action, the General Partner in

its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action lawfully taken or omitted. The power of attorney granted hereby is a special power of attorney coupled with an interest sufficient in law to support an irrevocable power and will be irrevocable to the fullest extent permitted by law and will survive and not be affected by the subsequent death, disability, dissolution, termination or bankruptcy of the Subscriber and will extend to the Subscriber's successors, assigns and legal representatives.

If the undersigned is executing on behalf of an entity, the undersigned has been duly authorized by such entity to execute this Subscription Agreement, which includes this Power of Attorney, and this Subscription Agreement, together with this Power of Attorney, has been duly executed and delivered on behalf of such entity and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms. If the Subscriber is an individual, the Subscriber has the legal capacity to execute, deliver and perform the obligations contained in this Subscription Agreement, including this Power of Attorney.

The undersigned agrees to hold the General Partner harmless from any liability, damages or loss that the undersigned sustains from the General Partner's action or failure to act except to the extent such losses, liability or damages are directly caused by the gross negligence or willful misconduct of the General Partner.

**10.** Data Protection

(a) The Subscriber acknowledges that information supplied on this Subscription Agreement and otherwise in connection with the Subscriber's subscription for an Interest (collectively ***Personal Information***) may be held by the Fund, the General Partner, the Investment Manager and/or the Administrator and may be used for the purpose of:

(1) processing the Subscriber's subscription for an Interest and completion of information on the register of limited partners of the Fund; carrying out the Subscriber's instructions or responding to any enquiry purporting to be given by the Subscriber or on behalf of the Subscriber;

(2) dealing in any other matters relating to the Subscriber's holding of an Interest (including the mailing of reports or notices); and/or

(3) observing any legal, governmental or regulatory requirements of any relevant jurisdiction (including any disclosure or notification requirements to which any recipient of the data is subject).

(b) The Subscriber acknowledges and agrees that, subject to the requirements of applicable law relating to personal information, the General Partner and the Administrator may:

(1) retain Personal Information after the Subscriber has withdrawn or transferred all of its Interest and after the termination of the Fund;

(2)   maintain Personal Information on computer systems based or maintained in such places as the General Partner or Administrator determines, which may be in countries that have not enacted data protection legislation;

(3)   disclose and transfer Personal Information, by any method including electronically and/or by making available the original or a copy of the Subscription Agreement itself, to any of its employees, officers, directors, agents and/or affiliates or to any third party employed to provide administrative, computer or other services or facilities to any person to whom data is disclosed or transferred as aforesaid;

(4)   disclose Personal Information where such disclosure is required by any law or order of any court or pursuant to any direction, request or requirement (whether or not having the force of law) of any central bank or governmental or other regulatory or taxation authority; and/or

(5)   disclose and transfer Personal Information by any method, including electronically and/or by making available the original or a copy of the Subscription Agreement itself, to the General Partner, the Investment Manager and/or the professional advisors of the General Partner and/or the Investment Manager.

## 11.   Notices

Any notice required or permitted to be given to the Subscriber in relation to the Fund will be sent to the email address specified in Part A, Section I of the Subscriber Information Form or to such other address as the Subscriber designates by written notice received by the General Partner.

## 12.   Governing Law

This Subscription Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any conflict of law principles that would result in the application of the laws of any other jurisdiction.

[Signature Pages Follow]

## SIGNATURE PAGE

(Complete and sign)

By signing below, the Subscriber (1) confirms that the information contained in the Subscriber Information Form is accurate and complete, (2) agrees to the terms of this Subscription Agreement, the Partnership Agreement and, if applicable, any Side Letter (3) requests that the records of the Fund reflect the Subscriber's admission as a limited partner.

If the Subscriber is an individual retirement account, Keogh Plan or other self-directed plan, the custodian or trustee of such account or plan must execute this Subscription Agreement below.

