*Execution Version*

# Iterative Capital, L.P.

A Delaware Limited Partnership

Amended and Restated Limited Partnership Agreement

**January 12, 2018**

NOTICE

NEITHER ITERATIVE CAPITAL, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY FOREIGN JURISDICTION.  THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF INTERESTS IN ITERATIVE CAPITAL, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE OR FOREIGN SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT.

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ................................................................................................. 1

Article II ORGANIZATION ........................................................................................ 10
    **2.1**    Continuation of Limited Partnership .............................................. 10
    **2.2**    Name of Partnership ...................................................................... 11
    **2.3**    Principal Office; Registered Office ................................................ 11
    **2.4**    Term of Partnership ....................................................................... 12
    **2.5**    Object and Powers of Partnership ................................................. 12
    **2.6**    Liability of Partners ....................................................................... 12
    **2.7**    Actions by Partnership ................................................................... 12
    **2.8**    Reliance by Third Parties ............................................................... 12
    **2.9**    UCC Status of Limited Partner Interests ...................................... 12
    **2.10**   Classes and Series of Interests ...................................................... 13

Article III CAPITAL ................................................................................................... 13
    **3.1**    Contributions to Capital ................................................................ 13
    **3.2**    Rights of Partners in Capital ......................................................... 14
    **3.3**    Capital Accounts ........................................................................... 14
    **3.4**    Allocations of Net Profit and Net Loss .......................................... 15
    **3.5**    Allocation of Management Fees, Withholding Taxes and Certain Other
            Expenditures ................................................................................. 16
    **3.6**    Reserves; Adjustments for Certain Future Events ......................... 18
    **3.7**    Performance Allocation ................................................................. 18
    **3.8**    Limited Participation Investments ................................................. 19
    **3.9**    Allocation to Avoid Capital Account Deficits ............................... 19
    **3.10**   Special Situation Investment Sub-Accounts .................................. 19
    **3.11**   Regulatory Allocations .................................................................. 21
    **3.12**   Allocations for Income Tax Purposes ........................................... 22
    **3.13**   Individual Partner's Tax Treatment ............................................... 24
    **3.14**   Distributions .................................................................................. 24
    **3.15**   Co-Investments ............................................................................. 24

Article IV MANAGEMENT ........................................................................................ 25
    **4.1**    Duties and Powers of the General Partner ..................................... 25
    **4.2**    Expenses ........................................................................................ 26
    **4.3**    Rights of Limited Partners ............................................................. 29
    **4.4**    Other Activities of Partners ........................................................... 29
    **4.5**    Exculpation; Indemnification ......................................................... 30

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ............................. 32
    **5.1**    Admission of Limited Partners ...................................................... 32
    **5.2**    Admission of Additional General Partners .................................... 32
    **5.3**    Transfer of Interests of Limited Partners ...................................... 32
    **5.4**    Transfer of Interest of the General Partner .................................... 33
    **5.5**    Withdrawal of Interests of Partners ............................................... 33

**5.6**   Withdrawal of Original Limited Partner ................................................................ 38

Article VI DISSOLUTION AND LIQUIDATION .......................................................... 38
**6.1**   Dissolution of Partnership ........................................................................... 38
**6.2**   Liquidation of Assets .................................................................................. 38

Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS ......................... 39
**7.1**   Accounting and Reports ............................................................................. 39
**7.2**   Certain Tax Matters .................................................................................... 40
**7.3**   Valuation of Partnership Assets and Interests ................................................ 41
**7.4**   Determinations by the General Partner ......................................................... 42
**7.5**   Books and Records ..................................................................................... 42
**7.6**   Confidentiality ........................................................................................... 43

Article VIII GENERAL PROVISIONS .......................................................................... 44
**8.1**   Amendment of Partnership Agreement ......................................................... 44
**8.2**   Special Power-of-Attorney ......................................................................... 46
**8.3**   Notices ...................................................................................................... 47
**8.4**   Agreement Binding Upon Successors and Assigns; Delegation ....................... 48
**8.5**   Governing Law ........................................................................................... 48
**8.6**   Not for Benefit of Creditors ....................................................................... 48
**8.7**   Consents and Voting ................................................................................... 48
**8.8**   Merger and Consolidation ........................................................................... 48
**8.9**   BHCA Subject Persons ............................................................................... 49
**8.10**   Interpretation of Partnership Accounting Systems and Terminology ................. 50
**8.11**   Survival ..................................................................................................... 50
**8.12**   RIC Limited Partners ................................................................................. 50
**8.13**   Bad Actor Limited Partners ........................................................................ 50
**8.14**   Miscellaneous ............................................................................................ 51
**8.15**   Entire Agreement ....................................................................................... 51

THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Iterative Capital, L.P. is dated effective as of January 12, 2018, by and among Iterative Capital GP, L.L.C., as General Partner, Brandon Buchanan, as withdrawing Original Limited Partner, and those Persons who are admitted as Limited Partners in accordance with this Agreement. Capitalized terms have the meanings set forth in Article I below.

PRELIMINARY STATEMENTS

(A)     The General Partner and the Original Limited Partner formed this limited partnership under the Act by entering into the Prior Agreement and causing the Certificate to be filed with the Secretary of State of the State of Delaware.

(B)     The parties hereto desire to continue the Partnership as a limited partnership under the Act and to make certain modifications to the Prior Agreement, as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the Prior Agreement is amended and restated in its entirety to read as follows:

**Article I**
**DEFINITIONS**

For purposes of this Agreement:

"***Accounting Period***" means each period that starts on the day immediately following the last day of the preceding Accounting Period, and that ends on the earliest of the following dates:

(a)     the last day of a calendar quarter;

(b)     any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)     the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner;

(d)     the date of a disposition or other Recognition Event with respect to a Special Situation Investment; or

(e)     any other date which the General Partner selects.

"***Act***" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as in effect on the date hereof and as amended from time to time, or any successor law.

"*Advisers Act*" means the U.S. Investment Advisers Act of 1940, as amended, and the rules promulgated thereunder.

"*Affiliate*" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person.  For these purposes, "control" (including "controlled by" and "under common control") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Affiliated Investor*" means the General Partner, the Principals and Limited Partners affiliated with the General Partner or the Investment Manager, including their respective employees, members or partners and their respective immediate family members.

"*Agreement*" means this Amended and Restated Limited Partnership Agreement of the Partnership, as amended from time to time.

"*Allocation SLPs*" means, with respect to each Master Fund, the General Partner, any sub-advisors engaged by the Investment Manager (in its capacity as the investment manager of such Master Fund) to manage a portion of such Master Fund's portfolio of Investments and any other Person designated by the General Partner or the Investment Manager, each of which is a special limited partner of such Master Fund for purposes of the receipt of a portion of the Performance Allocation allocable with respect to such Master Fund.

"*Authorized Representative*" has the meaning set forth in Section 7.6(a).

"*Bad Actor Limited Partner*" means a Limited Partner that (a) would cause the disqualification of the Partnership from using Rule 506 under the Securities Act due to the operation of paragraph (d) thereof (or its successor) if such Limited Partner were to beneficially own 20% or more of the outstanding voting interests of all of the Partners (excluding any other Interests that are Non-Voting Interests) or (b) the General Partner determines is likely to become subject to a conviction, order, judgment or finding that would be likely to cause the disqualification described in clause (a).

"*BBA*" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"*BBA Effective Period*" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in the Bipartisan Budget Act Section 1101(g)(1), as applicable, or in any other BBA guidance.

"*BHCA*" means the U.S. Bank Holding Company Act of 1956, as amended.

"*BHCA Subject Person*" means any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

2

"***Business Day***" means any day other than (a) Saturday and Sunday and (b) any other day on which banks located in New York, New York, Los Angeles, California or the Cayman Islands are required or authorized by law to be closed.

"***Capital Account***" means, with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 3.3.

"***Capital Sub-Account***" means, with respect to each Investor and each Master Fund, a separate capital sub-account within the Partnership's or the Offshore Fund's (or any Other Feeder Fund's) capital account, as applicable, in such Master Fund that corresponds to (a) a Class of Interests held by such Investor in the Partnership with respect to which an investment in such Master Fund has been made (to the extent of such investment), or (b) a class (or sub-class, to the extent applicable) of shares held by such Investor in the Offshore Fund with respect to which an investment in such Master Fund has been made (to the extent of such investment) (or a class of interests or a class (or sub-class to the extent applicable) of shares, as applicable, held by such Investor in an Other Feeder Fund), as applicable; provided that, for purposes of clarity, each Master Fund will maintain a separate Capital Sub-Account for each Class of Interests held by a Partner.

"***Cash Equivalents***" means (a) securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States of America is pledged in support thereof), (b) time deposits and certificates of deposit of any domestic commercial bank (including a domestic branch of a foreign bank) having capital and surplus in excess of $500,000,000 and having a long-term debt rating of at least A- by Standard & Poor's Corporation or A3 by Moody's Investors Service, Inc., (c) repurchase obligations with a term of not more than 7 days for underlying securities of the types described in clause (a) entered into with any bank meeting the qualifications specified in clause (b) above, and (d) commercial paper rated at least A-1 or the equivalent thereof by Standard & Poor's Corporation or at least P-1 or the equivalent thereof by Moody's Investors Service, Inc. and in each case maturing within 30 days after the date of acquisition.

"***Certificate***" means the Certificate of Limited Partnership of the Partnership referred to in Section 2.1(b).

"***Class A Interest***" means a Class of Interests having the rights and obligations applicable to Class A Interests as set forth in this Agreement and which correspond to the "Class A Capital Sub-Accounts" of each Master Fund with respect to which an investment in such Master Fund has been made (to the extent of such investment).

"***Class B Interest***" means a Class of Interests having the rights and obligations applicable to Class B Interests as set forth in this Agreement and which correspond to the "Class B Capital Sub-Accounts" of each Master Fund with respect to which an investment in such Master Fund has been made (to the extent of such investment).

"***Class of Interest***" means a class of Interests set forth in this Agreement and having such rights and obligations as the General Partner determines.  The Partnership currently has two Classes of Interests: Class A Interests and Class B Interests.

"***Co-Investment Expenses***" has the meaning set forth in Section 3.15(b).

"***Co-Investment Vehicle***" has the meaning set forth in Section 3.15(a).

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended or may be hereafter amended, or any successor law.

"***Commencement Date***" means the first date on or as of which a Limited Partner, other than the Original Limited Partner, makes a capital contribution to the Partnership.

"***Early Withdrawal Reduction***" has the meaning set forth in Section 5.5(b)(ix).

"***Election Notice***" has the meaning set forth in Section 8.9(c).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations thereunder in effect from time to time.

"***FATCA***" means legislation known as the U.S. Foreign Account Tax Compliance Act, Sections 1471 through 1474 of the Code and any Regulations thereunder, including any subsequent amendments, and administrative guidance promulgated thereunder (or which may be promulgated in the future), any applicable intergovernmental agreements and related statutes, regulations or rules and other guidance thereunder, any governmental authority pursuant to the foregoing authorities, and any agreement entered into with respect thereto.

"***Fiscal Year***" means the period commencing on the Commencement Date and ending on December 31 of the year in which such Commencement Date occurred, and thereafter, each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner elects another fiscal year; underlined provided that any such other fiscal year is permissible for U.S. federal income tax purposes.  In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "***Fiscal Year***" means the portion of the calendar year ending on the date on which the Partnership is terminated.

"***GAAP***" means generally accepted accounting principles in the United States, as amended.

"***General Partner***" means Iterative Capital GP, L.L.C., a Delaware limited liability company, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"***Indemnified Person***" has the meaning set forth in Section 4.5(a).

"***Interest***" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to

4

comply with all the terms and provisions of this Agreement and, for clarity, is cumulative of such Partner's interests in all Classes of Interests, to the extent such Partner has an interest in more than one Class of Interests.

"***Investment Company Act***" means the U.S. Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

"***Investment Management Agreement***" means the investment management agreement by and among the Investment Manager, the General Partner, the Partnership, the Master Funds and the Offshore Fund, as amended from time to time.

