**Memorandum Number _____**

Confidential Private Placement Memorandum

*Limited Partner Interests in*

# Iterative Capital, L.P.

*General Partner*
Iterative Capital GP, L.L.C.

*Investment Manager*
Iterative Capital Management, L.P.

***This Memorandum amends and restates the previous version of the Confidential Private Placement Memorandum dated September 2017 (the "Prior Memorandum") and contains material changes to and supersedes in its entirety the contents of the Prior Memorandum.***

December 2017

208641483 v41

## **TABLE OF CONTENTS**

Page

NOTICE ........................................................................................................................... ii

DIRECTORY .................................................................................................................... v

EXECUTIVE SUMMARY OF PRINCIPAL TERMS ........................................................ 1

INVESTMENT PROGRAM ............................................................................................. 3

MANAGEMENT AND ADMINISTRATION ..................................................................... 5

SUMMARY OF TERMS ................................................................................................. 8

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST ................................. 34

TAX CONSIDERATIONS ............................................................................................... 54

ERISA AND OTHER REGULATORY CONSIDERATIONS ............................................ 65

## NOTICE

This Confidential Private Placement Memorandum (this "***Memorandum***") is being furnished on a confidential basis solely to selected qualified investors (or their respective authorized representatives) considering the purchase of limited partner interests (the "***Interests***") in Iterative Capital, L.P. (the "***Fund***").  This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Iterative Capital GP, L.L.C. (the "***General Partner***") (other than to professional advisors of the prospective investor receiving this Memorandum from the General Partner or its authorized representative).

Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund.  Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure; provided, however, that such disclosure shall not include the name (or other identifying information not relevant to the tax structure or tax treatment) of any person and shall not include information for which nondisclosure is reasonably necessary in order to comply with applicable securities laws.  Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner.  Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice.  Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other matters relevant to the suitability of an investment in the Fund for such investor.  In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum.  The Interests have not been recommended by any U.S. federal or state, or any non-U.S. securities commission or regulatory authority.  Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum.  Any representation to the contrary is a criminal offense.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized.  The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any of the states of the United States.  The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws.  There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws.  Each subscriber for an Interest will be required to certify that it is an "accredited investor" as defined in Regulation D under the Securities Act.  The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended.

Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a substantial degree of risk. See "*Risk Factors and Potential Conflicts of Interest*" beginning at page 31. No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom. The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund. Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not purport to be, and should not be construed as, a complete description of the limited partnership agreement of the Fund or the investment management agreement by and among the Investment Manager, the Master Funds, the Offshore Fund (each as defined below), the General Partner and the Fund. Each prospective investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Fund's limited partnership agreement, the terms of the Fund's limited partnership agreement control.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those described in "Risk Factors and Potential Conflicts of Interest," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

Pursuant to an exemption from the Commodity Futures Trading Commission, neither the General Partner nor the Investment Manager is registered as a commodity pool operator (a "***CPO***") and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the applicable Master Funds' portfolio(s); or (b) the aggregate net notional value of the applicable Master Funds' commodity interest positions does not exceed 100% of the liquidation value of the applicable Master Funds' portfolio(s) and further that all pool participants are required to be accredited investors or certain other qualified investors.

All references herein to "$" refer to U.S. dollars.

References in this Memorandum to the investment activity of the Fund should be construed to refer to the Fund's investment activities through Iterative Capital Master, L.P., Iterative Mining Master, L.P. and any other collective investment vehicle(s) that may be formed in the future in which the Fund and Iterative Capital, Ltd. directly or indirectly invest (the "***Master Funds***"), and references to the Fund include the Master Funds, unless otherwise specified or the context so requires.

This Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

## DIRECTORY

| | |
|---|---|
| **General Partner** | Iterative Capital GP, L.L.C.<br>226 East 54th Street, 2nd Floor<br>New York, NY 10022 |
| **Investment Manager** | Iterative Capital Management, L.P.<br>226 East 54th Street, 2nd Floor<br>New York, NY 10022 |

*Telephone:*    (212) 363-0258
*Email:*        ████████@iterative.capital
*Attention:*    Brandon Buchanan and/or Christopher Dannen

| | |
|---|---|
| **Auditors** | Cohen & Company |
| **Administrator** | MG Stover & Co.<br>1331 17th Street, Suite 720<br>Denver, CO 80202 |
| **Legal Counsel** | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street; 44th Floor<br>Houston, Texas 77002 |

\*　\*　\*　\*　\*

*This Memorandum does not purport to be and should not be construed as a complete description of the limited partnership agreement of any of the Fund, Iterative Capital Master, L.P. or Iterative Mining Master, L.P., each as may be amended from time to time. Any potential investor in the Fund is encouraged to review these limited partnership agreements carefully, in addition to consulting appropriate legal and tax counselors.*

## EXECUTIVE SUMMARY OF PRINCIPAL TERMS

*The following information is presented as a summary of certain of the Fund's key terms only and is qualified in its entirety by reference to the more detailed information appearing in "Summary of Terms" herein, and to the limited partnership agreements of the Fund and the Master Funds, as amended.  Capitalized terms not defined have the meanings set forth elsewhere in this Memorandum.*

**The Fund and the Master Funds**

Iterative Capital, L.P., a Delaware limited partnership, invests through Iterative Capital Master, L.P., a Cayman Islands exempted limited partnership, Iterative Mining Master, L.P., a Delaware limited partnership, and any other collective investment vehicle(s) that may be formed in the future in which the Fund and Iterative Capital, Ltd. directly or indirectly invest.

**General Partner**

Iterative Capital GP, L.L.C., a Delaware limited liability company.

**Investment Manager**

Iterative Capital Management, L.P., a Delaware limited partnership.

**Principals**

The General Partner and the Investment Manager are controlled by Christopher Dannen and Brandon Buchanan.

**Investment Strategy**

The Fund seeks to maximize capital appreciation by investing all of its investible assets in the Master Funds, which invest, directly or indirectly, in cryptocurrencies and network tokens, as well as in mining operations and equipment relating to the generation thereof, as described in more detail herein.

**Minimum Investment**

Class A Interests: $5,000,000 minimum for initial investments.

Class B Interests: $250,000 minimum for initial investments.

**Management Fee**

Class A Interests: 1.5% (annualized) of the balance of each Capital Sub-Account (as defined herein) in each Master Fund, paid each quarter in advance.

Class B Interests: 2.0% (annualized) of the balance of each Capital Sub-Account in each Master Fund, paid each quarter in advance.

**Performance Allocation**

Class A Interests: 20% of net profits generally allocated by each Master Fund each calendar year, subject to a "high water mark" and calculated on an aggregate basis across all Master Funds.

Class B Interests: 25% of net profits generally allocated by each Master Fund each calendar year, subject to a "high water mark" and calculated on an aggregate basis across all Master Funds.

**Withdrawals**          Withdrawals are generally permitted quarterly, at the end of each calendar quarter, with at least 90 calendar days' prior written notice, subject to an "early withdrawal reduction" during the first 12 calendar months equal to a percentage of the gross withdrawal proceeds ranging from 10% to 4% depending on the date of withdrawal. Withdrawals are subject to reserves for contingencies, a partial hold-back pending completion of an annual audit and suspension restrictions.

**Variation of Terms**   The General Partner and/or the Investment Manager (as applicable) may agree with certain Limited Partners to a variation of the terms set forth in this Memorandum or establish additional Classes (as defined herein) that have terms that differ from those described herein, including different management fees, performance allocations, transparency and withdrawal rights.

## INVESTMENT PROGRAM

**Investment Objective**

The Fund is being formed for the purpose of investing all of its investible assets in the Master Funds, which will, directly or indirectly, acquire, generate, manage and hold investments in cryptocurrencies and network tokens (collectively, "***Coins***" or "***Investments***"), which Investments will be made through (i) trading on established cryptocurrency exchanges or in "over the counter" or other markets, (ii) structuring, designing and participating in "Token Generation Events," or (iii) "mining" new Coins using computing hardware configured for that purpose.  The principal objectives of the Master Funds will be (a) acquiring the Investments on favorable terms; and (b) managing, trading and holding such Investments for income producing purposes.  Each Master Fund may also invest in limited amounts of futures contracts for hedging purposes.

**Investment Strategy**

The Master Funds' investment strategies will be implemented using four main approaches: (i) cryptocurrency and network token accumulation (i.e., buy-and-hold); (ii) algorithmic and human-initiated trading based on research, fundamental analysis and technical trends; (iii) mining operations and equipment; and (iv) strategic acquisition and disposition activity involving crypto-networks. The Master Funds may implement other strategies both in conjunction with and instead of these main approaches. For purposes of this Memorandum, the term "trading" shall include, but not be limited to, any investment in, divestment of, exchange for value or other commercial transaction for or with cryptocurrencies with another party.

**Roles of the Master Funds**

More specifically, Iterative Capital Master, L.P., a Cayman Islands exempted limited partnership (the "***Strategic Master Fund***"), will focus on the Investment Manager's strategic investments (i.e., the buy-and-hold, algorithmic and human-initiated trading and strategic acquisition and disposition strategies), which is expected to make up approximately 60% of the total value of the Master Funds' combined assets.  The Strategic Master Fund is therefore expected to generate profits by making investments that the Investment Manager thinks will increase in value due to the price movements in the underlying Coins.  Within these strategies, the Strategic Master Fund expects to devote approximately 15% of the total value of the Master Funds' combined assets to a sub-strategy focused on the algorithmic trading of Coins, which may be conducted through the engagement of a sub-advisor to the Master Funds.  In addition, the Strategic Master Fund expects to deploy approximately 10% of the total value of the Master Funds' combined assets through a patient strategy of accumulating new or recently developed Coins with the goal of providing network support in relation to such Coins.

On the other hand, Iterative Mining Master, L.P., a Delaware limited partnership (the "***Mining Master Fund***"), will focus on investing in mining operations and equipment and participating in transactions on an "over-the-counter" cryptocurrency dealer and exchange, which strategy is expected to make up approximately 30% of the Master Funds' combined assets.  The Investment Manager's strategy for the Mining Master Fund encompasses two interrelated profit-generating sub-strategies. The first is the mining of Coins the value of which the Investment Manager expects will exceed the costs associated with such mining.  The Coins mined by the Mining Master Fund will be made available to be sold through the "over-the-counter" cryptocurrency dealer and exchange managed by

3

Iterative OTC, L.L.C., a separate business owned and operated by the Investment Manager ("**Iterative OTC**").  In exchange for Iterative OTC's right of first refusal to purchase the Mining Master Fund's Coins, the Mining Master Fund will be entitled to more favorable pricing terms than those offered to other buyers and sellers of Coins.  The Mining Master Fund may also receive additional consideration from Iterative OTC, to potentially include a percentage of Iterative OTC's profits on the sale of Coins purchased from the Mining Master Fund should Iterative OTC's sale price exceed the price it purchased the Coins from the Mining Master Fund by more than a specific amount.  While the Mining Master Fund will not own Iterative OTC or otherwise participate in the profits of Iterative OTC (other than the additional consideration described herein relating to Iterative OTC's sale of Coins originating from the Mining Master Fund and the management fee offset described below), it is expected that both of the Master Funds will benefit from greater access to the markets for Coins.  See "*Management and Administration – Iterative OTC*."  While the Mining Master Fund's portfolio of Coins will be monitored, the Investment Manager is expected to focus on meeting the demand for specific Coins from Iterative OTC.  Therefore, the Mining Master Fund's portfolio will differ from the portfolio of the Strategic Master Fund, which will focus solely on investment strategies that seek to generate the highest level of profits through direct investments in such Coins.

*The Investment Manager may sponsor the formation of one or more additional Master Funds for tax, legal, regulatory or other reasons in connection with the making of other Investments in the future.  The investment objectives, asset allocations and methods summarized above represent the General Partner's and Investment Manager's current intentions.  Depending on conditions and trends in the markets and the economy in general, the General Partner and the Investment Manager may pursue any objectives, employ any investment techniques, redeploy assets or purchase any type of investment in any quantity (in relative or absolute terms) that they consider appropriate and in the best interests of the Master Funds whether or not described in this section.  The foregoing discussion includes and is based upon numerous assumptions and opinions of the General Partner and Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.  **There can be no assurance that the Master Funds' investment strategies will achieve profitable results.  Investors risk the loss of their entire investment.***

## MANAGEMENT AND ADMINISTRATION

**The General Partner and the Investment Manager**

The general partner of the Fund and each Master Fund is Iterative Capital GP, L.L.C., a Delaware limited liability company registered in the Cayman Islands as a foreign company. Iterative Capital Management, L.P., a Delaware limited partnership, serves as the investment manager to the Fund, the Offshore Fund (as defined below) and each Master Fund.

**The Investment Management Agreement**

The Investment Management Agreement to be entered into by and among the Fund, the Offshore Fund, the Master Funds, the General Partner and the Investment Manager (the "***Investment Management Agreement***") provides that, in the absence of willful misconduct, bad faith or gross negligence, each of the Investment Manager, its principals, shareholders, managers, employees and affiliates will be indemnified by the Fund to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement. For its services the Investment Manager is entitled to the Management Fees (as defined herein) and reimbursement of any expenses incurred on behalf of the Fund. The Investment Management Agreement is terminable upon the dissolution of the Fund, the Offshore Fund or any Master Fund or by the Investment Manager, the Offshore Fund or the General Partner (on behalf of the Fund or any Master Fund) upon at least 75 days' prior notice.

**Investment Personnel**

The Investment Manager has successfully raised capital for 3 vehicles, Iterative Instinct Fund I, L.P., i2 Storj SPV, LP and Iterative Mining, LLC. The key investment professionals of the Investment Manager responsible for the Master Funds' investments are described below.

***Brandon Buchanan***. Mr. Buchanan is a founder and principal of the Investment Manager. Prior to founding the Investment Manager, Mr. Buchanan was the Chief Operating Officer and General Counsel of Metamorphic Ventures, an early stage venture capital fund with ~$100M AUM, where he oversaw fund operations and was a member of the deal team. Prior to Metamorphic, he was a Corporate Associate at Gunderson Dettmer, where he served as counsel to a number of the top startups, incubators and venture capital funds, advising on company formation, business strategy, fund formation, corporate governance, and venture financings. Additionally, he was involved in several M&A transactions, including the representation of Tumblr in its acquisition by Yahoo! and Betaworks' acquisition of Instapaper.

Before joining Gunderson Dettmer, he was an Associate in the M&A group of Credit Suisse AG's investment banking division, where his areas of focus included TMT and Healthcare M&A. He was part of the team that led the sell-side efforts for a venture-backed biopharmaceutical company, Relypsa, Inc., which eventually culminated into an IPO and the sell-side representation of GE with respect to its air filtration business.

Mr. Buchanan earned a B.A. in Political Science and a B.A. in Sociology from Brown University in 2007 and a juris doctorate from Harvard Law School in 2010.

*Christopher Dannen*.  Mr. Dannen is a founder and principal of the Investment Manager. Prior to founding the Investment Manager, Mr. Dannen was an independent strategy consultant. He has engaged clients including Bloomberg LP and Quartz.com (Atlantic Media Group). He is the author of the top-selling textbook *Introducing Ethereum and Solidity: Foundations of blockchain and cryptocurrency programming for beginners.*

At Bloomberg, Mr. Dannen worked with the infrastructure engineering team to collect ethnographic research from senior engineers, to be used in strategic recruiting. At Quartz, he worked with the Senior Director of Branded Content in order to come up with enterprise software content franchises in conjunction with clients like HP and Hitachi.

Before consulting independently, Mr. Dannen was a Senior Strategist at Undercurrent LLC, a 30-person management consulting company which was acquired in 2015. During his time at Undercurrent, Mr. Dannen developed long-term technology-focused business tactics for C-suite clients at American Express, General Electric, ARGO Insurance, and Pepsico.

At *Fast Company* magazine Mr. Dannen served as senior technology editor for two years, launching a content vertical aimed at engineers, and building out a nationwide e-commerce hackathon sponsored by Target. As an entrepreneur, he co-founded an iOS development shop in Brooklyn, NY, which continues to operate today as Sneakers Agency.

Mr. Dannen began his career as a technology reporter for CBS News covering publicly-traded enterprise software companies. He has authored four books. A self-taught programmer, Mr. Dannen holds one provisional patent on a computing hardware device for blockchain video distribution, filed Mar 8, 2016, number US 62/299,493.

*Leo Zhang*.  Leo Zhang is the research lead of the Investment Manager.  Mr. Zhang has 5 years of experience in financial services. Prior to joining the Investment Manager, he was a corporate finance and strategy analyst at Global Atlantic Financial Group, managing the capital positions of the entire organization.