The Subscriber is subscribing for which class of Interest:

☐ Class A Interest
☒ Class B Interest

Dated: 1/5 , 20 18

**AMOUNT OF SUBSCRIPTION**

$ 1,000,000.⁰⁰

_KDH Consulting Group LLC_
Name of Subscriber

_Anthony D. Raf_
Subscriber's Signature

_ANTHONY DEGRADI_

_MANAGING MEMBER_
Name and title or representative capacity, if applicable

Dated:_____, 20___

_____
Name of Subscriber's Spouse
(*if a natural person and purchasing jointly*)

_____
Signature of Spouse
(*if a natural person and purchasing jointly*)

_____
Name of custodian or trustee

_____
Signature
Title: _____

If the Subscriber is a custodian or trustee acting for an individual retirement account or other self-directed retirement plan, the beneficial owner of the individual retirement account or other self-directed retirement plan is required to execute the page titled "Additional Representation with respect to Investments by an IRA or Self-Directed Pension Plan".

The Subscriber's subscription is accepted, subject to the provisions of the Subscription Agreement, the Partnership Agreement and, if applicable, any Side Letter.

Iterative Capital GP, L.L.C., General Partner

By: _____
Name: Brandon Buchanan
Title:  Manager

Dated: January 12 , 20 18

## SIGNATURE PAGE

(Complete and sign)

By signing below, the Subscriber (1) confirms that the information contained in the Subscriber Information Form is accurate and complete, (2) agrees to the terms of this Subscription Agreement, the Partnership Agreement and, if applicable, any Side Letter (3) requests that the records of the Fund reflect the Subscriber's admission as a limited partner.

If the Subscriber is an individual retirement account, Keogh Plan or other self-directed plan, the custodian or trustee of such account or plan must execute this Subscription Agreement below.

The Subscriber is subscribing for which class of Interest:

☐ Class A Interest
☒ Class B Interest

Dated: *1/5*, 20*18*

**AMOUNT OF SUBSCRIPTION**

$ *1,000,000.00*

*KDN Consulting Group LLC*

_____
Name of Subscriber's Spouse
(*if a natural person and purchasing jointly*)

Name of Subscriber

_____
Signature of Spouse
(*if a natural person and purchasing jointly*)

Subscriber's Signature

*Anthony DeGrmi*
*managing member*
Name and title or representative capacity, if applicable

Dated:_____, 20___

_____
Name of custodian or trustee

_____
Signature
Title: _____

If the Subscriber is a custodian or trustee acting for an individual retirement account or other self-directed retirement plan, the beneficial owner of the individual retirement account or other self-directed retirement plan is required to execute the page titled "Additional Representation with respect to Investments by an IRA or Self-Directed Pension Plan".

The Subscriber's subscription is accepted, subject to the provisions of the Subscription Agreement, the Partnership Agreement and, if applicable, any Side Letter.

Iterative Capital GP, L.L.C., General Partner

By:
Name:  Brandon Buchanan
Title:   Manager

Dated: January 12 , 2018

Iterative Capital, L.P.—Signature Page

## ADDITIONAL REPRESENTATION WITH RESPECT TO
## INVESTMENTS BY AN IRA OR SELF-DIRECTED PENSION PLAN

If the Subscriber is an IRA or self-directed pension plan, the individual who established the IRA or the individual who directed the pension plan's investment in the Fund, as the case may be, the "*Fiduciary*": (i) has directed the custodian or trustee of the Subscriber to execute this Subscription Agreement on the line set forth above for authorized signatory; and (ii) has signed below to indicate that he or she has reviewed, directed and certifies to the accuracy of the representation and warranties made by the Subscriber herein.

_____

Name

_____

Signature

Name and Address of Custodian
and Contact Individual:

_____

_____

_____

Account Number or other Reference Number:

_____

Custodian's Tax I.D. Number:

_____

Additional Representations

## APPENDIX A

### DEFINITIONS

Beneficial Interest Holder: A holder of any beneficial interest in an Interest.