"***Investment Manager***" means Iterative Capital Management, L.P., a Delaware limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"***Investments***" means investments in cryptocurrencies and network tokens, as well as in mining operations and equipment relating to the generation thereof made by the Master Funds as described in the Partnership's offering memorandum.

"***Investor***" means any Partner, shareholder of the Offshore Fund or beneficial owner of any Other Feeder Fund.

"***Limited Partner***" means any Person admitted to the Partnership as a limited partner, until the entire Interest of such Person has been withdrawn or a substitute Limited Partner or Limited Partners are admitted with respect to such Person's entire Interest.  For all purposes of the Act, the Limited Partners constitute a single class or group of limited partners.

"***Majority-in-Interest of Limited Partners***" means Limited Partners whose Ownership Percentages represent more than 50% of the aggregate Ownership Percentages of all Limited Partners or the class or series of Limited Partners, as applicable.

"***Management Fee***" has the meaning set forth in each Master Fund Partnership Agreement.

"***Master Fund Partnership Agreements***" means the Amended and Restated Exempted Limited Partnership Agreement of Iterative Capital Master, L.P., the Amended and Restated Limited Partnership Agreement of Iterative Mining Master, L.P., and each limited partnership agreement or other operating agreement, as applicable, governing each other Master Fund, in each case as the same may be amended or restated from time to time in accordance with the terms thereof.

"***Master Funds***" means Iterative Capital Master, L.P., a Cayman Islands exempted limited partnership, Iterative Mining Master, L.P., a Delaware limited partnership, and any other collective investment vehicle(s) in which the Partnership and the Offshore Fund (and any Other Feeder Fund(s)) directly or indirectly place their assets and conduct their investment and trading activities.

"***Master Ownership Percentage***" means, with respect to each Master Fund, a percentage established for each Capital Sub-Account of an Investor in such Master Fund determined by dividing the amount of such Capital Sub-Account at any time (exclusive of any Special Situation Investment Sub-Accounts associated with such Capital Sub-Account) by the sum of all Capital Sub-Accounts of Investors in such Master Fund as of the same time (exclusive of all Special Situation Investment Sub-Accounts in such Master Fund).  Notwithstanding the foregoing, if a section of this Agreement refers to a specific date for the calculation of the Master Ownership Percentage with respect to a particular Master Fund, the Master Ownership Percentage with respect to such Master Fund will, for the purposes of that section, be calculated as of such date. The sum of the Master Ownership Percentages of all Capital Sub-Accounts in a Master Fund must equal 100% at any given time.

"***Negative Basis***" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

"***Negative Basis Partner***" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the Withdrawal Date, but such Partner will cease to be a Negative Basis Partner at such time as it has received allocations pursuant to Section 3.12(d) equal to such Partner's Negative Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"***Net Assets***" means the total value, as determined by the Investment Manager in accordance with Section 7.3, of all Investments and other assets of the Partnership other than any amounts recorded in a Special Situation Investment Sub-Account (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6 but not including any amounts recorded in a Special Situation Investment Sub-Account).  Except as otherwise expressly provided herein, Net Assets as of the first day of any Accounting Period are determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Accounting Period, but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Accounting Period, and after giving effect to any Management Fee charges (borne indirectly at the level of the Master Funds), and Net Assets as of the last day of any Accounting Period are determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

      (a)     any Performance Allocations (borne indirectly at the level of the Master Funds) as of the date on which such determination is made;

      (b)     any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c)      withholding or other taxes (including any amounts payable under any BBA provision), expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdbacks or other amounts recorded pursuant to Section 3.6 and any increases or decreases in the value of amounts specially allocated pursuant to Section 3.8 during the Accounting Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Accounting Period.

"*Net Loss*" means any amount by which the Net Assets as of the first day of an Accounting Period exceed the Net Assets as of the last day of the same Accounting Period.

"*Net Profit*" means any amount by which the Net Assets as of the last day of an Accounting Period exceed the Net Assets as of the first day of the same Accounting Period.

"*Nonrecourse Deductions*" has the meaning set forth in Regulations Section 1.704-2(b)(1) and (c).

"*Non-Voting Interest*" means an Interest, the holder of which is not entitled to vote, consent or withhold consent with respect to any Partnership matter (including, but not limited to, mergers, sales of substantially all assets or consolidations of the Partnership), except as otherwise expressly provided in this Agreement.

"*Offshore Fund*" means Iterative Capital, Ltd., a Cayman Islands exempted company that invests in parallel with the Partnership in the Master Funds.

"*Original Limited Partner*" means Brandon Buchanan.

"*Other Account*" means existing and future investment vehicles and separate accounts advised or managed by the Investment Manager, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"*Other Feeder Fund*" means any other investment vehicle sponsored by the Investment Manager or one of its Affiliates that invests in parallel with the Partnership and the Offshore Fund in the Master Funds.

"*Ownership Percentage*" of a Partner at any date means the percentage computed by dividing that Partner's Capital Account balance (including the value of any Special Situation Investment Sub-Accounts in any Master Fund) at that date by the aggregate of all Partners' Capital Account balances (including the value of any Special Situation Investment Sub-Accounts in any Master Fund) at that date, except as described in Sections 8.9, 8.12 and 8.13.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "*Partners*" means the General Partner and all of the Limited Partners.

"***Partnership***" means the limited partnership governed by this Agreement.

"***Partnership Minimum Gain***" has the meaning set forth in Regulations Section 1.704-2(b)(2) and (d).

"***Partnership Percentage***" means a percentage established for each Partner on the Partnership's books as of the first day of each Accounting Period.  The Partnership Percentage of a Partner for an Accounting Period is determined by dividing the amount of such Partner's Capital Account as of the beginning of the Accounting Period (excluding the value of any Special Situation Investment Sub-Accounts) by the sum of the Capital Accounts of all of the Partners as of the beginning of the Accounting Period (excluding the value of any Special Situation Investment Sub-Accounts).  The numerator and denominator of the above are calculated after crediting all capital contributions to the Capital Account or Partnership, as appropriate, which are effective as of such date, net of all deductions, including Management Fees (borne indirectly at the level of the Master Funds).  The sum of the Partnership Percentages of all Capital Accounts for each Accounting Period must equal 100%.

"***Performance Allocation***" means, with respect to each Master Fund, the performance allocation, as defined in the relevant Master Fund Partnership Agreement, allocable to the Allocation SLPs of such Master Fund pursuant to such Master Fund Partnership Agreement.

"***Person***" means any individual, partnership, corporation, limited liability company, trust or other entity or any government (including a governmental agency or political subdivision thereof).

"***Positive Basis***" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest).

"***Positive Basis Partner***" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the Withdrawal Date, but such Partner ceases to be a Positive Basis Partner at such time as it has received allocations pursuant to Section 3.12(c) equal to such Partner's Positive Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"***Post Reserve Fee***" has the meaning set forth in Section 3.5(a)(ii).

"***Principals***" means Christopher Dannen and Brandon Buchanan.

"***Prior Agreement***" means the limited partnership agreement of the Partnership dated September 1, 2017.

"***Recognition Event***" means, in part or in whole with respect to a Special Situation Investment made by a Master Fund, any of the following: (a) a sale of such Special Situation Investment for cash; (b) an exchange of such Special Situation Investment for marketable securities; (c) an in-kind distribution of such Special Situation Investment to partners of such

Master Fund; (d) at the discretion of the General Partner and if market quotations have become readily available, the occurrence of all events necessary to permit such Master Fund to make unrestricted public resales of such Special Situation Investment in the principal market for which such quotations are available; (e) a determination that the circumstances which resulted in classification as a Special Situation Investment no longer exist; and (f) the liquidation of such Master Fund's assets pursuant to the winding up and dissolution of such Master Fund.

"***Regulations***" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"***Regulatory Allocations***" has the meaning set forth in Section 3.11(d).

"***Revocation Notice***" has the meaning set forth in Section 8.9(c).

"***RIC Limited Partner***" means a Limited Partner that is registered as an investment company under the Investment Company Act.

"***Schedule of Partners***" means a schedule to be maintained by the General Partner containing the following information with respect to each Partner: (a) name; (b) address; (c) date of admission; (d) amount and date of all capital contributions and withdrawals; and (e) the amount and date of any permitted Transfers.

"***Securities Act***" means the U.S. Securities act of 1933, as amended from time to time.

"***Special Situation Investment***" means an Investment held by a Master Fund (including any corresponding Investments held by such Master Fund used to hedge other Investments held by such Master Fund) designated as such by the General Partner (as the general partner of such Master Fund), either at the time of the acquisition or a later date, by reason of being subject to legal or contractual restrictions in transferability or being subject to other special considerations that, in the opinion of the General Partner, restrict the ability of such Master Fund to dispose of such Investment in conventional market transactions without impairing the value of such Investment until the occurrence of a Recognition Event with respect thereto.

"***Special Situation Investment Sub-Accounts***" means memorandum accounts to be maintained in the accounting records of the Partnership and the Offshore Fund (and any Other Feeder Fund) on an Investor-by-Investor basis with respect to each particular Special Situation Investment to reflect the entitlement of each Capital Sub-Account of an Investor in the relevant Master Fund (other than a Partner who does not have any credit balance in its Capital Sub-Account in such Master Fund at the time of the establishment of such Special Situation Investment Sub-Account that is unrelated to a pre-existing Special Situation Investment Sub-Account held by such Master Fund) to allocations and distributions attributable to such Master Fund's transactions involving such Special Situation Investment.

"***Specialist***" has the meaning set forth in the definition of "***Specialist Expenses***" below.

"***Specialist Expenses***" means compensation, which may include asset-based and performance-based compensation, paid to third-party management teams, operators, management companies, servicers, servicing organizations or other managers engaged to

manage, advise or provide other services with respect to the making and management of certain Investments, either directly or through a portfolio vehicle set up for such purposes, who are compensated for such services (any such third party, a "*Specialist*").  The term "Specialist Expenses" may also include any expenses related to the indemnification of Specialists for liabilities incurred in connection with their services to the relevant Master Fund(s) on terms to be negotiated by the Investment Manager.

"*Sub-Advisor Expenses*" means expenses related to the indemnification of one or more sub-advisors engaged by the Investment Manager (in its capacity as the investment manager of each Master Fund) for liabilities incurred in connection with their services to one or more Master Funds on terms to be negotiated by the Investment Manager, together with any other fees paid to such sub-advisors.

"*Suspension*" has the meaning set forth in Section 5.5(c).

"*Transfer*" means any direct, indirect or synthetic sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

"*Withdrawal Date*" has the meaning set forth in Section 5.5(b) or any other effective date of withdrawal pursuant to Section 5.5.

## Article II
## ORGANIZATION

### 2.1   Continuation of Limited Partnership

(a)   The General Partner and the Original Limited Partner hereby agree to continue the Partnership as a limited partnership under and pursuant to the Act and this Agreement.

(b)   The General Partner has executed and filed with the Secretary of State of the State of Delaware the Certificate, and must execute, acknowledge and file with the Secretary of State of the State of Delaware any amendments thereto as may be required by the Act, and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership.  The General Partner must cause any required amendment to the Certificate to be filed promptly following the event requiring such amendment.  All amendments may be signed by the General Partner (as required by the Act) and may be signed either personally or by an attorney-in-fact.

(c)     The parties hereto agree to operate the Partnership as a limited partnership pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Limited Partners and the General Partner are as provided in the Act, for limited partners and the general partner except as provided herein.

(d)     The parties hereto acknowledge and agree that the Partnership will be classified as a "partnership" and not as an association taxable as a corporation for U.S. federal income tax purposes.  No election may be made by the Partners or the Partnership to treat the Partnership as other than a "partnership" for U.S. federal, state and/or local income tax purposes and, to the extent necessary, the Partners or the Partnership must make any election to treat the Partnership as such.  The Partners must treat the Partnership consistently with its status as a "partnership" for U.S. federal income tax purposes and agree to undertake any further action which is necessary to treat the Partnership as such, and will not undertake any action that is inconsistent with the Partnership's status as a "partnership" for U.S. federal income tax purposes.