At Global Atlantic Financial Group, Mr. Zhang assisted in the governance and optimization of the capital structure, strategic investment, capital deployment, and risk functions. Prior to Global Atlantic, Mr. Zhang was an equity derivative analyst in the Morgan Stanley Global Capital Markets division. Mr. Zhang facilitated a wide variety of transactions involving convertible bonds, call spread structures and accelerated share repurchase programs.

Prior to Morgan Stanley, Mr. Zhang was a co-founder of financial research startup The Opportune Time, while at college. Mr. Zhang built the research arm and grew the subscriber base to over 2,000 in a year. Mr. Zhang graduated from Stanford University with a bachelor's degree in mathematics.

**The Administrator**

The Fund has appointed MG Stover & Co. (the "*Administrator*") to serve as its administrator and perform certain general administrative tasks for the Fund pursuant to an administration agreement by and among the Fund, the Offshore Fund, the Strategic Master Fund and the Administrator (the "*Administration Agreement*"), including keeping financial records, calculating the net asset value of

the Fund, including the Performance Allocations (as discussed below), maintaining the partner list and handling capital subscriptions and withdrawals.

Under the Administration Agreement, the Fund will indemnify and hold the Administrator harmless against any liability, actions, proceedings, claims, losses, demands, costs or expenses (including, without limitation, any reasonable attorneys' fees) in connection with (i) any action taken or omitted in accordance with or reliance upon written or oral instruction from the Investment Manager or other representative of the Fund; (ii) the Administrator's reliance on prices, valuations or any other information provided by pricing services, the Investment Manager or a representative of the Fund; (iii) liability arising from the offering of the Interests by the Fund in reliance on regulatory exemptions; (iv) any action or omission of the Fund, the Investment Manager or any past or current service provider other than the Administrator; and (v) the Administrator's provision of its services to the Fund; provided that, the indemnification set forth in this clause (v) will not apply to any liability or expense resulting from the Administrator's own gross negligence or willful breach of duty.

THE ADMINISTRATOR WILL NOT PROVIDE ANY INVESTMENT ADVISORY OR MANAGEMENT SERVICES TO THE FUND AND THEREFORE WILL NOT BE IN ANY WAY RESPONSIBLE FOR THE FUND'S PERFORMANCE.  THE ADMINISTRATOR WILL NOT BE RESPONSIBLE FOR MONITORING ANY INVESTMENT RESTRICTIONS OR COMPLIANCE WITH THE INVESTMENT RESTRICTIONS AND THEREFORE WILL NOT BE LIABLE FOR ANY BREACH THEREOF.

The Mining Master Fund has retained an outsourced, third-party financial service provider to maintain the books and records of the Mining Master Fund, and thus, the Administrator will not maintain such books and records.

**Iterative OTC**

Iterative OTC is a separate business of the Investment Manager, which is wholly-owned by the Investment Manager.  Iterative OTC is in the process of establishing an "over-the-counter" cryptocurrency dealer and exchange operation to purchase and sell cryptocurrency, including Coins mined by the Mining Master Fund.

As described above, the Mining Master Fund is expected to engage in mining Coins that can be sold to Iterative OTC on favorable pricing terms, and which Iterative OTC will then sell to third parties.  In exchange for Iterative OTC's right of first refusal to purchase the Mining Master Fund's Coins, the Mining Master Fund will be entitled to more favorable pricing terms than those offered to other buyers and sellers of Coins.  The Mining Master Fund may also receive additional consideration from Iterative OTC, to potentially include a percentage of Iterative OTC's profits on the sale of Coins purchased from the Mining Master Fund should Iterative OTC's sale price exceed the price it purchased the Coins from the Mining Master Fund by more than a specific amount.

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms of an investment in the Fund, and is subject, and qualified in its entirety by reference, to the limited partnership agreement of the Fund, as may be amended from time to time (the "**Partnership Agreement**"), the amended and restated exempted limited partnership agreement of Iterative Capital Master, L.P., as may be amended from time to time (the "**Strategic Master Fund Partnership Agreement**"), the amended and restated limited partnership agreement of Iterative Mining Master, L.P., as may be amended from time to time (the "**Mining Master Fund Partnership Agreement**" and together with the Strategic Master Fund Partnership Agreement, the "**Master Fund Partnership Agreements**") and the subscription documents of the Fund (the "**Subscription Documents**" and collectively with the Partnership Agreement and the Master Fund Partnership Agreements, the "**Governing Documents**").   This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Governing Documents.  Accordingly, statements made in this Memorandum are subject to the detailed provisions of the Governing Documents.  Prospective investors are urged to review the Governing Documents in their entirety prior to determining whether to invest in the Fund.  Capitalized terms used but not defined herein have the meanings assigned to those terms in the Partnership Agreement.*

| | |
|---|---|
| **The Fund** | Iterative Capital, L.P., a Delaware limited partnership (the "***Fund***"). |
| **Master-Feeder Structure** | Iterative Capital Master, L.P., a Cayman Islands exempted limited partnership, Iterative Mining Master, L.P., a Delaware limited partnership, and any other collective investment vehicle(s) that may be formed in the future in which the Fund and the Offshore Fund (as defined below) directly or indirectly invest (the "***Master Funds***" and each, a "***Master Fund***").  In order to facilitate investments by non-U.S. and certain tax-exempt investors, the Investment Manager (as defined below) or one of its affiliates will sponsor the formation of Iterative Capital, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***").  The Fund and the Offshore Fund will directly or indirectly invest all of their investible assets in, and conduct all of their investment and trading activities through, the Master Funds and will not make any investments except through the Master Funds.  The Master Funds may engage in rebalancing and trades between themselves in order to effectuate the Fund's investment strategy as further described in the Master Fund Partnership Agreements.  The Investment Manager or one of its affiliates may also sponsor one or more additional investment funds or accounts. |
| | References in this Memorandum to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Funds, and references to the Fund include the Master Funds, unless otherwise specified or the context so requires. |
| **General Partner** | Iterative Capital GP, L.L.C., a Delaware limited liability company (the "***General Partner***"). |

| | |
|---|---|
| **Investment Manager** | Iterative Capital Management, L.P., a Delaware limited partnership (the "***Investment Manager***"). |
| **Principals** | Christopher Dannen and Brandon Buchanan (the "***Principals***"). |
| **Investment Strategy / Purpose** | The Fund seeks to maximize capital appreciation by investing all of its investible assets in the Master Funds, which, directly or indirectly, invest in cryptocurrencies and network tokens (collectively, "***Coins***"), as well as in mining operations and equipment relating to the generation of Coins (collectively with the Coins, "***Investments***"). The Master Funds will play the roles set forth in "*Investment Program*" above. |

The Investment Manager intends to manage each Master Fund's Investments such that the value of such Master Fund's assets attributable to "investment securities" (as defined under the Investment Company Act (as defined below)), will not exceed 40% of the total value of such Master Fund's assets, exclusive of certain U.S. federal government obligations and cash items.

***There can be no assurance that the Master Funds' investment strategies will achieve profitable results.***

| | |
|---|---|
| **Eligible Investors** | Limited partner interests in the Fund ("***Interests***") may be purchased by investors who are "accredited investors," as defined in the Subscription Documents. Subscribers will be required to complete the Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The General Partner reserves the right to reject any investor for any reason or for no reason in its discretion. |

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

| | |
|---|---|
| **Classes or Series of Interests** | The Fund is currently offering two classes of Interests: Class A Interests (the "***Class A Interests***") and Class B Interests (the "***Class B Interests***"). Other than with respect to Management Fees, Performance Allocations (each as defined below) and the required minimum investment, Class A Interests and Class B Interests have identical rights and obligations. |

In accordance with the Partnership Agreement, the Fund may create and offer various additional classes or series of Interests with different terms and conditions than those described in this Memorandum, including without limitation, fees, performance allocations and withdrawal rights (each, a "***Class***").  New Classes or series of Interests may be established by the General Partner without notice to or approval of the Limited Partners (as defined below).

**Subscriptions**

Subscriptions for Interests are generally accepted as of the first Business Day (as defined below) of each calendar quarter and/or such other days as the General Partner may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date. The initial closing of the Fund is currently expected to occur on or about December 1, 2017. The minimum investment for Class A Interests is $5,000,000 and the minimum investment for Class B Interests is $250,000, although, in each case, the General Partner may accept investments in a lesser amount.

"***Business Day***" means any day other than Saturday, Sunday or any other day on which banks located in New York, New York, Los Angeles, California or the Cayman Islands are required or authorized by law to be closed.

A subscriber admitted to the Fund as a limited partner (a "***Limited Partner***") will receive, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time.  However, a subscriber will not participate in any Special Situation Investment (as defined below) that is initiated by a Master Fund prior to the admission of such subscriber to the Fund.

The Fund is seeking, in the aggregate with the Offshore Fund, $50 million of capital contributions, but may accept a greater or lesser amount in the discretion of the General Partner.

All subscribers will be required to comply with such anti-money laundering procedures as are required by applicable anti-money laundering regulations as further described in the Subscription Documents.

| | |
|---|---|
| **Capital Accounts** | The Fund will maintain a book capital account (a "***Capital Account***") for the General Partner and each Limited Partner (each a "***Partner***" and collectively, the "***Partners***") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss.   The initial balance of each Partner's Capital Account will equal the amount of cash or net value of any property contributed to the Fund by such Partner. |

The General Partner may, in its discretion, maintain separate memorandum sub-accounts for each Capital Account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting or to otherwise give effect to the provisions of the Partnership Agreement.   Each Capital Account will reflect the aggregate sum of the balances of all memorandum sub-accounts in a Partner's Capital Account.

Each Master Fund will issue to each of the Fund and the Offshore Fund a limited partner interest and will maintain (a) a capital account for each of the Fund and the Offshore Fund and (b) separate capital sub-accounts within each of their capital accounts in such Master Fund that correspond to (i) the Classes held by Limited Partners in the Fund with respect to which an investment in such Master Fund has been made (to the extent of such investment) and (ii) the classes (and sub-classes, to the extent applicable) of shares held by the shareholders of the Offshore Fund with respect to which an investment in such Master Fund has been made (to the extent of such investment) (each, a "***Capital Sub-Account***"); provided that, each Master Fund will maintain a separate Capital Sub-Account for each Class of Interests held by a Partner.

| | |
|---|---|
| **Affiliated Investors** | The General Partner, the Principals, and Limited Partners affiliated with the General Partner or the Investment Manager, including their respective employees, members or partners and their respective immediate family members ("***Affiliated Investors***") do not bear the Performance Allocations or Management Fees in favor of the General Partner, in its capacity as the general partner of the Master Funds, and the Investment Manager, respectively, but do generally share *pro rata* in other applicable expenses (as more fully described in the Partnership Agreement). |
| **Borrowing and Leverage** | Each Master Fund may acquire Investments on margin and arrange with banks, brokers and others to borrow money against a pledge of Investments in order to employ leverage when the Investment Manager deems such action appropriate. |

**Management Fee**

For its services to each Master Fund, the Investment Manager is entitled to management fees, calculated and payable each calendar quarter in advance (the "***Management Fee***") at an annual rate of:

    (i)    1.5% of the balance of each Capital Sub-Account in each Master Fund that is associated with a Class A Interest; and

    (ii)    2.0% of the balance of each Capital Sub-Account in each Master Fund that is associated with a Class B Interest.

The Management Fee payable by each Master Fund is appropriately adjusted for any partial quarter (including the quarter which includes the initial closing, upon which the first installment of the Management Fee will be paid to the Investment Manager). The Management Fee is calculated and charged with respect to each Master Fund and borne by the Limited Partners as a deduction to their Capital Sub-Accounts in each such Master Fund. No separate management fee will be charged at the Fund level. The Investment Manager may reduce or eliminate the Management Fee with respect to any Capital Sub-Account of a Limited Partner in its sole discretion.

The Management Fees payable by the Master Funds will be reduced (but not below zero) by any Special Income as defined and described in "–*Special Income*" below.

During any calendar quarter, to the extent not payable from the proceeds of any sales of Coins held by a Master Fund, the Management Fee with respect to such Master Fund shall accrue during such quarter until funds become available to pay the accrued Management Fee.

To the extent that any of the Master Funds engages a Sub-Advisor, the Investment Manager may assign a portion of the Management Fees to such Sub-Advisor and may, but will not be required to, assign any other portion of the Management Fees to which it is otherwise entitled to any other person or entity.

**Other Expenses**

<u>Organizational Expenses</u>. The Fund bears the expenses of the organization of the Fund and the offering of Interests (including legal and accounting fees, printing costs, travel, "blue sky" filing fees and expenses, placement agent fees and out-of-pocket expenses). Any of the foregoing organizational expenses directly related to the formation of the Fund, the Offshore Fund, the Master Funds, Iterative Intermediate, L.L.C., any special purpose vehicles of the Master Funds and the General Partner will be allocated between, and borne by, the Fund and the Offshore Fund *pro rata* in proportion to their respective aggregate capital contributions to all of the Master Funds or in such manner that the General Partner may determine in its reasonable discretion to be fair and equitable. In general, the Fund's financial statements will be

prepared in accordance with accounting principles generally accepted in the United States ("*GAAP*").  However, the Fund intends to amortize its organizational expenses over a period of 60 calendar months from the date the Fund commences operations because it believes such treatment is more equitable than expensing the entire amount of the organizational expenses in the Fund's first year of operation, as is required by GAAP. The General Partner may, however, limit the amount of start-up and organizational expenses that the Fund amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

<u>Investment and Operational Expenses</u>.  Each Master Fund bears all costs, fees and expenses directly related to such Master Fund's investments or prospective investments (whether or not consummated), including expenses related to research, due diligence, underwriting (if any) and private placements, brokerage commissions and other execution and transaction costs, interest on, and commitment fees and expenses associated with, debt balances or borrowings, exchange, clearing and settlement charges, investment related travel expenses, appraisal fees and custody fees.  Subject to the terms of the Partnership Agreement, the Fund bears any withholding, transfer or other taxes imposed or assessed on, or payable by, the Fund (including any interest and penalties).  The Fund also bears all out-of-pocket costs of the operation and administration of the Fund, including (i) accounting, audit and legal expenses (including those incurred for the Fund, the General Partner, the Investment Manager or any Master Fund to comply with applicable law, rule or regulation and including regulatory filings, costs of third party compliance consultants and other expenses), (ii) any fees of the Fund's administrator, (iii) costs of any litigation or investigation involving the Fund's activities, (iv) the costs, fees and expenses of any appraisers, accountants, service providers or other experts engaged by the General Partner, the Investment Manager or any Master Fund, as well as other expenses directly related to the Master Funds' investments, (v) the costs of hardware required to generate private key material, fees and other expenses associated with storing private key backup material in secure facilities, and travel (including international travel) to the vaults containing the cryptographic media containing such keys and any other associated costs and expenses, whether incurred at the request of Master Fund counter-parties or Limited Partners, or on the initiative of the General Partner or the Investment Manager, (vi) costs associated with reporting and providing information to existing and prospective Limited Partners and the costs and expenses associated with meetings of Partners, (vii) the costs associated with maintaining "directors and officers" or similar liability insurance for the benefit of the Fund, the General Partner, the Investment Manager, the Master Funds or any other indemnified person; (viii) any Specialist Expenses (as defined below); (ix) any Sub-Advisor Expenses (as defined below); (x) expenses of any

third party valuation agent; and (xi) any costs or expenses of winding up and liquidating the Fund.  The Fund also bears its *pro rata* portion of any of the foregoing costs or expenses directly related to the operation, administration and investment program of the Master Funds.  However, the General Partner or the Investment Manager may, in its discretion, choose to absorb any such expenses incurred on behalf of the Fund or the Master Funds.

Expenses generally will be borne *pro rata* by the Partners (in proportion to their respective percentage interests in any investment at the level of the Master Funds with respect to expenses related to such investment and in proportion to their respective ownership percentages in the Fund with respect to any other expenses); provided that, expenses may be specially allocated among the Partners on any other basis that the General Partner determines, in its sole discretion, is clearly more equitable in light of the purposes for which such expenses were incurred.

Neither the Fund nor any of the Master Funds has its own separate employees or office.  Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager.

For the avoidance of doubt, in the event a Master Fund co-invests with an Other Account (as defined below), such Master Fund shall only bear its *pro rata* share (based on ownership percentage of such investment) of the expenses incurred in connection with such investment.  The portion of any Master Fund expenses related to Investments which are not consummated that may be allocable to the participants in a Co-Investment Opportunity (as defined below) will be borne by the relevant Master Fund to the extent that the General Partner is unable to cause such other participants to bear such expenses.  Any of the foregoing fees paid by a Master Fund will be borne by the Fund and the Offshore Fund *pro rata*.