Close Associate: With respect to a Senior Foreign Political Figure, a person who is widely and publicly known internationally to maintain an unusually close relationship with the Senior Foreign Political Figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the Senior Foreign Political Figure.

FATF: The Financial Action Task Force on Money Laundering.

Foreign Bank: An organization that (a) is organized under the laws of a country outside the United States; (b) engages in the business of banking; (c) is recognized as a bank by the bank supervisory or monetary authority of the country of its organization or principal banking operations; (d) receives deposits to a substantial extent in the regular course of its business; and (e) has the power to accept demand deposits, but does not include the U.S. branches or agencies of a foreign bank.

Foreign Shell Bank: A Foreign Bank without a Physical Presence in any country, but does not include a Regulated Affiliate.

Government Entity: Any government or any state, department or other political subdivision thereof, or any governmental body, agency, authority or instrumentality in any jurisdiction exercising executive, legislative, regulatory or administrative functions of or pertaining to government.

Immediate Family: With respect to a Senior Foreign Political Figure, typically includes the political figure's parents, siblings, spouse, children and in-laws.

Municipal Entity: Any state, a political subdivision thereof or  municipal corporate instrumentality of the above, including (a) any agency, authority or instrumentality of the above, (b) any plan, program or pool of assets sponsored or established by the above and (c) any other issuer of municipal securities.

Municipal Escrow Investments: Proceeds of municipal securities and any other funds of a Municipal Entity or obligated person, such as a guarantor, that are deposited in an escrow account to pay the principal of, premium, if any, and interest on one or more issues of municipal securities.

Non-Cooperative Jurisdiction: Any foreign country or territory that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as FATF, of which the United States is a member and with which designation the United States representative to the group or organization continues to concur.  For FATF's list of non-cooperative countries and territories, see http://www.fatf-gafi.org/countries/#high-risk.

Physical Presence: A place of business that is maintained by a Foreign Bank and is located at a fixed address, other than solely a post office box or an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities, at which location the Foreign Bank: (a) employs one or more individuals on a full-time basis, (b) maintains operating records related to its

banking activities and (c) is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities.

Proceeds of Municipal Securities: Any of the following: (a) monies derived by a Municipal Entity from the sale of municipal securities; (b) investment income derived from the investment or reinvestment of the monies in (a); (c) any monies of a Municipal Entity or obligated person, such as a guarantor, held in funds under legal documents for the municipal securities that are reasonably expected to be used as security or a source of payment for the payment of the debt service on the municipal securities, including, reserves, sinking funds, and pledge funds created for such purposes and (d) the investment income derived from the investment or reinvestment of monies in such funds.

Publicly Traded Company: An entity whose securities are listed on a recognized securities exchange or quoted on an automated quotation system in the U.S. or country other than a Non-Cooperative Jurisdiction or a wholly-owned subsidiary of such an entity.

Qualified Plan: A tax qualified pension or retirement plan in which at least 100 employees participate that is maintained by an employer that is organized in the U.S. or is a U.S. Government Entity.

Regulated Affiliate: A Foreign Shell Bank that: (a) is an affiliate of a depository institution, credit union, or Foreign Bank that maintains a Physical Presence in the U.S. or a foreign country, as applicable; and (b) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or Foreign Bank.

Related Person: With respect to any entity, interest holder, director, senior officer, trustee, beneficiary or grantor of such entity; provided that, in the case of an entity that is a Publicly Traded Company or a Qualified Plan, the term *"Related Person"* will exclude any interest holder holding less than 5% of any class of securities of such Publicly Traded Company and beneficiaries of such Qualified Plan.

Senior Foreign Political Figure: A current or former senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, a senior executive of a non-U.S. government-owned corporation or other persons entrusted with prominent public functions. In addition, a Senior Foreign Political Figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a Senior Foreign Political Figure.

USA PATRIOT Act: The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (Pub. L. No. 107-56).