(e)     The General Partner may change the domicile of the Partnership to another state, country or other jurisdiction where advisable due to legal, tax or other considerations; <u>provided</u> that no such change of domicile would reasonably be expected to have a material adverse effect on the Limited Partners.

**2.2**     **Name of Partnership**

(a)     The name of the Partnership is Iterative Capital, L.P. or such other name as the General Partner may hereafter adopt, subject to causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware in accordance with the Act.  The General Partner will send a notice of any change of name to the Limited Partners.  All business of the Partnership must be conducted under such name or under such other name as the General Partner deems appropriate.

(b)     The Partnership has the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's termination or at such time as there ceases to be a general partner, the Partnership will assign the name and the goodwill attached thereto to the General Partner or one of its Affiliates without payment by the assignee(s) of any consideration therefor.

**2.3**     **Principal Office; Registered Office**

(a)     The Partnership's principal office is at such location as the General Partner may designate from time to time.

(b)     The registered office and registered agent of the Partnership is as specified in the Certificate.  The General Partner may from time to time change the registered

office of the Partnership to such other place, or change the registered agent of the Partnership to such other Person, as the General Partner deems appropriate.

**2.4     Term of Partnership**

The term of the Partnership commenced on the date on which the Certificate was filed with the Secretary of State of the State of Delaware and continues until the Partnership is dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1). The legal existence of the Partnership as a separate legal entity continues until the cancellation of the Certificate.

**2.5     Object and Powers of Partnership**

(a)     The Partnership is formed solely for the object and purpose of indirectly investing in Investments by directly or indirectly subscribing for and holding a limited partner interest in, and investing all of its investible assets in, the Master Funds. Notwithstanding any other provision of this Agreement, the Partnership will perform no other business and will not directly make any Investments as such Investments will be made by the Master Funds.

(b)     The Partnership possesses and may exercise all such powers and privileges as the General Partner considers necessary, convenient or incidental to the conduct, promotion or attainment of the aforesaid purpose of the Partnership.

**2.6     Liability of Partners**

In no event will any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any liability for the repayment or discharge of the debts and obligations of the Partnership, except to the extent provided herein or as required by the Act or other applicable law.

**2.7     Actions by Partnership**

The General Partner, on behalf of the Partnership, may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects.

**2.8     Reliance by Third Parties**

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

**2.9     UCC Status of Limited Partner Interests**

(a)     For purposes of the grant, pledge, attachment or perfection of a security interest in an Interest or otherwise, the Interests are deemed to be "securities" within the meaning of Section 8-102(a)(15) and as provided by Section 8-103(c) of the

Uniform Commercial Code as in effect from time to time in the State of Delaware or analogous provisions in the Uniform Commercial Code in effect in any other jurisdiction.

(b)     Any Interest may be evidenced by a certificate of partnership interest issued by the Partnership in such form as the General Partner may approve. Every certificate representing an Interest must bear a legend substantially in the following form:

"For the purposes of Section 8-103 of the Uniform Commercial Code of the United States of America in effect in any relevant jurisdiction, the certificates representing an interest in the Limited Partnership constitute "securities" within the meaning of Section 8-102 and Section 8-103 of the Uniform Commercial Code."

**2.10    Classes and Series of Interests**

The General Partner may, at any time, without notification to or consent of the other Limited Partners, create and offer different classes or series of Interests with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such class or series; provided that such class or series would not reasonably be expected to have a material adverse effect on the existing Limited Partners. The terms and rights of such class or series may be set forth in the Partnership's offering memorandum, a supplement thereto or a "side letter" or other agreement, which the General Partner may incorporate by reference. As of the effective date of this Agreement, the Partnership has two Classes of Interests: Class A Interests and Class B Interests.

**Article III**
**CAPITAL**

**3.1    Contributions to Capital**

(a)     The minimum required initial capital contribution with respect to a Class A Interest is $5,000,000, and the minimum required initial capital contribution with respect to a Class B Interest is $250,000. Notwithstanding the foregoing, the General Partner may change the required minimum initial contribution amount with respect to any Class of Interests or with respect to any, all or less than all Limited Partners holding a particular Class of Interests.

(b)     The Partnership may accept additional contributions at such times as the General Partner may permit, but no Limited Partner will be obligated to make any additional capital contribution to the Partnership, subject to the provisions of Section 3.5(b) and any contrary provision of the Act. The minimum required additional capital contribution of any existing Limited Partner to the Partnership is the amount the General Partner determines. The General Partner may change

the required minimum additional contribution amount at any time with respect to any Class of Interests or with respect to any, all or less than all Limited Partners holding a particular Class of Interests.

(c)     The General Partner or an Affiliate has made a capital contribution to the Partnership as set forth in the Schedule of Partners.  Except as required by the Act, the General Partner (or such Affiliate) is not required to make any additional capital contributions to the Partnership.  The General Partner (or such Affiliate) may, however, make capital contributions to the Partnership in such amounts and at such times as it may determine.  The General Partner or any of its Affiliates have the right at any time to make additional capital contributions as a Limited Partner or General Partner.  If an Affiliated Investor makes a capital contribution as a Limited Partner, the General Partner, in its capacity as the general partner of each Master Fund, has the authority to waive the Management Fees and/or Performance Allocations with respect to such Limited Partner.

(d)     Except as otherwise permitted by the General Partner (i) initial or additional capital contributions by each Partner must be paid in one installment with cash and/or Investments having an aggregate value as set forth in the Partnership's books and records, and (ii) initial contributions are due as of the date of admission of such Person as a Limited Partner.  Whether Investments may be accepted as a contribution to the capital of the Partnership is determined in the discretion of the General Partner.

**3.2     Rights of Partners in Capital**

(a)     No Partner is entitled to interest on its capital contributions to the Partnership.  For the avoidance of doubt, interest income, if any, earned on subscription amounts remitted to the Partnership prior to the date that an Interest is issued to a Partner is payable to the Partnership and not applied toward the purchase of an Interest.

(b)     No Partner has any right to the return of any capital contribution to the Partnership except (i) upon the withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1.  The entitlement to any such return is limited to the value of the Capital Account of the Partner.  The General Partner is not liable for the return of any such amounts.

**3.3     Capital Accounts**

(a)     The Partnership will maintain a separate Capital Account for each Partner.  The General Partner may, in its discretion, maintain separate memorandum sub-accounts related to a Capital Account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting, to reflect a Partner's interest in a Special Situation Investment or to otherwise give effect to the provisions of this Agreement.  Each Capital Account must reflect the aggregate sum of the balances of all memorandum sub-accounts in

such Partner's Capital Account, including any Special Situation Investment Sub-Accounts that relate to such Capital Account, unless otherwise specified herein.

(b)     Each Capital Account has an initial balance equal to the amount of any cash and the net value of any property (accepted only in the General Partner's discretion) constituting the relevant Partner's initial capital contribution to the Partnership.

(c)     Each Capital Account is increased by (i) the amount of any cash and the net value of any property constituting additional contributions to such Partner's Capital Account permitted pursuant to Section 3.1 and (ii) such Partner's allocable share of the Net Profits allocated by the Partnership to such Partner pursuant to Section 3.4.

(d)     Each Capital Account is reduced by (i) the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 3.14(a), 5.5 or 6.2, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(b)(vi), (ii) such Partner's allocable share of the Net Losses allocated by the Partnership to such Partner pursuant to Section 3.4, (iii) such Partner's *pro rata* portion of the expenses allocable (or specially allocable) by the Partnership pursuant to Section 3.5, (iv) such Partner's allocable share of the Performance Allocations allocable pursuant to Section 3.7 (borne indirectly at the level of the Master Funds), and (v) such Partner's *pro rata* portion of the expenses payable by the Partnership pursuant to Section 4.2(b).

(e)     Each Capital Account, including any related Special Situation Investment Sub-Accounts, is also adjusted to reflect all other allocations and other changes in the value of such Capital Account not otherwise described in this Section 3.3 in the manner specified in the remaining provisions of this Article III.

(f)     Each Master Fund maintains Capital Sub-Accounts within the Partnership's capital account in such Master Fund that correspond to the Classes of Interests held by the Partners with respect to which an investment in such Master Fund has been made (to the extent of such investment).

## 3.4     Allocations of Net Profit and Net Loss

(a)     Subject to the remaining provisions of this Article III, as of the close of each Accounting Period, any Net Profit or Net Loss of such Accounting Period is separately allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages as of the commencement of such Accounting Period.

(b)     Items of income, gain, loss, deduction, credit and expenses that are not allocable to specific Investments of a Master Fund and borne by the Capital Sub-Accounts in such Master Fund, including short-term interest income, and audit, administration and legal expenses, are separately allocated among and credited to or debited against the Capital Accounts (including any Special Situation

Investment Sub-Accounts) of the Partners in proportion to their respective Ownership Percentages for such Accounting Period.

(c)　　Items of income, gain, loss, deduction, credit and expenses that relate to a Special Situation Investment will be allocated pursuant to Section 3.10.

**3.5　Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures**

(a)　　The Management Fees are charged at the level of the Master Funds.  The Partnership bears its allocable portion of each Management Fee charged to a Master Fund in accordance with the relevant Master Fund Partnership Agreement. The Management Fee borne by the Partnership with respect to any Master Fund is allocated by the General Partner to the Capital Sub-Accounts of the relevant Limited Partners in such Master Fund based upon the Classes of Interests they hold, and such Capital Sub-Accounts are subject to the corresponding adjustments.  Each Management Fee is appropriately adjusted for any partial quarter.  The Investment Manager (as the investment manager of each Master Fund) may waive or reduce the Management Fees with respect to any Capital Sub-Account of a Limited Partner in its discretion.  During any calendar quarter, to the extent not payable from the proceeds of any sales of Investments held by a Master Fund, the Management Fee with respect to such Master Fund shall accrue during such quarter until funds become available to pay the accrued Management Fee.

(i)　　In the event that any Limited Partner withdraws the full balance of its Capital Account (and corresponding Capital Sub-Account in each Master Fund), other than amounts contained in any Special Situation Investment Sub-Account, the General Partner (as the general partner of each Master Fund) may establish reserves or holdbacks pursuant to each Master Fund Partnership Agreement equal to the Management Fee estimated to accrue with respect to any remaining Special Situation Investment Sub-Accounts in each such Master Fund, and the General Partner may debit the reserve account established with respect to each such Master Fund for the allocable portion of any Management Fee charged to such Master Fund at the same times and in the same manner in which it debited such Limited Partner's Capital Sub-Account in such Master Fund prior to withdrawal.

(ii)　　After the balance in a reserve account established above with respect to a particular Master Fund is reduced to zero, the General Partner will charge the fully withdrawing Limited Partner the portion of the Management Fee relating to any Special Situation Investment Sub-Account in such Master Fund (such portion of the Management Fee, the "***Post Reserve Fee***") at the same times and in the same manner in which it debited such Limited Partner's Capital Sub-Account in such Master Fund prior to withdrawal.  If the withdrawing Limited Partner does not pay the Post Reserve Fee at the time it is due, the Investment Manager (in its capacity

16

as the investment manager of such Master Fund) will advance the Partnership the amount of the Post Reserve Fee on behalf of the Limited Partner and the Partnership will reimburse the Investment Manager (in its capacity as the investment manager of such Master Fund) for such advanced amounts from the proceeds of the Special Situation Investment Sub-Account in such Master Fund.

(b)  Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including interest and penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amounts attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or withholding under FATCA), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required.  If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amounts under any BBA provision or under FATCA) with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement.  Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Accounting Period during which the Partnership so withholds, pays or incurs such obligation.  If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership, within 10 calendar days following request by the General Partner, in the amount of such excess.  The General Partner is not obligated to apply for or obtain a refund or reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such refund, reduction or exemption, or be otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax. Each Limited Partner agrees to repay to the Partnership and the General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)  Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, will be specially allocated only to the Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments.  Such allocations will be debited from the relevant Capital Accounts of such Partners as of the close

of the Accounting Period during which any such items were accrued by the Partnership.