**Specialists**

The Investment Manager may engage, on behalf of one or more Master Funds, third-party management teams, operators, management companies, servicers, servicing organizations or other managers to manage, advise or provide other services with respect to the making and management of certain Investments, either directly or through a portfolio vehicle set up for such purposes, who are compensated for such services.  Such specialists may be paid asset-based and performance-based compensation for their services ("***Specialist Expenses***").  Payments to specialists will generally be expenses of the relevant Master Fund(s) (to the extent not borne by a portfolio vehicle of such Master Fund(s)) and

will not offset the Management Fees or Performance Allocations and, therefore, may result in the Limited Partners bearing dual management and incentive fees or allocations.  However, the General Partner, as the general partner of each Master Fund, has the authority to waive the Management Fees or Performance Allocations (in whole or in part) in such circumstances.   "Specialist Expenses" may also include any expenses related to the indemnification of specialists for liabilities incurred in connection with their services to one or more Master Funds on terms to be negotiated by the Investment Manager, which expenses will generally be borne by such Master Fund(s).

|   |   |
|---|---|
| **Sub-Advisors** | The Master Funds may engage one or more sub-advisors to the Investment Manager (each, a "***Sub-Advisor***") to manage a portion of one or more Master Funds' portfolio of Investments and the Strategic Master Fund is expected to engage a Sub-Advisor using an algorithmic trading strategy.   A Sub-Advisor (or an affiliate thereof) may (1) become a special limited partner of one or more Master Funds, through which interest it would receive a portion of the Performance Allocation with respect to each such Master Fund, and (2) also receive a portion of the Management Fee with respect to each such Master Fund.  Alternatively, a Sub-Advisor may receive other fees negotiated by the Investment Manager.  In connection with engaging a Sub-Advisor, the Master Funds may bear expenses related to the indemnification of such Sub-Advisor for liabilities incurred in connection with its services to the Master Funds on terms to be negotiated by the Investment Manager (together with any other fees paid to Sub-Advisors, "***Sub-Advisor Expenses***"). |
| **Special Income** | As a result of its ownership of Iterative OTC, the Investment Manager may, directly or indirectly through Iterative OTC, receive fees, commissions and other compensation in connection with the "over-the-counter" cryptocurrency dealer and exchange operation managed by Iterative OTC (net of any expenses incurred by the Investment Manager or Iterative OTC in connection with generating such fees, "***Special Income***").  For the avoidance of doubt, Special Income does not include any management fees, incentive allocations or fees or carried interest payable by Co-Investment Vehicles (as defined below) to the Investment Manager or its affiliates. |

If any Master Fund or the Fund should receive any payments in the nature of Special Income, it is understood that such Master Fund or the Fund, as applicable, will receive such amounts as nominee of the Investment Manager or its affiliate, as applicable, and will promptly pay such amounts over to the Investment Manager or such affiliate.  Any Special Income received by the Investment Manager or its affiliates during a particular calendar quarter, subject to, if and to the extent applicable, a proportionate allocation of any such Special Income to any

Other Accounts buying or selling Coins through Iterative OTC (based on relative volume of purchases and sales of Coins), will serve to reduce, on a dollar-for-dollar basis, any Management Fees otherwise payable by the Master Funds on the first Business Day of the following calendar quarter.   Any such Special Income will be applied to reduce the Management Fees payable by the Master Funds *pro rata* in proportion to the relative amount of Management Fees payable by each such Master Fund on the relevant calendar quarter beginning.  For purposes of clarity, to the extent that Special Income received by the Investment Manager or its affiliates during a particular calendar quarter exceeds the aggregate amount of Management Fees payable by the Master Funds on the first Business Day of the following calendar quarter, such excess amount of Special Income will not offset any future Management Fees.

Any Special Income allocable to a particular Master Fund will be attributed to the Capital Sub-Accounts in such Master Fund *pro rata* based on the relative Capital Sub-Account balances as of the relevant calendar quarter beginning.

**Other Fees**

The Investment Manager may invest the Fund's capital (through the Master Funds) in one or more other existing or future investment vehicles advised or managed by the Investment Manager (collectively, with any future separate accounts advised or managed by the Investment Manager, "***Other Accounts***").   It is the practice of the Investment Manager and its affiliates to waive all management fees and performance allocations otherwise due to the Investment Manager or its affiliates (such management fees and performance allocations, the "***Other Fees***") with respect to the Fund's investment (via the Master Funds) in any Other Account in order to avoid the receipt of dual fees by the Investment Manager or its affiliates.  For the avoidance of doubt, no amount of the Other Fees earned by the Investment Manager or its affiliates from Other Accounts will be applied to reduce the Management Fees or Performance Allocations, or any similar fees otherwise owed by the Fund (through the Master Funds) to the Investment Manager or its affiliates.  Further, the Fund does not benefit from the Other Fees earned by the Investment Manager or its affiliates from Other Accounts.  If the Fund (through the Master Funds) is not invested in an Other Account, it will not have the right to participate in the investments of such Other Account.  The Fund's capital may not be invested in segregated accounts managed by the Investment Manager or its affiliates.

**Co-Investment Opportunities**

The General Partner may, but will not be obligated to, offer opportunities to invest in Investments alongside one or more Master Funds (the "***Co-Investment Opportunities***") to certain Limited Partners, shareholders of the Offshore Fund (together with the Limited Partners, each, an "***Investor***") or other persons (including Other Accounts and investors in

Other Accounts) on such terms and conditions as will be determined by the General Partner, which may include the payment of management fees, incentive allocations or fees or carried interest, none of which will offset or reduce Management Fees or the Performance Allocations. The General Partner or its affiliates may, but will not be obligated to, form a separate investment vehicle for the purpose of investing in one or more Co-Investment Opportunities (the "***Co-Investment Vehicle***"). The General Partner may offer a Co-Investment Opportunity to one or more Limited Partners or other persons without offering such Co-Investment Opportunity to other Limited Partners or persons. Co-Investment Opportunities may be allocated to such persons that may provide a benefit to the Fund in the General Partner's discretion. No Limited Partner will have any obligation to participate in any Co-Investment Opportunity.

**Allocation of Net Profit and Loss**

Net profit or net loss of the Fund (including unrealized gains or losses and Fund expenses) is allocated among the Capital Accounts of the Partners as of the close of each calendar quarter, at such times as the Fund receives an additional capital contribution or effects a withdrawal or distribution, at the time of a disposition or other "Recognition Event" (as described below) with respect to a Special Situation Investment at the level of the Master Funds, or at such other times as the General Partner may determine (each such period, an "***Accounting Period***").

Profit and loss attributable to Special Situation Investments made by a Master Fund are determined and allocated among such Master Fund's partners (and the relevant Capital Sub-Accounts) separately and are not reflected in the determinations and allocations of net profit or net loss attributable to the remainder of the Fund's net assets.

As of the close of each Accounting Period, the net profit or net loss of the Fund is allocated (subject to any Performance Allocations paid at the level of the Master Funds and described below) *pro rata* among the Capital Accounts of the Partners in proportion to their respective percentage interests in the Fund as of the commencement of such Accounting Period. Each Partner's percentage interest in the Fund as of the commencement of any Accounting Period is based on the value of the Partner's Capital Account at such time (excluding any memorandum sub-accounts attributable to such Partner's share of Special Situation Investments) relative to the value of all the Partners' Capital Accounts at such time (excluding all memorandum sub-accounts attributable to Special Situation Investments).

If the General Partner, in its capacity as the general partner of a Master Fund, determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Limited Partner may agree such

Limited Partner should not participate (or should receive a reduced participation) in the net profit or net loss with respect to any investment made by such Master Fund, the General Partner, in its capacity as the general partner of such Master Fund, may allocate net profit or net loss, if any, with respect to the investment at the level of the Master Funds to the other Investors in such Master Fund to the extent to which the above restrictions do not apply.

The Management Fee is calculated based on the balance of each Capital Sub-Account in each  Master Fund and is debited from each such Capital Sub-Account and corresponding Capital Account.  Allocations to each Capital Sub-Account of net profit or net loss of such Master Fund will be subject to periodic adjustment to give effect to the Performance Allocation, as described below.

**Special Situation Investment Allocations**

Certain Investments may be or become non-marketable or illiquid investments ("***Special Situation Investments***").  The General Partner may determine, in its discretion, whether and when to classify an Investment as a Special Situation Investment whether at the time of purchase or at a later date.  When a Master Fund makes a Special Situation Investment or on the date the Investment is designated as a Special Situation Investment, each Capital Sub-Account of an Investor in such Master Fund at such time is allocated a *pro rata* interest in the Special Situation Investment, based on the value of each such Capital Sub-Account at such time (exclusive of any other Special Situation Investment Sub-Accounts (as defined below) associated with each such Capital Sub-Account) relative to the value of all Capital Sub-Accounts in such Master Fund at the same time (excluding all Special Situation Investment Sub-Accounts in such Master Fund) (with respect to each Capital Sub-Account in a Master Fund, a "***Master Percentage Interest***"). An amount equal to a Capital Sub-Account's *pro rata* share of the cost of the Special Situation Investment is debited from the balance of such Capital Sub-Account (exclusive of its interest in other Special Situation Investments) and credited to a separate memorandum sub-account within the same Capital Sub-Account in the Master Fund, relating specifically to such Capital Sub-Account's *pro rata* interest in that Special Situation Investment (each, a "***Special Situation Investment Sub-Account***").  The Special Situation Investment Sub-Accounts relating to a particular Special Situation Investment are closed out, and the associated profit or loss is determined and allocated, upon the occurrence of a Recognition Event relating to such Special Situation Investment.

A "***Recognition Event***" means any of the following:

(i)   a sale of the Special Situation Investment for cash;

(ii)  an exchange of the Special Situation Investment for marketable securities;

(iii) an in-kind distribution of the Special Situation Investment to partners of the relevant Master Fund;

(iv)  at the discretion of the General Partner and if market quotations have become readily available, the occurrence of all events necessary to permit the relevant Master Fund to make unrestricted public resales of such Special Situation Investment in the principal market for which such quotations are available;

(v)   a determination that the circumstances which resulted in classification as a Special Situation Investment no longer exist; or

(vi)  the liquidation of the relevant Master Fund's assets pursuant to the winding up and dissolution of such Master Fund.

The profit or loss relating to a Special Situation Investment is equal to the difference between the sales proceeds (in the case of a sale) or the fair market value (in the case of another Recognition Event) and the original cost of the Special Situation Investment.   Appropriate adjustment is made for any expenses directly related to the Special Situation Investment and for any dividends or interest received with respect thereto.   The profit or loss relating to a particular Special Situation Investment is allocated *pro rata* among each of the Capital Sub-Accounts participating in such Special Situation Investment.   A Capital Sub-Account will receive its *pro rata* portion based on the balance of its associated Special Situation Investment Sub-Account, with no allocation being made to any Capital Sub-Account not having an associated Special Situation Investment Sub-Account relating to the particular Special Situation Investment.

When a Special Situation Investment Sub-Account is closed, the balance therein is combined with the associated Capital Sub-Account, and the Master Percentage Interest of each Capital Sub-Account in the relevant Master Fund will be adjusted accordingly.

**Performance Allocation**     The General Partner, as the general partner of each Master Fund, is entitled to a performance allocation at the end of each calendar year from each such Master Fund (the "***Performance Allocation***"), which is calculated and charged separately with respect to each Capital Sub-Account in such Master Fund, equal to:

      (i)     20% per annum with respect to Class A Interests; and

      (ii)    25% per annum with respect to Class B Interests

of the amount by which the relevant Capital Sub-Account's positive "Performance Change Amount" for the current calendar year exceeds such Capital Sub-Account's "Loss Carryforward Amount."

A Capital Sub-Account's "***Performance Change Amount***" for any calendar year equals such Capital Sub-Account's *pro rata* allocation of net profit or net loss (including taking into account Management Fees, any associated Special Situation Investment Sub-Account closed during the period or other items of income or expense specially allocable to the Capital Sub-Account).

The "***Loss Carryforward Amount***" for any calendar year equals the aggregate Performance Change Amounts, if negative, allocated to a Capital Sub-Account during any preceding calendar year, minus any subsequent positive Performance Change Amounts on which no Performance Allocation was charged.  If a withdrawal is made from a Capital Sub-Account at a time when there is a Loss Carryforward Amount with respect to such Capital Sub-Account, such Loss Carryforward Amount will be reduced in the same proportion that the withdrawal amount bears to the total Capital Sub-Account balance immediately prior to the withdrawal.

The Performance Allocation is calculated and charged to each Capital Sub-Account as of the last day of each calendar year.  The Performance Allocation is also calculated and charged with respect to any Capital Sub-Account from which there is a permitted or required withdrawal (corresponding to a Limited Partner's permitted or required withdrawal from its Capital Account at the Fund level) as of any time other than the last day of a calendar year on the basis of net profits allocated to such Capital Sub-Account through the applicable Withdrawal Date (as defined below).  In the case of a partial withdrawal, the Performance Allocation is calculated and charged only with respect to the portion of the Capital Sub-Account being withdrawn.

The Performance Allocation with respect to a particular Capital Sub-Account in a Master Fund will take into account expenses of the Fund incurred with respect to such Capital Sub-Account as of such calculation

date (in such a manner that all such expenses are so taken into account by one of the Master Funds).

No separate performance allocation will be charged at the Fund level.

The Performance Allocation with respect to any Capital Sub-Account may be waived or reduced by the General Partner in its discretion.

The General Partner does not receive a Performance Allocation on assets of a Master Fund while they are held in a Special Situation Investment Sub-Account in such Master Fund.

To the extent that the Master Funds engage a Sub-Advisor, the General Partner may allocate a portion of the Performance Allocations to such Sub-Advisor and may, but will not be required to, allocate any other portion of the Performance Allocations to which it is otherwise entitled to any other person or entity.

**Aggregate Calculation of Performance Allocations**

The Performance Allocation and Loss Carryforward Amount will be computed separately for each Capital Sub-Account in each Master Fund. However, any Loss Carryforward Amount associated with a particular Capital Sub-Account in a Master Fund will be appropriately adjusted for withdrawals from the relevant Limited Partner's corresponding Capital Sub-Account(s) in the other Master Fund(s), if applicable, in a manner consistent with the premise that any Performance Allocation debited against the applicable Capital Sub-Account in another Master Fund will be equal to the amount, if any, that would have been debited against the corresponding Capital Sub-Account in the first Master Fund as a Performance Allocation had such investments been made by the first Master Fund (without double counting) such that the aggregate Performance Allocations made by all of the Master Funds will be equal to a hypothetical single performance allocation calculation with respect to all investments made by each of the Master Funds.

**Distributions**

Subject to the withdrawal privilege described below, all earnings of the Fund (if any) are ordinarily retained for investment through the Master Funds.  Other than distributions made pursuant to a withdrawal described below, Limited Partners should not expect the Fund to make any distributions.

**Withdrawals Generally**

Subject to certain withdrawal restrictions described below, a Limited Partner is generally permitted to initiate complete or partial withdrawal of the balance of a Capital Account as of the last Business Day of each calendar quarter (and/or such other days as the General Partner may determine in its discretion) (each, a "***Withdrawal Date***").

Notice of any withdrawal must be provided in writing to the General Partner at least 90 calendar days prior to the proposed Withdrawal Date. The General Partner may, in its discretion, waive such notice requirements.

**Early Withdrawal Reduction**

A withdrawal of capital from a Capital Account (and the corresponding Capital Sub-Account) prior to the end of 12 complete calendar months after the date such capital was contributed to the Fund is subject to an early withdrawal reduction (the "***Early Withdrawal Reduction***") equal to:

(i)     10% of the gross withdrawal proceeds, if such withdrawal occurs prior to the end of 3 complete calendar months after the contribution of such capital to the Fund;

(ii)    8% of the gross withdrawal proceeds, if such withdrawal occurs after the end of 3 complete calendar months, but prior to the end of 6 complete calendar months after the contribution of such capital to the Fund;

(iii)   6% of the gross withdrawal proceeds, if such withdrawal occurs after the end of 6 complete calendar months, but prior to the end of 9 complete calendar months after the contribution of such capital to the Fund; and

(iv)    4% of the gross withdrawal proceeds, if such withdrawal occurs after the end of 9 complete calendar months, but prior to the end of 12 complete calendar months after the contribution of such capital to the Fund.

The Early Withdrawal Reduction is retained by the Master Funds for the benefit of the remaining Investors and deducted from the withdrawal proceeds of the withdrawing Limited Partner.  The Early Withdrawal Reduction will not apply in the event of a compulsory withdrawal.