**3.6    Reserves; Adjustments for Certain Future Events**

(a)    The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets and Special Situation Investments (at the level of the Master Funds), and proportionately against the Capital Accounts (and the corresponding Capital Sub-Accounts in the relevant Master Fund(s)) for contingent liabilities or probable losses, with such reserves to be in the amounts which the General Partner deems necessary or appropriate.  The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate.  The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be debited or credited, as the General Partner deems appropriate, to the Capital Accounts of current Partners that (i) are Partners at the time when such reserve is created, increased or decreased, as the case may be, or (ii) were Partners, or are transferees from Persons who were Partners, at the time of the act or omission giving rise to the contingent liability for which the reserve has been established by the General Partner.

(b)    If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately debited or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during such prior period(s).

**3.7    Performance Allocation**

(a)    The Performance Allocations are made at the level of the Master Funds.  The Partnership bears its allocable portion of each Performance Allocation allocable to a Master Fund in accordance with the relevant Master Fund Partnership Agreement.  The Performance Allocation borne by the Partnership with respect to any Master Fund is specially allocated by the General Partner to the Capital Sub-Accounts in such Master Fund belonging to the Limited Partners who are subject to such Performance Allocation based upon the Classes of Interests they hold, and such Capital Sub-Accounts are subject to the corresponding adjustments.

(b)    The Performance Allocation is only taken from a Master Fund with respect to assets that are held in a Partner's Special Situation Investment Sub-Account in such Master Fund once the Special Situation Investment Sub-Account is closed as provided in Section 3.10 and if all conditions for a Performance Allocation have been met for the applicable period under the relevant Master Fund Partnership Agreement (but for purposes of clarity is otherwise taken with respect to other assets as provided in Section 3.7(a)).

(c)     The General Partner (as the general partner of each Master Fund) may waive or reduce the Performance Allocations with respect to any Capital Sub-Account of a Limited Partner.

**3.8     Limited Participation Investments**

If the General Partner, in its capacity as the general partner of a Master Fund, determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Partner may agree such Partner should not participate (or should receive a reduced participation) in the Net Profit or Net Loss with respect to any Investment made by such Master Fund, the General Partner, in its capacity as the general partner of such Master Fund, may allocate Net Profit or Net Loss, if any, with respect to such Investment only to the Capital Sub-Accounts in such Master Fund belonging to Investors to whom the restrictions on participating in that Investment do not apply.  In order to allocate Net Profit or Net Loss accordingly, the General Partner, in its capacity as the general partner of such Master Fund, may establish and maintain a memorandum sub-account in the accounting records of such Master Fund on an Investor-by-Investor basis with respect to each such Investment of the relevant Master Fund.  The Net Profit and Net Loss and expenses relating to such Investment will be separately calculated and allocated based on the balance in each participating Investor's memorandum sub-account for such Investment divided by the sum of the balances of all memorandum sub-accounts for all participating Investors in such Investment.  In order to compensate a Partner, who is not participating in an Investment made by a Master Fund pursuant to this Section 3.8, for the use of such Partner's share of capital in such Master Fund to purchase the Investment, the General Partner, in its capacity as the general partner of such Master Fund, may credit the non-participating Capital Sub-Account of a Partner (and accordingly debit the Capital Sub-Account of each participating Investor) with a carrying charge.  Any distributions from the memorandum sub-account will be based on the participating Investor's respective percentage interest in such Investment.

**3.9     Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits will instead be allocated to the Capital Account of the General Partner.  Any credits in any subsequent Accounting Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.9 will instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.9 not previously recovered.

**3.10    Special Situation Investment Sub-Accounts**

(a)     Whenever a Master Fund makes a Special Situation Investment or whenever an existing Investment is designated by the General Partner (as the general partner of a Master Fund) as a Special Situation Investment, a Special Situation Investment Sub-Account will be established for each Capital Sub-Account in such Master Fund belonging to an Investor with a Master Ownership Percentage in such

Master Fund at such time to reflect such Capital Sub-Account's *pro rata* share of all allocations and distributions attributable to transactions involving such Special Situation Investment, based on such Capital Sub-Account's Master Ownership Percentage in such Master Fund at such time. Thereafter, all credits and debits relating to such Special Situation Investment (including those specifically referred to below) will be allocated among the Special Situation Investment Sub-Accounts for such Special Situation Investment *pro rata* in accordance with each Capital Sub-Account's share of the cost basis of such Special Situation Investment.

(b)    An amount equal to a Capital Sub-Account's share of the cost, in the case of Special Situation Investments so designated on the date of purchase, or carrying value on or about the date of designation, in the case of Special Situation Investments so designated after the date of purchase, will be credited to each participating Special Situation Investment Sub-Account. In addition, any costs and expenses directly related to the acquisition, ownership or disposition of a Special Situation Investment will be allocated exclusively among the Capital Sub-Accounts with an interest therein and will be reflected by means of a debit of such item from the Special Situation Investment Sub-Accounts. Special Situation Investment Sub-Accounts are not adjusted to reflect any change in the value of the Special Situation Investment prior to the occurrence of a Recognition Event with respect to such Special Situation Investment.

(c)    Upon the occurrence of a Recognition Event relating to a Special Situation Investment, the carrying value thereof will be adjusted to reflect the fair value or the proceeds thereof, as the case may be, and the Special Situation Investment Sub-Accounts relating to such Special Situation Investment will be closed.

(d)    When a Special Situation Investment Sub-Account relating to a particular Special Situation Investment made by a particular Master Fund is closed, the Master Ownership Percentage of each participating Capital Sub-Account in such Master Fund will be adjusted accordingly. If a Recognition Event affects only a portion of the Investment position constituting a single Special Situation Investment, the General Partner will sub-divide each affected Special Situation Investment Sub-Account and will close only the portion with respect to which the Recognition Event has occurred; provided, however, that the General Partner may postpone taking such action if it believes that one or more Recognition Events affecting the entire remaining Special Situation Investment are reasonably imminent.

(e)    If, immediately after a Recognition Event, the relevant Master Fund continues to hold the Investment that constituted the Special Situation Investment (or a marketable Investment that was exchanged for it), then for purposes of determining and allocating future profit or loss associated with that Investment, such Master Fund and the Partnership must treat such Investment as having been purchased at such time at a purchase price equal to the current fair market value.

**3.11**   **Regulatory Allocations**

Notwithstanding anything to the contrary in this Agreement:

(a)    Qualified Income Offset.  In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; provided that an allocation pursuant to this Section 3.11(a) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.11(a) were not in this Agreement.  This Section 3.11(a) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and is to be interpreted consistently therewith.

(b)    Minimum Gain Chargeback.  Notwithstanding any other provision of this Section 3.11, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, the Partners will be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of any such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulation Sections 1.704-2(f) and (g). This Section 3.11(b) is intended to comply with the minimum gain chargeback requirement in such sections of the Regulations and must be interpreted consistently therewith.

(c)    Gross Income Allocation.  In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 3.11(c) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.11(a) and this Section 3.11(c) were not in this Agreement.

(d)    Curative Allocations. The allocations set forth this Section 3.11 (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations.  It is the intent of the Partners that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss or deduction pursuant to this Section 3.11.  Therefore, notwithstanding any other

21

provision of this Article III (other than the Regulatory Allocations), the General Partner will make such offsetting special allocations of the Partnership income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

(e)    <u>Nonrecourse Deductions</u>.  Any Nonrecourse Deductions for any Fiscal Year or other period will be allocated to the Partners in accordance with their Partnership Percentages.

(f)    <u>Section 704(b) Compliance</u>.   The allocations provided in this Section 3.11 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

## 3.12    Allocations for Income Tax Purposes

(a)    <u>Income Tax Allocations</u>.  Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for U.S. federal income tax purposes in each Fiscal Year will be allocated among the Partners in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years.  To this end, the Partnership will establish and maintain records which show the extent to which the Capital Account of each Partner comprises amounts that have not been reflected in the taxable income of such Partner as of the last day of each Fiscal Year.  To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year will be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year will be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts.   Allocations under this Section 3.12 shall be made pursuant to the principles of Sections 704(b) and 704(c) of the Code, and Regulations Sections 1.704-1(b)(2)(iv)(f) and (g), 1.704-1(b)(4)(i) and 1.704-3(e), as applicable.  Foreign tax credits attributable to taxes incurred by the Partnership must be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations.   All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b)    <u>Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the

adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations; provided that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment must benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)     Positive Basis Allocations.  If the Partnership recognized gains or items of gross income (including short-term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner may elect: (i) to allocate such gains or items of gross income among such Positive Basis Partners, *pro rata* in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income have been so allocated or the Positive Basis of each such Positive Basis Partner has been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner that reflects equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership recognizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner, that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), then such Positive Basis Partner may be allocated an amount of such gains or items of gross income equal to the amount, if any, by which its or its Positive Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.12(c).

(d)     Negative Basis Allocations.  If the Partnership recognizes net losses or items of gross loss or deduction (including short-term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner may elect: (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Partner, until either the full amount of such losses or items of loss or deduction have been so allocated or the Negative Basis of each such Negative Basis Partner has been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner that reflects equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if,

following such Fiscal Year, the Partnership recognizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its or its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.12(d).

## 3.13    Individual Partner's Tax Treatment

Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership or which would result in inconsistent treatment, and each Partner further agrees to treat, on any U.S. federal, state, local and/or non-U.S. income tax return in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner consistent with the treatment of such item by the Partnership.

## 3.14    Distributions

(a)     The Partnership will make distributions in respect of withdrawals in accordance with Section 5.5 and liquidation in accordance with Section 6.2.  In addition, the General Partner may make other distributions at the times and in the amounts the General Partner determines.  Any distributions will be in the form of distributions received by the Partnership from the Master Funds and may be paid in cash, in kind or partly in cash and partly in kind.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner from any account in connection with its Interest if such distribution would violate Section 17-607 of the Act or other applicable law.

## 3.15    Co-Investments

(a)     The General Partner may, in its discretion, permit one or more of the Investors (but not necessarily all Investors) or other Persons, including Other Accounts and investors in Other Accounts, to co-invest alongside one or more Master Funds in one or more Investments.  The General Partner, in its discretion, will allocate the available Investment among the Investors and the other Persons, if any, who are co-investing.  The General Partner's agreement to permit one or more Investors or other Persons to invest in one or more Investments will not constitute a side letter or other similar agreement.   Notwithstanding anything contained in this Agreement to the contrary, to the extent that the General Partner allows Investors or other Persons to co-invest, (i) the General Partner or its Affiliates may structure any co-investment in one or more Investments through one or more partnerships,

companies or other collective investment vehicles managed or advised by the General Partner or the Investment Manager (each, a "***Co-Investment Vehicle***"), and (ii) the General Partner or the Investment Manager may charge a management fee, incentive allocation or any other fees or carried interest with respect to such co-investment, none of which will offset or reduce the Management Fees or Performance Allocations.

(b)     The General Partner will use its reasonable efforts to cause each Person participating in a co-investment opportunity to, indirectly through any Co-Investment Vehicle(s), bear such Person's *pro rata* share of expenses related to such co-investment, including "dead deal" costs, based on ownership percentage in or capital proposed to be committed to, as applicable, such co-investment ("***Co-Investment Expenses***").  To the extent Co-Investment Expenses are not borne by prospective co-investors, the relevant Master Fund(s) will bear all of the Co-Investment Expenses of any co-investments that are not consummated, and the Partnership will bear its *pro rata* portion thereof.

### Article IV
### MANAGEMENT

### 4.1    Duties and Powers of the General Partner

(a)     Subject to the terms and conditions of this Agreement, the General Partner has complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for managing and administering the affairs of the Partnership, and has the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership.