**Settlement of Withdrawal Proceeds**

The estimated amount due in connection with any withdrawal is normally paid within 30 calendar days after the Withdrawal Date, provided that (i) the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund or the remaining Limited Partners and (ii) in the event that distributions of withdrawal proceeds during a calendar year to a withdrawing Limited Partner exceed 95% of the lesser of: (A) the value of such Limited Partner's Capital Account (excluding amounts held in any Special Situation Investment Sub-Account associated with such Limited Partner's Capital Sub-Account at the level of the Master Funds) as of the beginning of such calendar year and (B)

the lowest value of such Limited Partner's Capital Account (excluding amounts held in any Special Situation Investment Sub-Account associated with such Limited Partner's Capital Sub-Account at the level of the Master Funds) as of the end of any calendar quarter during such calendar year or as of such Withdrawal Date, if not at a quarter end, the General Partner may hold back and distribute the excess requested amounts, without interest thereon, promptly following completion of the audit of the Fund's financial statements for such calendar year, or sooner in the General Partner's discretion.  Settlement may be paid in cash, cash equivalents or Coins.

The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal, as well as any Early Withdrawal Reductions described above.

A request for a partial withdrawal from a Capital Sub-Account at the level of the Master Funds (corresponding to a Limited Partner's request for a partial withdrawal at the Fund level) is charged to such Capital Sub-Account balance, excluding any portion recorded in Special Situation Investment Sub-Accounts associated with such Capital Sub-Account, unless otherwise agreed with the General Partner.  In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded from the balance of a Capital Sub-Account, excluding the portion recorded in any Special Situation Investment Sub-Accounts associated with such Capital Sub-Account, no settlements occur with respect to any such Special Situation Investment Sub-Accounts until the occurrence of a Recognition Event with respect to each such Special Situation Investment after the scheduled payment date for the withdrawal.  If the Recognition Event is a sale for cash, the settlement is funded in cash within 5 calendar days after the Recognition Event (without interest).  If the Recognition Event is not a sale for cash, the General Partner may effect the settlement either by making an in-kind distribution of the Capital Sub-Account's ratable share of the relevant Investment or by distributing the net proceeds derived from a sale of such Investment (and such 5 calendar day period will not apply).  In connection with any such settlement, a calculation of the Capital Sub-Account's net profits through the date of the Recognition Event is made to determine whether any Performance Allocation is to be credited to the General Partner.  The General Partner is entitled to withdraw an amount equal to any such Performance Allocation from its capital account at the same time and in the same form (in cash or in kind) as the distribution from the Capital Sub-Account.  In the event of a full or partial withdrawal in an amount that may not be satisfied by the balance of a Capital Sub-Account (corresponding to a Limited Partner's request for a withdrawal at the Fund level) exclusive of Special Situation Investment Sub-Accounts, if

any, associated with such Capital Sub-Account at the level of the Master Funds, the General Partner may withhold as a reserve an amount equal to the anticipated Management Fees attributable to the relevant remaining Special Situation Investments as determined by the General Partner in its sole and absolute discretion. The capital to be withdrawn does not participate in new Special Situation Investments made after the relevant Withdrawal Date.

**Withdrawal Conditions**
The General Partner may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner may reasonably require in its discretion.  This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the investor, the General Partner reserves the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the withdrawal proceeds will be paid. The withdrawal proceeds will not be paid to a third-party account if the investor and/or owner of the account fails to provide such information.

**Compulsory Withdrawals**
The General Partner reserves the right, in its discretion, to compel the withdrawal of any Limited Partner's Interest, in part or in its entirety, on not less than five days' prior written notice (or immediately if the General Partner determines in its discretion that such Limited Partner's continued participation in the Fund may cause the Fund, any Master Fund, the Investment Manager or the General Partner to violate any applicable law).  Settlements are made in the same manner as voluntary withdrawals, provided, however, settlement may be made in cash, cash equivalents, Coins or by issuance of a promissory note issued by the Fund (or any combination of the foregoing) as the General Partner in its discretion selects, and the Early Withdrawal Reduction will not apply in the event of a compulsory withdrawal.

**Suspension of Withdrawals and Withdrawal Payments**
The General Partner may suspend the issuance of Interests, the Partners' withdrawal privileges, the payment of withdrawal proceeds or the valuation of the Fund's net assets if any of these corresponding actions is taken by the General Partner, in its capacity as the general partner of each Master Fund, on behalf of any Master Fund. The General Partner, in its capacity as the general partner of each Master Fund, may suspend the issuance of limited partner interests in any Master Fund, limited partner withdrawal privileges with respect to any Master Fund, the payment of withdrawal proceeds by any Master Fund or the valuation of any Master Fund's net assets if it determines that such a suspension is warranted by extraordinary circumstances, including:

(i)    during any period when any exchange or over-the-counter market on which the relevant Master Fund's Investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

(ii)    during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner (in its capacity as the general partner of the relevant Master Fund), disposal of, or withdrawals or redemptions from, Investments by such Master Fund, or the determination of the value of the assets of such Master Fund, would not be reasonably practicable or would be seriously prejudicial to the non-withdrawing Investors;

(iii)    during any breakdown in the means of communication normally employed in determining the price or value of the relevant Master Fund's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of such Master Fund cannot reasonably be accurately ascertained within a reasonable time frame;

(iv)    during any period when the transfer of funds involved in the realization or acquisition of any Investments cannot, in the reasonable opinion of the General Partner (in its capacity as the general partner of the relevant Master Fund), be effected at normal rates of exchange;

(v)    in other circumstances where the General Partner (in its capacity as the general partner of the relevant Master Fund) is unable to fairly value such Master Fund's assets due to extreme market conditions;

(vi)    in contemplation of or during the winding-up or liquidation of the relevant Master Fund; or

(vii)    for such other reasons or for such other periods as the General Partner may in good faith reasonably determine.

Upon the reasonable determination by the General Partner that the conditions leading to suspension with respect to a particular Master Fund no longer apply, withdrawal rights at the level of the Master Funds shall be promptly reinstated, and withdrawal rights at the Fund level shall be promptly reinstated. In that situation, any pending withdrawal requests (or new, timely withdrawal requests) at the Fund level shall be honored as of the end of the last Business Day of the calendar month following such determination, unless such determination is made fewer than 10

25

days prior to such month end, in which case the General Partner shall honor any pending notices of withdrawal as of the end of the last Business Day of the following calendar month (or at such other time as the General Partner determines), in any event subject to the other restrictions on withdrawals described above.

**Affiliated Investor and Sub-Advisor Withdrawals**

Capital contributed by Affiliated Investors and any Sub-Advisors is generally subject to the same restrictions on withdrawal as those applicable to Limited Partners, provided that the General Partner and any such Sub-Advisors (to the extent that they receive a portion of the Performance Allocations as described in " – *Sub-Advisors*" above) may, unless prohibited by law, make withdrawals of all or any part of the Performance Allocations and gains thereon from their respective capital accounts at the level of the Master Funds as of any calendar month-end.

**Transfers**

Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in the General Partner's discretion.   The General Partner in its discretion may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement.

**Duty of Care; Indemnification**

The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Fund or the Limited Partners for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, bad faith or gross negligence or as otherwise required by (applicable) law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Fund's business or affairs to the fullest extent permitted by (applicable) law.   The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors.   The Fund must advance funds to any person entitled to indemnification by the Fund before the final disposition of such action, suit or proceeding if such person agrees to repay the advanced funds in the event that it is subsequently determined that such person is not entitled to indemnification.

Each Master Fund Partnership Agreement provides that the General Partner (in its capacity as the general partner of each such Master Fund), the Investment Manager and each of their affiliates are not liable to the relevant Master Fund or its limited partners, including the Fund, for any loss or damage arising by reason of being or having been the general partner of such Master Fund or the Investment Manager or from any acts or omissions in the performance of its services as general partner of such Master Fund or Investment Manager, as applicable, in the absence of willful misconduct, bad faith or gross negligence (as interpreted in accordance with the laws of the State of Delaware) or as otherwise required by (applicable) law, and contains provisions for the indemnification of the General Partner (in its capacity as general partner of each such Master Fund), the Investment Manager and each of their affiliates by the relevant Master Fund (but not by its limited partners individually) against any liabilities arising by reason of being or having been the general partner of such Master Fund or the Investment Manager or in connection with such Master Fund Partnership Agreement or such Master Fund's business or affairs to the fullest extent permitted by (applicable) law.

**Valuations**

In general, the Fund's financial statements will be prepared in accordance with GAAP.  The General Partner has delegated the valuation of the Fund's assets to the Investment Manager which values the Fund's assets as of the close of business at the close of each Accounting Period based on the valuation of the Master Funds in accordance with the Investment Manager's valuation policies and procedures.  The time of day determined to be the "close of business" will itself be determined in accordance with the Investment Manager's valuation policies and procedures and is currently set at midnight UTC. The General Partner (in its capacity as the general partner of each Master Fund) has also made a similar delegation in respect of each Master Fund's assets, and the Investment Manager has retained a third party valuation agent (the "***Valuation Agent***") to value the assets of the Mining Master Fund at fair value on a quarterly basis in accordance with the Investment Manager's policies and procedures. Special Situation Investments at the level of the Master Funds (which do not affect Capital Sub-Account allocations pending a Recognition Event) are generally carried at estimated fair value in accordance with GAAP as determined by the Investment Manager or the Valuation Agent, as applicable; provided, however, that for purposes of calculating the Management Fees paid to the Investment Manager, Special Situation Investments will be valued at the lower of cost or the fair value of such Special Situation Investments as determined by the Investment Manager or the Valuation Agent, as applicable, in good faith.  The estimated fair value of Special Situation Investments may be based on relevant factors including, but not limited to, historical cost, recent add-on transactions, estimated

27

liquidation or sales value, and meaningful third-party transactions in the private market.

Valuations may be suspended as set forth above in "*Suspension of Withdrawals and Withdrawal Payments*".

**Reserves**
Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its discretion deems necessary or appropriate.  In the discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Partners during any such prior period.

**Fiscal Year**
The Fund has a fiscal year ending on December 31 of each calendar year.

**Reports to Partners**
The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each Partner to complete U.S. federal and state income tax or information returns, along with any other tax information required by law.  The Fund also furnishes quarterly reports reviewing the Fund's performance for such calendar quarter.  The General Partner selects the Fund's independent accountants in its discretion.

**Notice Events**
The General Partner will provide written notice to each Limited Partner within 10 days of (i) the death of either Principal or (ii) the date on which either Principal ceases to be involved in the business of the Investment Manager.

**Dissolution and Liquidation**
Dissolution of the Fund may occur upon the General Partner's election, in its discretion, to dissolve the Fund or upon the occurrence of any event which results in the General Partner (or a successor to its business)

ceasing to be the general partner of the Fund or the dissolution of the Fund under Delaware law.  Upon the occurrence of any such event, the General Partner (or a liquidator elected by a majority in interest of the Limited Partners, if the General Partner is unable to perform this function) is charged with winding up the affairs of the Fund, liquidating its assets to the extent feasible and making liquidating distributions (in cash or in-kind, whether or not readily marketable) *pro rata* in accordance with each Partner's Capital Account balance.

**Tax Status**

The General Partner believes that the Fund and the Master Funds each should be treated as a partnership for U.S. federal income tax purposes and that neither the Fund nor any of the Master Funds should be subject to U.S. federal income taxation.  Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such Limited Partner), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions.  Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period may differ from its financial or economic results.  The deductibility of a Limited Partner's share of any Fund losses or deductions may be limited under the U.S. Internal Revenue Code of 1986, as amended (the "***Code***").  See "*Tax Considerations*."

The tax aspects of the Fund are complex.  Prospective investors should consult their tax advisors with specific reference to their own situation as it relates to an investment in the Fund.

**ERISA**

The General Partner intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***").  See "*ERISA and Other Regulatory Considerations*."

**Amendment of the Limited Partnership Agreement**

The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent.  However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; (c) reduce any Limited Partner's right to share in net profits or assets of the Fund or (d) change the respective liabilities of the General Partner and the Limited Partners, in each case, without the consent of each Limited Partner adversely affected thereby.  The above consent of adversely affected Limited Partners may be obtained by

29

negative consent (affording the Limited Partners notice and opportunity to object).

Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund as of a date that is not less than 45 calendar days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment.

**Variation of Terms**          The General Partner, in its discretion, may enter into a side letter or similar agreement with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of the Partnership Agreement or the Subscription Documents (including those relating to Management Fees, the Performance Allocations, transparency, and withdrawals) with respect to such Limited Partner, without obtaining the consent of any other Limited Partner (other than a Limited Partner who is materially and adversely affected by such waiver or modification).

## THE MASTER FUNDS

**The Master Funds' Partnership Interests**

Each Master Fund's limited partner interests are currently held by the Fund and the Offshore Fund, each as a limited partner.  Any Sub-Advisor may become a special limited partner of each Master Fund in connection with its engagement by the Investment Manager for purposes of receipt of a portion of the Performance Allocations.  The General Partner is a Delaware limited liability company registered as a foreign company in the Cayman Islands and is the general partner of each Master Fund. The General Partner may establish additional investment funds that share the same investment strategy as the Fund and the Offshore Fund and which invest in parallel with the Fund and the Offshore Fund as a limited partner in and through the Master Funds.

**The Strategic Master Fund**

Iterative Capital Master, L.P. (the "***Strategic Master Fund***") is constituted and registered as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 of the Cayman Islands (the "***Cayman Partnership Law***").  The Strategic Master Fund will continue until wound up and subsequently dissolved as provided in the Strategic Master Fund Partnership Agreement.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners.  Under the Cayman Partnership Law, any rights or property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement.  Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership.  Registration under the Cayman Partnership Law entails that the exempted limited partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Cayman Partnership Law, subject to the partnership agreement.

The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the exempted limited partnership has insufficient assets.  As a general matter, a limited partner of a Cayman Islands exempted limited partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

(i)      as expressed in the partnership agreement,

(ii)      if such limited partner takes part in the conduct of the business of the exempted limited partnership and holds itself out as a general partner to third parties, or

(iii)      if such limited partner is obligated pursuant to Section 34 of the Cayman Partnership Law to return a distribution made to it where the exempted limited partnership is insolvent and the limited partner has actual knowledge of such insolvency at that time.

**The Mining Master Fund**

Iterative Mining Master, L.P. (the "***Mining Master Fund***") has been formed and organized as a Delaware limited partnership under the Delaware Revised Uniform Limited Partnership Act (as amended, the "***Delaware Act***").  The Mining Master Fund commenced upon the filing of the certificate of limited partnership of the Mining Master Fund with the Secretary of State of the State of Delaware on October 24, 2017 and will continue until dissolved and liquidated as provided in the Mining Master Fund Partnership Agreement.

**The Master Fund Partnership Agreements**

*Exculpation and Indemnification.* Each Master Fund Partnership Agreement provides that the General Partner (in its capacity as the general partner of each Master Fund), the Investment Manager and each of their affiliates are not liable to the relevant Master Fund or its limited partners, including the Fund, for any loss or damage arising by reason of being or having been the general partner of such Master Fund or the Investment Manager or from any acts or omissions in the performance of its services as general partner of such Master Fund or Investment Manager, as applicable, in the absence of willful misconduct, bad faith or gross negligence (as interpreted in accordance with the laws of the State of Delaware) or as otherwise required by (applicable) law.

Pursuant to each Master Fund Partnership Agreement, each Master Fund will, to the fullest extent legally permissible under (applicable) law, indemnify the General Partner (in its capacity as general partner of each Master Fund), the Investment Manager and each of their affiliates from the assets of the relevant Master Fund against any liabilities arising by reason of being or having been the general partner of such Master Fund or the Investment Manager or in connection with such Master Fund Partnership Agreement or such Master Fund's business or affairs to the fullest extent permitted by (applicable) law; provided that such liabilities do not constitute the willful misconduct, bad faith or gross negligence (as determined in accordance with the laws of the State of Delaware) of such person.

The General Partner (in its capacity as the general partner of each Master Fund) is also indemnified by each limited partner of each Master Fund for any amounts of tax withheld or required to be withheld with respect to that partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith, to the extent that the balance of the partner's capital account is insufficient to fully compensate the General Partner for such costs.

*Contributions and Withdrawals by the Fund; Valuation*.  Limited partners of each Master Fund may make contributions at such times and in such amounts as the General Partner determines.  Assets of each Master Fund are valued in accordance with the valuation policies of the Investment Manager unless specific valuation procedures have been otherwise provided in the relevant Master Fund Partnership Agreement.  As a limited partner of each Master Fund, the Fund may voluntarily request a withdrawal of all or part of its capital in such Master Fund at such times and in such amounts as it may determine.   The General Partner will generally grant any such withdrawal request in a manner consistent with the withdrawal terms of the Fund.

*Amendment of each Master Fund Partnership Agreement*.  Each Master Fund Partnership Agreement may be amended as provided by such agreement, including by the General Partner acting alone in any manner that does not materially adversely affect any beneficial owner of the Fund or the Offshore Fund. Any amendment that would materially adversely affect any Investor will be submitted

to the Fund and the Offshore Fund, and the Fund and the Offshore Fund will vote their interests in the relevant Master Fund proportionately based on the votes of their respective Investors.