(b)     Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner has full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1.  The General Partner also has full power and authority to employ or consult any Persons (including Persons who may be Limited Partners or Affiliates of the General Partner) as the General Partner deems advisable for the operation and management of the Partnership, including, without limitation, accountants, attorneys, actuaries, consultants, or Specialists.

(c)     The General Partner may delegate to any other Person, including the Investment Manager, any power and authority vested in the General Partner pursuant to this Agreement. If the General Partner transfers the Investment Management Agreement or delegates the administration of the Partnership to any Person that is

not an Affiliate of the General Partner, then the General Partner must obtain the consent of Limited Partners constituting a Majority-in-Interest of Limited Partners that are not Affiliated Investors (which approval may be obtained by negative consent affording the Limited Partners at least 45 calendar days to object) prior to any such transfer or delegation.

(d)     Every power vested in the General Partner pursuant to this Agreement and any decision or determination that it is permitted to make is to be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein, and the General Partner is entitled to consider its own interests in making such decisions or determinations.   No provision of this Agreement is to be construed to require the General Partner to violate the Act, the Advisers Act or any other law, regulation or rule of any self-regulatory organization.   Notwithstanding any other provision of this Agreement, whenever in this Agreement the General Partner is permitted or required to make a decision in its "good faith" or under another expressed standard, the General Partner must act under such express standard and will not be subject to any other or different standards.

(e)     If requested by the General Partner, each Limited Partner shall deliver to the General Partner: (i) an affidavit in form satisfactory to the General Partner that the applicable Limited Partner (and its partners, shareholders, members, and/or beneficial owners, and/or controlling persons, as the case may be) is not subject to withholding under the provisions of any United States federal, state, local or non-U.S. laws; (ii) any certificate that the General Partner may reasonably request with respect to any such laws; (iii) any other form or instrument reasonably requested by the General Partner relating to such Limited Partner's status under such laws; and/or (iv) any information or documentation prescribed under FATCA or as may be necessary for the Partnership to comply with its obligations, or to avoid withholding, under FATCA or any other automatic exchange of information agreement or arrangement.   In the event that a Limited Partner fails or is unable to deliver to the General Partner an affidavit described in this Section 4.1(e), the General Partner may withhold amounts from such Partner in accordance with Section 3.5(b).

**4.2     Expenses**

(a)     Except as otherwise provided herein, the General Partner and the Investment Manager each pays all of its own operating and overhead costs (including salaries of employees and office rent), without reimbursement by the Partnership.

(b)     The Partnership pays, or reimburses the General Partner and the Investment Manager for, all other costs, fees and expenses arising in connection with the Partnership's operations.   The Partnership also bears its *pro rata* share of the costs, fees and expenses similar to those described in clauses (ii) through (xv) below that are incurred in connection with each Master Fund's operations and investment program.   Any organizational expenses of the type described in clause

26

(i) directly related to the formation of the Partnership, the Offshore Fund, the Master Funds, Iterative Intermediate, L.L.C., any special purpose vehicles of the Master Funds and the General Partner will be allocated between, and borne by, the Partnership and the Offshore Fund *pro rata* in proportion to their respective aggregate capital contributions to all of the Master Funds or in such manner that the General Partner may determine in its reasonable discretion to be fair and equitable.   Notwithstanding the foregoing, the Partnership bears the aggregate amount of Management Fees allocable to the Capital Sub-Accounts of all relevant Limited Partners in accordance with Section 3.5.   Expenses payable by the Partnership include the following:

(i)     the costs, fees and expenses associated with the organization of the Partnership and the offering of the Interests, including legal and accounting fees, printing costs, travel fees and expenses related to the Partnership's offering, filing fees (including any Form D and "blue sky" filing fees), placement agent fees and other out-of-pocket expenses and compliance with any applicable federal and state laws; provided that, such organizational costs, fees and expenses may be expensed immediately, or in the General Partner's discretion, amortized in whole or in part and capitalized over a period of 60 calendar months from the date the Partnership commences operations, which may result in an exception to GAAP;

(ii)    all costs, fees and expenses directly related to Investments or prospective Investments (whether or not consummated), including research and due diligence costs; underwriting (if any) and private placement costs; brokerage commissions and other execution and transaction costs; interest on, and commitment fees and expenses associated with, debt balances or borrowings; exchange, clearing and settlement charges; Investment related travel expenses; appraisal fees; custody fees; and the costs, fees and expenses of any appraisers, accountants, service providers or other experts engaged by the General Partner or the Investment Manager, as well as other expenses directly related to the Investments;

(iii)   except as provided in Section 3.5(b), any withholding, transfer or other taxes imposed or assessed on, or payable by, the Partnership (including any interest and penalties);

(iv)    fees, costs and expenses (including legal fees and expenses) incurred for the Partnership, the General Partner or the Investment Manager to comply with any applicable law, rule or regulation, including regulatory filings and costs of third party compliance consultants;

(v)     the costs, fees and expenses for financial and tax accounting, bookkeeping and reporting services, and administrative services performed by any Person on behalf of the Partnership, including the cost of any audit of the Partnership's financial statements and the preparation of its tax returns;

(vi)     the fees of the Partnership's administrator;

(vii)    the costs, fees and expenses of legal counsel and any other litigation or investigation involving Partnership activities;

(viii)   the costs of hardware required to generate private key material, fees and other expenses associated with storing private key backup material in secure facilities, and travel (including international travel) to the vaults containing the cryptographic media containing such keys and any other associated costs and expenses, whether incurred at the request of counter-parties or Limited Partners, or on the initiative of the General Partner or the Investment Manager;

(ix)     the costs and expenses associated with reporting and providing information to existing and prospective Partners and costs associated with meetings of Partners;

(x)      the costs associated with maintaining "directors and officers" or similar liability insurance for the benefit of the Partnership, the General Partner, the Investment Manager or any other Indemnified Person;

(xi)     any Specialist Expenses;

(xii)    any Sub-Advisor Expenses;

(xiii)   any Co-Investment Expenses;

(xiv)    expenses of any third party valuation agent; and

(xv)     any costs or expenses of winding up and liquidating the Partnership;

provided that, the costs and expenses set forth in clauses (ii), (viii), (xi), (xii) and (xiii) will be paid at the level of the Master Funds.

(c)      Except as otherwise provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6, 3.8, 3.10 and 5.5(b)(iv), Investment-related expenses are generally borne by the Capital Sub-Accounts of the Investors in the relevant Master Fund *pro rata* in accordance with their respective percentage interests therein, and other expenses of the Partnership (*e.g.*, administration, audit and legal expenses of the Partnership) are borne *pro rata* by the Partners in accordance with their respective Ownership Percentages; provided that, expenses may be specially allocated among the Partners on any other basis that the General Partner determines, in its sole discretion, is clearly more equitable in light of the purposes for which such expenses were incurred.

(d)      If the General Partner or the Investment Manager, as appropriate, incurs any Partnership expenses for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both a Master Fund and any Other

Account, the relevant Master Fund shall only bear its *pro rata* share of the expenses incurred in connection with such investment based on ownership percentage of such Investment.

**4.3    Rights of Limited Partners**

The Limited Partners may not take any part in the management, control or operation of the Partnership's business, and have no right or authority to act for, sign or bind the Partnership or vote on matters other than the matters set forth in this Agreement or as required by applicable law.

**4.4    Other Activities of Partners**

(a)    The General Partner is not required to devote any specific amount of its time to the affairs of the Partnership, but must devote such of its time to the business and affairs of the Partnership as it may determine to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)    Each Partner acknowledges and agrees that the General Partner, its Affiliates and their respective partners, managers, directors, officers, shareholders, members or employees may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of Other Accounts, investment in, or financing, acquisition and disposition of, investments, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other issuers, partners of any partnership, or trustees of any trust, or entering into any other commercial arrangements, whether or not any such activities may conflict with any interest of the parties with respect to the Partnership. Without in any way limiting the foregoing, each Partner hereby acknowledges that none of the General Partner, its Affiliates or their respective partners, managers, directors, officers, shareholders, members or employees have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the Partnership, but may refer the same to any other party or keep such opportunities for their own benefit. However, each Limited Partner acknowledges that the Investment Manager may invest the Partnership's capital (through one or more Master Funds) in one or more Other Accounts. In addition, each Partner hereby acknowledges that any fees or compensation received by the General Partner, its Affiliates and their respective partners, managers, directors, officers, shareholders, members or employees from any activities set forth in this Section 4.4(b) will not reduce or offset the Management Fees, Performance Allocations or any similar fees otherwise owed by the Partnership to any of the foregoing parties and will not benefit the Partnership.

(c)    The General Partner and its Affiliates must act in a manner that each considers fair, reasonable and equitable on an overall basis in allocating investment opportunities to each Master Fund and any Other Account. The allocation of co-

29

investment opportunities is addressed in Section 3.15.  The General Partner and its Affiliates will allocate investment opportunities among the Master Funds and Other Accounts as set forth in their policies and procedures, as may be amended from time to time, and as communicated to Limited Partners.  Except to the extent that the Partnership (through one or more Master Funds) invests in an Other Account, the Partnership will have no right to participate in the investments of any Other Account.

(d)     The General Partner and/or the Investment Manager may engage Specialists on behalf of one or more Master Funds.  Payments to Specialists will be expenses of the relevant Master Fund(s) to the extent not borne by a portfolio vehicle of such Master Fund(s), and the Partnership will bear its *pro rata* portion thereof in accordance with Section 4.2(b).  Specialist Expenses will not offset the Management Fees or Performance Allocations at the level of the Master Funds.

(e)     Each of the Partners hereby waives and covenants not to sue on the basis of any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners *inter se* which is or may be inconsistent with this Section 4.4.

## 4.5     Exculpation; Indemnification

(a)     To the maximum extent permitted by law, the General Partner, the Investment Manager, any of their Affiliates, each direct or indirect member, manager, partner, director, officer, shareholder and employee of any of the foregoing and, with the approval of the General Partner, any agent of any of the foregoing (including their respective executors, heirs, assigns, successors or other legal representatives) (each an "***Indemnified Person***") is not liable to the Partnership or to any of the Limited Partners for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, unless such loss or damage has occurred by reason of the willful misconduct, bad faith or gross negligence of such Indemnified Person or as otherwise required by law; provided that nothing in this Agreement is to be construed as waiving any legal rights or remedies which the Partnership may have under state or federal securities laws.  Notwithstanding any applicable provision of law or equity, to the maximum extent permitted by the Act, an Indemnified Person owes no duties (including fiduciary duties) to the Partnership or the Limited Partners; provided, however, that an Indemnified Person has the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

(b)     The Partnership (but not the Partners individually) must indemnify each Indemnified Person to the fullest extent permitted by law against any cost, expense (including reasonable attorneys' fees), judgment or liability incurred by or imposed upon it in connection with any action, suit or proceeding (including any proceeding before any judicial, administrative or legislative body or agency) to which it may be made a party or otherwise be involved or with which it may be threatened by reason of being or having been the General Partner or the

30

Investment Manager or in connection with this Agreement or the Partnership's business or affairs; <u>provided</u> that the Indemnified Person is not so indemnified to the extent such cost, expense, judgment or liability has been finally determined (i) in a non-appealable decision on the merits in any such action, suit or proceeding, or (ii) on a plea of *nolo contendere*, to have been incurred or suffered by the Indemnified Person solely by reason of willful misconduct, bad faith or gross negligence by the Indemnified Person.

(i)     The right to indemnification granted by this Section 4.5 is in addition to any rights to which the Indemnified Person may otherwise be entitled and inures to the benefit of the successors or assigns of such Indemnified Person.   The Partnership must pay the expenses incurred by the Indemnified Person in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by the Indemnified Person to repay such payment if there is an adjudication or determination that it is not entitled to indemnification as provided herein.