*Power of Attorney*.  Each limited partner of each Master Fund makes, constitutes and appoints the General Partner as its true and lawful agent and attorney-in-fact to make, sign, execute, certify, acknowledge, file and record any instrument deemed necessary or appropriate by the General Partner to carry out fully the provisions of each Master Fund Partnership Agreement, including the admission of any new partners to each such Master Fund and any amendments to each such Master Fund Partnership Agreement.  Each limited partner of each Master Fund authorizes the General Partner to take any further action that the General Partner considers necessary or advisable in connection with the foregoing.  The power of attorney given pursuant to each Master Fund Partnership Agreement to secure an interest in property and the obligations of each relevant limited partner under each such Master Fund Partnership Agreement is given to secure an interest and is irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of any Master Fund.

**Taxation of the Strategic Master Fund**

The Strategic Master Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law that thereafter is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations, shall apply to the Strategic Master Fund, or to any partner thereof, in respect of the operations or assets of the Strategic Master Fund or the partnership interest of a partner therein.

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves certain risks. Certain of these risks are summarized below. The Fund may not be suitable for all investors and is intended for sophisticated investors who can accept the risks associated with its investments. An investment in the Fund does not constitute a complete investment program. Investors will not have recourse except with respect to the assets of the Fund. Prospective investors should consider, among others, the risk factors and potential conflicts of interest described in this section. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund. **Any reference to the "Fund" for purposes of describing the risks associated with the investment program herein also means the "Master Funds", unless otherwise specified or the context so requires.***

### Cryptocurrency and Network Token Risks

*Virtual Currency Risks.* A cryptocurrency is a peer-to-peer, decentralized, digital currency whose implementation relies on the principles of cryptography to validate the transactions and generation of the currency itself. A network token relies on a network protocol with similar principles to a cryptocurrency, but also serves other functions than merely storage of value. As such, the creation and usage of cryptocurrency and network tokens is not subject to a fully-developed set of regulatory and licensing requirements and is subject to high levels of volatility and market abuse. Cryptocurrencies and network tokens exist entirely in electronic form, as entries in digital ledgers. The ledgers themselves, as well as the private encryption keys used to access cryptocurrency and network token balances, are held on personal hard drives or third-party servers, and as such are susceptible to all of the risks inherent in holding any electronic data, such as power failure, data corruption, security breach, communication failure and user error. As such, cryptocurrencies and network tokens are subject to theft, destruction or loss of value from hackers, corruption or technology specific factors such as viruses that do not affect traditional currency, which is underwritten by central banks and monetary authorities. Further, there can be no assurance that the computer code underlying Coins held by the Master Funds and their generation will not turn out to be flawed, resulting in unanticipated gluts of new cryptocurrencies or the corruption of existing holdings of Coins.

Transactions in cryptocurrencies or network tokens are recorded and authenticated not by a central repository, but by a peer-to-peer network. While decentralization avoids certain common threats to computer networks (e.g., denial of service attacks), the use of a peer-to-peer system relies on participants in the network having greater numbers and computing power than coordinated attackers. This authentication strategy necessitates investment in substantial amounts of computing power, which in turn increases the burdens on participants in the network to stay ahead of attackers. Prospective investors should be aware that, if and as the popularity of cryptocurrency and network tokens increases, the burdens on participants in the network (which are defrayed by transactional costs) can be expected to increase, reducing the value of the Master Funds' Investments.

Transactions in cryptocurrencies and network tokens also provide a high degree of anonymity, meaning they may be misused for criminal activities, including money laundering. This misuse could lead law enforcement agencies to close exchange platforms at short notice and prevent consumers from accessing or retrieving any funds that the platforms may be holding for them.

*Uncertain Legal Status.* The legal status of cryptocurrencies and network tokens is unclear. It may be illegal, now or in the future, to own, hold, sell or use digital currencies or tokens in one or more countries, including the United States. The uncertainties regarding legal and regulatory

requirements relating to cryptocurrencies, tokens or transactions utilizing cryptocurrencies or tokens, as well as potential accounting and tax issues, or other requirements relating to cryptocurrencies or network tokens could have a significant negative impact on the future marketability and value of the Coins, and thus the Master Funds and the Fund.

*Lack of Regulation*.  Many of the exchange platforms on which cryptocurrencies are traded are not subject to the same restrictions or governmental supervision as regulated exchanges, which may create opportunities for other traders to abuse the platforms.  However, future regulation will raise transaction costs, potentially offsetting and/or eliminating many of the key benefits of cryptocurrencies and network tokens. International coordination raises the risk of an uneven regulatory landscape.  The development of the market for cryptocurrencies and network tokens globally is in relative "limbo" due to regulatory uncertainty.  Currently because of the lack of understanding on exactly how cryptocurrencies and network tokens should be treated, payment services incorporating cryptocurrencies and network tokens are available only at the margins in the retail sector, predominantly in the United States.  Adoption of cryptocurrency- or token-enabled payment channels is likely to increase if the assets are recognized as currency (or other type of commodity) and regulated as such.

*CFTC, SEC and FinCEN Regulation*. Current and future legislation, U.S. Commodity Futures Trading Commission (the "***CFTC***") and U.S. Securities and Exchange Commission (the "***SEC***") rulemaking and other regulatory developments may impact the manner in which digital currencies and tokens are treated for classification and clearing purposes.  In particular, digital currencies or tokens may not be excluded from the definition of "commodity future" or "security" by CFTC and SEC rulemaking, respectively, or may not be excluded from such definitions if the Investment Manager determines to engage in certain trading strategies involving the use of leverage.  The General Partner cannot be certain as to how future regulatory developments will impact the treatment of digital currencies and tokens under the law.  As of the date of this Memorandum, the General Partner is not aware of any proposed rules or regulations relating to the regulation of digital currencies as commodity futures or securities.

However, the SEC has recently communicated that it is actively reviewing the digital currency and token markets with a focus on enforcing existing regulation.  Specifically, the SEC has confirmed that whether a specific digital currency or token will be treated as a security is a case-by-case, fact-specific determination, subject to analysis under existing case law and SEC interpretive guidance.  Moreover, the SEC has warned that all federal requirements relating to the offer and sale of securities still apply (to the extent a specific currency or token is found to be a security), regardless of whether the issuer is decentralized or autonomous and regardless of whether the securities are purchased using digital currency or through digital (including distributed ledger) channels.

The CFTC has held that at least some cryptocurrencies fall within the definition of a commodity under applicable law.  To the extent that digital currencies or tokens are deemed to fall within the definition of a commodity future pursuant to subsequent rulemaking by the CFTC, the Master Funds, the Fund and the General Partner may be required to register and comply with additional regulation under the Commodities Exchange Act of 1936, as amended.  Additionally, even if digital currencies or tokens are not deemed to fall within the definition of a commodity future, each Master Fund is permitted to engage in borrowing relating to its trading activities, which may cause each such Master Fund's Investments to be considered commodity futures.  Moreover, the General Partner may be required to register as a commodity pool operator and to register the Master Funds and the Fund as commodity pools with the CFTC through the National Futures Association.  Such

additional registrations may result in extraordinary, non-recurring expenses of the Fund.  If the General Partner determines not to comply with such additional regulatory and registration requirements, the Fund will terminate and liquidate at a time that may be disadvantageous to investors.

To the extent that one or more digital currencies or tokens held by the Master Funds are deemed to fall within the definition of a security pursuant to subsequent rulemaking by the SEC or otherwise, the Master Funds, the Fund and the General Partner may be required to register and comply with additional regulation under the U.S. Investment Company Act of 1940, as amended (the "**Investment Company Act**"), or similar state investment advisory statutes.  Moreover, the Investment Manager may be required to register as an investment adviser under the Investment Advisers Act of 1940, as amended, or similar state investment advisory statutes.  Such additional registrations may result in extraordinary, non-recurring expenses of the Fund.  If the General Partner determines not to comply with such additional regulatory and registration requirements, the Fund will terminate and liquidate at a time that may be disadvantageous to investors.

Additionally, other regulators, such as the Financial Crimes Enforcement Network ("**FinCEN**"), a bureau of the U.S. Department of the Treasury tasked with combatting money laundering and illicit use of the financial system, have recently taken action in the digital currency space.  As a result, at least one virtual currency exchange (BTC-e) was fined and subsequently shut down.  To the extent FinCEN takes action against other exchanges, whether or not these exchanges are utilized by the Master Funds, this may result in the digital currency and token markets becoming less liquid and reduce, potentially entirely, the value of the Master Funds' investments.  Investments held by the Master Funds on an exchange against which action is taken may also be lost temporarily or permanently.  Furthermore, it is possible that regulators such as FinCEN may seek to limit or prohibit the issuance, transmission or trade of digital currencies and tokens in general, or subject such transactions to significant regulatory burdens designed to reduce money laundering or other illicit uses, which would adversely affect the value of the Master Funds' investments.

*No FDIC or SIPC Protection.* Coins held by the Master Funds are not subject to Federal Deposit Insurance Corporation ("**FDIC**") or Securities Investor Protection Corporation ("**SIPC**") protections. No Master Fund is a banking institution or otherwise a member of the FDIC or SIPC and, therefore, the Coins held by the Master Funds are not subject to the protections enjoyed by depositors with FDIC or SIPC member institutions. The undivided interest in each Master Fund's holdings of Coins represented by Interests in the Fund are not insured.

*Risks Associated with Selling Cryptocurrency Through Over-the-Counter Transactions.*  Over-the-counter ("**OTC**") markets for cryptocurrency are subject to a maturing and still-uncertain set of regulations at the federal, state and international level.  By purchasing or selling Coins through cryptocurrency dealers, brokers and exchanges, including Iterative OTC, the Master Funds may become subject to regulation governing currency transactions, as well as regulations governing the purchase and sale of securities and commodities, and may be subject to taxation in manners that are still unclear.  When purchasing Coins through OTC markets, the Master Funds may be subject to risk based on the identity of the transaction counterparty (either a cryptocurrency dealer, a third party or another entity) and the provenance of the cryptocurrency being purchased.  When selling Coins through OTC markets, including to Iterative OTC, the Master Funds may be subject to risk based on the identity of the transaction counterparty (either a cryptocurrency dealer, a third party or another entity) and the subsequent use of the Coins by the purchasing entity.  By purchasing or selling Coins through Iterative OTC, the Master Funds may be subject to additional regulatory risk should the relationship between the Master Funds and Iterative OTC not be considered arms' length.  These risks

include, but are not limited to, the Master Funds being considered a money services business under the Bank Secrecy Act, the Master Funds being considered sellers of securities or certain types of regulated commodities contracts, and may be subject to the re-characterization of profits, and reallocation of associated tax obligations, between the Master Funds and Iterative OTC and their owners by the U.S. Internal Revenue Service (the "**Service**").  The Mining Master Fund's ability to transact with Iterative OTC on favorable pricing terms, and other consideration that may be paid by Iterative OTC to the Mining Master Fund, may increase this risk.  The Master Funds may be able to obtain more favorable pricing terms from dealers, brokers and exchanges other than Iterative OTC.  The nature of cryptocurrency means that any technological difficulties experienced by Iterative OTC may prevent the access, use, sale or other transaction of the Coins.  Some cryptocurrency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the customer initiates the transaction.  Iterative OTC may have insufficient counterparties for the Master Funds to transact the Coins (by purchasing from or selling to Iterative OTC, which in turn transacts with the relevant counterparties) at the time or price at which the Master Funds desire.  Because Iterative OTC intends to provide beneficial accounts for customers' cryptocurrency private keys and may also provide "cold storage" for these keys, Iterative OTC may become subject to additional regulation as a custodian of funds and may be liable for the loss, mishandling or other interruption in a customer's access to those keys and any subsequent inability to trade the associated cryptocurrency.

*Risk of Serving as Standby Seller.*  The disposition strategy of the Mining Master Fund is to act as a ready, willing and able seller of Coins to Iterative OTC.  While the Mining Master Fund's portfolio of Coins will be monitored, the Investment Manager is expected to focus on meeting the demand for specific Coins from Iterative OTC.  Therefore, the Mining Master Fund's portfolio will differ from the portfolio of the Strategic Master Fund, which will focus solely on investment strategies that seek to generate the highest level of profits through direct investments in such Coins.  For this reason, the Mining Master Fund may mine or sell Coins at times that the Investment Manager deems less advantageous or at times the Strategic Master Fund is pursuing an opposite strategy.  Due to this, the profits of the Mining Master Fund from sales of Coins are expected to be reduced, in particular relative to those of the Strategic Master Fund with respect to similar transactions.  While the Investment Manager expects that such transactions will ultimately benefit the Master Funds in other ways (through favorable pricing terms, additional consideration described herein with respect to Coins that the Mining Master Fund sells to Iterative OTC and the management fee offset described above), there is no guarantee that this will be the case.  <u>Neither Master Fund will otherwise participate in the profits of Iterative OTC, which is wholly-owned by the Investment Manager</u>.

*Concentration.*  The primary investment strategy of each Master Fund is to purchase and hold Coins.  Thus, each Master Fund may be subject to more rapid changes in value than would be the case if the Master Funds were required to maintain a diversification among various assets.  No assurance can be given that the Master Funds' investments will appreciate in value or that the Master Funds will ever be able to achieve liquidity on, or otherwise to recover, its investment in Coins.

*Expectations.*  The Master Funds' investment in Coins is based on multiple unstated assumptions and judgments of the Investment Manager with respect to, among other things, the future economic, legal, regulatory, competitive and market conditions affecting cryptocurrencies, which are difficult or impossible to predict accurately and are beyond the Investment Manager's control.  There can be no assurance that the Investment Manager's expectations with respect to the Coins will be correct and the Master Funds could be subject to loss if those expectations prove to be incorrect.

*Market Uncertainty.* Cryptocurrencies and network tokens represent a speculative investment and involve a high degree of risk.  Cryptocurrencies and network tokens are part of a new and rapidly evolving industry. The growth of this industry is subject to a high degree of uncertainty. The factors affecting the further development of this industry include:

> Continued worldwide growth in the adoption and use of cryptocurrencies and network tokens;
>
> Government and quasi-government regulation of cryptocurrencies, network tokens and their use, or restrictions on or regulation of access to and operation of related trading systems;
>
> Changes in consumer demographics and public preferences;
>
> The availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies; and
>
> General economic conditions and the regulatory environment relating to cryptocurrency and network token trading systems.

A significant portion of the demand for digital currencies and tokens is generated by speculators and investors seeking to profit from the short or long-term holding of such digital currencies tokens.  A decline in the popularity or acceptance of cryptocurrencies or network tokens could adversely affect the value of the Coins and have a detrimental impact on the performance of the Master Funds and the Fund.

*Price Volatility.*  The performance of the Master Funds and the Fund relates directly to the value of the Coins held by the Master Funds and fluctuations in their price could adversely such performance. Several factors may affect the price of such Coins, including, but not limited to:

> Total quantity of a certain Coin in existence;
>
> Global demand of a certain Coin;
>
> Global supply of a certain Coin;
>
> Investors' expectations with respect to the rate of inflation of fiat currencies;
>
> Investors' expectations with respect to the rate of deflation of cryptocurrencies and network tokens;
>
> Interest rates;
>
> Currency exchange rates, including the rates at which cryptocurrencies and network tokens may be exchanged for fiat currencies;
>
> Fiat currency withdrawal and deposit policies of the cryptocurrency and network token exchanges and liquidity on such exchanges;
>
> Interruptions in service from or failures of the cryptocurrency and network token exchanges (interruptions or failures at other cryptocurrency and network token exchanges may also have an indirect affect);
>
> Theft, or news of such theft, of cryptocurrencies or network tokens from individuals or retail and service providers, including companies that buy, sell, process payments or store cryptocurrencies and network tokens;
>
> Investment and trading activities of large investors, including private and registered funds, that may directly or indirectly invest in cryptocurrencies and network tokens;
>
> Trades of a significant size in comparison to the overall trading in the market for cryptocurrencies or network tokens over a short time period;
>
> "Spoofing" or other manipulative tactics employed by participants on the exchange platform;

Monetary policies of governments, trade restrictions, currency devaluations and revaluations;

Regulatory measures, if any, that restrict the use of cryptocurrencies or network tokens as a form of payment or the purchase of cryptocurrencies or network tokens;

The maintenance and development of the open-source software protocol of cryptocurrency and token networks;

Increased competition from other forms of digital assets or means of payments in which the Master Funds do not invest;

Global or regional political, economic or financial events and situations;

Expectations among cryptocurrency economy participants that the value of certain cryptocurrencies or network tokens will soon change; and

Fees, including miners' fees, associated with processing cryptocurrency and token transactions.