(ii)    In any suit brought by the Indemnified Person to enforce a right to indemnification hereunder, it is a defense that the Indemnified Person or other Person claiming a right to indemnification hereunder has not met the applicable standard of conduct set forth in this Section 4.5(b) or under applicable law.   In addition, in any suit in the name of the Partnership to recover expenses advanced pursuant to the terms of an undertaking, the Partnership is entitled to recover such expenses upon a final adjudication that the Indemnified Person or other Person claiming a right to indemnification hereunder has not met the applicable standard of conduct set forth in this Section 4.5(b).   In any such suit brought to enforce a right to indemnification or to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnified Person or other Person claiming a right to indemnification is not entitled to be indemnified, or entitled to an advancement of expenses, hereunder is on the Partnership (or any Limited Partner acting derivatively or otherwise on behalf of the Partnership or the Limited Partners) unless otherwise required by applicable law.

(iii)   Each Indemnified Person may not satisfy any right of indemnity or reimbursement granted in this Section 4.5 or to which it may be otherwise entitled except out of the assets of the Partnership, and no Partner will be personally liable with respect to any such claim for indemnity or reimbursement.   The General Partner may obtain appropriate insurance on behalf, and at the expense, of the Partnership to secure the Partnership's obligations hereunder.

(iv)    Nothing in this Agreement is to be construed as to provide for the indemnification of an Indemnified Person for any liability (including liability under U.S. federal securities laws) to the extent that such

indemnification would be in violation of applicable law but is to be construed so as to effectuate this Section 4.5 to the fullest extent permitted by law.

(v)     Each Indemnified Person is deemed a third-party beneficiary (to the extent not a direct party hereto) of this Agreement and, in particular, the provisions of this Section 4.5. The General Partner and/or the Investment Manager may enter into agreements on behalf of the Partnership with an Indemnified Person to provide an indemnity to the same extent provided in this Section 4.5.

## Article V
## ADMISSIONS, TRANSFERS AND WITHDRAWALS

### 5.1   Admission of Limited Partners

The General Partner may, at such times as the General Partner may determine, without advance notice to or the consent of the Limited Partners, admit to the Partnership any Person who executes this Agreement or any other writing evidencing the intent of such Person to become a Limited Partner. Such admission is effective when the General Partner enters the name of such Person on the books and records of the Partnership as a Partner and does not require the consent or approval of any other Partner. The General Partner has the authority to reject subscriptions for Interests in whole or in part.

### 5.2   Admission of Additional General Partners

(a)     Except as provided in Section 5.2(b), the General Partner may admit one or more Persons as additional general partners to the Partnership. No additional general partner may be added unless such additional general partner agrees to be bound by all of the terms of this Agreement.

(b)     Any Person to whom the General Partner has transferred its general partner interest in accordance with Section 5.4 will be admitted to the Partnership as a substitute General Partner without the consent of the Limited Partners unless otherwise provided for in Section 5.4.

### 5.3   Transfer of Interests of Limited Partners

(a)     No Transfer of any Limited Partner's Interest, whether voluntary or involuntary, is valid or effective, and no transferee may become a substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be granted, withheld or conditioned for any reason by the General Partner. Without limiting the General Partner's discretion pursuant to this Section 5.3(a), the General Partner expects to withhold consent to any Transfer of any Limited Partner's Interest, whether voluntary or involuntary, if the General Partner has reason to believe that such Transfer may result in a termination of the Partnership for U.S. federal income tax purposes under Section 708(b)(1)(B) of the Code or cause the Partnership to be treated as a "publicly traded partnership"

for U.S. federal income tax purposes under Section 7704(b) of the Code.  Any attempted Transfer not made in accordance with this Section 5.3, to the fullest extent permitted by law, is void *ab initio*.

(b)      Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner may require the transferring Limited Partner to execute and acknowledge an instrument of Transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement.

(c)      In the event of a Transfer of a Partner's Interest or in the event of a distribution of assets of the Partnership to any Partner, the Partnership may, but is not required to, file an election under Section 754 of the Code and in accordance with the applicable Regulations, to cause the basis of the Partnership's assets to be adjusted for U.S. federal income tax purposes as provided by Section 734 or 743 of the Code.

(d)      In the event of a Transfer at any time other than the end of a Fiscal Year, items of income, gain, loss, deduction or credit recognized by the Partnership for U.S. federal income tax purposes will be allocated between the transferring parties, as determined by the General Partner, using any permissible method under Code Section 706(d) and the Regulations thereunder.  The transferring parties agree to reimburse the General Partner and the Partnership for any incidental accounting fees and other expenses incurred by the General Partner and the Partnership in making allocations pursuant to this Section 5.3(d).

(e)      To the fullest extent permitted by law, any transferring Limited Partner agrees to (i) reasonably cooperate with the Partnership and the General Partner and (ii) remain liable to file income tax returns and to pay or bear income taxes, including any interest and penalties, under any BBA provision, in each case with respect to any pre-Transfer taxable years (or any portion thereof).

## 5.4     Transfer of Interest of the General Partner

The General Partner may not Transfer its Interest as a general partner of the Partnership, other than to one or more of its direct or indirect beneficial owners or their Affiliates, without the approval of a Majority-in-Interest of Limited Partners.

## 5.5     Withdrawal of Interests of Partners

(a)      The Interest of a Limited Partner may not be withdrawn from the Partnership prior to its dissolution except as provided in this Section 5.5.

(b)      Subject to a Suspension and the other provisions of this Section 5.5, a Limited Partner may voluntarily withdraw all or part of the capital in its Capital Account as of the last Business Day of each calendar quarter (and/or such other days as the General Partner may determine) (each, a "***Withdrawal Date***").

(i)     Each Limited Partner that wishes to withdraw any portion of its Capital Account pursuant to this Section 5.5 must provide written notice of its withdrawal request to the General Partner (or its delegate, *e.g.*, the administrator of the Partnership) at least 90 calendar days prior to the proposed Withdrawal Date (unless such notice period is shortened or waived by the General Partner). Any notice of withdrawal is irrevocable by the Limited Partner, unless otherwise agreed by the General Partner. For the avoidance of doubt, if a Limited Partner notifies the General Partner of its intent to withdraw and later chooses not to withdraw (with the General Partner's consent), any transaction costs incurred by the Partnership or the General Partner in connection therewith may be charged to such withdrawing Limited Partner. The General Partner may refuse to honor any Limited Partner's request for a full or partial withdrawal if such request is not accompanied by such additional information as the General Partner may reasonably require in its discretion, including any information required to determine the "adjusted basis" for U.S. federal income tax purposes in the Limited Partner's Interest withdrawn or required to comply with anti-money laundering laws and regulations.

(ii)    The estimated amount due in connection with any permitted withdrawal pursuant to this Section 5.5 is normally made within 30 calendar days after the Withdrawal Date, provided that, (i) the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership or the remaining Limited Partners and (ii) in the event that distributions of withdrawal proceeds during a calendar year to a withdrawing Limited Partner exceed 95% of the lesser of: (A) the value of such Limited Partner's Capital Account (excluding amounts held in Special Situation Investment Sub-Accounts) as of the beginning of such calendar year and (B) the lowest value of such Limited Partner's Capital Account (excluding amounts held in any Special Situation Investment Sub-Accounts) as of the end of any calendar quarter during such calendar year or as of such Withdrawal Date, if not at a quarter end, the General Partner may hold back and distribute the excess requested amounts, without interest thereon, promptly following completion of the audit of the Partnership's financial statements for such Fiscal Year, or sooner in the General Partner's discretion. Amounts withdrawn by a Limited Partner will not earn interest for the period from the effective Withdrawal Date through the settlement date.

(iii)   The General Partner may effect withdrawal payments (i) in cash, (ii) in kind, by transfer of marketable or non-marketable Investments to the Limited Partner, the value of which, as determined in accordance with Section 7.3, would satisfy the Limited Partner's request for withdrawal, or (iii) in any combination of the foregoing.

(iv)     In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the relevant Capital Account (and corresponding Capital Sub-Account in each Master Fund), excluding any assets held in a Special Situation Investment Sub-Account associated with each such corresponding Capital Sub-Account, no settlements may occur with respect to any such Special Situation Investment Sub-Account until the occurrence of a Recognition Event with respect to such Special Situation Investment after the scheduled payment date for the withdrawal.  If the Recognition Event is a sale for cash, the settlement is funded in cash within 5 calendar days after the Recognition Event (without interest), subject to the holdback pending audit.  If the Recognition Event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Capital Sub-Account's ratable share of the relevant Investment or by distributing the net proceeds derived from a sale of such Investment (and such 5 calendar day period will not apply).  In connection with any such settlement, a calculation is made in accordance with the relevant Master Fund Partnership Agreement to determine whether any Performance Allocation attributable to such Capital Sub-Account is to be credited to the Allocation SLPs of such Master Fund.  If any Performance Allocation is owed to the Allocation SLPs of such Master Fund pursuant to the immediately preceding sentence, such Allocation SLPs are entitled to withdraw an amount equal to any such Performance Allocation from their capital accounts in the relevant Master Fund at the same time and in the same form (in cash or in kind) as the distribution from the relevant Capital Sub-Account, notwithstanding Section 5.5(e) below.

(v)      The capital to be withdrawn by a Limited Partner will not participate in new Special Situation Investments made after the relevant Withdrawal Date.

(vi)     The General Partner may, in addition to the application of any Early Withdrawal Reduction, deduct from any withdrawal proceeds due to any Limited Partner pursuant to this Section 5.5 an amount representing the Partnership's actual or estimated expenses, as determined by the General Partner, associated with processing the withdrawal.  Any such withdrawal deduction is retained by the Partnership for the benefit of the remaining Limited Partners.

(vii)    The right of any Partner to withdraw or receive distributions pursuant to the provisions of this Section 5.5 is subject to all Capital Account allocations and adjustments contemplated by this Agreement and to the provision by the General Partner for all Partnership liabilities and for reserves and holdbacks for contingencies provided in Section 3.6.

(viii)   With respect to any amounts withdrawn, a withdrawing Partner does not share in the income, gains and losses of the Partnership or have any other

rights as a Partner (in the case of a complete withdrawal) after the applicable Withdrawal Date except with respect to any Interest remaining in Special Situation Investments, or as provided in Section 3.6. For the avoidance of doubt, none of the Partnership, the General Partner or the Investment Manager is liable to a Limited Partner for interest on the proceeds of any withdrawal.

(ix)     Notwithstanding the above, a withdrawal of capital from a Capital Account (and the corresponding Capital Sub-Account in each Master Fund) prior to the end of 12 complete calendar months after the date such capital was contributed to the Partnership is subject to an early withdrawal reduction (the "***Early Withdrawal Reduction***") equal to:

(A)     10% of the gross withdrawal proceeds, if such withdrawal occurs prior to the end of 3 complete calendar months after the contribution of such capital to the Partnership;

(B)     8% of the gross withdrawal proceeds, if such withdrawal occurs after the end of 3 complete calendar months, but prior to the end of 6 complete calendar months after the contribution of such capital to the Partnership;

(C)     6% of the gross withdrawal proceeds, if such withdrawal occurs after the end of 6 complete calendar months, but prior to the end of 9 complete calendar months after the contribution of such capital to the Partnership; and

(D)     4% of the gross withdrawal proceeds, if such withdrawal occurs after the end of 9 complete calendar months, but prior to the end of 12 complete calendar months after the contribution of such capital to the Partnership.

The Early Withdrawal Reduction is retained by the Master Funds for the benefit of the remaining Investors and deducted from the withdrawal proceeds from the relevant Capital Sub-Account(s) of the withdrawing Limited Partner. The Early Withdrawal Reduction will not apply in the event of a compulsory withdrawal pursuant to Section 5.5(f).

(c)     The General Partner may suspend or limit, in whole or in part, (i) the right of any Partner to withdraw or receive distributions of withdrawal proceeds from the Partnership, (ii) the valuation of the Partnership's Net Assets, or (iii) the issuance of Interests if any of these corresponding actions is taken by the General Partner (in its capacity as the general partner of each Master Fund) on behalf of any Master Fund in accordance with the relevant Master Fund Partnership Agreement (any such suspension or limitation, a "***Suspension***").