Periods of high price volatility, combined with low trading volume for a particular exchange platform, may cause the Master Funds to purchase Coins at unfavorable prices.

*Fraud Risk.*  Because trading in cryptocurrencies and network tokens is currently largely unregulated, such trading may be more exposed to fraud and failure than trading in assets on established, regulated exchanges for other products. To the extent that the cryptocurrency exchanges representing a substantial portion of the volume in cryptocurrency trading are involved in fraud or experience security failures or other operational issues, such failures may result in a reduction in the value of such cryptocurrencies and can adversely affect the Master Funds' and the Fund's performance.

*Hedging Risks.* The Investment Manager may employ certain hedging techniques to address perceived risks to the contents of each Master Fund's portfolio and its ability to deliver attractive returns.  Hedging against a decline in the value of a portfolio position is an imperfect science and may not eliminate anticipated fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline.  The practice of hedging establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value.  Such hedge transactions may also limit the opportunity for gain if the value of the portfolio position should increase.  In addition, the degree of correlation between price movements of the instruments used in a hedging strategy and price movements in the portfolio position being hedged may vary.  Moreover, for a variety of reasons, the Investment Manager may not seek or be able to establish a sufficiently accurate correlation between such hedging instruments and the portfolio holdings being hedged.  Such imperfect correlation may prevent the relevant Master Fund from achieving the intended result(s) of hedging or expose the relevant Master Fund to risk of loss.  The Investment Manager has broad latitude in executing its hedging program based on prevailing market perceptions and its assessment of risks to the portfolio.  As such, the implementation of hedges and the success or failure of those hedges in achieving their desired result will vary over time.

*Futures*.  Each Master Fund may trade on a limited basis in futures. Such trading activity is regulated by the CFTC. Pursuant to an exemption from registration under CFTC regulations, neither the General Partner nor the Investment Manager is required to register, and neither is registered, with the CFTC or the National Futures Associations ("***NFA***") as a commodity pool operator (a "***CPO***") or a commodity trading adviser (a "***CTA***").  To comply with the exemption, the Investment Manager is subject to specific limitations on the amount of commodities and futures that it can trade on behalf of

the Fund.  Should the Fund's investments (through the Master Funds) in futures instruments exceed the limits provided by the applicable exemption from registration, the Investment Manager will either have to register with the NFA or cease providing commodity interest trading advice to the Fund and liquidate the Fund's holdings of futures (through the Master Funds) which could result in losses and additional costs to the Fund.

Transactions in futures carry a high degree of risk. The amount of initial margin is small relative to the value of the futures contract so that transactions are 'leveraged' or 'geared.'  A relatively small market movement will have a proportionately larger impact on the funds invested by a Master Fund.  A Master Fund may sustain a total loss of initial margin funds and any additional funds deposited to maintain its position. If the market moves against the Master Fund's position or margin levels are increased, such Master Fund may be called upon to pay substantial additional funds on short notice to maintain its position.  If the relevant Master Fund fails to comply with a request for additional funds within the time prescribed, its position may be liquidated at a loss and the Master Fund will be liable for any resulting deficit.

*Custody of Fund Assets.*  The General Partner maintains custody of the Master Funds' Coins by generating and maintaining the private keys that control movement of the Coins held by the Master Funds.  With respect to the Master Funds, the General Partner is responsible for taking such steps as it determines, in its sole judgment, to be required to maintain access to these keys, and prevent their exposure from hacking, malware and general security threats.  However, the General Partner is not liable to the Master Funds, the Fund or to Limited Partners for the failure or penetration of the security system absent willful misconduct, bad faith or gross negligence or as otherwise required by law.  To the extent that the security system is penetrated, any loss of a Master Fund's digital currencies may adversely affect a Limited Partner's investment, and could result in total loss of capital.

*Risk of Loss of Private Key.* Digital currencies are controllable only by the possessor of unique private keys relating to the addresses in which the digital currencies are held.  The theft, loss or destructions of a private key required to access a digital currency is irreversible, and such private keys would not be capable of being restored by the relevant Master Fund.  Any loss of private keys relating to digital wallets used to store a Master Fund's digital currencies could result in the loss of the digital currencies and a Limited Partner could incur substantial, or even total, loss of capital.

*Risk of Loss Due to Incapacitation of Key Personnel.*  Mr. Dannen and Mr. Buchanan, as Principals of the Investment Manager, are the sole individuals in possession of the unique private keys required to access the digital currencies held by the Master Funds. The simultaneous incapacitation of both Mr. Dannen and Mr. Buchanan would likely result in the loss of (or loss of access to) the private keys and, consequently, the loss of the Coins held by the Master Funds.  In such an event, a Limited Partner could incur substantial, or even total, loss of capital.

*Technology and Security.* The Fund must adapt to technological change in order to secure and safeguard client accounts.  While the General Partner believes it has developed a proprietary security system reasonably designed to safeguard the Master Funds' digital currencies from theft, loss, destruction or other issues relating to hackers and technological attack, such assessment is based upon known technology and threats and current industry best practices.  As technological change occurs, the security threats to the Master Funds' digital currencies will likely adapt and previously unknown threats may emerge. Furthermore, the General Partner believes that the Master Funds may become more appealing targets of security threats as the size of the Master Funds' collective assets grows.  To the extent that the Master Funds are unable to identify and mitigate or stop new security threats, the

Master Funds' digital currencies may be subject to theft, loss, destruction or other attack, which could have a negative impact on the performance of the Master Funds and the Fund or result in loss of the Master Funds' assets.

*Security Breaches.* Any security breach caused by hacking, which involves efforts to gain unauthorized access to information or systems, or to cause intentional malfunctions or loss or corruption of data, software, hardware or other computer equipment, and the inadvertent transmission of computer viruses, could result in the halting of the Master Funds' operations, the suspension of withdrawals or a loss of Master Fund and Fund assets. While the General Partner believes its security system is consistent with current industry best practices, it is not impenetrable and may not be free from defect, and any loss due to a security breach or software defect will be borne by the Fund, absent willful misconduct, bad faith or gross negligence on the part of the General Partner.

**General Fund Risks**

*Lack of Operating History.* The Fund is a newly-formed entity which does not have an operating history for prospective investors to evaluate prior to making an investment in the Fund.

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Master Funds' investment program depends to a great extent upon correctly assessing the future course of the price movements of investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Master Funds, there is always some, and occasionally a significant, degree of market risk.

*No Participation by Limited Partners.* Substantially all decisions with respect to the management of the Fund are made exclusively by the General Partner. Limited Partners have no right or power to take part in the management of the Fund. The Investment Manager also makes all of the trading and investment decisions of the Fund.

*Reliance on Key Person*s. The Fund will be substantially dependent on the services of the Principals. In the event of the death, disability, departure or insolvency of the Principals, or the complete transfer of the Principals' interest in the Investment Manager, the business of the Fund may be adversely affected. The Principals will devote such time and effort as they deem necessary for the management and administration of the Fund's business. However, the Principals may engage in various other business activities in addition to managing the Fund, and consequently may not devote all time to Fund business.

*Master-Feeder Structure.* The Fund generally invests through a "master-feeder" structure with more than one master fund. Although a common investment fund structure, the "master-feeder" fund structure presents certain unique risks to investors. For example, a smaller feeder fund investing in a particular Master Fund may be materially affected by the actions of a larger feeder fund investing in such Master Fund. If a larger feeder fund withdraws from such Master Fund, the remaining feeder fund may experience higher *pro rata* operating expenses, thereby producing lower returns. A Master Fund may become less diverse due to a withdrawal by a larger feeder fund, resulting in increased portfolio risk. As a matter of Cayman Islands law, the Strategic Master Fund is not an entity with separate legal personality. Legal proceedings by or against a particular Master Fund may be instituted by or against the General Partner, as the general partner of such Master Fund. Expenses or liabilities of such Master Fund (or the General Partner) arising from any such suit would be borne by such Master Fund, and creditors of that Master Fund may enforce claims against all assets of such Master

Fund.  In addition, to the extent the Fund's assets are invested in a Master Fund, certain conflicts of interest may exist due to different tax considerations applicable to the Fund, the Offshore Fund and other feeder funds.

*Illiquidity*.  The investments made by the Fund (through the Master Funds) may be very illiquid, and consequently the Master Funds may not be able to sell such investments at prices that reflect the General Partner's assessment of their value or the amount paid for such investments by the Master Funds.  Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by the Master Funds and other factors.  In addition, the exchange platforms for cryptocurrencies may commingle the Master Funds' assets with the assets of other customers in a single account, which may delay or prevent the Master Funds from withdrawing the Coins at the desired time or in the desired amount.  Furthermore, the nature of the Master Funds' investments, especially those associated with financially distressed companies, may require a long holding period prior to profitability.  The Partnership Agreement authorizes the General Partner to make distributions in kind in lieu of or in addition to cash.  In the event the General Partner makes distributions in kind, such in-kind assets could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Withdrawals, Redemptions and Liquidity*.  The General Partner intends to satisfy withdrawal requests from the Limited Partners and redemption requests from investors in the Offshore Fund initially out of assets of the Master Funds that are the most liquid.  This is likely to result in the remaining assets of the Master Funds becoming more illiquid.  In particular, while the assets of the Mining Master Fund are expected to be available to satisfy such requests, it is likely that some or all of the assets of the Strategic Master Fund would first be used to do so due to their greater expected liquidity and the Investment Manager's strategy for the Mining Master Fund.  Thus, the remaining Investors will, indirectly, hold a more concentrated position in the assets of the Mining Master Fund.  This position may be, or become, more illiquid, which could negatively impact such remaining Investors.

*Leverage.*  Subject to applicable margin and other limitations, each Master Fund may borrow funds in order to make additional investments and thereby increase both the possibility of gain and risk of loss.  Consequently, the effect of fluctuations in the market value of each such Master Fund's portfolio would be amplified.  Interest on borrowings will be a portfolio expense of the relevant Master Fund and will affect the operating results of the Fund.  Also, the relevant Master Fund could potentially create leverage via the use of instruments such as options and other derivative instruments.

*Investment Authority.*  Substantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager.  Limited Partners have no right or power to take part in the management of the Fund.  In the event of the withdrawal or bankruptcy of the General Partner, generally the Fund will be liquidated.

*Possible Effect of Substantial Withdrawals*.  Substantial withdrawals of Interests could require the Master Funds to redeem or liquidate their investments more rapidly than otherwise desired in order to raise the cash necessary to fund the withdrawals.  Illiquidity in certain markets could make it difficult for the Investment Manager to liquidate positions on favorable terms, which could result in losses or a decrease in the net asset value of the Master Funds and the Fund.

*Lack of Transferability*.  Interests are subject to significant restrictions on transfer including the requirement that the General Partner consent to any such transfer.  Prospective investors in the Fund

will be required to represent that they are acquiring their Interest for investment purposes only and not with a view to or for resale or distribution.  The Interests have not been registered under the Securities Act, and therefore are subject to restrictions on transfer under the Securities Act.  There is no market for the Interests and it is not anticipated that such a market will develop.

*Performance Allocation.*  The Performance Allocations made to the General Partner (in its capacity as the general partner of each Master Fund) may create an incentive for the Investment Manager as an affiliate of the General Partner to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocations.

*Withdrawal Restrictions.*  There are significant restrictions on withdrawals from the Fund (which may be settled in Coins rather than cash) and on transfers of Interests.  The prior written consent of the General Partner is required for a transfer of the Interest of any Limited Partner.  Because of the restrictions on withdrawals and transfers, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk.  A subscription for Interests should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

*No Distributions.*  Because the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income.  Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*General Partner's Right to Dissolve the Fund.*  The Partnership Agreement provides that the General Partner may at any time dissolve the Fund in its discretion.

*Delay in Return of Capital.*  It is uncertain as to when profits, if any, will be realized by the Fund.  Even if the Master Funds' investments prove successful, they are unlikely to produce a realized return to the Fund, and thus the Limited Partners, for a period of several years.  Furthermore, the expenses of operating the Fund (including the Management Fees paid at the level of the Master Funds) may exceed its income, thereby requiring that the difference be paid from the Fund's capital.

*In Kind Distributions.*  Under such circumstances as the General Partner deems appropriate and in accordance with the Partnership Agreement, the Limited Partners may receive in-kind distributions of the Fund's interest in Coins (via the Master Funds), if permitted by law.  In connection with a liquidating distribution of the Fund, Limited Partners may receive distributions of Coins, which may not be readily marketable or salable, in accordance with the Partnership Agreement. The investments distributed in-kind will be valued by the Investment Manager or the Valuation Agent, as applicable, at what it deems their "fair value" as of the close of business on the relevant date, as determined in accordance with the Investment Manager's valuation policies and procedures, and this valuation will be conclusive for various purposes, including for the calculation of the Performance Allocations at the level of the Master Funds.

*Limited Partner Due Diligence Information.*  Due in part to the fact that prospective investors may ask different questions and request different information, the General Partner or the Investment Manager may provide certain information to one or more prospective investors that it does not provide to all prospective investors.  None of the answers or additional information provided is or will be integrated into this Memorandum, and no prospective investor may rely on any such answers or information in making its decision to subscribe for Interests.

43

*Cybersecurity.*   Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Fund and/or the Master Funds may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Fund's and/or the Master Funds' operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to Limited Partners.  Such interruptions could harm the Investment Manager's, the Fund's and/or the Master Funds' reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.

*Reliance on Third Party Advisors; Service Providers.*  The Fund, the Master Funds and the Investment Manager utilize the services of attorneys, accountants and other consultants in their operations.  The Master Funds, the Fund and the Investment Manager generally rely upon such advisors for their professional judgment with respect to legal, tax and other regulatory matters. Nevertheless, there exists a risk that such advisors may provide incorrect advice from time to time.  In particular, the Fund and the Master Funds have consulted with legal counsel, accountants and other experts regarding the formation of the Fund and the Master Funds.  Such personnel are accountable to the Fund, the Master Funds and the Investment Manager and not to the Limited Partners themselves.  To the extent that this offering could benefit by further independent review, such benefit will not be available in this offering.  Each prospective investor should consult its own legal, tax and financial advisors regarding the suitability of an investment in the Fund.  None of the Fund, the Master Funds, the General Partner or the Investment Manager will have any liability to Limited Partners for any reliance upon third-party advice.

The General Partner will select the Fund's service providers and will determine the compensation of such providers without review by or the consent of the Limited Partners or other independent party.  The Fund will bear the fees, costs and expenses related to such services, including any Specialist Expenses and Sub-Advisor Expenses.

*Modification of Terms.*  The General Partner and/or the Investment Manager has the discretion to agree with a Limited Partner to establish rights under, or alter or supplement the terms of, the Partnership Agreement, the Master Fund Partnership Agreements or the Subscription Documents (including those relating to the Management Fees, Performance Allocations, transparency and withdrawal) with respect to such Limited Partner without obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights under the Partnership Agreement are materially and adversely changed by such waiver or modification).

*Absence of Registration.*  Neither the Fund nor any Master Fund has or will register under the Investment Company Act.  Accordingly, the provisions of the Investment Company Act which, among other things, require that a fund's board of directors, including a majority of disinterested directors, approve certain of the Fund's activities and contractual relationships, prohibit certain trading and investment activities and prohibit the Fund from engaging in certain transactions with its affiliates, will not be applicable.  If, and to the extent that, claims or suits are brought by a regulator or otherwise and successfully concluded for failure to register the Fund or for acts or omissions constituting offenses

under the Investment Company Act, the ability of the Fund to operate successfully will likely be jeopardized.

The Investment Manager is not registered as an investment adviser with the Securities and Exchange Commission.  However, the Investment Manager may become registered under the Advisers Act, at a future date if it determines that registration is necessary or otherwise appropriate with applicable law

*U.S. Federal and State Securities Laws.*  This offering has not been registered under the U.S. Securities Act of 1933 (the "***Securities Act***"), and is made in reliance on the exemptive provisions of Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.  Similar reliance has been placed on exemptions from securities qualification requirements under applicable state securities laws.  No assurance can be given that the offering currently qualifies or will continue to qualify under one or more of such exemptive provisions.  If, and to the extent that, claims or suits for rescission are brought and successfully concluded for failure to register this offering or for acts or omissions constituting offenses under the Securities Act or other applicable U.S. federal and state securities laws, the ability of the Fund to operate successfully could be jeopardized.

*Indemnification.*  The Fund is required to indemnify and hold harmless the General Partner, the Investment Manager and each of their affiliates ("***Indemnified Persons***") against loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, in the absence of willful misconduct, bad faith or gross negligence or as otherwise required by law.  The Partnership Agreement contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Fund's business or affairs to the fullest extent permitted by law.