(d)     In the event of a Suspension, the General Partner must promptly notify each Limited Partner. Any Limited Partner who has submitted a withdrawal request

and to whom payment in full of the amount being withdrawn has not yet been remitted is not given any priority with respect to the withdrawal of such Interests or portions thereof after the cause for such Suspension ceases to exist. The General Partner may, however, allow any such Partners to rescind their withdrawal requests to the extent of any portion thereof for which withdrawal proceeds have not yet been remitted. Upon the reasonable determination by the General Partner that the conditions leading to the suspension with respect to a particular Master Fund no longer apply, the General Partner must promptly reinstate withdrawal rights and honor any pending withdrawal requests (or new, timely withdrawal requests) as of the end of the last Business Day of the calendar month following such determination unless such determination is made fewer than 10 days prior to such month-end, in which case the General Partner will honor any pending notices of withdrawal that have not been rescinded as of the end of the last Business Day of the following calendar month (or at such other time as the General Partner determines), subject to the withdrawal limitations described in this Section 5.5.

(e)     Capital contributed by the Affiliated Investors and the Allocation SLPs is generally subject to the same restrictions on withdrawal as those applicable to Limited Partners as set forth in this Section 5.5, provided that the Allocation SLPs of any Master Fund may, unless prohibited by law, make withdrawals of all or any part of the Performance Allocations and gains thereon from their capital accounts at the level of the Master Funds as of any calendar month-end and without notice to the Limited Partners.

(f)     The General Partner may, notwithstanding any Suspension, upon not less than 5 days' prior written notice (or immediately if the General Partner determines in its discretion that such Limited Partner's continued participation in the Partnership may cause the Partnership, any Master Fund, the Investment Manager or the General Partner to violate any applicable law), require any Limited Partner's Interest to be withdrawn in part or in its entirety from the Partnership (including, but not limited to, for reasons relating to FATCA) and for the Limited Partner to cease to be a limited partner of the Partnership (in the case of a withdrawal of a Limited Partner's Interest in its entirety) pursuant to this Section 5.5(f). Except as otherwise provided herein, settlement of withdrawals pursuant to this Section 5.5(f) are made in the same manner as voluntary withdrawals; provided, however, settlement may be made (i) in cash, (ii) Cash Equivalents, (iii) in kind, by transfer of marketable or non-marketable Investments, or (iv) by issuance of a promissory note issued by the Partnership (or any combination of the foregoing as the General Partner in its discretion selects). For the avoidance of doubt, the Early Withdrawal Reduction will not be applied to withdrawals made pursuant to this Section 5.5(f).

(g)     To the fullest extent permitted by law, any Limited Partner that withdraws from the Partnership agrees to (i) reasonably cooperate with the Partnership and the General Partner and (ii) remain liable to file income tax returns and to pay or bear income taxes, including any interest and penalties, under any BBA provision, in

each case with respect to any pre-withdrawal taxable years (or any portion thereof).

(h)     Notwithstanding the foregoing, the General Partner may waive any restrictions on any Limited Partner's ability to withdraw.

## 5.6     Withdrawal of Original Limited Partner

The Original Limited Partner (in its capacity as the original limited partner of the Partnership) hereby withdraws from the Partnership and is entitled to the return of any capital contribution, without interest or deduction, upon the Commencement Date.

## Article VI
## DISSOLUTION AND LIQUIDATION

## 6.1     Dissolution of Partnership

(a)     The Partnership will be dissolved upon the first to occur of the following dates:

(i)      any date on which the General Partner elects in writing to dissolve the Partnership; or

(ii)     the occurrence of any other event causing (A) the General Partner (or a successor to its business) to cease to be the general partner of the Partnership or (B) the dissolution of the Partnership under the Act.

(b)     The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.  Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.  Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

## 6.2     Liquidation of Assets

(a)     Upon dissolution of the Partnership, the General Partner must promptly liquidate the business and administrative affairs of the Partnership to the extent feasible, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority-in-Interest of Limited Partners will liquidate the business and administrative affairs of the Partnership.  Net Profit and Net Loss and any Special Situation Investment Sub-Accounts during any Accounting Period, which includes the period of liquidation, will be allocated pursuant to Article III.  The proceeds from liquidation will be divided in the following manner, subject to the Act:

(i)      the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation

38

(including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, must first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)     such debts as are owing to the Partners as Partners are next paid; and

(iii)    the Partners will next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the Accounting Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)     Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; provided, however, that if any in kind distribution is to be made, (i) the assets distributed in kind must be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind must be included in the Net Profit or Net Loss for the Accounting Period ending on the date of such distribution.

## Article VII
## ACCOUNTING AND VALUATION; BOOKS AND RECORDS

**7.1     Accounting and Reports**

(a)     The Partnership may adopt for tax accounting purposes any accounting method that the General Partner decides is in the best interests of the Partnership and that is permissible for U.S. federal income tax purposes.

(b)     As soon as practicable after the end of each Fiscal Year, the General Partner must cause an audit of the financial statements of the Partnership as of the end of each such period to be made by a firm of independent accountants selected by the General Partner.  As soon as is practicable thereafter, but subject to Section 7.5, the General Partner must furnish to each Limited Partner a copy of the set of annual financial statements prepared in accordance with GAAP by the Partnership's auditors, with such adjustments thereto as the General Partner determines appropriate, including the report of such independent accountants.

(c)     As soon as practicable after the end of each taxable year, the General Partner must furnish to each Limited Partner such information as may be required to enable each such Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year.  The General Partner has discretion

as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners must treat such items consistently on their own tax returns.

(d)     The General Partner will also furnish to the Limited Partners quarterly reports reviewing the Partnership's performance for such calendar quarter.

(e)     The General Partner will provide written notice to each Limited Partner within 10 days of (i) the death of either Principal or (ii) the date on which either Principal ceases to be involved in the business of the Investment Manager.

**7.2     Certain Tax Matters**

(a)     By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "***Tax Matters Partner***"), or, in each case, under any similar state or local law.  The Tax Matters Partner shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner.  The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period.  The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b)     The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

(c)     Each Limited Partner further agrees that such Limited Partner will not treat any Partnership item inconsistently on such Limited Partner's U.S. federal, state, local and/or non-U.S. tax returns or in any claim for a refund with the treatment of the item on the Partnership's tax returns and that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d)     The General Partner may in its discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or

40

permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws (including, but not limited to, making an election under Section 754 of the Code).

**7.3**     **Valuation of Partnership Assets and Interests**

(a)     The General Partner has delegated the valuation of the Partnership's assets to the Investment Manager, which values the assets of the Partnership as of the close of business on the last day of each Accounting Period based on the valuation of the Master Funds in accordance with the Investment Manager's policies and procedures, as may be revised from time to time.  Such valuations will generally be in accordance with GAAP, with such adjustments thereto as the Investment Manager determines appropriate.  In addition, the Investment Manager must value the assets which are being distributed in kind as of the close of the Business Day immediately preceding the distribution date in accordance with Section 5.5(b) or Section 6.2(b) (or if earlier, the most recent date for which valuation information is available).  In determining the value of the assets of the Partnership, no value is placed on the goodwill or name of the Partnership, or the office records, files, statistical data or any similar intangible assets of the Partnership not normally reflected in the Partnership's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell Investments pursuant to agreements entered into on or prior to such valuation date.

(b)     To the extent readily available, valuations will be based on independent market quotations obtained by the Investment Manager from recognized pricing services, market participants or other sources.  In the case of any Investment for which a quotation from an independent source is not available or is determined by the Investment Manager to be unreliable or inadequate, the Investment Manager (i) is authorized, to the extent permitted by applicable law, to value such positions at their fair value in such manner as the Investment Manager determines in good faith, including Special Situation Investments, (ii) is authorized to retain a third party valuation agent to value such positions at their fair value in such manner as such valuation agent determines in good faith, including Special Situation Investments, or (iii) may (but is not be required to) obtain an appraisal, at the expense of the Partnership, by an independent third party selected by the Investment Manager.  For purposes of calculating the Management Fees, Special Situation Investments will be valued at the lower of (i) cost or (ii) the fair value of the Special Situation Investment as determined by the Investment Manager or any valuation agent, as applicable, in good faith.  Except as otherwise determined by or at the direction of the Investment Manager, investment and trading transactions must be accounted for on the trade date.

(c)     Accounts are maintained in U.S. dollars, and except as otherwise determined by or at the direction of the Investment Manager:  (i) assets and liabilities

41

denominated in currencies other than U.S. dollars will be translated at the rates of exchange quoted by an independent pricing service as in effect as of the close of business on the relevant valuation dates (and exchange adjustments will be recorded in the results of operations); and (ii) investment and trading transactions and income and expenses will be translated at the rates of exchange in effect at the time of each transaction.

(d)     The same valuation principles apply at the level of the Master Funds, and the Partnership will utilize each Master Fund's valuations for all purposes in connection with the Partnership.

## 7.4    Determinations by the General Partner

(a)     All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, are determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations are final and binding on all the Partners; provided, however, that all calculations of the Performance Allocations will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)     The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or Capital Sub-Account (or other memorandum sub-account) as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

## 7.5    Books and Records

(a)     The General Partner must keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the Partnership.  The General Partner must afford to the Partnership's independent auditors reasonable access to such documents during customary business hours and must permit the Partnership's auditors to make copies thereof or extracts therefrom at the expense of the Partnership.

(b)     The General Partner may establish such standards as it deems appropriate regarding the access of Limited Partners to the books and records of the

Partnership and is not obliged to permit access by a Limited Partner to the name or address of any other Limited Partner.

**7.6**     **Confidentiality**

(a)     Each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns) or disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to any Investment (other than disclosure to such Limited Partner's directors, employees, agents, advisors, or representatives responsible for matters relating to the Partnership or to any other Person approved in writing by the General Partner (each such Person being hereinafter referred to as an "***Authorized Representative***")); <u>provided</u> that

(i)     such Limited Partner and its Authorized Representatives may make such disclosure to the extent that (A) the information to be disclosed is publicly available at the time of proposed disclosure by such Limited Partner or Authorized Representative, (B) the information otherwise is or becomes legally available to such Limited Partner other than through disclosure by the Partnership or the General Partner, or (C) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities or association; <u>provided</u> that such governmental agency, regulatory authorities or association is aware of the confidential nature of the information disclosed;

(ii)     such Limited Partner and its Authorized Representatives may make such disclosure to its beneficial owners to the extent required under the terms of its arrangements with such beneficial owners; and

(iii)     each Limited Partner will be permitted, after written notice to the General Partner, to correct any false or misleading information which becomes public concerning such Limited Partner's relationship to the Partnership or the General Partner.  Prior to making any disclosure required by law, each Limited Partner must use its best efforts to notify the General Partner of such disclosure.

Prior to any disclosure to any Authorized Representative or beneficial owner, each Limited Partner must advise such Authorized Representative or beneficial owner of the obligations set forth in this Section 7.6(a) and each such Authorized Representative or beneficial owner must agree to be bound by such obligations.

(b)     The General Partner may keep confidential from the Limited Partners, for such period of time as the General Partner deems reasonable, any information, including the identity of the Partners or information regarding the Partners or Investments, which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner

believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

(c)     Subject to applicable legal, fiscal and regulatory considerations, the General Partner will use reasonable efforts to keep confidential any information relating to a Limited Partner obtained by the General Partner in connection with or arising out of the Partnership which the Limited Partner requests to be kept confidential.

(d)     Notwithstanding the provisions of this Section 7.6, Partners (and their employees, representatives and other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and its transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to such Person by, or on behalf of the Partnership. For this purpose, "tax treatment" is the purported or claimed U.S. federal income tax treatment of a transaction and "tax structure" is limited to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction.  For this purpose, the names of the Partnership, the Partners, their Affiliates, the names of their partners, members or equity holders and the representatives, agents and tax advisors of any of the foregoing are not items of tax treatment or tax structure.

(e)     The General Partner may disclose to prospective investors such information relating to the Partnership or the Investments as it believes in good faith will benefit the Partnership and facilitate investment in the Partnership by such prospective investors.