*No Separate Counsel.*  The business terms and structure of the Fund were not negotiated at arm's length.  The Fund does not have counsel separate and independent from that of the General Partner and the Investment Manager.  No separate counsel has been retained by the Fund, the General Partner or the Investment Manager to act on behalf of Limited Partners.

*Definitive Terms and Conditions.* This Memorandum describes specific terms and conditions set forth in the Partnership Agreement, the Master Fund Partnership Agreements and various other documents or agreements. The actual terms and conditions set forth in such documents or agreements may vary materially from those described in this Memorandum for a variety of reasons, including but not limited to formal amendments to the Partnership Agreement or any of the Master Fund Partnership Agreements or negotiations with Limited Partners. Moreover, the Partnership Agreement and the Master Fund Partnership Agreements contain highly detailed terms and conditions, many of which are not described fully or at all in this Memorandum.  In all cases, the Partnership Agreement and the Master Fund Partnership Agreements will supersede this Memorandum and in the event of a conflict between this Memorandum and the Partnership Agreement or any of the Master Fund Partnership Agreements, the Partnership Agreement or the relevant Master Fund Partnership Agreement, respectively, will control.  Limited Partners are urged to carefully review the Partnership Agreement and the Master Fund Partnership Agreements and must also be aware that, pursuant to the rules governing amendments set forth therein, certain amendments to the Partnership Agreement and the

Master Fund Partnership Agreements may be adopted without the consent or approval of any Limited Partner.

*All Investments Risk the Loss of Capital.* No guarantee or representation is made that the Master Funds' Investments will be successful, and Investment results may vary substantially over time. There can be no assurance that the Fund will be able to generate returns for the Limited Partners or that the returns will be commensurate with the risks of investing in the Investments. There can be no assurance that any Limited Partner will receive any distribution from the Fund. Accordingly, an investment in the Fund should only be made by persons who can afford a loss of their entire investment. The returns of Limited Partners will be reduced by the Performance Allocations to the General Partner (in its capacity as the general partner of each Master Fund). The amounts may be significant and will reduce Fund returns.

*Economic Conditions.* Changes in economic conditions, including changes in interest rates, inflation rates, industry conditions, government regulation, competition, technological developments, political events and trends, tax laws and many other factors can affect substantially and adversely the business and prospects of the Fund and the value of the investments. None of these conditions is within the control of the Investment Manager.

*Business and Regulatory Risks of Private Investment Funds.* The financial services industry generally, and the activities of private investment funds and their managers in particular, have recently been subject to intense and increasing regulatory scrutiny. Such scrutiny may increase the Fund's, the Master Funds', the General Partner's and the Investment Manager's exposure to potential liabilities and to legal, compliance and other related costs. Increased regulatory oversight may also impose additional administrative burdens on the Investment Manager, including, without limitation, responding to investigations, implementing new policies, procedures and reporting requirements. Such burdens may divert the Investment Manager's time, attention and resources from its activities on behalf of the Fund and the Master Funds. The regulatory environment for private funds is evolving, and changes in the regulation of private funds and their activities may adversely affect the ability of the Master Funds to pursue their investment strategies and the value of investments held by the Master Funds. There has recently been an increase in governmental, as well as self-regulatory, scrutiny of the alternative investment industry in general.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment.* The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.

*Risk of Adverse Determination.* There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Service, or significantly modified by new legislation, changes in the Service's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum. No representation or warranty of any kind is

made by the General Partner with respect to the federal income tax consequences relating to an investment in the Fund.  The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts.  Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit*.  An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund.  If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment.  The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund.  The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Entity-Level Audits*.  Pursuant to the Bipartisan Budget Act of 2015, for taxable years beginning after December 31, 2017, the Service generally will be permitted to determine adjustments to items of income, gain, deduction, loss or credit of the Fund, and assess and collect taxes attributable thereto (including any applicable penalties and interest), at the Fund level.  If this new regime applies to the Fund (which depends, inter alia, on whether the Fund has more than 100 partners or any partner that is itself classified as a partnership for U.S. federal income tax purposes), then any person who is a partner of the Fund in the relevant year of the adjustment may indirectly bear the economic burden of any such taxes assessed or collected (initially determined at the highest rate of tax applicable to an individual or corporation in effect for the reviewed year), regardless of whether such person was a Limited Partner during any reviewed year.  It is expected that guidance will be issued that permits the Fund to reduce the underpayment of taxes owed by the Fund, including to the extent that the Fund demonstrates such taxes are allocable to a Limited Partner that would not owe any tax by reason of its status as a "tax-exempt entity" or the character of income is subject to a lower rate of tax.  The Fund may under certain circumstances have the ability to avoid such entity-level tax assessment or collection by electing to issue a statement to each partner of any reviewed year with its share of such adjustment, resulting in such partner being required to take into account any such adjustment for the taxable year which includes the date such statement was furnished.  In such case, the partners of the reviewed year would also incur a two-percentage point increase on the interest rate that would otherwise have been imposed on any underpayment of taxes.  There can be no assurances, however, that the Fund will avoid, or be able to avoid, any entity-level determination, assessment or collection.  Limited Partners should note that there is substantial uncertainty regarding the implementation of these rules and the impact on any current or future allocations made or cash available for distributions or withdrawals by the Fund.  The Fund may also be exposed to the risk that these rules apply to any lower-tier entity in which the Fund directly or indirectly invests and that is treated as a partnership for U.S. federal income tax purposes.  If this new legislation applies to the Fund, the Fund will designate a tax representative, which is expected to be the General Partner, the Investment Manager, or an affiliate thereof, who shall have the sole authority to act on behalf of the Fund with respect to dealings with the Service under these new procedures.  Prospective Limited Partners should consult their own tax advisors regarding this new legislation.

*Tax Considerations Taken into Account*.  The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may

assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax Liabilities Without Distributions*.  If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its allocable share of the Fund's profits, whether or not such profits have been distributed.  Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities.  In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund.  Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter.  In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter.  Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

*Delayed Schedules K-1*.  The Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year.  Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income*.  The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("***UBTI***") under Sections 512 and 514 of the Code.  Thus, an investment in the Fund may not be desirable for certain tax-exempt investors.  For example, the Fund may incur leverage giving rise to UBTI or participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes.  Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI.  Because of the Investment Manager's objective of maximizing the pre-tax returns of all the Limited Partners, the Investment Manager may be required to make certain decisions to maximize pre-tax returns that result in Tax-Exempt U.S. Investors (as defined below) recognizing more UBTI than might otherwise be the case.  In some cases, the Investment Manager may forgo actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes*.  Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund.  Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund.  Certain provisions of the Code may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected.  In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government.  The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain.  The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners.  Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

*The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund.  Many of the relevant tax considerations will vary depending on a prospective Limited Partner's individual circumstances.  The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations.  Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA and Other Regulatory Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.*

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

## Potential Conflicts of Interest

*Other Activities of Management*.  The Investment Manager manages Other Accounts in which, or alongside which, one or more of the Master Funds may invest, some of which have objectives and strategies substantially similar or identical to those of the Master Funds.  The Investment Manager may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including management of Other Accounts, investment in, or the financing, acquisition and disposition of, securities or other assets, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustees of any trust, or enter into any other commercial arrangements, whether or not any such activities may conflict with any interest of the parties with respect to the Fund or the Master Funds, without having to account to the Fund, the Master Funds or any Limited Partner for any profits or other benefits derived therefrom and without incurring any obligation to disclose or refer any such activity to the General Partner or any Limited Partner.  The Investment Manager will not be obligated to devote any specific amount of time to the affairs of the Fund or the Master Funds and their business activities may relate to Other Accounts.

Situations may occur where the Fund or the Master Funds could be disadvantaged because of the investment activities conducted by the Investment Manager for Other Accounts due, among other things, to the limited availability of an investment opportunity.  Furthermore, in connection with actions taken in the ordinary course of business of the Investment Manager in accordance with its fiduciary duties to Other Accounts, the Investment Manager may take, or be required to take, actions which adversely affect the interests of the Fund or the Master Funds.

*Other Account Involved in Mining Coins*.  The Investment Manager currently manages an Other Account with an investment strategy that involves mining Coins, which may be made available to be sold through the "over-the-counter" cryptocurrency dealer and exchange managed by Iterative OTC, to which the Mining Master Fund expects to make its Coins available for sale.  In addition, such Other Account may engage in its mining operations in the same data center(s) where the Mining Master Fund mines its Coins.  However, neither the Fund nor the Mining Master Fund will participate in profits from the business of such Other Account.  While the Investment Manager expects the businesses of the Mining Master Fund and the Other Account to be complementary, the Mining Master Fund and the Other Account may compete for limited opportunities to mine Coins, for the time and attention of the Investment Manager's personnel and for a limited number of buyers through Iterative OTC.  Any investment opportunities that would be appropriate for both the Mining Master Fund and

such Other Account will be subject to the Investment Manager's investment allocation policies and procedures.

*Management Fees and Performance Allocation.*  The General Partner, the Master Funds, the Fund, and the Investment Manager are affiliates, subject to the common control of the Principals.  In this regard, it should be noted that the Management Fee payable by each Master Fund to the Investment Manager and the incentive-based Performance Allocation that the General Partner, in its capacity as the general partner of each Master Fund, will receive under each Master Fund Partnership Agreement have not been established on the basis of an arm's-length negotiation among the Master Funds, the Fund, the General Partner and the Investment Manager.  However, the General Partner believes that the Management Fee and the terms of the Performance Allocation generally reflect prevailing market terms.

The Investment Manager may invest the Fund's capital (through the Master Funds) in one or more Other Accounts.  It is the practice of the Investment Manager and its affiliates to waive all Other Fees with respect to the Fund's investment (via the Master Funds) in any Other Account in order to avoid the receipt of dual fees by the Investment Manager or its affiliates.  For the avoidance of doubt, no amount of the Other Fees earned by the Investment Manager or its affiliates from Other Accounts will be applied to reduce the Management Fees or Performance Allocations, or any similar fees otherwise owed by the Fund or the Master Funds to the Investment Manager or its affiliates.  Further, the Fund does not benefit from the Other Fees earned by the Investment Manager or its affiliates from Other Accounts.  If the Fund (through the Master Funds) is not invested in an Other Account, it will not have the right to participate in the investments of such Other Account.  The Fund's capital may not be invested in segregated accounts managed by the Investment Manager or its affiliates.

*Allocation of Investment Opportunities*.  The Partnership Agreement and the Master Fund Partnership Agreements require that the General Partner, and the Investment Manager as a delegatee of the General Partner pursuant to the Investment Management Agreement, act in a manner that it considers fair, reasonable and equitable in allocating investment opportunities to the Fund and each Master Fund but does not otherwise impose any specific obligations or requirements concerning the allocation of time, effort or investment opportunities to the Fund or any Master Fund or any restrictions on the nature or timing of investments for the account of each Master Fund and for the Investment Manager's own account or for other accounts that the Investment Manager or its affiliates may manage.  The Investment Manager is not obligated to devote any specific amount of time to the affairs of the Fund or any Master Fund, and is not required to accord exclusivity or priority to the Master Funds in the event of limited investment opportunities arising from the application of speculative position limits or other factors.

When the Investment Manager determines that it would be appropriate for a particular Master Fund and one or more Other Accounts to participate in an investment opportunity, the Investment Manager will seek to execute orders for all of the participating investment accounts and vehicles on an equitable basis.  If the Investment Manager has determined to invest at the same time for more than one of the investment accounts or vehicles, the Investment Manager will generally place combined orders for all such accounts simultaneously and if all such orders are not filled at the same price, it will generally average the prices paid.  Similarly, if an order on behalf of more than one account or vehicle cannot be fully executed under prevailing market conditions, the Investment Manager will allocate the trade among the different accounts and vehicles on a basis that it considers equitable.  Situations may occur where the Fund and the Master Funds could be disadvantaged because of the investment activities conducted by the Investment Manager for Other Accounts.

From time to time, the Investment Manager may determine that a sale of positions from one client account to another is in the best interests of both accounts.  For example, a Master Fund may acquire investments from unrelated sellers and may re-offer a portion of such investments to affiliated investment vehicles that were subject to legal, fiscal or other restrictions on participating in the original transaction.  Alternatively, an affiliate may acquire an investment from an unrelated seller in anticipation of offering it to a Master Fund at a future date, if such Master Fund does not have available capital to make the investment when it is being marketed by the unrelated seller.  While these transactions with related parties are expected to expand the universe of opportunities that are available to the Fund (through the Master Funds) and other clients of the Investment Manager, the Fund will not necessarily derive a benefit from each such transaction, and the Fund and the other party to a particular transaction may have divergent interests.  Moreover, there may be uncertainties regarding the valuation of investments that are subject to these transactions.  Affiliates may earn commissions, spreads or other compensation from the Master Funds relating to such transactions.  Amounts due from the Master Funds to the Investment Manager and its affiliates are not adjusted for such commission, spreads or other compensation.

*Co-Investment*.  The General Partner from time to time may, subject to certain exceptions set forth in the Partnership Agreement or the Master Fund Partnership Agreements, offer certain Investors or other persons (including Other Accounts and investors in Other Accounts) opportunities to co-invest with one or more of the Master Funds in particular Investments.  Co-Investment Opportunities may result in additional benefits for those who so invest. As the General Partner retains complete discretion as to how Co-Investment Opportunities are allocated among investors in such Co-Investment Opportunities, the benefits of an Investment in which the General Partner has made Co-Investment Opportunities available will be received only by the Partners selected by the General Partner for such opportunities, and not by any of the other Partners.  In some cases, Co-Investment Opportunities may be offered to Other Accounts or subsidiaries of the Investment Manager and/or its affiliates.  These allocations present conflicts of interest, and there can be no assurance that it might not be alleged that the Fund (through the Master Funds) received a smaller allocation or inferior terms in Investments than it would otherwise have received if the Investment Manager did not have a conflict of interest in advising both investors or from particular counterparties.  In addition, such co-investment transactions could create conflicts of interests to the extent the Investment Manager (or one of its affiliates) is simultaneously representing the interests of more than one co-investing party. In addition, the General Partner may form specially created Co-Investment Vehicles. Such co-investments may be on terms that may differ from those of Partners in the Fund.

*Principal Transactions*.  The Principals, as well as the employees and officers of and organizations affiliated with the General Partner and the Investment Manager ("***Affiliates***"), may buy and sell investments for their own account or the account of others, but may not buy investments from or sell investments to the Fund or any of the Master Funds.  The Affiliates may engage for their own accounts, or for the accounts of others, in other business ventures of any nature, and the Fund has no right to participate in or benefit from the other management activities of the Investment Manager described above and the Affiliates are not obligated to account to the Fund for any profits or benefits made or derived therefrom, nor shall they have any obligation to disclose or refer to the Fund any of the investment or service opportunities obtained through such activities.

*Sub-Advisor*.  The Principals are expected to be minority owners of a potential Sub-Advisor. While any conflicts of interest will be handled in accordance with the Partnership Agreement, the Master Fund Partnership Agreements and the policies of the Investment Manager, such ownership may

incentive the Investment Manager to favor such Sub-Advisor or such other fund over the Master Funds.

*Allocation of Expenses.*   The Investment Manager may from time to time incur expenses on behalf of a Master Fund and the Other Accounts.   The Investment Manager will attempt to allocate such expenses on a *pro rata* basis.

*Specialists.*   The Investment Manager may engage, on behalf of one or more Master Funds, specialists to manage certain Investments in order to obtain special knowledge, expertise or access to intellectual property (e.g., trading algorithms, software or other rights), either directly or through a portfolio vehicle set up for such purposes.   Such specialists may be paid asset-based and performance-based compensation for their services, and such payments will generally be expenses of the Fund (through the relevant Master Fund(s)) and will not offset the Management Fees or Performance Allocations and, therefore, may result in the Limited Partners bearing dual management and incentive fees or allocations. The Fund (through the Master Fund(s)) may also bear expenses related to the indemnification of such specialists for liabilities incurred in connection with their services to one or more Master Funds on terms to be negotiated by the Investment Manager.   Any specialists engaged by the Investment Manager on behalf of the Master Funds that are also affiliated with the Investment Manager will be approved by a majority in interest of the Investors prior to being engaged by the Investment Manager.

*Relationship with Iterative OTC.*   The Mining Master Fund expects to mine Coins and make them available for sale through the "over-the-counter" cryptocurrency dealer and exchange managed by Iterative OTC, a separate business owned and operated by the Investment Manager.   The Investment Manager is expected to benefit, through its ownership of Iterative OTC, from the Mining Master Fund acting as a standby seller to Iterative OTC.   The Investment Manager may similarly benefit should the Strategic Master Fund conduct transactions through the exchange in accordance with its trading strategies.