(f)     The Investment Manager and any other Person acting as a service provider to the Partnership has the right to access all information belonging to the Partnership.

## Article VIII
## GENERAL PROVISIONS

**8.1     Amendment of Partnership Agreement**

(a)     Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, by the General Partner with the consent of a Majority-in-Interest of Limited Partners (which approval may be obtained by negative consent affording the Limited Partners at least 45 calendar days to object).

(b)     Any amendment that would:

(i)     increase the obligation of a Partner to make any contribution to the capital of the Partnership;

(ii)     reduce the Capital Account of a Partner other than in accordance with Article III;

       (iii)     adversely alter any Partner's rights with respect to the allocation of Net Profit or Net Loss or with respect to distributions and withdrawals; or

       (iv)     change the respective liabilities of the General Partner and the Limited Partners;

may only be made if the prior consent of each Partner adversely affected thereby is obtained (which approval may be obtained by negative consent affording the affected Limited Partners at least 45 calendar days to object).

(c)     Notwithstanding paragraphs (a) and (b) of this Section 8.1, this Agreement may be amended by the General Partner without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner, whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment, has an opportunity to withdraw from the Partnership (without being subject to the Early Withdrawal Reduction) as of a date determined by the General Partner that is not less than 45 calendar days after the General Partner has furnished written notice of such amendment to each affected Limited Partner and that is prior to the effective date of the amendment. The admission and withdrawal of Limited Partners will not require notice or disclosure to, or the approval of, the other Limited Partners.

(d)     The General Partner may at any time without the consent of the other Partners:

       (i)     add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

       (ii)     cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

       (iii)     change the name of the Partnership;

       (iv)     make any changes required by a governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners, provided, however, that no such amendment may be made unless such change (A) is for the benefit of, or not adverse to, the interests of Limited Partners, (B) does not affect the right of the General Partner to manage and control the Partnership's business, (C) does not affect the allocation of profits and losses among the Partners and (D) does not affect the limited liability of the Limited Partners;

       (v)     amend this Agreement to reflect a change in the identity of the General Partner which has been made in accordance with this Agreement;

       (vi)     amend this Agreement (other than with respect to the matters set forth in Section 8.1(b)) to effect compliance with any applicable laws, regulations or administrative actions;

(vii)    subject to Section 8.1(b), amend this Agreement to reflect the creation, and terms, of any new class or series of Interests;

(viii)    amend this Agreement to enable the Partnership or the Tax Matters Partner to comply with BBA provisions, or to make any elections or take any other actions available thereunder;

(ix)    effect any other amendment which would not, in the good faith judgment of the General Partner, adversely affect any of the existing Limited Partners; and

(x)    restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(e)    The General Partner may agree with a Limited Partner to waive, modify or supplement the application of any provision of this Agreement with respect to such Limited Partner without notifying or obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights as a Limited Partner pursuant to this Agreement would be materially and adversely changed by such waiver or modification). Any such waiver, modification or supplementation may be evidenced by a "side letter" or other document which will govern with respect to the applicable Limited Partner and be incorporated as part of this Agreement.

**8.2    Special Power-of-Attorney**

(a)    Each Limited Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns), with full power of substitution, as the true and lawful representative and attorney-in-fact of, and in the name, place and stead of, such Limited Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish:

(i)    an amendment to this Agreement that complies with the provisions of this Agreement (including the provisions of Section 8.1);

(ii)    the Certificate and any amendment thereof required because this Agreement is amended, including an amendment to effectuate any change in the membership of the Partnership or in the capital contributions of the Partners;

(iii)    any financing statement or other filing or document required or permitted to perfect the security interests contemplated by any provision hereof; and

(iv)    all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the State of Delaware, or any other jurisdiction in which the Partnership determines to

46

do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership, or to effect the dissolution or termination of the Partnership.

(b)     Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without that Limited Partner's consent.  If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner contemplated by this Agreement, each Limited Partner agrees that, notwithstanding any objection which such Limited Partner may assert with respect to such action, the General Partner is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which the General Partner determines necessary or appropriate to permit such amendment to be made or action to be lawfully taken or omitted.  Each Partner is fully aware that each other Partner relies on the effectiveness of this special power-of-attorney with a view to the orderly administration of the affairs of the Partnership.  This power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the General Partner and as such:

(i)     is irrevocable and continues in full force and effect notwithstanding the subsequent death or incapacity of any party granting this power-of-attorney, regardless of whether the Partnership or the General Partner has had notice thereof; and

(ii)     survives the delivery of an assignment by a Limited Partner of the whole or any portion of such Limited Partner's Interest, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this power-of-attorney given by the assignor survives the delivery of such agreement for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

## 8.3     Notices

Notices which may be or are required to be given under this Agreement by any party to another must be given by hand delivery, transmitted by facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and must be addressed to the respective parties hereto at their addresses as set forth on the Schedule of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner.  Notices will be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted

47

electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.

**8.4    Agreement Binding Upon Successors and Assigns; Delegation**

This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder are not assignable, transferable or delegable except as provided in Sections 4.1(c), 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections will be null and void *ab initio*.

**8.5    Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of law rules thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in the Delaware Court of Chancery. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the Schedule of Partners maintained by the General Partner.

**8.6    Not for Benefit of Creditors**

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership. Except for the rights of the Indemnified Persons hereunder, this Agreement is not intended for the benefit of non-Partner creditors, and no rights are granted to non-Partner creditors under this Agreement.

**8.7    Consents and Voting**

(a)     Upon the request of any Limited Partner, the General Partner may designate an Interest as a Non-Voting Interest, in which case the Limited Partner will not have the right to vote on any matter, including amendments.

(b)     Any and all consents, agreements or approvals provided for or permitted by this Agreement must be in writing and a copy thereof must be filed and kept with the books of the Partnership. For the avoidance of doubt, an amendment made pursuant to Section 8.1(c) or Section 8.1(d) or pursuant to negative consent under Sections 8.1(a) or 8.1(b) will not require any affirmative written response by any Limited Partner who is not electing to withdraw from the Partnership.

**8.8    Merger and Consolidation**

(a)     The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an

48

agreement of merger or consolidation which has been approved in the manner contemplated by Section 17-211(b) of the Act.

(b)       Notwithstanding anything to the contrary contained elsewhere in this Agreement, an agreement of merger or consolidation approved in accordance with Section 17-211(b) of the Act may, to the extent permitted by Section 17-211(g) of the Act, (i) effect any amendment to this Agreement, (ii) effect the adoption of a new limited partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the limited partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) will be the limited partnership agreement of the surviving or resulting limited partnership.

**8.9     BHCA Subject Persons**

Notwithstanding any other provision of this Agreement to the contrary:

(a)       Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that provides the General Partner an Election Notice and thereafter does not provide the General Partner a Revocation Notice, and that at any time has an Ownership Percentage in excess of 4.9% of the aggregate Ownership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, is deemed to hold an Ownership Percentage of only 4.9% of the aggregate Ownership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 8.9 on all such Limited Partners), and such Ownership Percentage in excess of said 4.9% is deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Ownership Percentages; <u>provided</u> that this limitation does not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of this Agreement up to the full amount of its Ownership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partner's Interest.  The foregoing voting restriction continues to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; <u>provided</u>, <u>however</u>, that the foregoing voting restriction does not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no Person acquires more than 2% of the Partnership's outstanding Interests; or (iv) in a single transaction to a third party who acquires at least a majority of the Partnership's outstanding Interests without regard to the Transfer of such Interests.

(b)      Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that provides the General Partner an Election Notice, and does not thereafter provide the General Partner a Revocation Notice, is not entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law.  Such right to consent is deemed granted to the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Ownership Percentages.

(c)      A Limited Partner that is a BHCA Subject Person and that elects to be subject to Section 8.9(a) and (b) must notify the General Partner thereof (an "***Election Notice***") and, on the General Partner's receipt of such Election Notice, such Limited Partner will be subject to Section 8.9(a) and (b) until 10 calendar days after such Limited Partner notifies the General Partner that it elects no longer to be subject to Section 8.9(a) and (b) (a "***Revocation Notice***"), which period may be reduced by the General Partner.

**8.10    Interpretation of Partnership Accounting Systems and Terminology**

In the event that the Partnership employs an accounting system which is different from the accounting system of the General Partner or whose terminology does not conform precisely to the terminology in this Agreement, the General Partner shall have the authority to interpret such accounting system and/or terminology in a manner which it, in its sole discretion, determines to be consistent with the objectives of this Agreement.

**8.11    Survival**

The obligations and covenants of the Limited Partners set forth in Sections 3.5, 7.2(b) and 7.2(c) hereof shall survive the Transfer or withdrawal by any Partner of the whole or any portion of its Interest, the death or legal disability of any Partner, and the dissolution or termination of the Partnership.

**8.12    RIC Limited Partners**

An Interest of a RIC Limited Partner does not entitle the RIC Limited Partner to vote or consent with respect to any Partnership matter unless the RIC Limited Partner's vote or consent with respect to its Interest would not be considered to be "voting securities" as defined under Section 2(a)(42) of the Investment Company Act.  Except as provided in this Section 8.12, an Interest held by a RIC Limited Partner as a Non-Voting Interest is identical in all regards to all other Interests held by Limited Partners.

**8.13    Bad Actor Limited Partners**

Under Rule 506(d) under the Securities Act, the Partnership may be banned from selling Interests under Rule 506 if a Limited Partner beneficially owning 20% or more of the Partnership's voting securities engages in a "bad act" set forth in Rule 506.  Accordingly, each Limited Partner agrees that the General Partner may deem the portion of any Bad Actor Limited Partner's Interest to be, or convert any Bad Actor Limited Partner's Interest into, a Non-Voting Interest (except for the purposes of voting on any amendment to this Agreement that would

materially and adversely change the Bad Actor Limited Partner's rights and preferences as a Limited Partner other than pursuant to an amendment under Section 8.1(c)) to the extent that the General Partner determines that such portion is in excess of 19.99% of the outstanding aggregate voting Interests of all Partners excluding any Interests that are Non-Voting Interests.

## 8.14    Miscellaneous

(a)    The captions and titles preceding the text of each section hereof are to be disregarded in the construction of this Agreement.  Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.  Use of the word "or" in this Agreement is not exclusive, but means "and/or."  Words in the singular include the plural, and words in the plural include the singular.  Any pronoun used in this Agreement will include the corresponding masculine, feminine or neuter forms.  Provisions apply to successive events and transactions.  The words "herein," "hereof" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.  All references in this Agreement to Articles, Sections, Schedules, paragraphs, subparagraphs and clauses will be deemed to be references to Articles, Sections, paragraphs, subparagraphs and clauses of, and Schedules to, this Agreement unless the context will otherwise requires.  References to "$" or "dollars" will mean United States dollars.  Unless otherwise expressly provided in this Agreement, any agreement, instrument or statute defined or referred to in this Agreement or in any agreement, instrument or statute that is referred to in this Agreement means such agreement, instrument or statute as from time to time amended, restated, waived or otherwise modified or supplemented, including (i) in the case of agreements or instruments, by waiver or consent, and (ii) in the case of statutes, by succession of comparable successor statutes, and references to all attachments thereto and instruments incorporated therein.

(b)    This Agreement may be executed in counterparts, each of which is deemed to be an original hereof.

(c)    If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

## 8.15    Entire Agreement

The parties acknowledge and agree that this Agreement, together with any other agreement with a Limited Partner pursuant to Section 8.1(e), constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

The parties hereto have executed this Agreement as of the day and year first above written.

GENERAL PARTNER

*On behalf of itself and as attorney-in-fact for the Limited Partners*

**Iterative Capital GP, L.L.C.**

By: _____
Name:  Brandon Buchanan
Title: Managing Member

ORIGINAL LIMITED PARTNER

*Solely to acknowledge withdrawal from the Partnership*

**Brandon Buchanan**

_____
Brandon Buchanan

*Signature Page to Amended and Restated Limited Partnership Agreement of Iterative Capital, L.P.*