*Purchase of Assets from Affiliates.*   An investment vehicle owned by Affiliates and other associates of the Investment Manager, including Other Accounts, is negotiating the sale of computing equipment intended for mining to the Mining Master Fund.   Although the sale price for the computing equipment is expected to be based on a valuation of the assets of the investment vehicle conducted by a third party valuation agent, representatives of the Investment Manager will be on both sides of the negotiation, and thus, the terms of the sale will not be established on the basis of an arm's-length negotiation.   By executing the Subscription Documents, each Limited Partner will be deemed to have consented specifically to the conflicts of interest arising from the purchase of computing equipment described above.

*Prospective Consent of Partners.*   Pursuant to the terms of the Partnership Agreement, each Partner will be deemed to have consented prospectively to any and all of the activities of the type or nature described in this Memorandum, including, without limitation, the activities described in this "*Potential Conflicts of Interest*," whether or not such activities have or could have an effect on the Fund's affairs, and no such activity will in and of itself constitute a breach of any duty owed by any person to the Fund or any Partner.

*Diverse Interests of Limited Partners.*   Limited Partners may include a mix of taxable and tax-exempt entities and domestic and foreign persons or entities.   Because Limited Partners may have conflicting investment, tax and other interests with respect to their investment in the Fund, conflicts of

interest may arise between Limited Partners themselves in connection with decisions made by the Investment Manager that may be more beneficial to one Limited Partner than for another Limited Partner especially with respect to Limited Partners' tax situations.  Generally, in structuring the Master Funds' Investments, the Investment Manager will be obligated to consider the investment and tax objectives of the Fund and Limited Partners as a whole, rather than the investment, tax or other objectives of any single or particular group of Limited Partners.

*Side Letters.*  The General Partner may enter into written agreements ("**Side Letters**") with certain of the Limited Partners.  These Side Letters may entitle a Limited Partner to make an investment in the Fund on terms other than those described herein.  Any such terms, including with respect to (i) additional or different reporting obligations of the Fund, (ii) ability to transfer to affiliates or other parties, (iii) distributions, fees and expenses or (v) any other matters described therein, may be more favorable than those offered to any other Limited Partners.  The General Partner will not be required to offer the terms of such Side Letters to any or all of the other Limited Partners.

*Legal Representation*.  Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") serves as counsel to the Fund, the Offshore Fund, the Master Funds, the Investment Manager, the General Partner and certain of their Affiliates (the "**Clients**") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time.  Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests.  No independent counsel has been retained to represent the Limited Partners.  In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the Principals' biographical data, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

## TAX CONSIDERATIONS

### Introduction

The following is a summary of certain aspects of U.S. federal income taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest in the Fund. The Fund has not sought and will not seek a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting the Fund or its Limited Partners, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the Treasury regulations promulgated under the Code (the "*Treasury Regulations*"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect). Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund. This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code section 1221.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or foreign tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors. This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("*AMT*") to the Limited Partners. There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

*The tax consequences of an investment in the Fund are particularly complex. Accordingly, prospective investors should not consider this discussion as a substitute for careful tax planning. Prospective investors should consult with their own tax advisors, attorneys or accountants on matters relating to an investment in the Fund with special references to such investor's particular situation.*

### Certain United States Taxation Matters

<u>U.S. Entity Classification</u>

The General Partner believes that, under the provisions of the Code and the Treasury Regulations promulgated thereunder, as currently in effect, the Fund and the Master Funds should each be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). The General Partner believes that the Fund may qualify for one or more exemptions from the publicly traded partnership rules, although there is no assurance that the partnership will so qualify.

The remainder of this discussion assumes that each of the Fund and the Master Funds will be treated, for U.S. federal income tax purposes, as a partnership and not as a publicly traded partnership treated as an association that is taxable as a corporation. Unless the context requires otherwise, references to the Fund in the following discussion include each Master Fund.

U.S. Federal Income Taxation of the Fund

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner otherwise subject to tax will be required to report separately on its U.S. federal income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's taxable income and gain regardless of whether it has received or will receive a distribution from the Fund. Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. Under current law, an audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "***Tax Matters Partner***," will have the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority. All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs (either positively or negatively) from its U.S. federal income tax basis in its Interest. There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation. If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The guidance from the Service is limited regarding the federal income tax treatment of Coins. Pursuant to IRS Notice 2014-21, Coins are treated as property and not currency for federal income tax purposes. Absent further guidance, Coins held for investment by the Fund (through the Master Funds) should be considered capital assets. This treatment is subject to change as additional guidance is provided.

The Fund expects to act as a trader or investor, and not as a dealer, with respect to its transactions in Coins. Generally, the gains and losses realized by a trader or investor on the sale of property are capital gains and losses. Thus, in general, the Fund expects that its gains and losses from its transactions in Coins typically will be capital gains and capital losses. These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction. Property held for more than 12 months generally will be eligible for long-term capital gain or loss treatment. Long term capital gains may be eligible for favorable tax rates in the hands of non-corporate U.S. Limited Partners. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals who are United States persons with modified adjusted gross income that exceeds certain thresholds (for example, $250,000 for married individuals filing jointly, $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of (i) their investment income, net of deductions properly allocable to such income, or (ii) the excess of their modified adjusted gross income above such thresholds. Trusts and estates also may be subject to this additional tax. The General Partner expects that most or all of the Fund's income will be treated as investment income for this purpose, and as a result, certain Limited Partners receiving allocations of income from the Fund for these taxable years will be subject to this tax. This tax will be in addition to any U.S. federal income tax imposed on such Limited Partners with respect to their allocable share of income of the Fund.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments. Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund. For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands. Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains. These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one

56

year.  Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

If the Fund is treated as a trader and the Coins are treated as securities or commodities for U.S. federal income tax purposes, the Fund may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on Coins as if the Coins were sold for fair market value at the close of any taxable year of the Fund.  The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market.  The election would apply with respect to Coins held in connection with the Fund's trade or business as a trader in Coins.  The election would not apply to any Coins with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment.  In the event that the Fund makes such an election, the Fund's gains and losses from marking Coins to market (and gain or loss recognized before the end of the taxable year with respect to any Coins that would have been marked to market) would be treated as ordinary income and losses.  The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the Coins to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when an investment is sold.  These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment.  Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative.  In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments.  In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260.  The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners.  However, there can be no assurance that the Service or a court would agree with the Fund's position.  Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests.  Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets.  Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

Taxation of Distributions and Withdrawals

Cash non-liquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn.  Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability.  Conversely, if the cash distributed by the Fund to a Limited Partner for any year exceeds the taxable income of the Fund allocated to such Limited Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest.  To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero).  Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest.  Such capital gain or loss will be short-term or long-term depending upon the Partner's holding period (or holding periods) for its Interest.  However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations).

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables).  However, a distribution of "marketable securities" will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c). The General Partner cannot provide any assurances that Coins are "marketable securities" or that the Fund will be an "investment partnership" for these purposes.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or

deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing additional taxable income in the Partner's last taxable year. In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners. Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

<u>Limitations on Losses and Deductions</u>

Limited Partners that are individuals or certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund. For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Code section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund) would be deductible only as itemized deductions, subject to the limitations of Code sections 67 and 68. In this regard, if all or a portion of the Performance Allocations to the General Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of such expense could be subject to such limitations. Itemized deductions are non-deductible in computing such Limited Partner's AMT income and AMT liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Code section 469. Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity losses from other activities likely will be restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain and qualified dividend income is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest expenses unless it has sufficient investment income from

all sources including the Fund.  Any amount not deducted as a result of the application of the investment interest limitation may be carried forward to future years, subject to certain limitations.

The Fund may incur certain expenses in connection with its organization and the marketing of its Interests.  Amounts paid or incurred to organize a partnership are not deductible, but may, by election of the Fund, be capitalized and amortized over a period of not less than 180 months.  Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

Tax Consequences for Tax-Exempt U.S. Investors

A Limited Partner that is an organization exempt from U.S. federal income tax under Code section 501(a) (a "***Tax-Exempt U.S. Investor***") will be subject to tax on its allocable share of the Fund's income that is considered to be UBTI, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI.  Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business.  A Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph).

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("***UDFI***").  In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness."  In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI.  Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

The Fund may generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors.  A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI will vary depending upon the degree of leverage utilized by the Fund and could be significant.  In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

*We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.*

Tax Consequences for Non-U.S. Investors

The Fund will invest all of its investible assets in Coins. Section 864(b)(2) of the Code provides a safe harbor (the "***Safe Harbor***") applicable to a non-U.S. person (other than a dealer in securities)

that engages in the U.S. in trading securities (including contracts or options to buy or sell securities) for its own account pursuant to which such non-U.S. person will not be deemed to be engaged in a U.S. trade or business.  The Safe Harbor also provides that a non-U.S. person (other than a dealer in commodities) that engages in the U.S. in trading commodities for its own account is not deemed to be engaged in a U.S. trade or business if "the commodities are of a kind customarily dealt in on an organized commodity exchange and if the transaction is of a kind customarily consummated at such place."

There is significant uncertainty as to whether trading in Coins qualifies for the benefits of the Safe Harbor. If the Fund's activities do not qualify for the benefits of the Safe Harbor and such activities rise to the level of "trading" for U.S. federal income tax purposes, then Limited Partners that are not "United States persons" (as such term is defined in Section 7701(a)(30) of the Code) may earn material amounts of income that would be treated as "effectively connected with the conduct of a trade or business within the United States" ("***ECI***") as a result of their investment in the Fund.  In such case, such Limited Partners may incur U.S. federal (and, potentially, state and local) taxes on a net income basis (and, under certain circumstances, "branch profits" taxes) that could materially and adversely affect the economic returns of such Limited Partners.  Such Limited Partners may also become subject to a variety of filing requirements as a result of an investment in the Fund.  The Fund has no obligation to minimize ECI.  Non-U.S. persons should consult their own tax advisors in this regard.

> ***We urge prospective non-U.S. Investors to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.***

Investor Tax Filings and Record Retention.

The U.S. Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions.  In general, these Treasury Regulations require investors in specified transactions (including partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements.  Significant monetary penalties (in addition to penalties that generally may be applicable as a result of a failure to comply with the applicable Treasury Regulations) may be imposed for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope, and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain investors to the special tax filing and record retention rules.  Additionally, under these Treasury Regulations, an investor's recognition of loss upon its disposition of its Interest could cause the investor to become subject to special tax filing and record retention rules.

Reporting Under FATCA

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an

agreement with the Service (an "***FFI Agreement***"), and/or complies with an IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "***Cayman-U.S. IGA***"), which is treated as in effect, and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014 and guidance notes thereunder, each as updated from time to time.

The Strategic Master Fund is likely to be considered an FFI. In order to avoid incurring U.S. withholding under FATCA, the Strategic Master Fund is generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder. The Strategic Master Fund intends to register with the Service and expects to comply with the Cayman-U.S. IGA and, therefore, generally does not expect to become subject to U.S. withholding under FATCA.

In addition, the Fund may be required to act as a withholding agent for the Service under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation (including the prescribed forms) to the Fund or its agents showing its exemption from such withholding or compliance with FATCA. The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations of income and gains made to investors.

The General Partner, the Investment Manager and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned. In this regard, the General Partner, the Investment Manager and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner, the Investment Manager and the Fund in complying with their obligations under FATCA. In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Investment Manager, the Fund or the General Partner (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests.

State and Local Taxes

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund. State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income. Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents. Each potential investor is urged to consult with its own tax advisor in this regard.

***Each prospective Limited Partner should consult its own tax advisor with respect to its state and local tax consequences and filing obligations as a result of an investment in the Fund.***

Other Taxes

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes. Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund. It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction. However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties. Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains). The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The

tax matters relating to the Fund are complex and are subject to varying interpretations.  There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions.  Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund.  In no event will the Investment Manager, the Fund, the General Partner, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations.  This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding an Interest.  The foregoing does not address tax considerations affecting investors that are not U.S. persons.  Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any foreign tax consequences of such an investment in its particular situation.*

## ERISA AND OTHER REGULATORY CONSIDERATIONS

**ERISA Considerations**

General

Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their capital or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "***Benefit Plan Investors***" means any employee benefit plan subject to part 4 of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

In order to prevent the assets of the Fund from being considered Plan Assets under ERISA, it is the intention of the Fund to monitor the investments in the Fund and prohibit the acquisition, withdrawal or transfer of any Interests by any Limited Partner, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of Interests of any class owned by Benefit Plan Investors would be less than 25% of the aggregate value of the class of Interests (determined, as described above, by excluding certain Interests held by the General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of Interests by Benefit Plan Investors to less than 25%, the Fund may require the compulsory withdrawal of Interests of any class. Each Limited Partner that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the

date it acquires an Interest the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "**Maximum Percentage**") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of an Interest, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the General Partner of that occurrence and shall, if and as directed by the General Partner, in a manner consistent with the restrictions on transfer set forth herein, withdraw or dispose of some or all of the Interests held in its general account or Plan Asset Entity.

If the Fund's assets were considered Plan Assets, then, under ERISA and the Code, the General Partner would be a fiduciary, and certain employees, partners and officers of the General Partner as well as certain affiliates would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties, the lending of money or other extensions of credit, the sale, exchange or leasing of property by the Fund or certain related parties or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions. Additionally, individual investment in Interests by persons who are fiduciaries, and/or parties-in-interest and disqualified persons, to a Plan might be deemed to constitute prohibited transactions under such circumstances.

Representations by Plans

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

In addition, each fiduciary of each Plan proposing to invest in the Fund will be required to represent that either (i) in connection with its decision to invest in the Fund, the undersigned is represented by an entity (A) described in 29 CFR §2510.3-21(c)(1)(i); (B) that is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies; (C) who acknowledges that neither the General Partner nor any of its affiliates or employees is undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the undersigned's investment in the Fund; and (D) who is acting as a fiduciary under ERISA with respect to the undersigned's investment in the Fund and is responsible for exercising independent judgment in evaluating such investment; and/or (ii) neither the General Partner nor any of its affiliates or employees has rendered "investment advice" (within the meaning of 29 CFR §2510.3-21(a)) to the undersigned in connection with the undersigned's decision to invest in the Fund.

Ineligible Purchasers

Interests may not be purchased with Plan Assets if the General Partner, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an

agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan.  A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Plans' Reporting Obligations

***The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting obligation for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.***

Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code.  Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund.  Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code.  Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.

**Other Regulatory Matters**

Securities Act of 1933

Interests are not registered under the U.S. Securities Act of 1933, as amended, or any other securities law, including state securities or blue sky laws.  Interests are offered without registration in reliance upon the exemption contained in Regulation D of this act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering.  Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

Investment Adviser Registration

The Investment Manager is not registered as an investment adviser with the Securities and Exchange Commission.  However, the Investment Manager may become registered under the U.S. Investment Advisers Act of 1940, as amended, at a future date if it determines that registration is necessary or otherwise appropriate with applicable law.

Investment Company Act Registration

The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended.

Commodity Exchange Act

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator (a "***CPO***") or a commodity trading adviser under the Commodity Exchange Act, as

amended, because the Fund is limiting participation to certain qualified investors and is restricting the Fund's commodity interest trading (through the Master Funds), and the Investment Manager only provides commodity trading advice to the Fund (or other pools for which it is an exempt CPO). Therefore, unlike a registered CPO, there is no requirement to deliver this Memorandum or other disclosure document or any certified annual report to the Fund's investors.

Cayman Islands Mutual Funds Law Regulation

The Strategic Master Fund is regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands ("***Mutual Funds Law***"). The Cayman Islands Monetary Authority (the "***Authority***") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Strategic Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the Strategic Master Fund and may result in the Authority applying to the court to have the Strategic Master Fund wound up.

The Strategic Master Fund is not, however, subject to supervision in respect of its investment activities or the constitution of the Strategic Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Strategic Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of the control person of the Strategic Master Fund, to appoint a person to advise the Strategic Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Strategic Master Fund, as the case may be. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

As a regulated mutual fund in the Cayman Islands, the Strategic Master Fund is also subject to legislation and regulations aimed at the prevention of money laundering.

Requests for Information

The Strategic Master Fund, or any of its agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2016 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2017 Revision) or Reporting of Savings Income Information (European Union) Law (2014 Revision) and associated regulations, agreements, arrangements and memoranda of understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the General Partner, the Fund, the

Strategic Master Fund and any of its or their directors or agents, may be prohibited from disclosing that the request has been made.

Anti-Money Laundering Regulations

All subscriptions for Interests will be subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the General Partner or its delegate may require verification of identity from all prospective investors.  Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The General Partner reserves the right to request such information as is necessary to verify the identity of a prospective investor.  The General Partner also reserves the right to request such identification evidence in respect of a transferee of Interests.  In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the General Partner may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The General Partner also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the General Partner suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, the General Partner and the Investment Manager with any such laws or regulations in any relevant jurisdiction.