# Iterative Capital Management, L.P.

March 1, 2020

**To:**    The limited partners in Iterative Capital, L.P. and shareholders of Iterative Capital, Ltd. (collectively, the "**Investors**" and, such funds, the "**Feeder Funds**")

**From:** Iterative Capital Management, L.P. (the "**Investment Manager**"), Iterative Capital GP, L.L.C. (the "**General Partner**") and the board of directors of Iterative Capital, Ltd. (the "**Board**" and, together with the Investment Manager and the General Partner, "**Iterative**")

**RE:**    Conversion and Consolidation of Iterative Capital Fund Structure

## THIS OFFER WILL EXPIRE AT MIDNIGHT, NEW YORK, NEW YORK TIME ON MARCH 27, 2020, UNLESS OTHERWISE EXTENDED AS SET FORTH BELOW.

Iterative has organized a series of transactions with respect to the Feeder Funds, and Iterative Capital Master, L.P. (the "**Capital Master Fund**") and Iterative Mining Master, L.P. (the "**Mining Master Fund**" and together with the Capital Master Fund, the "**Master Funds**"), the two "master funds" through which the Feeder Funds directly or indirectly invest all of their investible assets (such Feeder Funds, together with the Master Funds, the "**Fund Complex**"). An alternative to a full dissolution and liquidation of the Fund Complex, these transactions are designed to result in, at each Investor's option: (1) immediate liquidity for Investors who wish to exit their investment ("**Exiting Investors**") or (2) the ability for Investors who wish to continue their investment in the Fund Complex' mining activities ("**Continuing Investors**") to do so through a more streamlined and cost-efficient structure, as described in more detail below (the "**Proposed Transactions**").

Iterative believes that the Proposed Transactions include the following benefits for Investors:

- For Exiting Investors, immediate liquidity in the form of cash (rather than an in-kind distribution of Master Fund assets) at a reasonable price based on the current net asset value of the Master Funds' assets (without regard to the current side pocket and other liquidity restrictions);

- For Continuing Investors, the ability to continue their investment in crypto asset mining through a single entity, which is expected to enjoy greater operational efficiencies and reduced costs; and

- No performance allocation or management fee will be made or paid in connection with the Proposed Transactions, and no additional fees, including transaction fees, will be paid to Iterative in connection with the Proposed Transactions.

If the requisite approvals are received and the Proposed Transactions are consummated, the following will occur:

- Iterative Capital, L.P. (the "**Domestic Fund**"):

  - *Exiting Investors*:

    - The Master Funds will sell a sufficient amount of their crypto assets to generate sufficient cash proceeds to make distributions in full to all Exiting Investors;

    - Exiting Investors in the Domestic Fund will then receive an amount equal to (a) the net asset value of their investment in the Domestic Fund as of December 31, 2019 (as calculated in accordance with the limited partnership agreement of the Domestic Fund, the "**Domestic LPA**"), *less* (b) their pro rata share of the costs and expenses associated with the Proposed Transactions (including any costs associated with the sale of the Master Funds' crypto assets and reasonable reserves established by the Investment Manager to pay for anticipated final audit expenses of the constituents of the Fund Complex being dissolved); and

    - Following the distribution described above, Exiting Investors will be redeemed in full from the Domestic Fund.

  - *Continuing Investors*:

    - Following the redemption of the Exiting Investors, as described above, the Domestic Fund will be converted to a Delaware limited liability company ("**Mining NewCo**") and governed by the operating agreement attached hereto as Appendix II to Exhibit C (the "**Mining NewCo LLCA**");

    - Mining NewCo will be treated as a partnership for U.S. federal income tax purposes;

    - Each Master Fund will distribute the Continuing Investors' pro rata share of such Master Fund's assets to Mining NewCo (i.e., all remaining cryptocurrency positions and mining equipment); and

    - Following the occurrence of the transactions described below with respect to the Offshore Fund, the Master Funds will be promptly wound-up (in the case of the Mining Master Fund) or struck-off (in the case of the Capital Master Fund) and dissolved.

- Iterative Capital, Ltd. (the "**Offshore Fund**"):

  - *Exiting Investors*:

    - The Master Funds will sell a sufficient amount of their crypto assets to generate sufficient cash proceeds to make distributions in

full to all Exiting Investors and to satisfy any presumptive tax liability associated with the liquidation of Iterative Intermediate, L.L.C. (i.e., a Delaware limited liability company wholly owned by the Offshore Fund that has elected to be treated as a domestic corporation for U.S. federal income tax purposes and through which the Offshore Fund holds its investment in Iterative Mining Master, L.P.) (the **Domestic Blocker**");

- Exiting Investors in the Offshore Fund will then receive an amount equal to (a) the net asset value of their investment in the Offshore Fund as of December 31, 2019 (as calculated in accordance with the memorandum and articles of association of the Offshore Fund, the "**Offshore Articles**"), *less* (b) their pro rata share of the costs and expenses associated with the Proposed Transactions (including any costs associated with the sale of the Master Funds' crypto assets, as well as the dissolution of the Domestic Blocker, and reasonable reserves established by the Investment Manager to pay for anticipated final audit expenses of the constituents of the Fund Complex being dissolved), *less* (c) their pro rata share of the presumptive tax liability of the Domestic Blocker, and any associated withholding tax as a result of the sales and distributions described above; and

- Following the distribution described above, Exiting Investors will be redeemed in full from the Offshore Fund.

o   *Continuing Investors*:

- Following the redemption of the relevant Exiting Investors in the Domestic Fund, as described above, the Domestic Fund will be converted to a Delaware limited liability company (i.e., "**Mining NewCo**") governed by the Mining NewCo LLCA;

- Mining NewCo will be treated as a partnership for U.S. federal income tax purposes;

- Following the redemption of the relevant Existing Investors from the Offshore Fund, the Offshore Fund will contribute its remaining share of cryptocurrency assets and its Domestic Blocker interests to Mining NewCo, in exchange for an equity interest in Mining NewCo. The Domestic Blocker will subsequently be dissolved;

- The Offshore Fund will be struck-off and dissolved and its interest in Mining NewCo distributed to the non-U.S. Continuing Investors (if any);

- Each non-U.S. Continuing Investor will receive an interest in Mining NewCo, in proportion to its indirect interest in the Master

Funds, reduced by its pro rata share of the cost of liquidating, and the presumptive tax liability of, the Domestic Blocker, and any associated withholding tax as a result of the sales and distributions described above; and

▪ Following the occurrence of the transactions described above, the Master Funds will be promptly wound-up (in the case of the Mining Master Fund) or struck-off (in the case of the Capital Master Fund) and dissolved.

Following the consummation of the Proposed Transactions, Mining NewCo is expected to pursue a crypto asset and network token mining strategy. Long-term, its strategy is to plan and operate large scale mining operations domestically and abroad. Initially, it will utilize the mining assets from Iterative Mining Master, LP (both the GPUs and the DCR ASICs) and operate them for the duration of their hardware lifecycle. The vehicle will be permitted to stake and lend coins to earn extra rewards/revenue prior to full liquidation, which is anticipated to be within three years of the mining hardware's obsolescence.

Akin Gump Strauss Hauer & Feld, LLP represents the General Partner, the Investment Manager, the Fund Complex (and Mining NewCo) in the Proposed Transactions.

The attached Consent and Disclosure Letter is being sent to record holders by overnight delivery.  The Consent and Disclosure Letter explains in detail the terms of the Proposed Transactions.

The Proposed Transactions have been approved by Iterative. In order to consummate the Proposed Transactions generally, we are seeking the approval of each Investor.  Investors who do not timely respond or who do not elect to be either an Exiting Investor or Continuing Investor will be mandatorily redeemed prior to the effectiveness of the Proposed Transactions through an in-kind distribution of their pro rata share of the Master Funds' assets (and bear any cost and tax liability associated with such in-kind distribution).  Such in-kind distribution is expected to consist of both crypto assets (in the form of a hardware wallet) and mining equipment (disconnected from the internet and packaged in a shipping container at the expense of the receiving Investor).

By electing to participate as an Exiting Investor or Continuing Investor, each Investor will approve the Proposed Transactions, which approval will also serve as a consent to the conflicts and risks associated with the Proposed Transactions and the adoption of the Mining NewCo LLCA, as well as a waiver of any applicable provisions of the Domestic LPA or Offshore Articles, as applicable (and the limited partnership agreements of the Master Funds). Once the necessary consents from the Investors are received, Iterative intends to take all necessary steps and actions to consummate the Proposed Transactions.

The information in this letter and the attached Consent and Disclosure Letter comprise all of the material information that will be provided by Iterative. The control persons of the General Partner and the Investment Manager and the promoters of the Fund Complex (and Mining NewCo) are set forth in Exhibit A.  The Feeder Funds do not intend to make another offer for

Investors to receive liquidity or continue their investment in a Feeder Fund through Mining NewCo at any time in the future.  While the Feeder Funds will bear the expenses of this offering, neither Iterative nor the Fund Complex will charge any transfer or other similar fees to execute this exchange offer.

Neither Iterative nor any constituent fund of the Fund Complex makes any recommendation to the Investors as to whether or not they should participate in this exchange offer.  Each Investor must make his/her own decision as to whether or not to participate in the exchange offer. In doing so, each Investor should consult with his/her own advisors, including his/her own tax, financial, immigration, and legal advisors, before making any decisions regarding the exchange offer.

Iterative is seeking to obtain the relevant approval of the Proposed Transactions from Investors by means of a written consent (the "**Investor Written Consent**").  You should read the Consent and Disclosure Letter in its entirety before completing and submitting your Investor Written Consent.  A copy of the Mining NewCo LLCA is attached hereto as <u>Appendix II to Exhibit C</u>.  Should you have any questions, please contact Brandon Buchanan directly at: ███████@iterative.capital.

This offer will expire at midnight, New York, New York time on March 27, 2020. Attached as <u>Exhibit B</u> to this cover letter to the Consent and Disclosure Letter is a form of Investor Written Consent. **In order to participate in this exchange offer, we ask that you return a completed Investor Written Consent to the Investment Manager in the enclosed prepaid overnight package, or via hand delivery, regular mail or overnight courier or by email, to the physical mailing address or email address indicated on the Investor Written Consent, no later than <u>midnight March 27, 2020</u>.**

<u>**This offer will expire at midnight, New York, New York time on March 27, 2020**</u>. Iterative has the right, in its sole discretion, at any time to extend the period of time during which this exchange offer is open in the event Iterative believes that an Investor desires to participate in the exchange offer, but has not submitted his/her Investor Written Consent by March 27, 2020. Such extension will be for the period of time that Iterative determines is necessary to get a definitive response from each such Investor.  If Iterative determines to extend the period of time during which this offer is open, it will give you written notice by 12:00 a.m. Eastern time on the business day following the scheduled expiration date of the exchange offer, including with respect to the new expiration date. Iterative may reject any or all Investor Written Consents that Iterative determines are not in appropriate form or that it determines are unlawful to accept or not timely made.

Promptly following the expiration of this exchange offer, Iterative will countersign each of the properly submitted Investor Written Consents and return a copy to such Investor.  The Proposed Transactions will become effective immediately following the mandatory redemption of any Investors who fail to respond or make an election, or, if there are no such Investors, the first distribution of cash made in redemption of an Exiting Investor.

**This exchange offer is subject to a number of risks. Please refer to the risk factors discussed in the Consent and Disclosure Letter prior to making a decision with respect to**

**the exchange offer and the Proposed Transactions and whether to elect to be an Exiting Investor or Continuing Investor.** There are inherent conflicts of interest in this offering because each Feeder Fund is offering its Investors the option to either exit or continue their investment through a consolidated operating entity sponsored by Iterative, with the liquidity for such exit option consisting of the sale of such amount of the Master Fund's crypto assets as is necessary to redeem all Exiting Investors (plus, while not anticipated to be necessary, any mining equipment assets necessary to fully redeem all Exiting Investors), which may include assets in which the Continuing Investors previously participated through their indirect interest in each Master Fund. Although each Feeder Fund is making this exchange offer in order to provide liquidity and continuing investment options for the benefit of the Investors, affiliates of Iterative will benefit from extending the existence of the Domestic Fund in the form of Mining NewCo, with the possibility that Iterative or its affiliates will earn additional performance compensation in the future.  Investors should review the conflicts of interest section in the Consent and Disclosure Letter attached hereto.  Furthermore, for Continuing Investors, the Proposed Transactions will have a different risk profile than that of the Investors' original investment in the relevant Feeder Fund, which may result in a complete loss of an Investor's investment. **You should consult with your tax advisor to determine the personal tax consequences to you of participating in this exchange offer. The personal tax consequences to you of participating in this exchange offer will depend on your decision to become either an Exiting Investor or Continuing Investor, as well as the decision (or failure to respond) of the other Investors. Please refer to the Consent and Disclosure Letter for additional information regarding the material tax consequences of participating in the Proposed Transactions.**

Prospective Mining NewCo LLCA:

Once the Domestic Fund converts and reorganizes as a limited liability company (i.e., "Mining NewCo"), Mining NewCo will be governed by the Mining NewCo LLCA.  The Investment Manager requests that you read the attached prospective Mining NewCo LLCA, and your execution of the Investor Written Consent will evidence your consent to the Mining NewCo LLCA.  The Mining NewCo LLCA will go into effect upon the effective date of the Proposed Transactions.

THIS COVER LETTER, THE CONSENT AND DISCLOSURE LETTER AND THE INFORMATION INCORPORATED BY REFERENCE THEREIN ARE "CONFIDENTIAL INFORMATION" AND ACCORDINGLY, ARE SUBJECT TO THE APPLICABLE PROVISIONS OF THE GOVERNING DOCUMENTS OF THE FUND COMPLEX AND THE SUBSCRIPTION DOCUMENTS OF THE FEEDER FUNDS.

Thank you for your support and your consideration of these matters.

| **Iterative Capital Management, L.P.** | **Iterative Capital GP, L.L.C.** | **Board of Directors of the Offshore Fund** |
|---|---|---|
| By: Iterative Instinct UPG, LLC, its general partner | | |

**Brandon Buchanan**                    **Chris Dannen**

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the Mergers or the other Proposed Transactions or determined whether this Consent and Disclosure is accurate or adequate.  Any representation to the contrary is a criminal offense.

## <u>EXHIBIT A</u>

### CONTROL PERSONS OF THE GENERAL PARTNER, THE INVESTMENT MANAGER AND PROMOTERS OF THE FEEDERS FUNDS

<u>CONTROL PERSONS OF THE GENERAL PARTNER AND INVESTMENT MANAGER</u>

BRANDON BUCHANAN AND CHRISTOPHER DANNEN, managing members of the General Partner and the general partner of the Investment Manager

<u>PROMOTERS OF THE FEEDER FUNDS</u>

ITERATIVE CAPITAL GP, L.L.C.

ITERATIVE CAPITAL MANAGEMENT, L.P.

BRANDON BUCHANAN AND CHRISTOPHER DANNEN, solely in their capacity as members of the board of directors of the Offshore Fund

## <u>EXHIBIT B</u>

## ITERATIVE CAPITAL, L.P. AND ITERATIVE CAPITAL, LTD.

## INVESTOR WRITTEN CONSENT

*All capitalized terms used in this Investor Written Consent but not defined shall have the meanings ascribed to such terms in the cover letter to which this Investor Written Consent is attached.*

**As more fully described in the Consent and Disclosure Letter, this Investor Written Consent is being used to seek consent of the Investors to the Proposed Transactions.**

The Investor agrees that he/she has had sufficient opportunity to (i) review and understand the materials relating to the Proposed Transactions, including, but not limited to, those sections of the attached Consent and Disclosure Letter dealing with risk factors, conflicts of interest, expenses (including, but not limited to, associated transaction expenses), and tax consequences of the Proposed Transactions, (ii) ask questions of, and receive answers from, the Investment Manager or its affiliates relating to all materials provided in connection with the Proposed Transactions, and (iii) obtain any additional information that the Investment Manager can acquire without unreasonable effort or expense prior to midnight, New York, New York time on March 27, 2020, that is necessary to evaluate the merits and risks of the Proposed Transactions and its election with respect thereto.

The Investor hereby directs Iterative to effectuate the Proposed Transactions when it receives this completed and executed Investor Written Consent.  The Investor hereby acknowledges that the election with respect to becoming a Continuing Investor or Exiting Investor on the signature pages hereto is binding and irrevocable and may not be withdrawn, even in the event of an extension of the period of time during which the exchange offer is open.

The Investor acknowledges and agrees that each warranty, representation, covenant, and agreement made in, and all other information provided in, the subscription documents that he/she submitted to become an Investor of the relevant Feeder Fund (the "**Subscription Documents**") is still true, accurate, and complete as of the date hereof.  The Investors further agrees to update any information in such Subscription Documents as soon as possible after discovering that such information is no longer true, accurate, or complete.

The Investor acknowledges that it made representations as to its status as an "accredited investor" as represented in its Subscription Documents and, if electing to be a Continuing Investor, this Investor Written Consent. The Investor further agrees that if its status as an "accredited investor" has changed since it submitted its Subscription Documents or it is otherwise a non-accredited investor, it will automatically be deemed an Exiting Investor, regardless of its response below.

The Investor acknowledges and agrees that he/she possesses by himself/herself, or together with his/her professional advisors, sufficient knowledge of the investment, legal and tax consequences of participating in the Proposed Transaction in the capacity corresponding to its

election to participate as either an Exiting Investor or Continuing Investor on the Investor's signature page to make such an informed and sophisticated investment decision.  The Investor certifies that he/she has not received any investment, legal or tax advice from any constituent fund of the Fund Complex, the General Partner, the Investment Manager or Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") and understands that Akin Gump acts as U.S. counsel to the constituent funds of the Fund Complex, the General Partner, and their respective affiliates.  The Investor also understands that, in connection with the Proposed Transactions, and ongoing advice to the constituent funds of the Fund Complex, the General Partner, the Investment Manager and their respective affiliates, Akin Gump will not be representing Investors in the Feeder Funds, including the Investor, and no independent counsel has been retained to represent the Investor, other than any counsel or professional advisors retained by such Investor.

Except as otherwise provided in the current Domestic LPA or Offshore Articles, as applicable, the current limited partnership agreements of the Master Funds, or, with respect to Continuing Investors the Mining NewCo LLCA, the Investor, on behalf of himself/herself, his/her affiliates, and each of their respective employees, officers, directors, owners, shareholders, insurers, representatives, agents, successors, and assigns, expressly, irrevocably, and unconditionally fully and forever waives, releases, and discharges each constituent fund of the Fund Complex (including Mining NewCo), the General Partner, the Investment Manager, and any of their respective affiliates from any and all claims, demands, damages, actions, causes of action, debts, obligations, and liabilities of any kind whatsoever whether known or unknown, arising out of or attributable to (i) the entire process by which the Investor will participate in the Proposed Transactions as an Exiting Investor or Continuing Investor when Iterative receives his/her executed signature page to the Investor Written Consent and directing Iterative to give effect to such exchange, and (ii) with respect to Continuing Investors, the performance of the Investor's investment in Mining NewCo, as further evidenced in the Mining NewCo LLCA, as amended, revised or supplemented from time to time.

[*Signature pages follow*]

**This offer will expire at midnight, New York, New York time on March 27, 2020**.

Investors who do not timely respond *or* who do not elect to be either an Exiting Investor or Continuing Investor will be mandatorily redeemed prior to the effectiveness of the Proposed Transactions through an in-kind distribution of their pro rata share of the Master Funds' assets. Therefore, if you do not consent to the Proposed Transactions, you may simply retain these materials and wait to be redeemed.

By electing to participate as an Exiting Investor or Continuing Investor, each Investor will approve the Proposed Transactions (including the conversion of the Domestic Fund, which approval will also serve as a consent to the conflicts and risks associated with the Proposed Transactions and the adoption of the Mining NewCo LLCA, as well as a waiver of any applicable provisions of the Domestic LPA or Offshore Articles, as applicable (and the limited partnership agreements of the Master Funds).

**Please check only ONE box below:**

❑ **I consent to the Proposed Transactions and desire to be a Continuing Investor, continue my investment through Mining NewCo and become bound by the Mining NewCo LLCA as a member thereof.**

By checking the box above, the Investor hereby acknowledges that he/she has received, read, and understood the Mining NewCo LLCA, which will go into effect once the Domestic Fund has converted into a limited liability company, and has been given the opportunity to (i) ask questions of and receive answers from the General Partner or one of its affiliates, including the Investment Manager, concerning the terms and conditions of the Mining NewCo LLCA and other matters pertaining to the conversion of the Domestic Fund, and (ii) obtain any additional information that the General Partner can acquire without unreasonable effort or expense that is necessary to evaluate the conversion of the Domestic Fund and the exchange of interests hereby. The Investor hereby approves and consents to the execution of the Mining NewCo LLCA, directs the Investment Manager as his/her true and lawful attorney-in-fact, with full power of substitution, to execute such Mining NewCo LLCA once the Domestic Fund has been converted, and agrees to be bound by all of the terms and provisions of the Mining NewCo LLCA. The Investor understands and agrees that the foregoing power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the Investment Manager, and as such it will: (i) be irrevocable and continue in full force and effect notwithstanding the subsequent death or incapacity of any party granting the foregoing power-of-attorney, regardless of whether the Investment Manager shall have had notice thereof; and (ii) survive the delivery of an assignment by the Investor of the whole or any portion of my membership interest in Mining NewCo.

By checking the box above, the undersigned hereby acknowledges that it is an "accredited investor," as such term is defined in the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder. Please refer to Appendix I to this Exhibit B for a list of the criteria pursuant to which you may qualify as an accredited investor. If you are not able to truthfully make the foregoing representation,

you will be deemed to be an Exiting Investor.  If you have any questions with respect to your status, please contact the Investment Manager for a questionnaire.

❑ **I consent to the Proposed Transactions and desire to be an <u>Exiting Investor</u> and be redeemed, for cash, from the relevant Feeder Fund.**

By checking either box above, the undersigned (to the extent the undersigned is a shareholder in the Offshore Fund) (a) understands and agrees that, in light of the Proposed Transactions, the Offshore Fund will ultimately be struck-off and dissolved pursuant to section 156 of the Companies Law (2020 Revision) of the Cayman Islands, and represents and warrants that it will not apply to the Grand Court of the Cayman Islands for the reinstatement of the Offshore Fund and its restoration to the Cayman Islands Companies Register (to the extent eligible to do so).  The undersigned further understands that the Offshore Fund will not be recommending to its shareholders that it be placed in voluntary winding up and voluntary liquidators will not be appointed.  The undersigned further represents and warrants that it will not pass any special resolution to the effect that the Offshore Fund be placed in voluntary winding up.

<u>Investors who do not timely respond *or* who do not elect to be either an Exiting Investor or Continuing Investor will be mandatorily redeemed prior to the effectiveness of the Proposed Transactions through an in-kind distribution of their pro rata share of the Master Funds' assets. Therefore, if you do not consent to the Proposed Transactions, you may simply retain these materials and wait to be redeemed.</u>

[*Signature pages continued*]

By signing below, the Investor (a) agrees to the terms of the Investor Written Consent and (b) directs Iterative to effectuate the Proposed Transactions and its election with respect thereto.

Dated: _____, 2020

_____          _____
Name of Investor's Spouse                        Name of Investor
*(if a natural person and purchased jointly)*

_____          _____
Signature of Spouse                                   Investor's Signature
*(if a natural person and purchased jointly)*

 

_____
Name and title or representative
capacity, if applicable

**NOTES**

1.  If the Investor is a corporation, this form must be executed under its common seal or the hand of a duly authorized officer.

2.  In the case of joint holders of an interest as an Investor in a Feeder Fund, any holder may sign this form (other than a natural person who purchased jointly).

The relevant Iterative bodies accept the Investor's election with respect to the Proposed Transactions and, based on such election and its status as an "accredited investor" (if electing as a Continuing Investor), will effect the Proposed Transactions with respect to the Investor's election as a(n) _____ Investor.

**Iterative Capital Management,**          **Iterative Capital GP,**          **Board of Directors of the**
**L.P.**                                                          **L.L.C.**                                       **Offshore Fund**
By: Iterative Instinct UPG, LLC,
its general partner

**Brandon Buchanan**                                       **Chris Dannen**

Dated: _____, 2020

You should return your completed Investor Written Consent to the Manager using the enclosed prepaid overnight delivery package, or:

| Via hand delivery or regular mail or overnight courier to:<br><br>Iterative Capital Management, L.P.<br>233 Broadway, Suite 2703<br>New York, NY 10279<br>(917) 288-5544 | Via email in PDF form to:<br><br>██████ @iterative.capital<br><br>*Please include "Fund Restructuring" in the subject line.* |
|---|---|

# APPENDIX I

## ACCREDITED INVESTOR CRITERIA

### FOR NATURAL PERSONS:

☐      The Subscriber is a *natural person* whose individual net worth, or joint net worth with that person's spouse, at the time of purchase exceeds $1,000,000, excluding the value of the Subscriber's primary residence;[1]

☐      The Subscriber is a *natural person* with individual income (without including any income of the Subscriber's spouse) in excess of $200,000 or joint income with that person's spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year; or

☐      The Subscriber is a trust that is revocable or able to be amended by the grantor at any time or an individual retirement account and the grantor of the grantor trust or the owner of the individual retirement account is a *natural person* who meets either or both of the requirements described above.

### FOR ENTITIES:

☐      The Subscriber is an *entity* with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Partnership and is one of the following:

     ☐      a corporation;

     ☐      a partnership;

     ☐      a limited liability company;

     ☐      a business trust; or

     ☐      a tax-exempt organization described in Section 501(c)(3) of the Code;

☐      The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Partnership and whose decision to invest in the Partnership has been directed by a person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the investment;

---

[1]    An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

☐    The Subscriber is an employee benefit plan within the meaning of Title I of ERISA, (including an individual retirement account), which satisfies at least one of the following conditions:

    ☐    it has total assets in excess of $5,000,000;

    ☐    the investment decision is being made by a plan fiduciary that is a bank, savings and loan association, insurance company or registered investment adviser; or

    ☐    it is a self-directed plan (*i.e.*, a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor;

☐    The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions that has total assets in excess of $5,000,000;

☐    The Subscriber is licensed, or subject to supervision, by federal or state examining authorities such as a "bank," "savings and loan association," "insurance company," or "small business investment company" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity;

☐    The Subscriber is registered with the Securities and Exchange Commission as a broker or dealer or an investment company; or has elected to be treated or qualifies as a "business development company" (within the meaning of Section 2(a)(48) of the Investment Company Act of 1940, as amended (the "***Investment Company Act***"), or Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "***Investment Advisers Act***")); or

☐    The Subscriber is an entity in which *all* of the equity owners are persons described above.[2]

---

[2]    If the entity is an irrevocable trust, please contact Iterative to discuss whether the trust may be "looked through".

THIS CONSENT AND DISCLOSURE LETTER AND THE INFORMATION INCORPORATED BY REFERENCE HEREIN ARE "CONFIDENTIAL INFORMATION" AND ACCORDINGLY, ARE SUBJECT TO THE APPLICABLE PROVISIONS OF THE GOVERNING DOCUMENTS OF THE FUND COMPLEX AND THE SUBSCRIPTION DOCUMENTS OF THE FEEDER FUNDS.

<u>EXHIBIT C</u>

**CONSENT AND DISCLOSURE LETTER**

**FOR**

**INVESTORS**

**IN**

**ITERATIVE CAPITAL, L.P. AND ITERATIVE CAPITAL, LTD.**

**TABLE OF CONTENTS**

**Section
Page**

I.     FORWARD-LOOKING STATEMENTS ................................................................................... 1

II.    QUESTIONS AND ANSWERS ABOUT THE PROPOSED TRANSACTIONS ......................................... 3

III.   RISKS RELATED TO THE PROPOSED TRANSACTIONS; CONFLICTS OF INTEREST ................... 16

IV.    DESCRIPTION OF ITERATIVE CAPITAL MANAGEMENT .................................................. 31

V.     CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ............................................. 32

VI.    WHERE TO FIND MORE INFORMATION .......................................................................... 47

SUMMARY OF PRINCIPAL TERMS OF MINING NEWCO LLCA .............................................. 48

FORM OF MINING NEWCO LLCA ....................................................................................... 51

**This Consent and Disclosure Letter is for informational purposes and the solicitation of consents to the Proposed Transactions. We urge you to read this Consent and Disclosure Letter because it contains important information regarding the Proposed Transactions.**

## I.     FORWARD-LOOKING STATEMENTS

This Consent and Disclosure Letter contains "forward-looking statements."  Forward-looking statements include any statements that address future results or occurrences.  In some cases, you can identify forward-looking statements by terminology such as "may," "might," "will," "would," "should," "could" or the negative thereof.  Generally, the words "anticipate," "believe," "continue," "expect," "intend," "estimate," "project," "plan" and similar expressions identify forward-looking statements.   In particular, statements about the expectations, beliefs, plans, objectives, assumptions or future events or performance of Iterative Capital Management, L.P. (the "**Investment Manager**"), Iterative Capital GP, L.L.C. (the "**General Partner**") or the board of directors of Iterative Capital, Ltd. (the "**Board**" and, together with the Investment Manager and the General Partner, "**Iterative**") or their affiliates (collectively, the "**Iterative Parties**") contained in this Consent and Disclosure Letter under the headings "Risks Related to the Proposed Transactions; Conflicts of Interest" are forward-looking statements.  Many risks and uncertainties are inherent in the Iterative Parties' industry and markets.  Others are more specific to the business and operations of Iterative Capital, L.P. (the "**Domestic Fund**"), Iterative Capital, Ltd. (the "**Offshore Fund**" and, together with the Domestic Fund, the "**Feeder Funds**") and the Domestic Fund following its conversion to a limited liability company ("**Mining NewCo**").  The occurrence of the events described and the achievement of the expected results depend on many events, some or all of which are not predictable or within the control of any of the foregoing entities.  Actual results may differ materially from the forward-looking statements contained in this Consent and Disclosure Letter.

All of these forward-looking statements have been based upon current expectations, assumptions, estimates and projections, in consultation with the Investment Manager.  While it is believed that these expectations, assumptions, estimates and projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks, uncertainties and other factors, many of which are outside of any entity's control, which could cause the results, performance or achievements of Mining NewCo's assets or returns to differ materially from any results, performance, achievements or returns expressed or implied by such forward-looking statements.  All forward-looking statements in this Consent and Disclosure Letter and subsequent written and oral forward-looking statements attributable to any of the funds advised or managed by the Iterative Parties or any of the Iterative Parties, or persons acting on their behalf, are expressly qualified in their entirety by such risks, uncertainties and other factors. These risks, uncertainties and other factors include, but are not limited to:

For Exiting Investors:

- current market conditions impacting the ability of the Master Funds to sell their liquid cryptocurrency holdings (and, if required to fully redeem all Exiting Investors, mining equipment) for sufficient cash value to redeem all Exiting Investors based on their current valuation in the Domestic Fund or Offshore Fund, as applicable; and

- the Proposed Transactions (as defined below) or the announcement thereof

For Continuing Investors:

- future cash flow and earnings of Mining NewCo and the inability of Mining NewCo to dispose of or liquidate its investments on the anticipated time frames and at the anticipated valuations;

- adverse regulatory developments impacting Mining NewCo's businesses;

- compliance with laws and government regulations;

- the impact of the economic and employment conditions in the United States on the business and future results of operations of Mining NewCo;

- the impact of claims brought against the operations of Mining NewCo;

- the dependence of Mining NewCo on key management personnel (including, but not limited to, those of the General Partner and the Investment Manager);

- difficulties in improving the operations or investments acquired by the Mining NewCo;

- the impact of unknown or contingent liabilities acquired by the Mining NewCo; and

- the Proposed Transactions (as defined below) or the announcement thereof.

We caution you that the foregoing list of important factors may not contain all of the material factors that are important to you. In addition, in light of these risks and uncertainties, the matters referred to in the forward-looking statements contained in this Consent and Disclosure Letter may not in fact occur. No entity has undertaken any obligation to publicly update or revise any forward-looking statement as a result of new information, future events or otherwise, except as required by law.

The projections and estimates of value in this Consent and Disclosure Letter should not be relied upon in any way or manner in connection with the Mergers (as defined below) and should not be regarded for the purpose of this Consent and Disclosure Letter as representations or warranties by the Feeder Funds (including Mining NewCo following the conversion of the Domestic Fund), any other fund managed by the Iterative Parties, any of the Iterative Parties or any other person as to the accuracy of such information or that any such projections or valuations will be realized.

## II.     QUESTIONS AND ANSWERS ABOUT THE PROPOSED TRANSACTIONS

*The following are some brief answers to certain questions that you, as an investor in the relevant Feeder Fund (an "**Investor**"), may have regarding the Proposed Transactions contemplated in this Consent and Disclosure Letter.  You are urged to carefully read the remainder of this Consent and Disclosure Letter, including the documents attached to this Consent and Disclosure Letter and the materials or additional information you may obtain in accordance with the instructions set forth in the "Where to Find More Information" section.  The following and the remainder of this Consent and Disclosure Letter are subject to, and are qualified in their entirety by reference to, the limited liability company agreement of Mining NewCo, attached as Appendix II to this Exhibit C (as amended from time to time, the "**Mining NewCo LLCA**"), the limited partnership agreement of the Domestic Fund (the "**Domestic LPA**"), the memorandum and articles of association of the Offshore Fund (the "**Offshore Articles**") and the (exempted) limited partnership agreement of each of Iterative Capital Master, L.P. and Iterative Mining Master, L.P. (each, a "**Master LPA**").*

**General**

**Q:     Why am I receiving this Consent and Disclosure Letter?**

A:     Iterative has organized a series of transactions with respect to the Feeder Funds, Iterative Intermediate, L.L.C. (the "**Domestic Blocker**") and Iterative Capital Master, L.P. and Iterative Mining Master, L.P., the two "master funds" through which the Feeder Funds invest all of their investible assets (the "**Master Funds**" and, together with the Feeder Funds and the Domestic Blocker, the "**Fund Complex**").   These transactions are designed to result in, at each Investor's option: (1) immediate liquidity for Investors who wish to exist their investment ("**Exiting Investors**") and (2) the ability for Investors who wish to continue their investment in the Fund Complex' mining activities ("**Continuing Investors**") to do so through a more streamlined and cost-efficient structure, as described in more detail below.

You are receiving this Consent and Disclosure Letter because you are a limited partner of the Domestic Fund or a shareholder of the Offshore Fund (i.e., an "Investor").  You are being asked to approve the Proposed Transactions.   If approved, the Proposed Transactions are expected to be consummated prior to the close of the end of the first calendar quarter of 2020 (or, if such approval is delayed, promptly after such approval is obtained).

**The Proposed Transactions**

**Q:     Why is the General Partner proposing the Proposed Transactions?**

A:     In January 2018, Iterative sponsored the formation of the Fund Complex, closing approximately $15 million in capital contributions. The purpose of the Fund Complex was to directly or indirectly, acquire, generate, manage and hold investments in cryptocurrencies and network tokens through (i) trading on established cryptocurrency

exchanges or in "over the counter" or other markets, (ii) structuring, designing and participating in "Token Generation Events," or (iii) "mining" new coins using computing hardware configured for that purpose.

Although the Fund Complex had the traditional characteristics of a hedge fund, such as quarterly liquidity, indefinite life, performance allocation, etc., it became apparent throughout that first year and the next, that, due to the novelty of cryptocurrencies and uncertainty around regulations, that third party service providers would make operating the Fund Complex in a traditional manner challenging (and increasingly expensive). After the initial closing, the Investment Manager was required by MG Stover (the administrator of the Fund Complex) to hire three additional service providers if they were going to act as fund administrator: Houlihan Capital (for third party valuation of the mining hardware), Constellation Advisors (acting CFO), and Cohen & Co (tax specialists); this was in addition to MG Stover as fund administrator and Akin Gump as legal counsel. Coordinating among these groups proved difficult and reporting with any regularity became an issue – frustrating Investors and the Investment Manager alike. The lagging quarterly reports (sometimes taking upwards of four months to produce) meant that Investors did not reliably have information available to manage their investment in the Fund Complex.

Complicating matters in 2018 was the precipitous drop in the overall market capitalization of all (or almost all) cryptocurrencies, with prices dropping in some cases by as much as 90%. Bitcoin itself dropped from a peak of $20K per coin to $3K per coin. Having invested half of the assets of the Fund Complex in mining hardware, its positions became increasingly illiquid, compelling the Investment Manager to declare the mining assets as a special situation investment (i.e., "side pocket"), thereby putting the entire mining Master Fund in a side pocket and disabling Investors' ability to fully redeem. The difficulties associated with the accounting and tax preparation prompted MG Stover to resign from the engagement as fund administrator. Iterative then hired Triple Leo.

2019 was mostly uneventful; the market made tepid attempts at a recovery. The Investment Manager continued to try and optimize the operation and reduce expenditures. However, the costs of operating the mining operation, fund administration and auditing costs continued to eat away at margins due to the lagging prices of cryptocurrencies, Decred in particular, in which the Fund Complex has a large position, and the rapid depreciation schedule of the mining hardware. It was decided in late 2019 and the beginning of 2020 that it would be in the best interest of Investors to create a new entity for those Investors that had a longer time horizon for investment and provide liquidity to other Investors that no longer wished to remain in the Fund Complex but were stuck due to the placement of assets in a side pocket. It is through this lens, of reducing costs, providing an opportunity for liquidation, and re-aligning the interests of Investors and Iterative, that the Investment Manager has opted to restructure the Fund Complex and proceed with the Proposed Transactions, including the formation of Mining NewCo.

**Q:** **What are the expected benefits of the Proposed Transactions?**

A:     Iterative believes that the Proposed Transactions include the following benefits for Investors:

- For Exiting Investors, immediate liquidity in the form of cash (rather than an in-kind distribution of Master Fund assets) at a reasonable price based on the most recent net asset value of the Master Funds' assets determined by a third-party administrator and accounting team as of December 31, 2019 (without regard to the side pocket and other liquidity restrictions);

- For Continuing Investors, the ability to continue their investment in crypto asset mining through a single entity, which is expected to enjoy greater operational efficiencies and reduced costs; and

- No performance allocation or management fee will be made or paid in connection with the Proposed Transactions, and no additional fees, including transaction fees, will be paid to Iterative in connection with the Proposed Transactions.

**Q:     What are the Proposed Transactions?**

A:     Depending on which Feeder Fund you are an Investor of and your election with respect to the Proposed Transactions, the relevant Proposed Transactions will differ.   The "**Proposed Transactions**" include, but are not limited to, the following:

- Iterative Capital, L.P. (the "Domestic Fund"):

  o   *Exiting Investors*:

     ▪   The Master Funds will sell a sufficient amount of their crypto assets to generate sufficient cash proceeds to make distributions in full to all Exiting Investors, and to satisfy any tax liability associated with the Proposed Transactions;

     ▪   Exiting Investors in the Domestic Fund will then receive an amount equal to (a) the net asset value of their investment in the Domestic Fund (as calculated in accordance with the Domestic LPA), *less* (b) their pro rata share of the costs and expenses associated with the Proposed Transactions (including any costs associated with the sale of the Master Funds' crypto assets and reasonable reserves established by the Investment Manager to pay for anticipated final audit expenses of the constituents of the Fund Complex being dissolved); and

     ▪   Following the distribution described above, Exiting Investors will be redeemed in full from the Domestic Fund.

  o   *Continuing Investors*:

- ▪ Following the redemption of the Exiting Investors, as described above, the Domestic Fund will be converted to a Delaware limited liability company (i.e., Mining NewCo) and governed by the Mining NewCo LLCA attached hereto as <u>Appendix II to Exhibit C</u>;

- ▪ Mining NewCo will be treated as a partnership for U.S. federal income tax purposes;

- ▪ Each Master Fund will distribute the Continuing Investors' pro rata share of such Master Fund's assets to Mining NewCo (i.e., all remaining cryptocurrency positions and mining equipment); and

- ▪ Following the occurrence of the transactions described below with respect to the Offshore Fund, the Master Funds will be promptly wound-up (in the case of the Mining Master Fund) or struck-off (in the case of the Capital Master Fund) and dissolved.

- • <u>Iterative Capital, Ltd. (the "Offshore Fund")</u>:

  - ○ *Exiting Investors*:

    - ▪ The Master Funds will sell a sufficient amount of their crypto assets to generate sufficient cash proceeds to make distributions in full to all Exiting Investors and to satisfy any tax liability associated with the Proposed Transactions;

    - ▪ Exiting Investors in the Offshore Fund will then receive an amount equal to (a) the net asset value of their investment in the Offshore Fund as of December 31, 2019 (as calculated in accordance with the Offshore Articles), *less* (b) their pro rata share of the costs and expenses associated with the Proposed Transactions (including any costs associated with the sale of the Master Funds' crypto assets, as well as the dissolution of the Domestic Blocker, and reasonable reserves established by the Investment Manager to pay for anticipated final audit expenses of the constituents of the Fund Complex being dissolved), *less* (c) their pro rata share of the presumptive tax liability of the Domestic Blocker, and any associated withholding tax as a result of the sales and distributions described above; and

    - ▪ Following the distribution described above, Exiting Investors will be redeemed in full from the Offshore Fund.

  - ○ *Continuing Investors*:

    - ▪ Following the redemption of the Exiting Investors in the Domestic Fund, as described above, the Domestic Fund will be converted to

a Delaware limited liability company (i.e., Mining NewCo) governed by the Mining NewCo LLCA;

▪ Mining NewCo will be treated as a partnership for U.S. federal income tax purposes;

▪ Following the redemption of the relevant Existing Investors from the Offshore Fund, the Offshore Fund will contribute its remaining share of cryptocurrency assets and its Domestic Blocker interests to Mining NewCo, in exchange for an equity interest in Mining NewCo. The Domestic Blocker will subsequently be dissolved;

▪ The Offshore Fund will be struck-off and dissolved and its interest in Mining NewCo distributed to the non-U.S. Continuing Investors (if any);

▪ Each non-U.S. Continuing Investor will receive an interest in Mining NewCo, in proportion to its indirect interest in the Master Funds, reduced by its pro rata share of the cost of liquidating, and the presumptive tax liability of, the Domestic Blocker, and any associated withholding tax as a result of the sales and distributions described above; and

▪ Following the occurrence of the transactions described above, the Master Funds will be promptly wound-up (in the case of the Mining Master Fund) or struck-off (in the case of the Capital Master Fund) and dissolved.

Following the consummation of the Proposed Transactions, Mining NewCo is expected to pursue a crypto asset and network token mining strategy. Long-term, its strategy is to plan and operate large scale mining operations domestically and abroad. Initially, it will utilize the mining assets from Iterative Mining Master, LP (both the GPUs and the DCR ASICs) and operate them for the duration of their hardware lifecycle. The vehicle will stake and lend coins to earn extra rewards/revenue prior to full liquidation of such initial mining assets and related coins and other rewards, which is anticipated to occur within three years of the mining hardware's obsolescence. The Investment Manager may, however, reinvest any such coins or rewards generated by the initial mining assets into new mining hardware or other mining-related investments that it determines to be in the best interest of Mining NewCo's investors.

**Q:    What are the conditions to consummation of the Proposed Transactions?**

A:    The Proposed Transactions have been approved by Iterative. In order to consummate the Proposed Transactions generally, we are seeking the approval of each Investor. However, Investors who do not timely respond or who do not elect to be either an Exiting Investor or Continuing Investor will be mandatorily redeemed prior to the effectiveness of the Proposed Transactions through an in-kind distribution of their pro rata share of the Master Funds' assets (and bear any cost and tax liability associated with such in-kind

<u>distribution</u>).  Following such redemption, the consent of such Investors with respect to the Proposed Transactions will no longer be required, as they will no longer be Investors.

Iterative plans to make sufficient mandatory redemptions such that the Proposed Transactions will occur regardless of Investor participation, as the Proposed Transactions have been proposed as a potential benefit to Investors who desire to continue their investment, in lieu of a full dissolution and liquidation of the Fund Complex, and as a way to provide cash (rather than an in-kind distribution of assets) to Investors who desire to exit their investment based on the net asset value of the Master Funds as of December 31, 2019.  However, Investors should note that such in-kind distributions to non-consenting Investors are expected to consist of both crypto assets (in the form of a hardware wallet) and mining equipment (disconnected from the internet and packaged in a shipping container at the expense of the receiving Investor), which may be difficult or impossible for such Investors to liquidate for a price equal to their contribution to the net asset value of the Master Funds' assets, if at all.

**Q:**    **What regulatory filings will be required to effect the Proposed Transactions?**

**A:**    Except for certain filings that will need to be made with the Delaware Secretary of State in connection with the conversion of the Domestic Fund into a limited liability company (and, if applicable, with the U.S. Internal Revenue Service ("**IRS**") and the Cayman Islands Tax Information Authority in connection with the winding up of entities in the Fund Complex), and standard private offering safe harbor filings, none of Iterative or the Fund Complex are required to make any material filings with any governmental entity, unless a governmental entity makes an unsolicited communication with any party to the Proposed Transactions informing such party that a filing is required.  (Certain termination filings will also be made post-effectiveness of the Proposed Transactions in connection with the winding-up and termination of the former constituents of the remainder of the Fund Complex.)

**Q:**    **Will any distributions to Investors be made during the period in which Iterative is seeking their consent, or will any Investors be permitted to withdraw or redeem during such period?**

A:    No.

**Q:**    **What are the fees and expenses related to the Proposed Transactions and how are they being paid?**

A:    It is expected that all Investors will benefit from the Proposed Transaction, either through the opportunity to continue their investment in a more stream-lined manner or the ability to obtain liquidity at a reasonable price based on the net asset value of the Master Funds' assets as of December 31, 2019.  Therefore, all Investors will bear their proportionate share of the costs and expenses (including legal fees and expenses) incurred in connection with the Proposed Transactions, including all costs associated with the sale of the crypto assets necessary to create the required liquidity and the termination of the constituent funds of the Fund Complex (other than the Domestic Fund), including final

audit expenses thereof.  All Investors, including Exiting Investors, will also bear the costs and expenses (including legal fees and expenses) associated with the conversion of the Domestic Fund into Mining NewCo, which Iterative believes is a crucial part of creating the benefits for all Investors described above.  Investors in the Offshore Fund will also be allocated their pro rata share of the presumptive tax liability of the Domestic Blocker, and any associated withholding tax as a result of the sales and distributions occurring as part of the Proposed Transactions.  The Investment Manager will create reasonable reserves for anticipated final audit expenses of the constituents of the Fund Complex being dissolved, which will be funded by Exiting Investors through their pro rata share thereof being deducted from their withdrawal proceeds and by Continuing Investors through Mining NewCo paying their pro rata share thereof.  Any excess reserves will be refunded to Investors following payment in full of all expenses associated with the Proposed Transactions.

Investors who fail to respond or make an election will be liquidated from the Fund Complex via an in-kind distribution prior to the incurrence of any expenses associated with the Proposed Transactions.

**Q:**     **What was the process used to determine the Proposed Transactions?**

A.      Iterative's primary goal was to restructure the Fund Complex in a way that would benefit all Investors, both Investors desiring to continue their investment and Investors desiring to exit their Investment (including those Investors who had previously submitted withdrawal/redemption requests).    Therefore, Iterative's goals were two-fold: (1) reducing operating expenditures for Continuing Investors and (2) create cash liquidity for Exiting Investors at a reasonable price.  Iterative believes the Proposed Transactions accomplish that in a way that creates the least additional tax and expense burden on Investors, taken as a whole.

In deciding to pursue the Proposed Transactions, Iterative considered a number of potential strategic alternatives, including a merger or "roll-up" with one or more other businesses of the Investment Manager.  Iterative also considered the alternative of continuing to manage the Fund Complex as currently formulated.

Ultimately, Iterative considered the fact that a merger or "roll-up" with one or more other businesses would be needlessly complicated and potentially expose Investors to other assets and liabilities with which they were unfamiliar or in which they had never expressed a desire to investor.  And, continuing the status quo would not provide Investors with an opportunity to obtain near-term liquidity.

**Mining NewCo LLCA**

**Q:**     **What are the terms of the Mining NewCo LLCA?**

A:      The material terms of the Mining NewCo LLCA are substantially similar to those of the Investment Manager's separate mining operating company.  Continuing Investors will receive credit for the fair market value of the portion of the Master Funds' assets which are distributed to Mining NewCo (and deemed contributed to Mining NewCo in the case

of any Continuing Investors from the Offshore Fund). This fair market value is based on the net asset value of the Master Funds as of December 31, 2019 (the same valuation used to determine the liquidating distributions made to Exiting Investors) and is designed to give all parties involved a fresh start as a new operating business that re-aligns the interests of both Continuing Investors and the Investment Manager. Continuing Investors will be entitled to receive a return of their capital contributions to Mining NewCo (based on the fair market value of the Master Fund assets contributed in-kind to Mining NewCo (calculated based on the net asset value of the Master Funds as of December 31, 2019)) before the Investment Manager will begin to receive a 20% share of Mining NewCo's profits (as more fully described in the Mining NewCo LLCA). For Investors who wish to continue their investment in the Master Fund's assets, the Investment Manager believes the distribution approach taken in the Mining NewCo LLCA to be better than the alternative of redeeming such investors along with the Exiting Investors at the December 31, 2019 valuation and dissolving the Fund Complex in its entirety, particularly in light of the mining hardware, which the Investment Manager believes would currently be difficult to realize for a fair value. Additionally, if future distributions to the Investment Manager from Mining NewCo (from which the Investment Manager will not receive fees) were to be subject to a high water mark or preferred return as a hold-over from the Fund Complex, the Investment Manager could be incentivized to take outsized risks or continue to lock up assets until it could realize any profit sharing.

A summary of the principal terms of the Mining NewCo LLCA is attached hereto as Appendix I to this Exhibit C.

The Mining NewCo LLCA is designed for its strategy as a true operating business – not a hedge fund (or investment fund of any type). The differences from the Domestic LPA and Offshore Articles are material and significant. **Each Investor should read and review the Mining NewCo LLCA in its entirety.**

**\*Any discussion of the Mining NewCo LLCA herein (including in the summary of principal terms attached hereto as Appendix I to this Exhibit C) is subject to, and qualified in its entirety by reference to, the full text of the Mining NewCo LLCA attached hereto as Appendix II to this Exhibit C.**

Q:   **How can I obtain a copy of the Mining NewCo LLCA?**

A:   A copy of the Mining NewCo LLCA is attached as Appendix II to this Exhibit C. **Each Investor should read and review the Mining NewCo LLCA in its entirety. Investors are urged to review the distribution provisions of the Mining NewCo LLCA carefully with their legal and other advisors.**

**Distribution to Exiting Investors**

Q:   **What distributions are expected to be made to the Exiting Investors when the Proposed Transactions are consummated?**

A:   Exiting Investors will be distributed an amount equal to the current net asset value of their investment, net of the expenses of the Proposed Transactions described herein

(including presumptive taxes and withholding tax in the case of Investors of the Offshore Fund).  Continuing Investors will receive a membership interest in Mining NewCo.

**Q:**     **Do I have to vote "YES" with respect to the Proposed Transactions in order to receive a distribution?**

A:      No. You may simply retain your copies of these materials, not return the Investor Written Consent and, when the Proposed Transactions are consummated, you will be mandatorily redeemed prior to the effectiveness of the Proposed Transactions through an in-kind distribution of your pro rata share of the Master Funds' assets.  Following such redemption, the consent of such Investors with respect to the Proposed Transactions will no longer be required, as they will no longer be Investors. However, Investors should note that such in-kind distributions to non-consenting Investors are expected to consist of both crypto assets (in the form of a hardware wallet) and mining equipment (disconnected from the internet and packaged in a shipping container at the expense of the receiving Investor), which may be difficult or impossible for such Investors to liquidate for a price equal to their contribution to the net asset value of the Master Funds' assets, if at all.

**Q:**     **What is the net asset value being used to make distributions to Exiting Investors?**

A:      Iterative is using the December 31, 2019 net asset value of the Fund Complex, the last net asset value that has been prepared by our third-party administrator and accounting teams.

**Tax Matters**

**Q:**     **Will I recognize any gain or loss for U.S. federal income tax purposes in connection with the Fund Merger?**

**A:**      The tax ramifications of the Proposed Transactions are complex and depend on whether you are an Existing Investor or a Continuing Investor, as well as whether you are an investor in the Onshore Fund or the Offshore Fund.

For a detailed description of the anticipated tax treatment for the relevant Investor categories, please see Certain U.S. Federal Income Tax Considerations below.

**Q:**     **If non-U.S. Continuing Investors would become subject to adverse tax consequences from holding an interest in Mining NewCo directly, will the Investment Manager accommodate an alternative holding structure?**

A:      Due to the expectation that Mining NewCo will be treated as a partnership for U.S. federal income tax purposes, Iterative understands there could be adverse tax consequences for a non-U.S. Continuing Investor that holds its interest in Mining NewCo directly.  Accordingly, Iterative will make reasonable efforts to facilitate the transfer of any non-U.S. Continuing Investor's interest in Mining NewCo to an alternative entity designated by such non-U.S. Continuing Investor.

**EACH INVESTOR IS URGED TO CONSULT ITS TAX ADVISORS IN ORDER TO UNDERSTAND FULLY THE POTENTIAL U.S. FEDERAL, STATE, LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF PARTICIPATING OR NOT PARTICIPATING IN THE PROPOSED TRANSACTIONS IN ITS PARTICULAR SITUATION AND SHOULD CAREFULLY REVIEW "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS" BELOW.**

## Interest of Iterative and its principals and affiliates in the Proposed Transactions

**Q:    How does Iterative and its affiliates intend to vote on the Proposed Transactions?**

A:    Iterative has already approved the Proposed Transactions and is now seeking the consents from Investors that are required for the Proposed Transactions to be consummated. To the extent of the investment of Iterative and its affiliates in the Fund Complex, Iterative and such affiliates will participate alongside the Continuing Investors. The Investment Manager will receive certain profits interests in Mining NewCo (i.e., the "Class A Common Units"), which are entitled to a 20% profits interest in distributions made by Mining NewCo following such time as all the Investor members (including Iterative in such capacity) have received a return of their capital, based on the fair market value of the Master Fund assets contributed in-kind.

Iterative is recommending that the Investors vote to approve the Proposed Transactions and elect to participate as either a Continuing Investor or Exiting Investor.

## Operation of Mining NewCo following the consummation of the Proposed Transactions

**Q:    What is the Investment Manager's plan for operating Mining NewCo after the Proposed Transactions are consummated?**

A:    Following the consummation of the Proposed Transactions, Mining NewCo is expected to pursue a crypto asset and network token mining strategy. Long-term, its strategy is to plan and operate large scale mining operations domestically and abroad, and use its inventories in proprietary trading strategies, executed with our partner Etale, a third-party software developer that will provide the Investment Manager with an execution system to implement the Investment Manager's proprietary algorithmic trading strategies, in exchange for sharing in the Investment Manager's profits. Initially, Mining NewCo will utilize the mining assets from Iterative Mining Master, LP (both the GPUs and the DCR ASICs) and operate them for the duration of their hardware lifecycle. The vehicle will stake and lend coins to earn extra rewards/revenue prior to full liquidation of the initial mining assets and related coins and other rewards, which is anticipated to occur within three years of such mining hardware's obsolescence. The Investment Manager may, however, reinvest any such coins or rewards generated by the initial mining assets into new mining hardware or other mining-related investments that it determines to be in the best interest of Mining NewCo's investors.

See "Risks Related to the Proposed Transactions; Conflicts of Interest" and the Mining NewCo LLCA, attached as Appendix II to this Exhibit C, for more information on fund

expenses following the consummation of the Proposed Transactions.  **Each Investor should read and review the Mining NewCo LLCA in its entirety.**

**Actions to be Taken; Voting**

Q:  **What am I being asked to approve?**

A:  You are being asked to approve the Proposed Transactions.  The Proposed Transactions must be approved, or disapproved, as a single proposal and not as discrete items. Your vote on the Proposed Transactions is requested regardless of whether you intend to elect as a Continuing Investor or Exiting Investor.  Investors who do not respond affirmatively will be mandatorily redeemed in kind.

Q:  **How can Investors vote on the Proposed Transactions?**

A:  Applicable law permits action of the Investors to be taken by written consent.  We are therefore asking that you return a completed Investor Written Consent before midnight, New York, New York time on March 27, 2020.

If you fail to sign and return the Investor Written Consent prior to the deadline, midnight, New York, New York time on March 27, 2020, you will be mandatorily redeemed from the applicable Feeder Fund in kind, unless the General Partner determines to accept late responses (in its sole discretion).  You must return your completed Investor Written Consent in the enclosed prepaid overnight package, or via hand delivery, regular mail or overnight courier or by email, to the address or email address indicated on the Investor Written Consent (this address is also included below in this section under "Who Can Help Answer Your Questions").

Q:  **What are the means by which I should deliver my Investor Written Consent?**

A:  You may return your completed Investor Written Consent in the enclosed prepaid overnight package, or via hand delivery, regular mail or overnight courier or by email, to the address or email address indicated on the Investor Written Consent (this address is also included below in this section under "Who Can Help Answer Your Questions").

Q:  **Can I revoke or change my vote and/or election after I submit my Investor Written Consent?**

A:  No.  You may not revoke or change your written election with respect to the Proposed Transactions.

Q:  **How will I be notified of the results of the votes of the Investors?**

A.  Iterative intends to promptly distribute a notice to the Investors promptly following the deadline to provide Investor Written Consents.

**Next Steps**

**Q:**     **When do you expect the Proposed Transactions to be completed?**

A:      Iterative expects the Proposed Transactions to be consummated as promptly as practicable following the deadline for responses (after giving effect to any extensions), ideally prior the conclusion of the first quarter of 2020, although there is no guarantee this will be feasible.

**Q:**     **What do I need to do now?**

A:      Please complete, sign and return a completed Investor Written Consent in the enclosed prepaid overnight package, or via hand delivery, regular mail or overnight courier or by email, to the address or email address indicated on the Investor Written Consent, no later than the deadline, which is midnight, New York, New York time on March 27, 2020. (Iterative may accept late responses in its sole discretion.)  If you have previously provided any IRS Form(s) W-9 or any applicable IRS Form(s) W-8, to the extent any such forms have expired or become inaccurate or incomplete in any respect, you are required to submit the updated form(s), as well as any other documentation required to be provided to support your claims on such forms, together with your completed Investor Written Consent.  If you are required to provide an updated IRS Form W-9 or W-8 and you do not provide such form, you may be subject to 24% backup withholding.  Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules from a payment to an Investor will be allowed as a credit against such Investor's U.S. federal income tax liability or may be refunded, provided the required information is furnished in a timely manner to the IRS.  IRS Forms W-9 and W-8 and their instructions can be obtained on the IRS web site at http://www.irs.gov.

### Who Can Help Answer Your Questions?

If you have more questions about the Proposed Transactions, would like additional copies of this Consent and Disclosure Letter or would like more information, you should contact Iterative at the address and telephone numbers set forth below, or contact Brandon Buchanan directly at ███████@iterative.capital.   Additional information is also set forth in this Consent and Disclosure Letter under "Where to Find More Information."

You should return your completed Investor Written Consent to Iterative using the enclosed prepaid overnight delivery package, or:

| Via hand delivery or regular mail or overnight courier to: | Via email in PDF form to: |
|---|---|
| Iterative Capital Management, L.P.<br>233 Broadway, Suite 2703<br>New York, NY 10279<br>(917) 288-5544 | ███████@iterative.capital<br><br>*Please include "Fund Restructuring" in the subject line.* |

### III.  RISKS RELATED TO THE PROPOSED TRANSACTIONS; CONFLICTS OF INTEREST

*You should carefully consider the following risk factors, together with all of the other information included in this Consent and Disclosure Letter, before you decide whether to approve the Proposed Transactions. If you are making an election as a Continuing Investor, you are also asked to review the additional risks related to an investment in the Mining NewCo. Such sections are subject to, and are qualified in their entirety by reference to, the Mining NewCo LLCA.*

#### A. Risks Related to the Proposed Transactions

*Insufficient Mining Assets.*  Following the consummation of the Proposed Transactions, Mining NewCo is expected to pursue a crypto asset and network token mining strategy.  This strategy will initially be reliant upon the mining assets from Iterative Mining Master, LP (both the GPUs and the DCR ASICs) contributed to Mining NewCo by Continuing Investors (i.e., those mining assets that remain after non-participating Investors and Exiting Investors are liquidated and expenses are paid, which will initially be effectuated through sales of crypto assets and then, if necessary, mining assets). However, there is no guarantee that Mining NewCo will have sufficient mining assets to operate efficiently at its inception.  Any Investor who fails to timely respond to this Consent and Disclosure Letter or who does not elect to be either an Exiting Investor or Continuing Investor will be mandatorily redeemed prior to the effectiveness of the Proposed Transactions through an in-kind distribution of its pro rata share of the Master Funds' assets (including mining hardware).  Additionally, it is possible that as of the date the Proposed Transactions are consummated, the price of the Master Funds' crypto assets will be less than such crypto assets' December 31, 2019 valuation used for purposes of determining amounts owed to Exiting Investors, in which case the Investment Manager could be forced to sell mining equipment if the sale of all crypto assets proves to be insufficient to redeem Exiting Investors in full.

*Legal Challenges and Delay.*  Any transaction involving a tender offer involves the risk of legal challenge and delay. While the Investment Manager believes it is proposing to consummate the Proposed Transactions in accordance with all applicable laws, it is possible that one or more Investor(s) could decide to bring suit in connection with the Proposed Transactions. Any such legal challenge could result in the Investment Manager being required to delay the consummation of the Proposed Transactions, as well as involve additional legal expenses of the Investment Manager in defending against any such legal challenge that would ultimately be borne by all Investors.  To the extent the Proposed Transactions are delayed, additional expenses may be incurred leading up to their ultimate consummation.

*Additional Wind-Up Expenses.* While the Investment Manager has determined what it believes to be a reasonable estimate of the fees and expenses that will be required to wind-up and dissolve the Fund Complex (other than the Domestic Feeder), there is no guarantee that such estimate will be accurate.  For example, winding up and dissolving legal entities in the Cayman Islands may involve unknown additional costs, and the reserves the Investment Manager intends to create could prove to be insufficient to cover such unknown costs.  In the event the aggregate fees and expenses incurred by the Investment Manager in winding up and dissolving the Fund Complex

(other than the Domestic Feeder) exceed the Investment Manager's estimate and reserves, Mining NewCo will bear such excess fees and expenses.

*Please refer to the "Conflicts of Interest" section below for disclosures regarding potential conflicts of interest in connection with the Proposed Transactions.*

## B. Risks Related to Mining NewCo

*Capitalized terms utilized but not otherwise defined in this "Risks Related to Mining NewCo" section have the meanings given to them in the form of Limited Liability Company Agreement, attached hereto as Appendix II to Exhibit C (the "**LLC Agreement**") of Mining NewCo (to be known as "I2 DCR SPV, LLC"), as applicable.*

General Risks Related to Mining NewCo

*Restrictions on Transfer; No Secondary Market for Purchased Units*. The interests in the Company have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**") or the securities laws of any state or non-U.S. jurisdiction, and no such registration is contemplated. There is no obligation on the part of any person to register the interests in the interests in the Company under the Securities Act or the securities laws of any state or non-U.S. jurisdiction. The interests in the Company may not be transferred or resold except as permitted under the Securities Act and any applicable securities laws of any state or non-U.S. jurisdiction, pursuant to registration or an exemption therefrom. In addition, the interests in the Company are generally not transferable without the approval of the holders of a majority of the Class A Common Units (which is expected to be the Manager or its Affiliates) and subject to other transfer provisions set forth in the LLC Agreement. There will be no secondary market for Purchased Units and none is expected to develop. Consequently, Members may not be able to liquidate their Purchased Units for an indefinite period of time, which may not be prior to the time the Company dissolves.

*No Right to Withdraw*. Except in limited circumstances, Members will not have the right to withdraw from the Company at any time prior to the termination of the Company.

*Lack of Member Control*. The Company is a newly formed entity with little or no operating history upon which prospective investors can evaluate anticipated performance, and the past performance of investments managed by the Manager or its Affiliates cannot be relied upon as an indication of the future results of an investment in the Company. The Members will not make decisions with respect to the management, disposition or other realization of the Investment, or other decisions regarding the Company's business and affairs.

*Management Risk.* The investment performance of the Company will be substantially dependent on the services of the Manager and its respective principals and managers. In the event of the death, disability, departure, insolvency, or withdrawal of any of these principals, the performance of the Company may be adversely affected.

*Absence of Recourse for Members.* The LLC Agreement limits the circumstances under which the Manager can be held liable to the Company. As a result, Members may have a more limited right of action in certain cases than they would in absence of such a limitation.

*Indemnification.*  The Company will be required to indemnify certain persons as set forth in the LLC Agreement.  Resulting liabilities may be material.  The indemnification obligation of the Company would be payable from the assets of the Company.

*Lack of Diversification*.  The Company has been organized for the purpose of operating a single business.  As a consequence, the unfavorable performance of such business will have a material adverse effect on the Company and the Members' return from their investment in the Company.

*Limited Information.*  Company investment analyses and decisions by the Manager may frequently be required to be undertaken on an expedited basis to take advantage of Company investment opportunities.  In such cases, the information available at the time of making a Company investment decision may be limited, and the Manager may not have access to complete information regarding the Company investment.  Therefore, no assurance can be given that the Manager will have knowledge of all circumstances that may adversely affect a Company investment.  In addition, the Manager may rely upon specialized expert input by various third-party consultants and service providers in connection with its evaluation of proposed Company investments.

*Operating Deficits.*  The expenses of operating the Company may exceed its income, thereby requiring that the difference be paid out of the Company's capital, reducing the amount available to the Company for investment activity and therefore its potential for profitability.  Members may need to made additional capital contributions to the Company (over the amounts they have previously committed to make) to cover such expenses.  In addition, since distributions to Members are based on available cash flow and proceeds from sales of investments, an investment in the Company is not suitable for investors seeking current distributions of income.  Moreover, an investor is required to report and pay taxes on its allocable share of income from the Company, even if no cash is distributed by the Company.

*Lack of Distributions.*  It is not expected that the Company will make ongoing or periodic distributions, or any.  Rather, the Company will hold or reinvest its mining rewards as an operating company.  There is also no secondary market for interests in the Company, nor is one expected to develop.  Therefore, an investment in the Company is not suitable for investors who need or expect significant liquidity.

*Dilution.*  Subject to certain, limited preemptive rights in favor of the Members, the Company is authorized to issue additional interests in the Company, which may be dilutive of the existing Members.  To the extent such interests are issued pursuant to an exemption to such preemptive rights or a Member elects not to purchase its share of such interests, it is expected that such issuance will generally be dilutive.

*Developments in Financial Markets.*  The global financial markets have in the past few years gone through pervasive and fundamental disruptions.  In light of such recent market turmoil and the overall weakening of the financial services industry, the Company and other financial institutions' financial condition may be adversely affected and they may become subject to legal, regulatory, reputational and other unforeseen risks that could have a material adverse effect on the Company's business and operations.

*Cybersecurity Risks.*   The information and technology systems of the Manager may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes.  Although the Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Manager may have to make a significant investment to fix or replace them.  The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Manager's and the Company's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors).  Such a failure could harm the Manager's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.

*U.S. Federal and State Securities Laws.*   The offering of interests in the Company has not been registered under the Securities , and is made in reliance on the exemptive provisions of Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.  Similar reliance has been placed on exemptions from securities qualification requirements under applicable state securities laws.  No assurance can be given that the offering currently qualifies or will continue to qualify under one or more of such exemptive provisions.  If, and to the extent that, claims or suits for rescission are brought and successfully concluded for failure to register this offering or for acts or omissions constituting offenses under the Securities Act or other applicable U.S. federal and state securities laws, the ability of the Company to operate successfully could be jeopardized.

Securities and investment businesses generally are comprehensively and intensively regulated under state and U.S. federal laws and regulations.  Any investigation, litigation or other proceeding undertaken by state or U.S. federal regulatory agencies or private parties could necessitate the expenditure of material amounts of Company resources for legal and other costs and could have other materially adverse consequences for the Company.

<u>Risks Specific to the Mining Operations of Mining NewCo</u>

*Virtual Currency Risks.*   A cryptocurrency is a peer-to-peer, decentralized, digital currency whose implementation relies on the principles of cryptography to validate the transactions and generation of the currency itself.  A network token relies on a network protocol with similar principles to a cryptocurrency, but also serves other functions than merely storage of value.  As such, the creation and usage of cryptocurrency and network tokens is not subject to a fully-developed set of regulatory and licensing requirements and is subject to high levels of volatility and market abuse.  Cryptocurrencies and network tokens exist entirely in electronic form, as entries in digital ledgers.  The ledgers themselves, as well as the private encryption keys used to access cryptocurrency and network token balances, are held on personal hard drives or third-party servers, and as such are susceptible to all of the risks inherent in holding any electronic data, such as power failure, data corruption, security breach, communication failure and user error.  As such, cryptocurrencies and network tokens are subject to theft, destruction or loss of value from hackers, corruption or technology specific factors such as viruses that do not affect

traditional currency, which is underwritten by central banks and monetary authorities. Further, there can be no assurance that the computer code underlying any cryptocurrency held by the Company and its generation will not turn out to be flawed, resulting in unanticipated gluts of new cryptocurrencies or the corruption of existing holdings of cryptocurrency.

Transactions in cryptocurrencies or network tokens are recorded and authenticated not by a central repository, but by a peer-to-peer network. While decentralization avoids certain common threats to computer networks (e.g., denial of service attacks), the use of a peer-to-peer system relies on participants in the network having greater numbers and computing power than coordinated attackers. This authentication strategy necessitates investment in substantial amounts of computing power, which in turn increases the burdens on participants in the network to stay ahead of attackers. Prospective investors should be aware that, if and as the popularity of cryptocurrency and network tokens increases, the burdens on participants in the network (which are defrayed by transactional costs) can be expected to increase, reducing the value of the Company's investments.

Transactions in cryptocurrencies and network tokens also provide a high degree of anonymity, meaning they may be misused for criminal activities, including money laundering. This misuse could lead law enforcement agencies to close exchange platforms at short notice and prevent consumers from accessing or retrieving any funds that the platforms may be holding for them.

*Price Volatility.* The performance of the Company's mining business relates directly to the value of the digital assets being mined and sold, and fluctuations in their price could adversely affect such performance. Several factors may affect the price of such digital assets, including, but not limited to:

- total quantity of a certain digital asset in existence;

- global demand of a certain digital asset;

- global supply of a certain digital asset, including whether the mathematical protocol under which such digital asset was mined permits the creation of a limited, predetermined amount of the asset as opposed to other protocols (such as the one underlying Ether) which have not limit on total supply;

- investors' expectations with respect to the rate of inflation of fiat currencies;

- investors' expectations with respect to the rate of deflation of digital assets;

- interest rates;

- currency exchange rates, including the rates at which digital assets may be exchanged for fiat currencies;

- fiat currency redemption and deposit policies of the digital asset exchanges and liquidity on such exchanges;

- interruptions in service from or failures of the digital asset exchanges (interruptions or failures at other digital asset exchanges may also have an indirect affect);

- theft, or news of such theft, of digital assets from individuals or retail and service providers, including companies that buy, sell, process payments or store digital assets;

- investment and trading activities of large investors, including private and registered funds, that may directly or indirectly invest in digital assets;

- trades of a significant size in comparison to the overall trading in the market for digital assets over a short time period;

- "spoofing" or other manipulative tactics employed by participants on the exchange platform;

- monetary policies of governments, trade restrictions, currency devaluations and revaluations;

- regulatory measures, if any, that restrict the use of digital assets as a form of payment or the purchase of digital assets;

- the maintenance and development of the open-source software protocol of digital asset networks;

- increased competition from other forms of digital assets or means of payments in which the Company does not invest;

- global or regional political, economic or financial events and situations;

- expectations among cryptocurrency economy participants that the value of certain digital assets will soon change; and

- fees, including miners' and staking fees, associated with processing digital asset transactions.

*Risks Associated with Engaging or Investing in Mining Activities*. The Company will engage in digital asset mining activities. Mining is the process whereby new digital assets are issued directly to competing miners in return for using their computers' processing power to help ensure the integrity and security of the underlying system. Mining difficulty (*i.e.*, the amount of processing power required to successfully mine a given digital asset), can increase or decrease over time depending on various factors, such as the number of other miners competing at the same time. Generally, as the computing power on a given digital asset's network increases, so too does mining difficulty.  Accordingly, mining a digital asset may require continual investment in computer hardware and cause an increase in energy costs for the miners.  Such investment and costs can adversely affect the profitability of engaging in mining activities. Additionally,

depending on the digital asset being mined, specialized hardware, such as GPUs or ASICs, may be required to efficiently mine, and new increasingly efficient versions of these systems are typically released from time to time. There may be limited producers of, or otherwise limited availability of, such hardware. To the extent that the Company is not able to acquire new versions of specialized hardware, it may not be able to mine as profitably or be at all profitable anymore.

Additionally, some forms of mining in which the Company will engage are not based on the computing power of its miners' systems, but rather on the amount of cryptocurrency a miner is willing to "stake" in a claim that it is correctly following the mining rules. In such proof-of-stake systems (as opposed to the proof-of-work system, used by Bitcoin), miners that stake larger amounts of cryptocurrency win larger rewards. Becoming a profitable miner in a proof-of-stake system requires balancing energy costs and the cost of staking large amounts of capital in the form of cryptocurrency, among other factors. The algorithms used to mine a particular digital asset can change abruptly, which can harm miners' profitability. For example, the developers of Ethereum are planning a switch from a proof-of-work system to a proof-of-stake system, which may make mining Ethereum less profitable for some miners. To the extent miners are holding onto large amounts of a digital asset, they are prone to becoming targets for cyber-attacks by malicious actors seeking to steal the digital asset.

*Risks Related to Insufficient Mining Incentives*. With respect to digital assets that the Company mines, if the award of new units of such digital assets for solving blocks and transaction fees for recording transactions is not sufficiently high, the Company's financial incentive to expend processing power to solve blocks and confirm transactions on the blockchain could be diminished to the point of the Company ceasing operations. Miners generate revenue from both newly created digital assets, known as the "block reward", as well as from fees taken upon verifying blockchain transactions. If the aggregate revenue from these income streams is less than aggregate mining costs, the Company's profitability may not support continued business.

Miners such as the Company ceasing operations would reduce the collective processing power on the network, which would adversely affect the confirmation process for transactions (i.e., temporarily decreasing the speed at which blocks are added to the blockchain until the next scheduled adjustment in difficulty for block solutions) and make digital asset networks more vulnerable to a malicious actor or botnet obtaining control in excess of 50% of the processing power, which would allow such actor or botnet to manipulate the blockchain and hinder transactions. Any reduction in confidence in the confirmation process or processing power of a digital asset network may adversely affect an investment in the Company.

*Risks Associated with Selling Cryptocurrency Through Over-the-Counter Transactions.* "Over-the-counter" ("**OTC**") markets for cryptocurrency are subject to a maturing and still-uncertain set of regulations at the federal, state and international level. By selling digital assets through cryptocurrency brokers and dealers, the Company may become subject to regulation governing currency transactions, as well as regulations governing the sale of securities and commodities, and may be subject to taxation in manners that are still unclear. When selling digital assets through OTC markets, the Company may be subject to risk based on the identity of the transaction counterparty (either a cryptocurrency dealer, a third party or another entity) and the subsequent use of the digital assets by the purchasing entity. These risks include, but are not

limited to, the Company being considered a money services business under the Bank Secrecy Act, the Company being considered a seller of securities or certain types of regulated commodities contracts, and the Company's profits (if any) being re-characterized, and reallocation of associated tax obligations, between the Company and the OTC dealer and their owners by the IRS.  The nature of cryptocurrency means that any technological difficulties experienced by an OTC dealer or other intermediary may prevent the access, use, sale or other transaction of the digital assets.  Some cryptocurrency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the customer initiates the transaction.  Some OTC dealers may have insufficient counterparties to whom the Company may sell the digital assets that it mines (by selling to the OTC dealer, which in turn transacts with the relevant counterparties) at the time or price at which the Company desires.

*Risks of Open-Source Structure*.  The open-source structure of many of the digital asset network protocols means that certain core developers and other contributors may not be directly compensated for their contributions in maintaining and developing the network protocol. A failure to properly monitor and upgrade network protocol could damage the relevant digital networks.  Certain digital networks operate based on open-source protocols maintained by the groups of core developers.  As these network protocols are not sold and their use does not generate revenues for development teams, core developers may not be directly compensated for maintaining and updating the network protocols.  Consequently, developers may lack a financial incentive to maintain or develop the network, and the core developers may lack the resources to adequately address emerging issues with the networks.  There can be no guarantee that developer support will continue or be sufficient in the future.  Additionally, some developers are funded by companies whose interests may be at odds with other participants in the network or with investors' interests.  To the extent that material issues arise with certain digital network protocols and the core developers and open source contributors are unable or unwilling to address the issues adequately or in a timely manner, the digital networks and an investment in the Company may be adversely affected.

*Technology and Security Risks.* The Company must adapt to technological change in order to secure and safeguard its own accounts and activities, and the cold storage accounts it maintains for clients.  While the Company believes it has developed a proprietary security system reasonably designed to safeguard the Company's cryptocurrencies from theft, loss, destruction or other issues relating to hackers and technological attack, such assessment is based upon known technology and threats and current industry best practices.  As technological change occurs, the security threats to the Company's cryptocurrencies and cold storage accounts will likely adapt and previously unknown threats may emerge. Furthermore, the Company and its cold storage accounts may become more appealing targets of security threats as the size of the Company's business grows.  To the extent that the Company is unable to identify and mitigate or stop new security threats, the Company's cryptocurrencies or those of its clients may be subject to theft, loss, destruction or other attack, which could result in loss of the Company's assets and liability to the Company.  Any security breach caused by hacking, which involves efforts to gain unauthorized access to information or systems, or to cause intentional malfunctions or loss or corruption of data, software, hardware or other computer equipment, and the inadvertent transmission of computer viruses, could result in the halting of the Company's operations and/or the suspension of the Company's cold storage activities. While the Company believes its security system is consistent with current industry best practices, it is not impenetrable and may not be

free from defect, and any loss due to a security breach or software defect will be borne by the Company, absent willful misconduct, bad faith or gross negligence on the part of its clients.

*Cold Storage Risks.* Cryptocurrencies exist entirely in electronic form, as entries in digital ledgers. The ledgers themselves, as well as the private encryption keys used to access cryptocurrency balances, are held on personal hard drives or third-party servers, and as such are susceptible to all of the risks inherent in holding any electronic data, such as power failure, data corruption, security breach, communication failure and user error. As such, cryptocurrencies are subject to theft, destruction or loss of value from hackers, corruption or technology specific factors such as viruses that do not affect traditional currency, which is underwritten by central banks and monetary authorities. Further, there can be no assurance that the computer code underlying cryptocurrency and their generation will not turn out to be flawed. Because the Company intends to utilize "cold storage" for the private keys associated with the cryptocurrency that it mines, the Company may be at risk of loss, mishandling, or other interruption to its access to those keys and any subsequent inability to sell the associated cryptocurrency. The Company is responsible for taking such steps as it determines, in its sole judgment, to be required to maintain access to these keys, and prevent their exposure from hacking, malware and general security threats. The theft, loss or destructions of a private key required to access a cryptocurrency wallet is irreversible, and such private keys may not be capable of being restored by the Company. Any loss of private keys relating to digital wallets used to provide cold storage services could result in the loss of the cryptocurrency and associated liability to the Company.

*Custody of Digital Assets.* The Manager maintains custody of the Company's digital assets by generating and maintaining the private keys that control their movement. The Manager is responsible for taking such steps as it determines, in its sole judgment, to be required to maintain access to these keys, and prevent their exposure from hacking, malware and general security threats. However, the Manager is not liable to the Company or its Members for the failure or penetration of the security system absent willful misconduct, bad faith or gross negligence (as interpreted in accordance with the laws of the State of Delaware) or as otherwise required by law. To the extent that the security system is penetrated, any loss of the Company's digital assets may adversely affect a Member's investment, and could result in total loss of capital.

*Risks of Flawed or Ineffective Source Code.* If the source code or cryptography underlying a digital asset mined by the Company proves to be flawed or ineffective, malicious actors may be able to steal the Company's digital asset. In the past, flaws in the source code of digital assets have been exposed and exploited. Several errors and defects have been publicly found and corrected, including those that disabled some functionality for users and exposed users' personal information. Discovery of flaws in, or exploitations of, the source code that allow malicious actors to take or create additional digital assets in contravention of known network rules have occurred. In addition, the cryptography underlying a digital asset could prove to be flawed or ineffective, or developments in mathematics or technology, including advances in digital computing, algebraic geometry and quantum computing, could result in such cryptography becoming ineffective. In any of these circumstances, if the Company holds the affected digital asset, a malicious actor may be able to steal the Company's digital assets, which would adversely affect an investment in the Company. Even if the Company did not hold the affected digital asset, any reduction in confidence in the source code or cryptography underlying digital assets

generally could negatively affect the demand for any digital asset that the Company may mine and therefore adversely affect an investment in the Company.

*Fraud Risks*.  Because trading in digital assets is currently largely unregulated, such trading may be more exposed to fraud and other security and operational failures than trading in other assets that are supported by more established regulatory regimes and trading infrastructures.  The system of trading intermediaries and escrow agents that currently facilitate OTC transactions in digital assets is still in the nascent stage of development.  To the extent that any facilitators of the Company's transactions involving its mined digital assets turn out to be engaged in fraud or experience security failures or other operational issues, the performance of the Company could be adversely affected.

*Regulatory Risks.*  Cryptocurrency dealers and cold-storage providers are regulated by a variety of federal, state, and other agencies, but the regulations are uncertain, incomplete, and subject to variation and change.  Future regulation may increase the costs of the Company's operations.  In the most extreme case, it may be illegal, now or in the future, to own, hold, sell or use cryptocurrencies in one or more countries, including the United States and China.  There are uncertainties regarding legal and regulatory requirements relating to cryptocurrencies in a number of areas, including but not limited to the following:

- *Currency Regulation*.  As an organization engaged in the mining and subsequent sale of cryptocurrency, the Company must expend resources and employ personnel responsible for promoting compliance with applicable laws, which includes procedures and controls to prevent, monitor for, report on, and cooperate with information sharing requests about suspected money laundering, terrorist financing, and other illegal or improper conduct, among other undertakings. Moreover, the Company may now or in the future be required to register with, and may need to obtain licenses or permits from, government authorities in the United States in order to conduct business, including federal government agencies as well as agencies in a number of states and potentially foreign countries or subdivisions thereof. Failure to comply with these requirements can contribute to legal and operational liabilities.  It is also possible that regulators such as U.S. Department of the Treasury's Financial Crimes Enforcement Network may seek to limit or prohibit the issuance, transmission or trade of cryptocurrencies in general, or subject such transactions to significant additional regulatory burdens designed to reduce money laundering or other illicit uses, which would increase the Company's costs of operations.

- *Securities Law*.  The Company will only engage in the mining and sale of cryptocurrencies, and will not sell other types of network tokens, including those generated and/or sold through initial coin offerings or similar processes. The Company will maintain a list of cryptocurrencies that it will mine and sell, and the Company reserves the unfettered right to remove or delist a cryptocurrency from this list at any time.  However, it is possible that securities regulators in the U.S. and elsewhere in the world may determine that one or more of the cryptocurrencies mined and sold by the Company meets the definition of a "security" under applicable law.  Specifically, the Securities and Exchange Commission ("**SEC**") has declared that whether a specific digital currency or token will be treated as a security is a case-by-case, fact-specific determination, subject to analysis under existing case law and SEC interpretive

guidance.  In recent months, the SEC has increased the level and scope of its review of cryptocurrencies and the purchase and sale of cryptocurrencies and tokens.  Moreover, the SEC has warned that all federal requirements relating to the offer and sale of securities still apply (if a specific currency or token is found to be a security), regardless of whether the issuer is decentralized or autonomous and regardless of whether the securities are purchased using cryptocurrency or through digital (including distributed ledger) channels.  Should a cryptocurrency mined or sold by the Company subsequently be determined to be a security, the Company may face liability for having transacted in a security without complying with applicable regulations.  The Company must expend resources and periodically monitor the cryptocurrencies it mines and sells to mitigate against this risk.

- *Commodities Law*.  The Company's activities as a cryptocurrency miner may implicate commodities laws in the U.S. and elsewhere in several ways.  The Commodity Futures Trading Commission ("**CFTC**") has determined that at least some cryptocurrencies, such as Bitcoin, fall within the definition of a "commodity" under the U.S. Commodity Exchange Act of 1936, as amended (the "**CEA**"), and at least one federal court has affirmed this determination as well as the CFTC's jurisdiction over spot market transactions in cryptocurrencies with respect to fraud and anti-manipulation authority.  To the extent that certain digital assets themselves are deemed to be futures, swap or retail foreign exchange or retail commodity contracts pursuant to subsequent rulemaking by the CFTC, the Company may be required to comply with additional regulation under the CEA which could affect the manner in which the Company is permitted to conduct business, which likely would result in higher costs and lower profits.

*Regulatory Uncertainty in China*.  In September 2017, Chinese regulators banned initial coin offerings in the country as well as crypto-to-fiat currency order book exchange trading services, causing a number of digital asset exchanges in the country to close.  There have also been reports that the Chinese government is considering additional measures to end all digital asset trading-related activities and services taking place in the country, including mining.  Due to this uncertainty regarding the Chinese government's future actions with respect to the regulation of digital assets and related services, the viability of the Company's mining operations in China may be at risk and therefore any investment in the Company could be adversely affected.

## C. Tax Risks

*Uncertainty and Complexity of Tax Treatment*.  The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain.  Statutory provisions and administrative regulations have been interpreted inconsistently by the courts.  Additionally, some statutory provisions remain to be interpreted by administrative regulations.  Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Company.  Each prospective investor should have the tax aspects of an investment in the Company reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.

*Tax Considerations*.  There can be no assurance that the conclusions set forth herein will not be

challenged successfully by the IRS or any other applicable taxing authority, or significantly modified by new legislation, changes in the IRS's positions or court decisions. The Company has not applied for, nor does it expect to apply for, any advance rulings from the IRS with respect to any of the U.S. federal income tax consequences described herein. The Company may take positions with respect to certain tax issues which depend on legal conclusions not yet addressed by the courts. Should any such positions be successfully challenged by the IRS, there could be a material adverse effect on the Company and an Investor might be found to have a different tax liability for that year than that reported on its income tax returns.

*Entity-Level Audits.* Under the audit regime adopted under the U.S. Bipartisan Budget Act of 2015, as amended ("**BBA**"), the IRS is generally permitted to determine adjustments to items of income, gain, deduction, loss or credit of the Company, and assess and collect taxes attributable thereto (including any applicable penalties and interest), at the Company level. Although certain elections or procedures may be available to mitigate the impact of such determination, assessment or collection, there can be no assurances that the Company will avoid, or be able to avoid, any entity-level determination, assessment or collection. In addition, any such elections or procedures may have differing results on the tax liability of the Investors, depending on the tax status of each Investor, and the Company may not be able to take into account the particular facts or circumstances of an Investor. An Investor may be required to bear a share of the economic burden of taxes so assessed or collected without regard to whether such person was an Investor, or without regard to its relative ownership interest, during the taxable year of the Company to which such taxes relate. Each partnership required to file, or that files, a U.S. income tax return, must designate a representative under the BBA (the "**Partnership Representative**") with the sole authority to act on behalf of, and to bind, the partnership, its partners, and any other person whose tax liability is determined by taking into account adjustments under the BBA. Limitations on the authority of the Partnership Representative in the Partnership Agreement or in any other agreement will not be binding during examinations upon audit or any other proceedings. In addition, Investors will not be able to participate in any such examinations or proceedings without permission of the IRS. Investors should note that the BBA regime is complex and that the impact on any current or future allocations made or cash available for distributions or withdrawals by the Company is uncertain. The legal and accounting costs incurred in connection with any audit of the Company will be borne by the Company. The cost of any audit of any Investor will be borne solely by the Investor. Prospective Investors should consult their own tax advisors in this regard.

*Tax Liabilities without Distributions.* If the Company has taxable income in a fiscal year, each Investor otherwise subject to tax will be taxed on that income in accordance with its allocable share of the Company's profits, whether or not such profits have been distributed. In order to satisfy its tax liability, an Investor may need sufficient funds from sources other than the Company. Furthermore, the Company may make investments with respect to which the Company recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter. In addition, the Company may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter. Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Investors.

*Delayed Schedules K-1.* Final Schedules K-1 may not be available until completion of the

Company's annual audit, and the Company will likely not be able to provide final Schedules K-1 to Investors for any given tax year until significantly after April 15 of the following year. Investors should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Tax Treatment of Cryptocurrencies and Other Digital Assets.* The U.S. federal income tax treatment of investment or trading activity in connection with cryptocurrencies and other digital assets is subject to significant uncertainty. The IRS has provided limited guidance with respect to certain aspects of the tax treatment of cryptocurrencies, but not with respect to any other kinds of digital assets. In addition, there is no guidance with respect to the tax treatment of certain of the activities or income associated with the crypto industry (such as mining, staking, coin lending, etc.). Prospective investors are urged consult their own tax advisors regarding the tax consequences of an investment in cryptocurrencies and other digital assets.

*Unrelated Business Taxable Income and Effectively Connected Income.* The Company may engage in activities that will give rise to material amounts of "unrelated business taxable income" ("**UBTI**") and "income effectively connected with the conduct of a U.S. trade or business ("**ECI**") for U.S. federal income tax purposes. Thus, an investment in the Company may be less desirable for certain U.S. tax-exempt organizations or for non-U.S. investors. Additionally, the use of the leverage by the Company to acquire investments may generate "unrelated debt-financed income" that is treated as UBTI. Because of the "flow-through" principles applicable to partnerships, if UBTI or ECI is realized by the Company, an investor that is a U.S. tax-exempt organization will realize UBTI and an investor that is a non-U.S. person will realize ECI, respectively.

*Recently Enacted Tax Reform Legislation.* Recently enacted U.S. tax reform legislation made significant changes to the rules potentially applicable to the Company and/or its investors. Certain of these new rules are complex and, pending guidance that may be forthcoming, the impact on the Company and its investors may be unclear. Prospective investors should consult their own tax advisors regarding potential changes in any tax laws, potentially with retroactive effect. For example, such tax reform has limited a taxpayer's ability to avoid recognition of gain or loss on property that qualifies as "like kind" to certain real property assets. As a result, the Company generally does not expect to be able to sell or otherwise exchange cryptocurrencies of any type for other cryptocurrencies without giving rise to a taxable event.

*Non-U.S. Taxation.* With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Company, political or social instability or diplomatic developments that could affect investments in those countries. The tax treatment of mining, staking, coin lending, investment or trading activity in connection with cryptocurrencies and other digital assets is also subject to significant uncertainty in other countries, and various legislative efforts have been introduced the outcome of which is uncertain. An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities or cryptocurrency markets of different countries, and their associated risks, are expected to change independently of each other.

## D. Conflicts of Interest

*Conflicting Interests of Investors*.  While the Proposed Transactions may not reflect the best price or quickest exit for Investors, the do reflect Iterative's attempt to balance the interests of two groups of investors with conflicting needs.  In order for Exiting Investors to be fully redeemed from the Fund Complex, the Investment Manager will need to sell a sufficient amount of its liquid cryptocurrency holdings to generate sufficient cash proceeds to make distributions in full to all Exiting Investors.  Therefore, given the Fund Complex's current mix of holdings, Continuing Investors will effectively be selling their liquid cryptocurrency assets to Exiting Investors in exchange for such Exiting Investors' proportionate share of the illiquid mining assets.  As a result, Continuing Investors will be more heavily invested in mining equipment through Mining NewCo, which is a less liquid investment than cryptocurrency and subject to even greater risks than the cryptocurrency that is produced from the mining operations (as described elsewhere in this Consent and Disclosure Letter).  While this restructuring arrangement will provide Exiting Investors the benefit of liquidity, the amount of investment proceeds they ultimately receive will still be based, in part, on the December 31, 2019 valuation of their pro rata share of the mining hardware.  As this valuation will only reflect depreciation of the mining hardware taken to date, and not the actual value of that hardware, Exiting Investors may not receive the highest possible value for their investment by exiting the Fund Complex at this time instead of continuing on as an investor in Mining NewCo.

*Difference in Valuations*.  In general, the Investment Manager is proposing to use the December 31, 2019 net asset value of the Fund Complex to consummate the Proposed Transactions because this valuation reflects the last figures prepared by our third-party administrator and accounting teams that are available to timely consummate the Proposed Transactions.  However, as the delay in getting fund financials is a primary reason for entering into the Proposed Transactions (as further explained elsewhere in this Consent and Disclosure Letter), there is significant risk that the net asset value figure being used will not accurately reflect the actual value of the assets as of the date upon which the Proposed Transactions would be consummated.  In addition, while there may be some benefit to Investors derived from having all parties participate in the Proposed Transactions based on this valuation, to the extent the value of the mining equipment does not reflect the value of the actual cryptocurrency that has been mined, the net asset value being used to consummate the Proposed Transactions may not reflect the actual value.

In addition, Continuing Investors will receive credit for the fair market value of the portion of the Master Funds' assets which are distributed to Mining NewCo (and deemed contributed to Mining NewCo in the case of any Continuing Investors from the Offshore Fund).  The fair market value of these assets will be the same value calculated as of December 31, 2019 that would be relevant in providing liquidity to Exiting Investors.  Rather than further delay the Proposed Transactions and incur additional expenses from obtaining a more recent valuation, the Investment Manager has instead determined to offer all Investors, including Continuing Investors, their options underlying the Proposed Transactions based on the most recent financial figures obtained from third-party administrator and accounting teams for the assets, despite the actual value likely differing at the time the Proposed Transactions would be consummated.  While Investors risk the actual value of the assets being higher at the time the Proposed Transactions would be consummated, there is an equal risk that the actual value could be lower than the December 31, 2019 valuation as well.

*Investment Manager's Financial Incentives.*  While the Investment Manager will not receive any management or performance fees or allocations in connection with consummating the Proposed Transactions, it will receive a 20% profits interest in distributions made by Mining NewCo following such time as all the Investor members (including Continuing Investors and Iterative in such capacity) have received a return of their capital, based on the fair market value of the Master Fund assets contributed in-kind to Mining NewCo.   Accordingly, the Investment Manager may realize a financial benefit from the continued use of Continuing Investors' capital through Mining NewCo.

***Investors are not represented by legal counsel, except to the extent you obtain your own legal counsel to review the Proposed Transactions.***

Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") serves as counsel to the General Partner, the Investment Manager, the Fund Complex (and Mining NewCo) and certain of their affiliates (the "**Clients**") in connection with the Proposed Transactions, as well as certain other matters for which the Clients may engage Akin Gump from time to time.  Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the constituent funds of the Fund Complex or the Mining NewCo LLCA, as applicable.  In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Investors nor does it purport to represent their interests.  No independent counsel has been retained to represent the Investors.  In assisting in the preparation of this Consent and Disclosure Letter and any other documents relating to the Proposed Transactions, Akin Gump has relied on information provided by the Clients and certain of their service providers without verification and does not express a view as to whether such information is accurate or complete.

## IV.     DESCRIPTION OF ITERATIVE CAPITAL MANAGEMENT

The key investment professionals of the Investment Manager are described below.

**Chris Dannen** is co-founder, Chief Investment Officer and managing partner of the Investment Manager, and head of product at i2 Trading, a wholesale dealer and trading desk. His career has been devoted to the study and design of human systems in an entrepreneurship context. As a corporate ethnographer, Chris documented process and organization design inside hundreds of large corporations and early-stage startups, learning how successful products are conceived and executed. His writing on innovation has been published in Fast Company, Wired, and MIT Technology Review. As a strategist, he has consulted independently for Bloomberg LP, Microsoft, Edelman, Soho House, General Assembly and Atlantic Media, plus others as a staff strategist for Undercurrent LLC and ReD Associates, including Samsung, GE, and American Express. As an entrepreneur, he co-founded the iOS development shop Sneakers Agency in Brooklyn, NY in 2013, and began his first small-scale cryptocurrency mining operation in 2014. He is the author and co-author of five books on software development, UX/UI, and design, and serves as technology advisor to M-RAD Architecture in Los Angeles. He graduated from the University of Virginia and lives in Manhattan, NY.

**Brandon Buchanan** is co-founder, Chief Operating Officer and managing partner of the Investment Manager, and Chief Compliance Officer and Chief Operating Officer of i2 Trading. Prior to co-founding the Investment Manager and its subsidiaries, Brandon was the Chief Operating Officer and General Counsel of Metamorphic Ventures (now Compound Ventures), an early stage venture capital fund with over $100 million in assets under management, where he oversaw fund operations and was a member of the deal team. Prior to Metamorphic, he was a Corporate Associate at Gunderson Dettmer, where he served as counsel to a number of the premiere startups, incubators and venture capital funds, advising on company formation, business strategy, fund formation, corporate governance, and venture financings. Additionally, he was involved in several mergers and acquisitions transactions, including the representation of Tumblr in its acquisition by Yahoo! and Betaworks' acquisition of Instapaper. Before joining Gunderson Dettmer, he was an Associate in the mergers and acquisitions group of Credit Suisse AG's investment banking division, where his areas of focus included TMT and Healthcare. He was part of the team that led the sell-side efforts for a venture-backed biopharmaceutical company, Relypsa, Inc., which eventually culminated in an initial public offering, and the sell-side representation of GE with respect to its air filtration business. He earned a B.A. in Political Science and a B.A. in Sociology from Brown University in 2007 and a juris doctorate from Harvard Law School in 2010.

## V.    CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

**Introduction**

The following is a summary of certain aspects of U.S. federal income taxation of Mining NewCo, the Fund Complex and its investors arising in connection with the Proposed Transactions and is supplemental to the discussion of U.S. federal income tax consequences set forth in the offering memorandum of the applicable Feeder Fund.  No ruling from the U.S. Internal Revenue Service (the "**IRS**") or any similar state or local authority with respect to any of the tax issues affecting the Proposed Transactions will be sought.

This summary is based on U.S. tax laws, regulations, judicial decisions, undertakings and rulings in force on the date of this Consent and Disclosure Letter.  Changes in existing laws or regulations and their interpretation may occur after the date of this Consent and Disclosure Letter and could alter the U.S. federal income tax consequences of the Proposed Transactions with respect to the Fund Complex and its investors (including on a retroactive basis).

The term "**U.S. Limited Partner**" or "**U.S. Person**" in this summary means an investor in the Fund Complex, as applicable, who is, for U.S. federal income tax purposes: (i) a citizen or individual resident of the United States; (ii) a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if a U.S. court is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or if the trust has in effect a valid election to be treated as a U.S. person.  A "**Non-U.S. Person**" is an investor who is not a U.S. person for U.S. federal income tax purposes.

This summary does not discuss all of the tax consequences that may be relevant to a particular investor or to certain investors subject to special treatment under the U.S. federal income tax laws, such as partnerships, insurance companies, financial institutions or securities dealers.  If an investor is a partnership for U.S. federal income tax purposes, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership.  An investor who is a partnership should consult its own tax advisor, and all investors are urged to consult their tax advisors regarding the tax consequences of the Proposed Transactions in their particular circumstances.

Capitalized terms used but not defined in this "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS" section shall have the meanings assigned to such terms in the other portions of this Consent and Disclosure Letter.

**EACH INVESTOR IS URGED TO CONSULT ITS TAX ADVISOR IN ORDER TO UNDERSTAND FULLY THE U.S. FEDERAL, STATE, LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF THE PROPOSED TRANSACTIONS IN ITS PARTICULAR SITUATION.**

**U.S. Federal Income Tax Consequences Relating to Mining NewCo**

U.S. Entity Classification

The Investment Manager believes that, under the provisions of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), and the Treasury Regulations promulgated thereunder, as currently in effect, Mining NewCo should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Mining NewCo are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). The Investment Manager believes that Mining NewCo may qualify for one or more exemptions from the publicly traded partnership rules, although there is no assurance that Mining NewCo will so qualify.

The remainder of this discussion assumes that Mining NewCo will be treated, for U.S. federal income tax purposes, as a partnership and not as a publicly traded partnership treated as an association that is taxable as a corporation.

U.S. Federal Income Tax Treatment of Mining NewCo

As a partnership, Mining NewCo will not be subject to U.S. federal income tax. Each Investor otherwise subject to tax will be required to report separately on its U.S. federal income tax return its distributive share of Mining NewCo's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Mining NewCo LLCA. Each Investor will be liable for any taxes owed upon its distributive share of the income or gains realized by Mining NewCo, and may claim deductions for its distributive share of Mining NewCo's losses and deductions and credits for its distributive share of Mining NewCo's credits, to the extent allowed under the Code. Each Investor will be taxed on its distributive share of the Mining NewCo's taxable income and gain regardless of whether it has received or will receive a distribution from Mining NewCo. Consequently, an Investor may be subject to tax with respect to its share of the taxable income of Mining NewCo for a taxable year and may not receive a corresponding distribution of cash from Mining NewCo in such year with which to satisfy its tax liability in respect of such taxable income.

Mining NewCo will file an annual partnership information return with the IRS that reports the results of its operations for the taxable year, and will distribute annually to each Investor a form showing its distributive share of Mining NewCo's items of income, gain, loss, deduction or credit. The Investment Manager will have the authority to decide how to report these items on

Mining NewCo's tax returns, and all Investors will be required under the Mining NewCo LLCA to treat the items consistently on their own returns.

Under the audit regime adopted by the U.S. Bipartisan Budget Act of 2015, as amended, or any similar rules under state or local law ("**BBA**"), a partnership required to file, or that files, a U.S. income tax return, must appoint a representative (the "**Partnership Representative**") with the sole authority to act on behalf of the partnership in connection with audits, assessments, collections and related proceedings, and to bind the partnership and the Investors.  The Mining NewCo is expected to designate the Investment Manager or any of its affiliates as the Partnership Representative, to the extent permitted under applicable law.  The BBA permits the IRS to adjust any item of the Mining NewCo's income, gain, loss, deduction or credit (and any partner's distributive share thereof) for any taxable year under review (the "**Review Year**"), and to assess on and collect from the Mining NewCo any tax attributable thereto (including additions to tax, interest and penalties).  Under the default BBA regime, the Mining NewCo is required to pay any imputed underpayment amount as a result of any such adjustment.  In such case, any person who is an Investor of the Mining NewCo in the year of such adjustment may be required to bear a share of the economic burden of any such taxes assessed or collected, without regard to whether such person was an Investor, or without regard to his relative ownership interest during the Review Year.   Under certain circumstances, the amount of the imputed underpayment determined under the default regime may be reduced in whole or in part to the extent of the allocable share of any Investors that file amended returns and pay any associated taxes, qualify as tax-exempt partners under Section 168(h) of the Code, or are subject to a lower rate of tax, in each case with respect to the Review Year.  There can be no assurances that the Mining NewCo will be able to reduce, or will reduce, the amount of an imputed underpayment pursuant to these procedures.  Under an alternative BBA regime, the Partnership Representative may elect out of the default regime for the Mining NewCo and require that its partners directly take into account the amount of any adjustment, in which case the Mining NewCo is required to send an adjusted Schedule K-1 to each person who was a partner in the Review Year and each such person (whether a current or former partner) will generally be required to pay any resulting tax (including interest and penalties, as well as a two-percentage point increase on the interest rate that would otherwise have been imposed on any underpayment of taxes).  There can be no assurances that the Mining NewCo will make, or will be able to make, a valid election to apply this alternative regime under any particular circumstances.  Similar rules may apply to any entity treated as a partnership for U.S. federal income tax purposes in which the Mining NewCo directly or indirectly invests.  The BBA regime is complex, and in certain circumstances the effect of its implementation on the Mining NewCo and the Investors may be unclear. Prospective Investors should consult their own tax advisors regarding the application of the BBA regime to an investment in the Mining NewCo in their particular circumstances.

In certain cases, Mining NewCo may be required to file a statement with the IRS, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority.  All Investors are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency.  Given the uncertainty and complexity of the tax laws, it is possible that the IRS may not agree with the manner in which Mining NewCo's items have been reported.

Under the Mining NewCo LLCA, for U.S. federal income tax purposes, the Investment Manager has the discretion to allocate specially an amount of Mining NewCo's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Investor to the extent that the Investor's Capital Account differs (either positively or negatively) from its U.S. federal income tax basis in its Interest.  There can be no assurance that, if the Investment Manager makes such a special allocation, the IRS will accept such allocation.  If such allocation is successfully challenged by the IRS, Mining NewCo's allocations to the remaining Investors would be affected as well.

U.S. Federal Income Taxation of Mining NewCo's Activities

Mining NewCo expects to engage in a mixture of activities consisting of (i) certain activity expected to be treated as the conduct of a U.S. trade or business (which may include, depending on all facts and circumstances, mining activity and other cryptocurrency related activities) ("**Business Activity**") and (ii) certain investment or trading activity with respect to cryptocurrency or other digital assets ("**Trading Activity**").

With respect to its Business activity, Mining NewCo expects to realize ordinary trade or business income, deductions and losses.  The treatment of property held in connection with the Business Activity will depend on all facts and circumstances, and may include, without limitation, "inventory," "Section 1231 property," and "Section 1245 property."  The disposition of inventory gives rise to ordinary income and losses.  Section 1231 property is generally property that is not inventory and is either (i) property used in the conduct of a trade or business, subject to depreciation, and held for more than one year, or (ii) real property used in a trade or business and held for more than one year.  Any net gain with respect to Section 1231 property will be treated as long-term capital gain, while net loss will be taxable as ordinary loss.  Section 1245 property is (i) all depreciable personal property, whether tangible or intangible, and (ii) certain depreciable real property.  Gain realized with respect to Section 1245 property must generally be recaptured as ordinary income to the extent of earlier depreciation deductions.  The amount of gain that exceeds such recaptured amounts is treated as Section 1231 gain as described above.  If Section 1245 property is sold at a loss, the loss is treated as a Section 1231 loss and treated as ordinary in nature.  Additional special rules may apply that are beyond the scope of this summary.   In addition, the tax treatment of Business Activity that involves, for example, mining, staking, coin lending, running a master node, and certain other cryptocurrency or other digital asset related activities, and the characterization of any business assets held or used in connection with such activity, is uncertain and will therefore depend on all facts and circumstances.  However, Mining NewCo generally expects to treat fee income in connection with Business Activity, including certain miners,' staking and coin lending fees, as giving rise to ordinary business income.  Prospective Investors should consult their own tax advisors in this regard.

With respect to its Trading Activity, Mining NewCo generally expects to act as a trader or investor with respect to its transactions in cryptocurrencies and other digital assets.  Generally, the gains and losses realized by a trader or investor on the sale of property are capital gains and losses.  Thus, in general, Mining NewCo expects that its gains and losses from its transactions in certain cryptocurrencies and other digital assets typically will be capital gains and capital losses.  These capital gains and losses may be long-term or short-term depending, in general,

upon the length of time Mining NewCo maintains a particular investment position and, in some cases, upon the nature of the transaction.  Property held for more than 12 months generally will be eligible for long-term capital gain or loss treatment.  Long term capital gains may be eligible for favorable tax rates in the hands of non-corporate U.S. Investors.  Investors should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

Guidance from the IRS regarding the U.S. federal income tax treatment of cryptocurrencies and other digital assets is limited.  Pursuant to IRS Notice 2014-21, "virtual currency" is generally treated as property and not currency for U.S. federal income tax purposes.   This IRS position was confirmed in certain "Frequently Asked Questions" on the IRS web site (the "**FAQs**"), but the treatment as official guidance of these FAQs is uncertain.  Absent further guidance, virtual currencies held for investment by Mining NewCo generally should be considered capital assets, but it is not entirely clear how U.S. tax principles will apply, including certain rules regarding holding period and basis computation. This treatment is subject to change as additional guidance is provided.  The IRS also provided certain guidance regarding hard forks and airdrops in Rev. Ruling 2019-24 which is beyond the scope of this summary.  The Service has not issued guidance regarding the U.S. federal income tax treatment of digital assets other than virtual currencies, and there is significant uncertainty concerning the tax consequences of investment and trading activity in connection with cryptocurrencies and other digital assets. Prospective investors are urged to consult their own tax advisors regarding the tax consequences of an investment in cryptocurrencies and other digital assets.

In addition, individuals who are United States persons with modified adjusted gross income that exceeds certain thresholds (for example, $250,000 for married individuals filing jointly, $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of (i) their investment income, net of deductions properly allocable to such income, or (ii) the excess of their modified adjusted gross income above such thresholds.  Trusts and estates also may be subject to this additional tax.  The Investment Manager expects that most or all of Mining NewCo income will be treated as investment income for this purpose, and as a result, certain Investors receiving allocations of income from Mining NewCo for these taxable years will be subject to this tax.  This tax will be in addition to any U.S. federal income tax imposed on such Investors with respect to their allocable share of income of Mining NewCo.

Mining NewCo may be involved in a variety of hedging transactions to reduce the risk of changes in value in Mining NewCo's investments.  Special rules may apply to determine the tax treatment of such hedging transactions, which may affect Mining NewCo's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by an Investor outside of Mining NewCo.  For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in Mining NewCo's hands.  Except with respect to certain situations where the property used by Mining NewCo to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains. These rules also may terminate the running of the holding period of "substantially identical property" held by Mining NewCo.  Moreover, a loss on a short sale will be treated as a long-

term capital loss if, on the date of the short sale, "substantially identical property" has been held by Mining NewCo for more than one year.  Certain hedging transactions also may cause a constructive sale of Mining NewCo's long position that is the subject of the hedge.

If Mining NewCo is treated as a trader, Mining NewCo may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities or commodities as if the securities or commodities were sold for fair market value at the close of any taxable year of the Mining NewCo. There can be no assurance that cryptocurrencies and other digital assets will be treated as securities or commodities for these purposes.  The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market.  The election would apply with respect to securities or commodities held in connection with the Mining NewCo's trade or business as a trader in securities or commodities.  The election would not apply to any securities or commodities with respect to which the Mining NewCo could demonstrate, to the satisfaction of the Service, that they are held for investment.  In the event that the Mining NewCo makes such an election, the Mining NewCo's gains and losses from marking securities or commodities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses.  The rules relating to appreciated financial positions under Code Section 1259 and wash sales under Code Section 1091 would not apply to the securities to which the election applies and the Code Section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

Mining NewCo may be required to purchase foreign currency with which to make its investments and may receive foreign currency when an investment is sold.  These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during Mining NewCo's holding period of an investment.  Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.  Cryptocurrencies and other digital assets are generally not expected to be treated as foreign currencies, although there can be no assurances in this regard.

The U.S. federal income tax treatment of Mining NewCo's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative.  In particular, it is possible that Mining NewCo may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments.  In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260.  Mining NewCo intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Investors.  However, there can be no assurance that the IRS or a court would agree with Mining NewCo's position.  Moreover, the IRS might take the contrary position that Mining NewCo is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that Mining NewCo should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (e.g., the "Subpart F," "global intangible low-taxed income" and "passive foreign investment company" provisions), any investments by the Mining NewCo in certain foreign corporations may cause an Investor to (a) recognize taxable income prior to the Mining NewCo's receipt of distributable proceeds, (b) pay an interest charge on receipts that are deemed as having been deferred, (c) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain, or (d) become subject to certain reporting requirements with respect to such investments. There can be no assurance that the General Partner or the Mining NewCo will mitigate, or be able to mitigate, the application of these provisions, or provide certain information with respect to such foreign corporations or such filing requirements. Potential investors are advised to consult with their own tax advisors with respect to the application of these "anti-deferral provisions" in their particular circumstances.

Under the Mining NewCo LLCA, the Investment Manager has the authority to elect on behalf of Mining NewCo, under Code section 754, to adjust the tax basis of Mining NewCo's assets in connection with certain distributions to Investors or certain transfers of Interests. Such an election, if made, could affect the amount of an Investor's distributive share of the gain or loss recognized by Mining NewCo upon the disposition of its assets. Because of the complexity and additional expense involved in making a section 754 election, the Investment Manager has no present intention to make such election on behalf of Mining NewCo.

Prospective investors that are subject to the alternative minimum tax ("**AMT**") should consider the tax consequences of an investment in Mining NewCo in view of their AMT position, taking into account the special rules that apply in computing the AMT.

In addition, it is possible that Mining NewCo and its Investors are subject to state and/or local taxation in the United States, including withholding taxes at the Mining NewCo level.

Taxation of Distributions and Withdrawals

Cash non-liquidating distributions and withdrawals, to the extent they do not exceed an Investor's basis in its Interest, will not result in taxable income to that Investor, but will reduce its tax basis in its Interest by the amount distributed or withdrawn. Cash distributed to an Investor in excess of the basis of its Interest is generally taxable as capital gain.

Investors should be aware that an Investor's share of the taxable income of Mining NewCo for any year may exceed the amount of cash distributed to such Investor for that year, which may require that the Investor make an out-of-pocket expenditure to cover its tax liability. Conversely, if the cash distributed by Mining NewCo to an Investor for any year exceeds the taxable income of Mining NewCo allocated to such Investor for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of an Investor's tax basis of its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Investors, the tax bases of the Investors in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is initially avoided may become due later through the realization of gain upon the sale of assets of Mining NewCo, the liquidation of Mining NewCo or the sale of Interests.

Mining NewCo's ability to make cash distributions to a withdrawing Investor or to the Investors, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by Mining NewCo for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of an Investor receiving a cash liquidating distribution from Mining NewCo, such Investor generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Investor and such Investor's adjusted tax basis in its Interest.  Such capital gain or loss will be short-term or long-term depending upon the Investor's holding period (or holding periods) for its Interest.  However, a withdrawing Investor will recognize ordinary income to the extent such Investor's allocable share of Mining NewCo's "unrealized receivables" exceeds the Investor's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations).

Distributions of property other than cash, whether in complete or partial liquidation of an Investor's Interest, generally will not result in the recognition of taxable income or loss to the Investor (except to the extent such distribution is treated as made in exchange for such Investor's share of Mining NewCo's unrealized receivables).  However, a distribution of "marketable securities" will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Investor), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c).  The Investment Manager cannot provide any assurances that cryptocurrency or any other digital assets are "marketable securities" or that Mining NewCo will be an "investment partnership" for these purposes.

As discussed above, under the Mining NewCo LLCA, the Investment Manager has the discretion to allocate specially an amount of the Mining NewCo's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Investor to the extent that the Investor's capital account differs from its U.S. federal income tax basis in its Interest.  Such a special allocation may result in the withdrawing Investor recognizing additional taxable income in the Investor's last taxable year.  In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Investor may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Investors.  Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Investor may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Investors.

Assuming Mining NewCo has not made an election pursuant to Code section 754 and the Investment Manager does not exercise its discretion to specially allocate losses to a withdrawing Investor, distributions of property or cash by Mining NewCo to an Investor in redemption of its Interest in certain circumstances where Mining NewCo has a substantial built-in loss may require Mining NewCo to reduce the tax basis of its remaining property.

Limitations on Losses and Deductions

Investors that are individuals or certain types of corporations may be limited in their ability to deduct expenses or losses of Mining NewCo.  For instance, if or to the extent that Mining

NewCo's operations do not constitute a "trade or business" within the meaning of Code section 162 and other provisions of the Code, an individual Investor's distributive share of the Mining NewCo's expenses (including any amounts that are treated for tax purposes as expenses of Mining NewCo) would be deductible only as itemized deductions, subject to the limitations of Code sections 67 and 68. Furthermore, Investors that are individuals or certain types of corporations are generally disallowed from deducting expenses that are treated as miscellaneous itemized deductions  for tax years beginning on or after January 1, 2018, and before January 1, 2026. Itemized deductions are non-deductible in computing such Investor's AMT income and AMT liability.

Further, certain income, gains and losses of Mining NewCo generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Code section 469.  Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity losses from other activities likely will be restricted in their ability to use such losses to offset income and gains from Mining NewCo, although losses of Mining NewCo will not be subject to the passive activity loss limitation.

The ability of a non-corporate Investor to deduct its share of the Mining NewCo's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code.  In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses).  For this purpose, any long-term capital gain and qualified dividend income is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates.  Mining NewCo's activities are expected to be treated as giving rise to investment income for an Investor, and the investment interest limitation would apply to a non-corporate Investor's share of the interest expenses attributable to Mining NewCo's operation.  Accordingly, a non-corporate Investor would be denied a deduction for all or a part of its distributive share of Mining NewCo's ordinary losses attributable to interest expenses unless it has sufficient investment income from all sources including Mining NewCo.  Any amount not deducted as a result of the application of the investment interest limitation may be carried forward to future years, subject to certain limitations.

Interest expenses of Mining NewCo could also be subject to certain deductibility limitations as business interest pursuant to section 163(j) of the Code (i.e., with respect to Mining NewCo's Business Activity or, with respect to Mining NewCo's Trading Activity, if Mining NewCo is treated as a trader for tax purposes), tested and applied at Mining NewCo level.

For tax years beginning after December 31, 2017, and before January 1, 2026, Section 199A of the Code allows non-corporate taxpayers a deduction of up to 20% for "qualified business income" ("**QBI**") earned through pass-through entities, such as partnerships and limited liability companies taxed as partnerships, S corporations, disregarded entities and trusts. QBI is generally defined as all domestic business income other than investment income (*e.g.*, dividends (other than qualified "real estate investment trust" ("**REIT**") dividends, cooperative dividends and

certain income from publicly traded partnerships), investment interest income, short-term capital gains, long-term capital gains, commodities gains, and foreign currency gains).

Non-corporate U.S. Investors of Mining NewCo may be eligible for a deduction with respect to their allocable share of the Mining NewCo's QBI that is earned through portfolio companies that are pass-through entities. However, the deduction is subject to several limitations that may materially limit the amount of the deduction available for Investors. For example, the deduction is generally limited to 50% of W-2 wages (or, if greater, 25% of W-2 wages, plus 2.5% of the cost of tangible depreciable property), in each case, with respect to the qualified trade or business. This limitation generally does not apply to REIT dividends and income from publicly traded partnerships. Non-corporate Investors are urged to consult their tax advisors regarding the potential availability of any such deduction.

Mining NewCo may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but may, by election of Mining NewCo, be capitalized and amortized over a period of not less than 180 months. Amounts paid or incurred to market interests in Mining NewCo that qualify as "syndication expenses" are not deductible or amortizable.

Tax Consequences for Tax-Exempt U.S. Investors.

An Investor that is an organization exempt from U.S. federal income tax under Code section 501(a) (a "**Tax-Exempt U.S. Investor**") will be subject to tax on its allocable share of Mining NewCo's income that is considered to be UBTI, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Tax-Exempt U.S. Investors may incur potentially substantial amounts of UBTI in connection with Mining NewCo's Business Activity (including certain miners,' staking and coin lending fee income). With respect to Mining NewCo's Trading Activity, Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. A Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of Mining NewCo's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph). A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of Mining NewCo's, "unrelated debt-financed income" pursuant to Code section 514 ("**UDFI**"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in Mining NewCo would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

Mining NewCo may generate income attributable to debt-financed property which will be attributed to the Investors, including any Tax-Exempt U.S. Investors. A Tax-Exempt U.S. Investor's share of Mining NewCo's income that is treated as UBTI will vary depending upon the materiality of income realized by Mining NewCo's in connection with its Business Activity that is treated as UBTI and, with respect to its Trading Activity, the degree of leverage utilized by Mining NewCo and could be significant. In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in Mining NewCo.

**US Tax-Exempt Investors are urged to consult their own tax advisors regarding the tax consequences of Mining NewCo's Business Activity, Trading Activity, and any other cryptocurrency or digital asset related transactions.**

<u>Tax Consequences for Non-U.S. Investors</u>

With respect to Mining NewCo's Business Activity, Mining NewCo expects to take the position that is engaged, or treated as engaged, in the conduct of a U.S. trade or business. To such extent, any Investor who is a Non-U.S. Person (a "**Non-U.S. Investor**") will be treated as so engaged. Any of Mining NewCo's income that is treated as effectively connected with the conduct of such trade or business ("**ECI**") will be subject to U.S. federal income tax on a net basis at corporate or individual tax rates, as applicable. Non-U.S. Investors would be required to file a U.S. federal (and potentially, state or local) income tax return to report its income. Corporate Non-U.S. Investors are generally also subject to a 30% U.S. federal "branch profits" tax on their share of after-tax effectively connected earnings and profits not reinvested in a U.S. trade or business during the year (subject to any applicable tax treaty benefits). Mining NewCo would also be required to withhold and pay over to the Service a portion of each Non-U.S. Investor's share of such ECI determined at the corporate or individual rate of taxation, as applicable. Any amounts so withheld would be creditable (subject to certain limitations) against the Non-U.S. Investor's ultimate U.S. federal income tax liability, and the Non-U.S. Investor would be entitled to a refund to the extent that the amount withheld exceeded its U.S. federal income tax liability for the taxable year. In addition, it is possible that Mining NewCo and its Non-U.S. Investors are subject to state and/or local taxation in the United States, including withholding taxes at the Mining NewCo level.

With respect to Mining NewCo's Trading Activity, pursuant to a safe harbor in the Code (the "**Safe Harbor**"), trading in securities or commodities for Mining NewCo's own account is not considered a U.S. trade or business, provided, in the case of commodities, that such commodities are of a kind customarily dealt in on an organized commodity exchange and the relevant transaction is of a kind customarily consummated at such place. Absent specific guidance, it is uncertain whether digital assets and other cryptocurrencies qualify as "commodities" for this purpose. In addition, the Service has proposed to expand the scope of this Safe Harbor with any activity effecting "derivative transactions." However, so long as the applicable Treasury Regulations are not finalized, it is not clear whether and to which extent any activity involving derivatives will qualify. Even if digital assets and other cryptocurrencies qualify as "commodities" for Safe Harbor purposes, it is not clear whether any derivative transactions Mining NewCo may enter into will qualify as "derivatives" and any exchange where the relevant

digital assets and other cryptocurrencies are traded will qualify as an "organized commodity exchange" for such purposes.  In addition, while Mining NewCo believes the better view is that it should be regarded as an investor or a trader, there can be no assurances that Mining NewCo will not be regarded as conducting certain dealer activity.  Trading income or gains that do not benefit from Safe Harbor treatment are generally expected to be treated in a manner similar to Business Activity income (i.e., subject to tax) as described above.

Gains derived by Mining NewCo that are not effectively connected with the conduct of a U.S. trade or business will generally not be subject to regular U.S. federal net income taxation. However, certain types of U.S. source income may be subject to U.S. withholding taxes. Therefore, to the extent Mining NewCo receives dividend income from U.S. sources, Non-U.S. Investors will be subject to U.S. withholding tax at a 30% rate (subject to any applicable tax treaty benefits).  U.S. source interest income received by Mining NewCo generally will be exempt from U.S. federal income and withholding tax to the extent such interest qualifies as "portfolio interest," or qualifies under another statutory exemption.  Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto).  In addition, interest on U.S. bank deposits, certificates of deposit and certain obligations with maturities of 183 days or less (from original issuance) will not be subject to withholding tax.  Interest (including original issue discount) derived by the Mining NewCo from U.S. sources not qualifying as "portfolio interest" or not otherwise exempt under U.S. law will be subject to U.S. withholding tax at a rate of 30%.  In addition, income from certain swaps and other derivatives directly or indirectly over dividend paying stock are subject to U.S. withholding tax.

As discussed above, capital gains from the sale of capital assets generally are not subject to U.S. withholding tax.  Since guidance on the issue is limited, however, there can be no assurances that Mining NewCo will be able to treat, or will treat, a sale or exchange of cryptocurrencies or other digital assets as giving rise to gains or loss in respect of a capital asset for purposes of the foregoing.  In addition, the treatment of income that Mining NewCo may receive is uncertain and Mining NewCo may be required to deduct 30% withholding with respect to certain mining, staking, coin lending or other transaction fees in connection with cryptocurrency-related activities).

**Non-U.S. Investors are urged to consult their own tax advisors regarding the tax consequences of Mining NewCo's Business Activity, Trading Activity, and any other cryptocurrency or digital asset related transactions.**

Tax Consequences of the Proposed Transactions for Mining NewCo

The remaining cryptocurrency positions that are distributed to Mining NewCo by the Master Funds are expected to have a carryover basis at the level of Mining NewCo for U.S. federal income tax purposes.  The cryptocurrency positions are currently generally expected to have a built-in loss (or, potentially, minimal gain) for U.S. federal income tax purposes. Any future gain or loss in respect of the cryptocurrency assets will be determined based on the carryover basis of those assets at the time of the distribution, and allocated to the Investors of Mining NewCo.

The mining equipment that is distributed to Mining NewCo is generally expected to have (i) a carryover basis in respect of the proportionate share of the Continuing Investors in Mining Master; and (ii) a stepped up basis in respect of (X) the proportionate share of the Exiting Investors from the Domestic Fund; and (Y) the proportionate share of the Offshore Fund in Mining Master. Any future gain or loss in respect of the cryptocurrency assets will generally be determined based on the basis of Mining NewCo in the mining assets following the Proposed Transactions, and allocated to the Investors accordingly.

**U.S. Federal Income Tax Consequences Relating to the Proposed Transactions for Investors**

For purposes of this discussion, it is assumed that U.S. Investors invested in the Domestic Fund, and that Non-U.S. Investors and UBTI sensitive U.S. Tax-Exempt Investors invested in the Offshore Fund.

<u>Federal Income Tax Consequences of the Proposed Transactions to U.S. Exiting Investors</u>

Exiting Investors who are U.S. persons are expected to be redeemed with proceeds received through a sale of cryptocurrency.  Because the cryptocurrency is currently expected to generate a loss for U.S. federal income tax purposes, those dispositions are themselves not expected to generate taxable income or gain.

However, the mining assets are expected to have a built-in taxable gain as a result of depreciation deductions previously taken in respect of those assets.  Under Section 751(b) of the Code, Exiting Investors who are U.S. Persons could recognize gain in connection with their proportionate share of the built-in gain (i.e. the built-in gain that would have otherwise been shifted to the Continuing Investors). The gain under Section 751(b) is generally expected to be taxed at ordinary income rates.

Subject to the foregoing, a U.S. Investor (including a U.S. Tax-Exempt Investor) receiving a cash liquidating distribution generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the Investor and the adjusted tax basis in his Interest.  Such capital gain or loss will be short-term or long-term depending upon the Investor's holding period (or holding periods) for its Interest, and will be ordinary income to the extent such Investor's allocable share of "unrealized receivables" exceeds the Investor's basis in such unrealized receivables.

<u>Federal Income Tax Consequences of the Proposed Transactions to U.S. Continuing Investors</u>

U.S. Persons who are Continuing Investors are not expected to realize taxable gain or loss solely as a result of the Proposed Transactions. No allocable gain or loss is expected to result from the distribution of assets from the Master Funds to the Domestic Fund (which will be renamed and repurposed as Mining NewCo, and is generally expected to be treated as a continuation of the Domestic Fund for tax purposes).

Such Investors should review "U.S. Federal Income Taxation of Mining NewCo's Activities" and "Tax Consequences for Tax-Exempt U.S. Investors" above.

Federal Income Tax Consequences of the Proposed Transactions to Non-U.S. Exiting Investors

Non-U.S. Exiting Investors are not expected to incur any direct tax or filing obligations in connection with the Proposed Transactions. However, the amount distributed to Exiting Non-U.S. Investors will be reduced by the amount of tax (if any) incurred by the Domestic Blocker as a result of the liquidation of the Domestic Blocker pursuant to the Proposed Transactions. The liquidation of the Domestic Blocker is expected to generate taxable gain due to a reduced basis in the mining equipment that resulted from past depreciation deductions taken by the Domestic Blocker. The Domestic Blocker may have accumulated net operating losses or tax credits that may be available to reduce the amount of taxable gain it will incur. However, the capacity to offset taxable gain with net operating losses or tax credits will depend on the amount of available losses and credits and statutory limitations on the use of such losses and credits.

Capitalization or repayment of shareholder debt used to fund the Domestic Blocker, if any, could potentially also result in gross-based withholding tax at a rate of 30% on any accrued but unpaid interest from such debt depending on all facts and circumstances.

No taxable gain or loss is expected to be realized in respect of the cryptocurrency assets or the dissolution of the Offshore Fund.

On the other hand, Non-U.S. Investors who fail to respond to the Consent Letter will receive mining equipment and cryptocurrency positions in kind, and should consult their own tax advisers in this regard.

Federal Income Tax Consequences of the Proposed Transactions to Non-U.S. Continuing Investors

Continuing Investors who are non-U.S. Persons will bear their proportionate share of the tax on the dissolution of the Domestic Blocker. The tax liability is expected to be funded with proceeds from the sale of cryptocurrency assets, thereby reducing the amount of cryptocurrency assets deemed contributed by Non-U.S. Investors who are Continuing Investors. Accordingly, the amount of interests in Mining NewCo received by non-U.S. Continuing Investors will be reduced in proportion to their share of the tax incurred by the Domestic Blocker at the time of its liquidation.

In addition, following the dissolution of the Domestic Blocker, non-U.S. Continuing Investors will hold interests directly in Mining NewCo, which will be treated as a partnership for U.S. federal income tax purposes. Such Non-U.S. Investors are expected to incur ECI withholding at the level of Mining NewCo, as well as ECI tax payment and U.S. tax filing requirements at the investor level.  Accordingly, such investors should carefully review "U.S. Federal Income Taxation of Mining NewCo's Activities" and "Tax Consequences for Non-U.S. Investors" above and consult their own advisers.

State and Local Tax Consequences of the Proposed Transactions

This summary does not address certain state and local tax considerations that may be relevant the Proposed Transactions, or any Business Activity or Trading Activity conducted by Mining NewCo.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Fund Complex and its investors in connection with the Proposed Transactions, and does not purport to be a complete analysis of all relevant tax rules and considerations, nor does it purport to be a complete listing of all potential tax risks inherent in the Proposed Transactions. Each investor is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any foreign tax consequences of the Proposed Transactions in its particular situation.*

## VI.   WHERE TO FIND MORE INFORMATION

As an investor in the relevant Feeder Fund, you were previously furnished with the audited consolidated financial statements of such Feeder Fund for each of the most recent fiscal years (including the related notes thereto), and unaudited consolidated financial statements of such Feeder Fund for each of the four most recent fiscal quarters (the "**Financial Statements**").  We urge you to read this Consent and Disclosure Letter in conjunction with such Financial Statements.  To request additional copies of the Financial Statements, free of charge, please contact the Investment Manager at the address and telephone number set forth below, or contact Brandon Buchanan directly at ███████@iterative.capital.

Iterative Capital Management, L.P.
233 Broadway, Suite 2703
New York, NY 10279
(917) 288-5554

Iterative will also provide interested investors with the opportunity to discuss the Proposed Transactions with representatives of Iterative.  A copy of the Mining NewCo LLCA is attached as <u>Appendix II to this Exhibit C</u>.

**All investors are reminded of, and are required to comply with, their respective obligations under the Domestic LPA or Offshore Articles, subscription documents and side letters, if applicable, to keep confidential and not disclose or use for any purpose unrelated to the Fund Complex any information, documents and materials made available to Investor (including but not limited to this Consent and Disclosure Letter and all exhibits, schedules and annexes hereto and all materials and information made available to investors in connection with the Proposed Transactions).**

## APPENDIX I

## SUMMARY OF PRINCIPAL TERMS OF MINING NEWCO LLCA

*The summary of principal terms of the Mining NewCo LLCA below is intended for Continuing Investors and is subject to, and qualified in its entirety by reference to, the full text of the Mining NewCo LLCA attached hereto as <u>Appendix II to this Exhibit C</u>.*

*All capitalized terms used in this Appendix I but not defined shall have the meanings ascribed to such terms in the <u>Exhibit C</u> (Consent and Disclosure Letter) to which this <u>Appendix I</u> is attached.*

| | |
|---|---|
| **ISSUER:** | I2 DCR SPV, L.L.C., a Delaware limited liability company ("***Mining NewCo***"). |
| **INVESTORS:** | Each Continuing Investor (each an "***Investor***", collectively, "***Investors***"). |
| **SECURITY:** | 8,000 newly issued uncertificated units of non-voting Class B common membership interests of Mining NewCo (the "***Class B Common Units***"). |
| **RESTRUCTURING:** | In connection with the Proposed Transactions, the Domestic Fund will be restructured such that all of limited partner interests of the Domestic Fund will be converted into (a) the Class B Common Units, which will represent 80% of the issued and outstanding Common Units (as defined below) and (b) the Class A Common Units (defined below), in each case, of Mining NewCo. |
| **PURCHASE PRICE :** | An amount per Class B Common Unit equal to the aggregate contributions of the Continuing Investors, divided by the total number of Class B Common Units (i.e., 8,000). |
| **DISTRIBUTIONS; PRIORITY:** | The Manager (as defined below) may make distributions when and if declared by the Manager in its sole discretion, subject to appropriate reserves and as described under "Reinvestment" below, will be allocated among the holders of the Class B Common Units ("the ***Class B Members***") *pro rata* in proportion to the number of Class B Common Units held by each Class B Member, until the each Class B Member has received a distribution equal to its initial capital contribution, then to the Class B Members and the holder of the Class A Common Units (as defined below) (the "***Class A Member***" and together with the Class B Members, the "***Members***") *pari passu* on a *pro rata* basis based on the number of Common Units (as defined below) held by each Member. |
| **REINVESTMENT:** | In addition to the creation of appropriate reserves, the Manager of Mining NewCo will be permitted to retain for reinvestment any or all of net profits of Mining NewCo. |
| **TAG ALONG:** | The holders of the Class B Common Units will have customary tag-along rights that allow them to participate on a *pro rata* basis in transfers of greater than 50% of the total outstanding Class A voting common membership interests of Mining NewCo (the "***Class A Common Units***", and together with the Class B Common Units, the "***Common Units***") subject to customary carve- |

| | outs. |
|---|---|
| **DRAG ALONG:** | The holder(s) of a majority of the Class A Common Units will have customary drag-along rights in the event of a proposed sale of all outstanding Common Units to a third party (whether structured as a merger, reorganization, asset sale or otherwise). |
| **RIGHT OF FIRST REFUSAL:** | The holder(s) of the Class A Common Units will have a right of first refusal over any transfer of Class B Common Units that is not a permitted transfer. |
| **PREEMPTIVE RIGHTS:** | If Mining NewCo authorizes the issuance of any additional Common Units after the date of the Mining NewCo LLCA, subject to certain carve-outs, then Mining NewCo shall first offer to sell such Common Units to each Member on the terms and conditions on which Mining NewCo has determined to sell such securities. |
| **TRANSFER:** | The Class B Common Units may not be transferred without the prior written consent of the holder(s) of a majority of the Class A Common Units; provided, however, that the definitive documentation will provide that consent to transfers to certain affiliates, family members and estate-planning vehicles of the holders of Class B Common Units will not be unreasonably withheld. |
| **INFORMATION RIGHTS:** | All unit holders will have customary information rights, including unaudited financial reports within 180 days after the end of the fiscal year and quarterly unaudited financial reports within 60 days after the end of each fiscal quarter (other than 4th quarter). |
| **VOTING; GOVERNANCE:** | The Class B Common Units will not have any voting rights except as required by applicable law; provided, however, that the consent of the holders of at least seventy-five percent (75%) of the Class B Common Units will be required with respect to the following: (1) Additional Capital.  Call for additional capital contributions (other than in connection with the issuance of additional units). (2) Merger or Consolidation.  Other than in connection with the drag-along rights described above, the merger, reorganization or consolidation of Mining NewCo (whether in a single transaction or in a series of related or substantially contemporaneous transactions) with or into another legal entity (or engage in any other transaction having substantially the same effect). (3) Bankruptcy.  The initiation of any bankruptcy or similar proceeding. (4) Charter Documents.  Terminate, amend or modify Mining NewCo's certificate of formation or the Mining NewCo LLCA in a manner that would have a disproportionate material adverse economic effect on the holders of the Class B Common Units. The member designated by the holder(s) of a majority of the Class A Common Units will serve as the managing member of Mining NewCo and is initially |

| | expected to be Iterative Capital Management, L.P. (in such capacity, the "***Manager***"). |
|---|---|
| **INDEMNIFICATION:** | All Members, Manager(s) and officers of Mining NewCo will be entitled to customary indemnification by Mining NewCo. |
| **GOVERNING LAW:** | Delaware. |

## **APPENDIX II**

**FORM OF MINING NEWCO LLCA**

**[See attached]**

# LIMITED LIABILITY COMPANY AGREEMENT

of

## [I2 DCR SPV, L.L.C.]

a Delaware limited liability company

THE INTERESTS REPRESENTED BY UNITS PURSUANT TO THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH UNITS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ..........................................................................................1

    **1.1**    **Certain Definitions** .....................................................................................1

**ARTICLE II ORGANIZATIONAL MATTERS**.........................................................7

    **2.1**    **Formation** ...................................................................................................7
    **2.2**    **Name**...........................................................................................................7
    **2.3**    **Purpose**......................................................................................................7
    **2.4**    **Term** ...........................................................................................................7
    **2.5**    **Foreign Qualification** ...............................................................................7
    **2.6**    **Registered Office; Registered Agent; Offices** .........................................7

**ARTICLE III MEMBERS AND UNITS** ......................................................................7

    **3.1**    **Units Generally**..........................................................................................7
    **3.2**    **Authorization and Issuance of Common Units** .......................................8
    **3.3**    **Other Issuances** ........................................................................................8
    **3.4**    **Certification of Units** ...............................................................................8
    **3.5**    **Admission of New Members** .....................................................................8
    **3.6**    **Liability to Third Parties**.........................................................................8
    **3.7**    **No Withdrawal** ..........................................................................................8
    **3.8**    **Voting** ........................................................................................................8
    **3.9**    **Meetings** ....................................................................................................9
    **3.10**   **Action Without Meeting** .........................................................................10
    **3.11**   **Power of Members** ..................................................................................10
    **3.12**   **No Interest in Company Property** ..........................................................10
    **3.13**   **Confidentiality**........................................................................................11

**ARTICLE IV CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS** .......11

    **4.1**    **Capital Contributions**............................................................................11
    **4.2**    **Additional Capital Contributions**.........................................................11
    **4.3**    **Loans** .......................................................................................................11
    **4.4**    **Return of Contributions**.........................................................................11
    **4.5**    **Establishment and Determination of Capital Accounts** ......................11
    **4.6**    **Computation of Amounts** .......................................................................12
    **4.7**    **Negative Capital Accounts** ....................................................................12

**ARTICLE V DISTRIBUTIONS AND ALLOCATIONS** .........................................12

    **5.1**    **General**.....................................................................................................12
    **5.2**    **Timing of Distributions** ..........................................................................12
    **5.3**    **Amounts Available for Distribution; Reinvestment**.............................12
    **5.4**    **Distributions in Kind**..............................................................................12
    **5.5**    **Allocation of Profits and Losses**............................................................13
    **5.6**    **Regulatory and Special Allocations**......................................................13
    **5.7**    **Tax Distributions; Withholding**.............................................................13

Page

5.8    Set-off ............................................................................................................14

**ARTICLE VI TAX ALLOCATIONS AND OTHER MATTERS**.................................14

6.1    General.........................................................................................................14
6.2    Positive Basis Allocations ...........................................................................14
6.3    Negative Basis Allocations ..........................................................................15
6.4    Non-Recourse Liabilities .............................................................................15
6.5    Certain Tax Matters ....................................................................................15

**ARTICLE VII MANAGEMENT** ...............................................................................17

7.1    Managing Member........................................................................................17
7.2    Action by Written Consent...........................................................................17
7.3    Officers ........................................................................................................17

**ARTICLE VIII EXCULPATION, INDEMNIFICATION** .........................................17

8.1    Limitation of Liability; Exculpation ...........................................................17
8.2    Indemnification ...........................................................................................18

**ARTICLE IX BOOKS AND RECORDS; INFORMATION RIGHTS** ......................19

9.1    Books and Records.......................................................................................19
9.2    Bank Accounts.............................................................................................19
9.3    Information Rights.......................................................................................19
9.4    Fiscal Year ...................................................................................................20

**ARTICLE X TRANSFERS**......................................................................................20

10.1    Conditions to Transfers .............................................................................20
10.2    Effect of Class B Common Units in Hands of the Transferee ...................21
10.3    Joinder .......................................................................................................21
10.4    Imposition of Restrictions .........................................................................22
10.5    Duration of Article X..................................................................................22
10.6    Limitation on Admission ...........................................................................22
10.7    Other Limitations.......................................................................................22

**ARTICLE XI DISSOLUTION** .................................................................................22

11.1    Events of Dissolution..................................................................................22
11.2    Distributions...............................................................................................22
11.3    Conduct of Winding-Up .............................................................................23

**ARTICLE XII SPECIAL RIGHTS**...........................................................................23

12.1    Limited Preemptive Rights .........................................................................23
12.2    Drag-Along Rights ......................................................................................24
12.3    Tag-Along Rights.........................................................................................24
12.4    Other Agreements with Respect to Drag-Along and Tag-Along
Transactions.............................................................................................................25
12.5    Initial Public Offering.................................................................................26

**ARTICLE XIII ADDITIONAL AGREEMENTS** .....................................................27

13.1    Representations and Warranties ................................................................27

<u>Page</u>

**ARTICLE XIV GENERAL PROVISIONS** ..........................................................................**28**

    **14.1**    **Remedies** ........................................................................................**28**
    **14.2**    **Waiver** ...........................................................................................**29**
    **14.3**    **Notices** ..........................................................................................**29**
    **14.4**    **Entire Agreement** ........................................................................**29**
    **14.5**    **Amendments and Modifications** ................................................**29**
    **14.6**    **Binding Effect; Benefits** ............................................................**30**
    **14.7**    **No Third Party Beneficiaries** ....................................................**30**
    **14.8**    **Severability** ..................................................................................**30**
    **14.9**    **Headings** ........................................................................................**30**
    **14.10**  **No Strict Construction** ................................................................**30**
    **14.11**  **Interpretation** ..............................................................................**30**
    **14.12**  **Counterparts** ................................................................................**30**
    **14.13**  **Governing Law** ............................................................................**31**

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## [I2 DCR SPV, L.L.C.]

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "*Agreement*") of [I2 DCR SPV, L.L.C.] (the "*Company*"), dated as of [__], 2020, is by and among the Members (as herein defined), each of whose signature is set forth on the signature page to this Agreement.

## PRELIMINARY STATEMENTS

A.  The Company was originally formed as Iterative Capital, L.P., a Delaware limited partnership (the "*Partnership*").

B.  Pursuant to a Plan of Conversion dated as of the date first set forth above and the filing of the Certificate of Conversion of the Partnership and the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, the Partnership will continue its existence in the form of the Company.

C.  The Members of the company have been determined in accordance with those certain Investor Written Consents and attached Investor Consent and Disclosure Letter relating to the restructuring and conversion of the Partnership.

## AGREEMENTS

NOW, **THEREFORE**, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    **Certain Definitions**.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

"*Affiliate*" of a Person means any other Person Controlling, Controlled by or under common Control with such Person.  An "Affiliate" of the Company includes each of the Company's direct or indirect Subsidiaries, whether or not in existence on the date hereof.  For the purposes hereof, the Company and its Subsidiaries shall not be deemed an Affiliate of any Member.

"*Agreement*" has the meaning set forth in the Preface.

"*Available Units*" has the meaning set forth in Section 12.1(c) hereof.

"*BBA*" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Treasury Regulations thereunder (whether proposed,

temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"*Book Value*" means with respect to Company property the asset's adjusted basis for U.S. federal income tax purposes reduced by any amounts attributable to the inclusion of liabilities in such basis pursuant to Section 752 of the Code, except that the Book Value of all assets may, in the reasonable discretion of the General Partner, be adjusted to equal their respective fair market values, in accordance with the rules set forth in Treasury Regulations section 1.704-1(b)(2)(iv)(f). In the case of any Company Property that has a Book Value that differs from its adjusted tax basis, the Book Value shall be adjusted by the amount of depreciation, depletion and amortization calculated for purposes of the definitions of "Profit" and "Loss" rather than the amount of depreciation, depletion and amortization determined for U.S. federal income tax purposes.

"*Capital Account*" has the meaning set forth in Section 4.5 hereof.

"*Capital Contribution*" in respect of any Unit means a contribution to the capital of the Company made in respect of such Unit, including the purchase price paid or any in-kind contribution to the Company for such Unit.

"*Certificate*" has the meaning set forth in Section 2.1 hereof.

"*Class A Member(s)*" means a Member holding Class A Common Units.

"*Class B Member(s)*" means a Member holding Class B Common Units.

"*Common Units*" means the limited liability company interests of the Company designated herein as Common Units having such rights, designations and preferences as provided for in this Agreement, which includes Class A Common Units and Class B Common Units.

"*Common Unit Ownership*" means, with respect to any Member, the quotient, expressed as a percentage, equal to (a) the number of Common Units owned by such Member divided by (b) the number of Common Units owned by all Members.

"*Code*" has the meaning set forth in Section 6.1 hereof.

"*Company*" has the meaning set forth in the Preface.

"*Company Minimum Gain*" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d) and (g)(3).

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"*Control Seller*" has the meaning set forth in Section 12.2 hereof.

"***Delaware Act***" means the Delaware Limited Liability Company Act, 6 Delaware Code Section 18-101 et seq., as amended from time to time (or any corresponding provisions of succeeding law).

"***Drag-Along Sale***" has the meaning set forth in <u>Section 12.2</u> hereof.

"***Fair Market Value***" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Manager based on such factors as the Manager, in the exercise of its reasonable business judgment, considers relevant.

"***Family***" means the spouse and descendants (whether natural or adopted) of a Person (collectively, "***Relatives***"), any custodian of a custodianship for and on behalf of such Person or of a Relative who is a minor, or any trustee of a trust solely for the benefit of one or more of the foregoing.

"***Indemnitee***" has the meaning set forth in <u>Section 8.2(a)</u> hereof.

"***Independent Third Party***" means any Person who, immediately prior to the contemplated transaction: (a) does not directly or indirectly beneficially own in excess of five percent (5%) of the Units, (b) is not an Affiliate of any other Person that directly or indirectly beneficially owns in excess of five percent (5%) of the Units, and (c) is not a member of the Family of any other Person that directly or indirectly beneficially owns in excess of five percent (5%) of the Units.

"***Initial Capital Contribution***" has the meaning set forth in <u>Section 4.1</u> hereof.

"***Initial Public Offering***" has the meaning set forth in <u>Section 12.5(a)</u>.

"***Initiating Sellers***" has the meaning set forth in <u>Section 12.3</u> hereof.

"***IPO Entity***" has the meaning set forth in <u>Section 12.5(a)</u>.

"***Loan Participation Member***" has the meaning set forth in <u>Section 4.3</u> hereof.

"***Losses***" means items of Company loss and deduction determined according to <u>Section 5.5</u> hereof.

"***Manager***" has the meaning set forth in <u>Section 7.1</u> hereof.

"***Member***" means (a) each Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof and (b) and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units.  The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"***Member Loans***" has the meaning set forth in <u>Section 4.3</u> hereof.

"***Member Minimum Gain***" has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i).

"***Members Schedule***" has the meaning set forth in Section 3.1 hereof.

"***Negative Basis***" means, with respect to any Member and as of any time of calculation, the excess of such Member's "adjusted tax basis" in its interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such interest) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Company.

"***Negative Basis Member***" means any Member who withdraws all or a portion of its interest from the Company and who has a Negative Basis as of the date of such withdrawal, but such Member will cease to be a Negative Basis Partner at such time as it has received allocations pursuant to Section 6.3 equal to such Member's Negative Basis as of the date of such withdrawal and without regard to such Member's share of the liabilities of the Company under Section 752 of the Code.

"***New Interests***" has the meaning set forth in Section 3.3 hereof.

"***Non-Control Seller***" has the meaning set forth in Section 12.2 hereof.

"***Non-Initiating Seller***" has the meaning set forth in Section 12.3 hereof.

"***Offered Units***" has the meaning set forth in Section 12.1(a) hereof.

"***Officers***" has the meaning set forth in Section 7.3 hereof.

"***Participating Member***" has the meaning set forth in Section 12.1(c) hereof.

"***Partnership***" has the meaning set forth in the Preliminary Statements.

"***Partnership Representative***" has the meaning set forth in Section 6.5(a) hereof.

"***Permitted Transferee***" has the meaning set forth in Section 10.1(b) hereof.

"***Person***" means any individual, partnership, corporation, limited liability company, joint venture, trust, association or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"***Positive Basis***" means, with respect to any Member and as of any time of calculation, the excess of the amount that such Member is entitled to receive upon withdrawal from or liquidation of the Company over such Member's "adjusted tax basis" in its interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest).

"***Positive Basis Partner***" means any Member who withdraws all or a portion of its interest from the Company and who has a Positive Basis as of the date of such withdrawal, but

such Member ceases to be a Positive Basis Member at such time as it has received allocations pursuant to Section 6.2 equal to such Member's Positive Basis as of the date of the withdrawal and without regard to such Member's share of the liabilities of the Company under Section 752 of the Code.

"*Profits*" or "*Losses*" means for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or other period, determined in accordance with section 703 of the Code, with the following adjustments:

1.      any income of the Company that is exempt from United States federal income taxation and is not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

2.      upon an adjustment, pursuant to the definition of "Book Value," to the Book Value of any Company property subject to depreciation, cost recovery or amortization, any further deductions for such depreciation, cost recovery or other amortization attributable to such property shall for purposes of Capital Account maintenance equal an amount that bears the same ratio to the Book Value at the beginning of such year or other period as the United States federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to the property's adjusted tax basis at the beginning of such year or other period; provided that where such property has no remaining tax basis at the beginning of such year or other period, deductions for depreciation, cost recovery or other amortization attributable to such property for purposes of Capital Account maintenance shall be computed using any reasonable method as selected by the Manager; and

3.      any expenditures of the Company not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall, for purposes of Capital Account maintenance, be treated as items of deduction, subtracted from such taxable income or loss and allocated among the Partners pursuant to Section 5.5.

"*Public Offering*" means a public offering of Units (or the securities of any successor entity of the Company) or Units or equity interests of a Subsidiary pursuant to an effective registration statement under the Securities Act.

"*Public Sale*" means any sale pursuant to a Public Offering or any sale to the public pursuant to Rule 144 (as defined below).

"*Regulatory Allocations*" has the meaning set forth in <u>Section 5.6</u> hereof.

"*Rule 144*" means Rule 144 adopted by the SEC under the Securities Act.

"*Sale of the Company*" means the sale (in a single transaction or a series of related transactions) of the Company to any Independent Third Party or group of Independent Third Parties (other than pursuant to a Public Sale) pursuant to which such Independent Third Party or group of Independent Third Parties acquire (i) all or substantially all of the then outstanding Units (whether by merger, consolidation, sale or Transfer of Units, reorganization, recapitalization or otherwise) or (ii) all or substantially all of the assets of the Company.

"*Sale Units*" has the meaning set forth in <u>Section 12.2</u> hereof.

"*SEC*" means the Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933 and the rules and regulations promulgated thereunder, in each case as amended from time to time, or any successor thereto.

"*Subject Units*" has the meaning set forth in <u>Section 10.1(c)(i)</u> hereof.

"*Subsidiary*" means any Person of which the Company owns equity interests having a majority of the voting power in electing the governing body of such Person directly or through one or more Subsidiaries or, in the case of a partnership, limited liability partnership or other similar entity, equity interests conveying, directly or indirectly, a majority of the economic interests in such partnership or entity.

"*Tag-Along Sale*" has the meaning set forth in <u>Section 12.3</u> hereof.

"*Tag-Along Units*" has the meaning set forth in <u>Section 12.3</u> hereof.

"*Tax Distributions*" has the meaning set forth in <u>Section 5.7(a)</u> hereof.

"*Transfer*" means any transfer, sale, assignment, pledge, encumbrance or other disposition, irrespective of whether any of the foregoing is effected voluntarily, by operation of law or otherwise, or whether inter vivos or upon death.

"*Transfer Offer Notice*" has the meaning set forth in <u>Section 10.1(c)(i)</u> hereof.

"*Transfer Option Period*" has the meaning set forth in <u>Section 10.1(c)(i)</u> hereof.

"*Transferring Member*" has the meaning set forth in <u>Section 10.1(c)(i)</u> hereof.

"*Treasury Regulations*" has the meaning set forth in <u>Section 6.1</u> hereof.

"*Unit Equivalents*" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, and any option, warrant or other right to subscribe for, purchase or acquire Units.

"*Units*" means (a) the Common Units of the Company and (b) any other membership interests or other equity interests into which or for which the membership interests described in (a) may be converted or exchanged pursuant to a plan of incorporation, recapitalization, reorganization, merger, sale of assets or otherwise.

"*Voting Members*" has the meaning set forth in <u>Section 3.9(b)</u> hereof.

"*Voting Units*" has the meaning set forth in <u>Section 3.9(a)</u> hereof.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1     **Formation**.  Upon the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware on [__], 2020 (the "*Certificate*"), the Partnership continued its existence in the form of a limited liability company pursuant to the Delaware Act (i.e., as the Company).  The fact that the Certificate is on file in the office of the Secretary of State, State of Delaware shall constitute notice that the Company is a limited liability company.  The rights and liabilities of the Members shall be as provided under the Delaware Act, the Certificate, and this Agreement.

2.2     **Name**.  The name of the Company is "[I2 DCR SPV, L.L.C.]"  The Manager may change the name of the Company at any time and from time to time for any business reason.

2.3     **Purpose**.  The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be organized under the Delaware Act.

2.4     **Term**.  The term of the Company commenced on the date specified in the Certificate and shall continue until the Company is dissolved pursuant to Article XI hereof.

2.5     **Foreign Qualification**.  Prior to conducting business in any jurisdiction other than Delaware, the Company will comply (to the extent procedures are available and reasonably within the Company's control) with all requirements necessary to qualify the Company as a foreign limited liability company, and (if necessary) keep the Company in good standing, in that jurisdiction.

2.6     **Registered Office; Registered Agent; Offices**.  The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware will be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by law.  The registered agent of the Company in the State of Delaware will be the initial registered agent named in the Certificate or such other Person or Persons as the Manager may designate from time to time in the manner provided by law.  The principal office of the Company will be at such place as the Manager may designate from time to time, which need not be in the State of Delaware.  The Company may have such other offices as the Manager may designate from time to time.

## ARTICLE III
## MEMBERS AND UNITS

3.1     **Units Generally**.  The membership interests in the Company shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series. Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series.  The Manager shall maintain a schedule of all Members, their respective mailing addresses and the amount and series of Units held by them (the "***Members Schedule***"), and shall update the Members Schedule upon the issuance or Transfer of any Units

to any new or existing Member. A copy of the Members Schedule as of the execution of this Agreement is attached hereto as <u>Schedule A</u>.

       3.2    **Authorization and Issuance of Common Units.**  Subject to compliance with <u>Section 12.1</u> and <u>Article X</u>, but subject to <u>Section 12.5</u>, the Company is hereby authorized to issue up to 10,000 Common Units, of which 2,000 shall be designated as Class A Common Units and 8,000 shall be designated as Class B Common Units.  As of the date hereof, the number of Common Units issued and outstanding are reflected on the Members Schedule opposite each Member's name.

       3.3    **Other Issuances.**  In addition to the Common Units, the Manager is hereby authorized, subject to compliance with <u>Section 12.1</u> and <u>Article X</u>, and whether or not in connection with an Initial Public Offering, to authorize and issue or sell to any Person any of the following (collectively, "***New Interests***"): (i) any new type, class or series of Units not otherwise described in this Agreement, which Units may be designated as classes or series of Common Units but having different rights and (ii) Unit Equivalents.  The Manager is hereby authorized, subject to <u>Section 14.5</u>, to amend this Agreement to reflect such issuance and to fix the relative privileges, preference, duties, liabilities, obligations and rights of any such New Interests, including the number of such New Interests to be issued, the preference (with respect to distributions, in liquidation or otherwise) over any other Units and any contributions required in connection therewith.

       3.4    **Certification of Units**.  The Manager in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member.

       3.5    **Admission of New Members**.  Subject to compliance with the provisions of this Agreement, one or more additional Members of the Company may be admitted to the Company upon the approval of the Manager; <u>provided</u> that such new Member (a) makes any capital contribution required pursuant to this Agreement and (b) executes a joinder agreement substantially in the form attached hereto as <u>Exhibit A</u>.

       3.6    **Liability to Third Parties**.  The Members of the Company shall not be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of any court.

       3.7    **No Withdrawal**.  A Member shall not cease to be a Member as a result of the bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act. So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

       3.8    **Voting**.

       (a)    Except as otherwise provided by this Agreement (including <u>Section 3.8(b)</u>, <u>Section 12.5</u> and <u>Section 14.5</u>) or as otherwise required by the Delaware Act or applicable law:

(i)     each Member shall be entitled to one vote per Class A Common Unit on all matters upon which the Members have the right to vote under this Agreement; and

(ii)     the Class B Common Units shall not entitle the holders thereof to vote on any matters required or permitted to be voted on by the Members.

(b)     Notwithstanding anything to the contrary contained in this Agreement, but subject to Section 12.5, at any time that there are any Class B Common Units outstanding, the Company shall not engage in or cause any of the following transactions or take any of the following actions, and the Manager shall not permit or cause the Company to engage in, take or cause any such action except with the prior approval of the holders of at least seventy-five percent (75%) of the outstanding Class B Common Units voting separately as a class:

(i)     require any Member to make an additional capital contribution, other than a capital contribution in connection with the issuance of any additional Units;

(ii)     the merger, reorganization or consolidation of the Company (whether in a single transaction or a series of related or substantially contemporaneous transactions) with or into another legal entity or otherwise engaging in a transaction having a similar effort, other than in connection with a transaction described in Section 12.2;

(iii)     the initiation of any bankruptcy or similar proceedings; and

(iv)     terminate, amend or modify the Certificate or this Agreement in a manner that would have a disproportionate material adverse economic effect on the holders of the Class B Common Units.

3.9     **Meetings**.

(a)     Voting Units.  As used herein, the term "***Voting Units***" shall mean the Common Units, for purposes of calling or holding any meeting of the Members holding such Common Units, providing notice of such a meeting, forming a quorum for such a meeting, or taking any action by vote at a meeting or by written consent without a meeting, in all cases to take any action or conduct any business, in which the Members holding such class of Common Units are entitled to vote on.

(b)     Calling the Meeting.  Meetings of the Members may be called by (i) the Manager or (ii) by a Member or group of Members holding more than one-third (1/3) of the then-outstanding votes attributable to the relevant Voting Units. Only Members who hold the relevant Voting Units ("***Voting Members***") shall have the right to attend meetings of the Members.

(c)     Notice.  Written notice stating the place, date and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than five (5) days and not more than thirty (30) days before the date of the meeting to each Voting Member, by or at the direction of the Manager or the Member(s) calling the meeting, as the case may be.  The Voting Members

may hold meetings at the Company's principal office or at such other place as the Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(d)     Participation.  Any Voting Member may participate in a meeting of the Voting Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(e)     Vote by Proxy.  On any matter that is to be voted on by Voting Members, a Voting Member may vote in person or by proxy, and such proxy may be granted in writing, by means of electronic transmission or as otherwise permitted by applicable law.  Every proxy shall be revocable in the discretion of the Voting Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.

(f)     Conduct of Business.  The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Voting Members holding any Common Units; provided, that the appropriate Voting Members shall have been notified of the meeting in accordance with Section 3.9(c).  Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(g)     Quorum; Required Vote.  A quorum of any meeting of the Voting Members shall require the presence of the Members holding a majority of the appropriate Voting Units held by all Members.  Subject to Section 3.10, no action at any meeting may be taken by the Members (i) unless the appropriate quorum is present and (ii) at any meeting at which a quorum is present, without the affirmative vote of Members holding a majority of the Voting Units held by all Members.

3.10    **Action Without Meeting**.  Notwithstanding the provisions of Section 3.9, any matter that is to be voted on, consented to or approved by Voting Members may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by electronic transmission, by a Member or Members holding not less than a majority of the appropriate Voting Units held by all Members.  A record shall be maintained by the Manager of each such action taken by written consent of a Member or Members.

3.11    **Power of Members**.  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Delaware Act.  Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

3.12    **No Interest in Company Property**.  No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby

irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

3.13  **Confidentiality**.  Each Member agrees to maintain the confidentiality of all proprietary, nonpublic information, documents and materials relating to the business of the Company or any of its Subsidiaries which the Member now or in the future may receive by virtue of being a Member, except to the extent disclosure of any such information is required by law or authorized by the Company (including as may be set forth in a separate agreement between any Member and the Company) or reasonably occurs in connection with disputes over the terms of this Agreement.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

4.1  **Capital Contributions**.  In consideration of the issuance by the Company of Units to the Members, each of the Members shall be deemed to have contributed (in the form of cash or such other form of consideration acceptable to the Manager) an initial Capital Contribution to the Company ("***Initial Capital Contribution***") equal to the amount set forth opposite such Member's name on Schedule B hereto.  The Manager may from time to time amend Schedule B to reflect any subsequent Capital Contributions.

4.2  **Additional Capital Contributions**.  Subject to Section 5.7(b), unless approved by the requisite number of Voting Units in accordance with Article III, no Member shall be required to make any additional capital contributions to the Company. Any future capital contributions made by any Member shall only be made with the consent of the Manager and in connection with an issuance of Units made in compliance with Section 12.1.

4.3  **Loans**.  Any Member may make loans to the Company ("***Member Loans***") at such times and on such terms as are agreed upon by the Manager; provided that all Class A Members and all Class B Members holdings at least 1,000 Class B Common Units (each, a "***Loan Participation Member***") shall be given the opportunity, but shall not be obligated, to participate in making such Member Loans in proportion to their respective Common Unit Ownership; provided, further, that in the case of an emergency, Member Loans may initially be sought from any Member or Members so long as the remaining Loan Participation Members are given the opportunity to participate in such emergency loan in proportion to their Common Unit Ownership after the emergency loan is made to the Company.

4.4  **Return of Contributions**.  A Member shall not have a separate right to receive a return of such Member's Capital Contributions (including such Member's Initial Capital Contribution) or to receive interest thereon, but shall have such distribution and liquidation rights as are provided herein.

4.5  **Establishment and Determination of Capital Accounts**.  A capital account ("***Capital Account***") shall be established for each Member on the books of the Company, initially reflecting an amount equal to such Member's Initial Capital Contribution pursuant to Section 4.1 hereof and shall be adjusted as otherwise required by the Code and the Treasury Regulations thereunder, including but not limited to, the rules of Treasury Regulations Section 1.704-

1(b)(2)(iv).  Any references in this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be increased or decreased from time to time as set forth above.

      4.6    **Computation of Amounts**.  For purposes of computing the amount of any item of Company income, gain, loss or deduction to be allocated pursuant to Article V hereof and to be reflected in the Capital Accounts, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose); provided that any such item of Company income, gain, loss or deduction shall be adjusted as necessary to comply with Treasury Regulation Section 1.704-1(b).

      4.7    **Negative Capital Accounts**.  No Member shall be required to pay to the Company or to any other Member any deficit or negative balance which may exist from time to time in such Member's Capital Account.

## ARTICLE V
## DISTRIBUTIONS AND ALLOCATIONS

      5.1    **General**.  Subject to Section 3.3, Section 5.7 and Section 12.5 hereof, distributions shall be made to the Members as follows:

      (a)    First, to the Class B Members pro rata in proportion to the number of Class B Common Units held by each Class B Member until the Class B Members have received aggregate distributions pursuant to this Section 5.1(a) equal to their Initial Capital Contributions with respect to the Class B Common Units; and

      (b)    Second, to the Members pro rata in proportion to their Common Unit Ownership.

      5.2    **Timing of Distributions**.  Subject to this Section 5.2 and Section 5.7 hereof and applicable law, including without limitation, Section 18-607 of the Delaware Act, the Manager shall, in its sole discretion, determine whether, when and to what extent distributions shall be made.

      5.3    **Amounts Available for Distribution; Reinvestment**.  Subject to Section 5.2, the Manager shall determine, in its sole discretion, the amounts available (if any) for distribution to the Members.  Prior to any distribution to Members, the Manager shall, in addition to creating appropriate cash reserves for the ordinary course operation and reasonable business needs of the Company, be permitted to designate for retention and reinvestment in the Company any or all of the Company's net profits.  The Manager may apportion any excess cash remaining for distribution to Members in accordance with this Article V.

      5.4    **Distributions in Kind**.  Subject to applicable law, distributions of property other than cash may be made in the discretion of the Manager.  Subject to Section 12.5(b), distributions of property shall be valued at the fair market value therein as determined by the Manager, less any encumbrances.

5.5    **Allocation of Profits and Losses**.  For each fiscal year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions made during such fiscal year and all special allocations made pursuant to Section 5.6 hereof with respect to such fiscal year, all Profits and Losses (other than Profits and Losses specially allocated pursuant to Section 5.6 hereof) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such fiscal year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be distributed to such Member if the Company were to liquidate all of its assets for the Book Value thereof and distribute the proceeds thereof pursuant to Section 11.2 hereof, minus (b) the sum of (i) such Member's share of Company Minimum Gain and Member Minimum Gain and (ii) the amount, if any, that such Member is obligated to contribute to the capital of the Company as of the last day of such fiscal year.

5.6    **Regulatory and Special Allocations**.  Notwithstanding the provisions of Section 5.5 above, if necessary, the Company shall make special allocations to comply with (i) the Company Minimum Gain charge back provisions of Treasury Regulation Section 1.704-2(f); (ii) the Member Minimum Gain charge back provisions of Treasury Regulation Section 1.704-2(i); and (iii) the qualified income offset provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).  The allocations set forth in the prior sentence (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this Article V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Profits and Losses among the Members so that to the extent possible, the net amount of such allocations of Profits and Losses and other items and the Regulatory Allocations (including Regulatory Allocations that, although not yet made, are expected to be made in the future) to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not been made.

5.7    **Tax Distributions; Withholding**.

(a)    Provided there is sufficient cash available for distribution, as determined by Manager, the Manager may elect to make cash distributions ("***Tax Distributions***") as it deems sufficient for the Members (or their direct or indirect beneficial owners, as applicable) to pay their U.S. federal, state and local income taxes on income allocated to such Members by the Company for tax purposes during such taxable year.  Determinations of Tax Distributions shall be made in the sole discretion of the Manager.  Any distributions made pursuant to this Section 5.7 shall be treated as advances against, and shall be deducted from, subsequent distributions under this Agreement (other than this Section 5.7).

(b)    Notwithstanding anything to the contrary herein, to the extent the Manager or the Company is required by law (including under circumstances where the Manager or the Company is unable to rely conclusively on any withholding certification provided by a Member) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Member (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision or backup withholding), the Manager or the Company may withhold such amounts and make such tax payments as so required.  If the Company directly or indirectly pays or incurs any withholding tax or other tax obligation

(including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Members, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Member or Members, as applicable, pursuant to the terms of this Agreement. Such amount will be debited against the Capital Account(s) of such Member or Members as of the close of the taxable year during which the Company so withholds, pays or incurs such obligation. If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Member or Members, as applicable, then such Member or Members and any successors must make a contribution to the capital of the Company within 10 calendar days following a request by the Manager in the amount of such excess. The Manager is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax on behalf of any Member that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax. Each Member agrees to repay to the Company and the Manager and each of the partners and former partners of the Manager, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.

5.8    **Set-off**. The Company may set-off against and reduce any distributions payable under this Article V by any bona fide amounts actually owing from a Member to the Company.

## ARTICLE VI
## TAX ALLOCATIONS AND OTHER MATTERS

6.1    **General**. All allocations for income tax purposes of items of income, gain, loss, deduction, credit, basis adjustment and the like for any taxable year of the Company shall be in accordance with the allocations made pursuant to Section 5.5 and Section 5.6. Notwithstanding the foregoing, all allocations shall be made in accordance with the law, including the provisions of section 704 of the Internal Revenue Code of 1986, as amended from time to time (the "***Code***"), and the regulations promulgated thereunder (the "***Treasury Regulations***").

6.2    **Positive Basis Allocations**. If the Company recognized gains or items of gross income (including short-term capital gain) from the sale of Company assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Members withdraws from the Company, the Manager may elect: (i) to allocate such gains or items of gross income among such Positive Basis Members, *pro rata* in proportion to the respective Positive Basis of each such Positive Basis Member, until either the full amount of such gains or items of gross income have been so allocated or the Positive Basis of each such Positive Basis Member has been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Members to the other Members in such manner that reflects equitably the amounts credited to such Members' Capital Accounts pursuant to Section 5.5; provided, however, that if, following such Fiscal Year, the Company recognizes gains or items of gross income from a sale of an investment the proceeds of which are designated on the Company's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Member, that continues to be a Member in the Company following such withdrawal (*i.e.,* such Positive Basis Member effected a partial, and not a complete, withdrawal of its interest), then such Positive Basis Member may be allocated an amount of such gains or items of gross income equal

to the amount, if any, by which its or its Positive Basis as of the date of the relevant withdrawal exceeds the amount allocated to such Member pursuant to clause (i) of this Section 6.2.

6.3     **Negative Basis Allocations**. If the Company recognizes net losses or items of gross loss or deduction (including short-term capital loss) from the sale of Company assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Members withdraws from the Company pursuant to Section 5.5, the Manager may elect: (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Members, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Member, until either the full amount of such losses or items of loss or deduction have been so allocated or the Negative Basis of each such Negative Basis Member has been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Members to the other Members in such manner that reflects equitably the amounts credited to such Members' Capital Accounts pursuant to Section 5.5; provided, however, that if, following such Fiscal Year, the Company recognizes net losses or items of gross loss and deduction from a sale of an investment the proceeds of which are designated on the Company's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Member that continues to be a Member in the Company following such withdrawal (i.e., such Negative Basis Member effected a partial, and not a complete, withdrawal of its Interest), there may be allocated to such Negative Basis Member an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its or its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Member pursuant to clause (i) of this Section 6.3.

6.4     **Non-Recourse Liabilities**.  For purposes of Treas. Reg. §1.752-3(a)(3), relating to allocation of non-recourse liabilities of the Company among Members for purposes of allocating non-recourse deductions, each Member's interest in profits of the Company shall be in proportion to each Member's Common Unit Ownership.  For purposes of Treas. Reg. §1.704-2, allocations of income, gain, loss, deduction and expenditure attributable to non-recourse liabilities also shall be allocated among Members in proportion to their respective Common Unit Ownership.

6.5     **Certain Tax Matters**.

(a)     By joining this Agreement, the Members appoint and designate the Manager as the "partnership representative" within the meaning of Section 6223 of the Code (the "***Partnership Representative***"), or, in each case, under any similar state or local law.  The Partnership Representative shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the Manager if the Manager is not the Partnership Representative.  The Manager shall have the exclusive authority to appoint and designate an Affiliate of the Manager as a successor Partnership Representative.  The Partnership Representative shall be reimbursed by the Company for all costs and expenses incurred by it, and to be indemnified by the Company with respect to any action brought against it, in its capacity as the Partnership Representative.

(b)     The Members agree that any and all actions taken by the Partnership Representative shall be binding on the Company and all of the Members and the Members shall cooperate with the Company and Manager, and undertake any action reasonably requested by the

Company or the Manager, in connection with any elections made by the Partnership Representative or as determined to be reasonably necessary by the Partnership Representative under any BBA provision.

(c)     Each Member further agrees that such Member shall not treat any Company item inconsistently on such Member's U.S. federal, state, local and/or non-U.S. tax returns or in any claim for a refund with the treatment of the item on the Company's tax returns and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company, unless the prior written consent of the Manager has been obtained.

(d)     To the fullest extent permitted by law, each Member agrees to (i) provide such cooperation and assistance, including executing and filing forms or other statements and providing information about the Member, as is reasonably requested by the Partnership Representative to enable the Company to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Member was admitted to the Company, (ii) amend the Member's tax returns and pay any resulting taxes, interest and penalties in connection with the Company electing under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from the Company's electing under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Company from and against any liability with respect to the Member's share of any tax deficiency (including any interest and penalties associated therewith) paid or payable by the Company that is (a) allocable to such Member (as reasonably determined by the Manager in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Member was a Member in the Company or (b) attributable (as reasonably determined by the Manager) to the failure of such Member to cooperate with or provide any such forms, statements, or other information as requested by the Partnership Representative pursuant to clause (i) above.

(e)     The Company may adopt for tax accounting purposes any accounting method that the Manager decides is in the best interests of the Company and that is permissible for U.S. federal income tax purposes.

(f)     The Manager may, in its sole discretion, cause the Company to make or revoke any tax election which the Manager deems appropriate, including, without limitation, an election pursuant to Section 754 of the Code.

(g)     In the event of a Transfer, the Manager will be permitted to allocate income based on any permissibly method under Section 706 of the Code and the relevant Treasury Regulations, as determined in its sole discretion.

(h)     In the event the adjusted tax basis of an asset does not equal its Book Value, the Manager may apply any permissible method for allocating depreciation, as determined in its sole reasonable discretion.

(i)     The obligations and covenants of the Members set forth in Sections 5.7(b) and 6.5 hereof shall apply jointly and severally to such Member and any direct or indirect transferee of or successor to such Member's interest and shall survive such Member's ceasing to be a Member in the Company and/or the termination, dissolution, liquidation and winding up of the Company.

## ARTICLE VII
## MANAGEMENT

7.1     **Managing Member**.  The business and affairs of the Company shall be managed by or under the direction of a managing Member (the "*Manager*").  The Manager shall be designated by a majority of the outstanding Class A Common Units held by the Class A Member(s).  The initial Manager shall be Iterative Capital Management, L.P.

7.2     **Action by Written Consent**.  Any action permitted or required by applicable law or this Agreement to be taken at a meeting of the Manager may be taken without a meeting and if a consent in writing, setting forth the action to be taken, is signed by the Manager.

7.3     **Officers**.  The Manager may designate one or more persons to be officers of the Company (each, an "*Officer*").  Any Officers so designated have authority to perform such duties as the Manager delegates to them.  The Manager may assign titles to particular Officers. Each Officer holds office until his successor has been duly designated and qualified or until his death or until he resigns or has been removed in the manner hereinafter provided.  Any number of offices may be held by the same person.  The salaries or other compensation, if any, of the Officers of the Company is to be fixed by the Manager.  Any Officer may resign as such at any time.  Resignations are to be made in writing and take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager.  The acceptance of a resignation is not necessary to make it effective, unless expressly so provided in the resignation.  Any Officer may be removed as such, either with or without cause, by the Manager whenever in their judgment the best interests of the Company will be served thereby.  Any vacancy occurring in any office of the Company shall be filled by the Manager.

## ARTICLE VIII
## EXCULPATION, INDEMNIFICATION

8.1     **Limitation of Liability; Exculpation**.

(a)     The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager.

(b)     No Member, Manager or Officer of the Company shall be liable to the Company or to any Member for any action (or omission to act) taken with respect to the Company so long as such Member, Manager or Officer:  (i) acted in good faith; (ii) was neither grossly negligent nor engaged in fraud or willful malfeasance; and (iii) did not knowingly violate any material law.  A Member, Manager or an Officer shall be fully protected and justified with respect to any action or omission taken or suffered by such Person in good faith if such action or

omission was taken or suffered in reliance upon and in accordance with the opinion or advice as to matters of law, of legal counsel or, as to matters of accounting, of accountants selected with reasonable care so long as such Member, Manager or Officer:  (i) acted in good faith; (ii) was neither grossly negligent nor engaged in fraud or willful malfeasance; and (iii) did not knowingly violate any material law.  A failure to observe any formalities or requirements of this Agreement, the Certificate or the Delaware Act shall not be grounds for imposing personal liability on any Members, Manager or Officer for liabilities of the Company.

(c)    EACH MEMBER HEREBY ACKNOWLEDGES AND AGREES THAT, IN ACCORDANCE WITH SECTION 18-1101 OF THE DELAWARE ACT, NO MEMBER OR MANAGER SHALL HAVE ANY LIABILITY TO THE COMPANY OR ANY OTHER MANAGER OR MEMBER FOR BREACH OF FIDUCIARY DUTIES; PROVIDED THAT THIS SENTENCE SHALL NOT BE CONSTRUED TO LIMIT OR ELIMINATE LIABILITY FOR ANY ACT OR OMISSION THAT CONSTITUTES A BAD FAITH VIOLATION OF THE IMPLIED CONTRACTUAL COVENANT OF GOOD FAITH AND FAIR DEALING.

8.2    **Indemnification**.

(a)    The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such Person is or was a Member, Manager, Affiliate of a Member or Officer or agent of the Company, or is or was serving at the request of the Company as a manager, director, officer or agent of another limited liability company, corporation, partnership, joint venture, trust or other entity or enterprise (each, an "*Indemnitee*"), against any loss, damage, liability or expense (including attorneys' fees, costs of investigation and amount paid in settlement) incurred by or imposed upon the Indemnitee in connection with any action, suit or proceeding, unless it shall have been finally adjudicated that the Indemnitee:  (i) did not act in good faith; (ii) was either grossly negligent or engaged in willful malfeasance; or (iii) knowingly violated any material law. Notwithstanding the foregoing, no indemnification shall be payable hereunder to any Indemnitee in respect of any action in which such Indemnitee is a plaintiff, other than an action for indemnification under this Section 8.2.  The Manager shall have the discretion to extend the protection of this Section 8.2 to employees of the Company or of any Subsidiary who are not officers.

(b)    The Company shall pay the expenses incurred by an Indemnitee in defending any action, suit or proceeding, or in opposing any claim arising in connection with any potential or threatened action, suit or proceeding, in each case for which indemnification may be sought pursuant to this Article VIII, in advance of the final disposition thereof, upon receipt of a written undertaking by such Indemnitee to repay such payment if it shall be determined by a court of final jurisdiction that such Indemnitee is not entitled to indemnification therefor as provided herein.

(c)    The rights to indemnification and advancement of expenses conferred in this Article VIII shall not be exclusive of any other right which any Indemnitee may have or hereafter acquire under any law, statute, rule, regulation, charter document, bylaw, contract or

agreement and shall inure to the benefit of the executors, administrators, personal representatives, successors and permitted assigns of each such Indemnitee.

(d)     Recourse by an Indemnitee for indemnity under this <u>Article VIII</u> shall be only against the Company as an entity, and no Member shall by reason of being a Member be liable for the Company's obligations under this <u>Article VIII</u>.

(e)     The Company may purchase and maintain insurance on behalf of any Person who is or was a Member, Manager, Affiliate of a Member or Manager, officer, agent or employee of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another Person, against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, whether or not such Person would be entitled to indemnity against such liability under the provisions of this <u>Article VIII</u>.

(f)     Rights and benefits conferred on an Indemnitee under this <u>Article VIII</u> shall be considered a contract right and shall not be retroactively abrogated or restricted without the written consent of the Indemnitee affected by the proposed abrogation or restriction.

## ARTICLE IX
## BOOKS AND RECORDS; INFORMATION RIGHTS

9.1     **Books and Records**.  Proper and complete books and records of the Company, in which shall be entered fully and accurately the transactions of the Company, shall be kept and maintained at all times at the principal offices of the Company or, subject to the provisions of the Delaware Act, at such other place as the Manager may from time to time determine.

9.2     **Bank Accounts**.  Funds of the Company shall be used only for Company purposes and shall be deposited in such accounts in banks or other financial institutions as may be established from time to time by the Manager.  Withdrawals shall be made by such Persons as are designated from time to time by the Manager.

9.3     **Information Rights**.

(a)     <u>Financial Statements</u>.  Promptly upon receipt thereof, the Company shall mail to each Member (i) within one hundred eighty (180) days after the end of each fiscal year, unaudited financial reports, including a consolidated balance sheet, profit and loss statement and statement of cash flows of the Company for and as of the end of such fiscal year and (ii) within sixty (60) days after the end of each fiscal quarter (other than the fourth quarter), unaudited financial reports, including a consolidated balance sheet, profit and loss statement and statement of cash flows of the Company for and as of the end of such fiscal quarter.

(b)     <u>Inspection and Copying of Records</u>.  Subject to the confidentiality provision of <u>Section 3.13</u> and upon reasonable request by a Member, a Member or any representative designated by such Member shall have the right during normal business hours to (i) visit and inspect any of the properties of the Company and (ii) inspect and copy such corporate and financial records of the Company; <u>provided</u>, <u>however</u>, that nothing herein shall

obligate the Company to take any actions that would unreasonably interrupt the normal course of the Company's business.

(c)     Duration of Section 9.3.    Notwithstanding anything to the contrary contained in this Agreement, the provisions of this Section 9.3 shall terminate upon the consummation of a Public Offering or Sale of the Company.

9.4    **Fiscal Year**.  The fiscal year of the Company shall end on December 31st of each year.

## ARTICLE X
## TRANSFERS

10.1    **Conditions to Transfers**.

(a)     Restrictions on Transfers of Class B Common Units.   No holder of Class B Common Units shall Transfer any interest in any Class B Common Units, except:  (i) with the prior written consent of the holders of a majority of the Class A Common Units (which consent may be withheld for any reason or no reason unless the proposed Transfer is to a Permitted Transferee, in which case consent will not be unreasonably withheld); or (ii) as expressly permitted by Article XII with respect to an Initial Public Offering in accordance with Section 12.5, a Sale of the Company or a Tag-Along Sale.  Any Transfer of Class B Common Units in violation of this Agreement shall be null and void.

(b)     Permitted Transferees.   "*Permitted Transferee*" includes:  (i) an inter vivos trust of which the transferring Member during his lifetime is the sole trustee or otherwise has voting control of the Units; (ii) a family partnership, limited partnership, limited liability company or similar estate planning vehicle of which the transferring Member has voting control over such entity; (iii) any member of such Member's or Permitted Transferee's Family (whether inter vivos or upon death); (iv) a Member who Transferred such Class B Common Units to such Permitted Transferee; (v) the Company; (vi) any member, partner or shareholder of such Member or Permitted Transferee and, if such member, partner or shareholder is a corporation, limited liability company or partnership, such member may transfer such Class B Common Units to the ultimate holders of the equity interest in such member, or to a liquidating trust for their benefit; (vii) any Person which such Member or any of its Affiliates, directly or indirectly, has the sole power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Class B Common Units, by contract or otherwise; or (viii) any of such Member's Affiliates.

(c)     Right of First Refusal.

(i)     Other than Transfers permitted under Section 10.1(a) or in connection with Section 12.5, any Member holding Class B Common Units desiring to Transfer all or any portion of its Class B Common Units (a "*Transferring Member*") to a ready, willing and able Transferee must first offer to transfer such Class B Common Units (the "*Subject Units*") to the Class A Member(s) as a group.  Such offer will be made by an irrevocable written offer (the "*Transfer Offer Notice*") to Transfer all of the Subject Units and will contain a complete description of the transaction in which the Transferring

20

Member proposes to Transfer the Subject Units, including the name of the proposed Transferee (including any significant beneficial owners thereof) and the consideration specified.  The Class A Member(s) will have thirty (30) days (the "**_Transfer Option Period_**") after actual receipt of the Transfer Offer Notice within which to advise the Transferring Member whether or not they will acquire their pro rata portion of the Subject Units upon the terms and conditions contained in the Transfer Offer Notice.  If, within the Transfer Option Period, one or more Class A Member(s) elects to acquire the Subject Units, then such Class A Member(s) will close such transaction no later than the later to occur of (A) the closing date set forth in the Transfer Offer Notice or (B) sixty (60) days after the last day of the Transfer Option Period.

(ii)     If the Class A Member(s) as a group decline to acquire all of the Subject Units in accordance with this Section, subject to receiving the required consent of the holders of a majority of the Class A Common Units, the Transferring Member may Transfer such Subject Units, no later than sixty (60) days after the end of the Transfer Option Period, to the Transferee named in the Transfer Offer Notice upon the terms described in such Transfer Offer Notice.  If such Transfer does not timely occur in accordance with the terms of such Transfer Offer Notice, the Transferring Member and the Subject Units will again be subject to the provisions of this <u>Section 10.1(c)</u>.

(iii)     Upon consummation of any Transfer described in this <u>Section 10.1(c)</u> (whether to a Member or any other Person), the Transferee and its Class B Common Units will automatically become a party to, and be bound by, this Agreement and will thereafter have all of the rights and obligations of a Member hereunder.  Notwithstanding the foregoing, all Transfers pursuant to this <u>Section 10.1(c)</u> must also comply with and be governed by this Agreement, including any restrictions on Transfers therein and on any Transferee becoming a Substituted Member.

10.2     **Effect of Class B Common Units in Hands of the Transferee**.   Class B Common Units that are Transferred pursuant to this <u>Article X</u> shall thereafter continue to be subject to all restrictions on Transfer and shall be entitled to all rights contained in this Agreement except as otherwise provided in this <u>Article X</u>.  Without limiting the generality of the foregoing, the Transferee must comply with the provisions of this <u>Article X</u> if such Transferee shall propose to Transfer any such Class B Common Units, as if such Transferee were a Member. If any Class B Common Units are Transferred to a Transferee that is not admitted as a Member pursuant to <u>Section 10.6</u>, than the Transferee shall issue an irrevocable proxy to the Transferring Member to vote such Transferred Class B Common Units with respect to all matters submitted to the Members upon which holders of Class B Common Units are entitled to vote.

10.3     **Joinder**.   Any Person (including any Permitted Transferee) to whom Class B Common Units are to be Transferred (except pursuant to a Public Sale) shall execute and deliver, as a condition to such Transfer, all documents deemed reasonably necessary by the Company, in consultation with its counsel, to evidence such party's joinder in, acceptance of, and agreement with, the obligations with respect to the Class B Common Units contained in this Agreement. Such documents shall include, without limitation, a joinder in substantially the form attached as <u>Exhibit A</u> hereto. Each such transferor of Class B Common Units shall, prior to the Transfer, cause the Transferee thereof to so execute and deliver such documents.

10.4    **Imposition of Restrictions**.  Class B Common Units that are Transferred shall thereafter continue to be subject to all restrictions and obligations imposed by this Agreement with respect to Class B Common Units and Transfers thereof.

10.5    **Duration of Article X**.  Notwithstanding anything to the contrary contained in this Agreement, the provisions of this Article X shall terminate upon the consummation of a Public Offering or Sale of the Company.

10.6    **Limitation on Admission**.  Notwithstanding anything to the contrary that may be expressed or implied in this Agreement, upon a Transfer of Class B Common Units permitted pursuant to this Article X, no Transferee of such Class B Common Units shall be admitted into the Company as an additional or substituted Member or have any rights to participate in the management of the business and affairs of the Company as a Member without the prior express written consent of the Manager, which consent may be granted or withheld in the sole discretion of the Manager for any reason or for no reason.  A Transferee of a Class B Common Unit must comply with Section 3.5 and Section 10.3 to be admitted into the Company as an additional or substituted Member.

10.7    **Other Limitations**.  Notwithstanding anything in this Article X to the contrary, no Transfer of Class B Common Units shall be permitted, and no Transferee of Class B Common Units shall be admitted to the Company as a Member, if, in the opinion of the Manager, such transfer or admission alone or in conjunction with one or more other transfers or admissions would:  (a) result in a violation of applicable securities laws, (b) result in the Company being taxable as a corporation, (c) result in the Company becoming a "publicly traded partnership" within the meaning of section 7704(b) of the Code, (d) be an event which would constitute a violation or breach (or, with the giving of notice or passage of time, would constitute a violation or breach) of any law, regulation, ordinance, agreement or instrument by which the Company, or any of its properties or assets, is bound, or (e) require the Company to register under the Investment Company Act of 1940, as amended.  Any purported Transfer of Class B Common Units in violation of this Agreement will be null and void.

## ARTICLE XI
## DISSOLUTION

11.1    **Events of Dissolution**.  The Company shall be dissolved upon the earliest to occur of:  (a) (i) the written consent of the Class A Members holding at least two-thirds (2/3) of the then outstanding Class A Common Units and (ii) the written consent of the Class B Members holding at least a majority of the then outstanding Class B Common Units, (b) the sale or disposition of all or substantially all of the assets of the Company, (c) the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Delaware Act, or (d) as required by any applicable statute or law.

11.2    **Distributions**.  The assets of the Company on winding-up shall be applied first to the expenses of the winding-up, and thereafter all of the remaining assets of the Company shall be distributed in the following order: (a) first, to creditors of the Company, including any Member who is also a creditor (by virtue of any Member Loan or otherwise), in the order of priority as provided by law and (b) thereafter, as set forth in Section 5.1 herein.

11.3    **Conduct of Winding-Up**.  The winding-up of the business and affairs of the Company shall be conducted by the Manager except as otherwise required by law.

## ARTICLE XII
## SPECIAL RIGHTS

12.1    **Limited Preemptive Rights**.

(a)    Subject to Section 12.5, if at any time after the effective date of this Agreement the Company authorizes the issuance and sale of any Units (other than as a dividend on the outstanding Units) (the "***Offered Units***"), the Company shall first offer to sell such Offered Units to each Member except for the issuance of Units: (i) in consideration for the acquisition of another Person's business by the Company or by any of its Subsidiaries (whether by acquisition of equity interests or assets, or by merger, consolidation or other similar transaction); (ii) pursuant to a Public Offering; (iii) to the current or future officers, employees or directors of the Company or any of its Subsidiaries (or to any entity controlled by any of such officers, employees or directors) pursuant to a management plan that has been approved by the Class A Members holding at least a majority of the then-outstanding Voting Units; (v) to the Company's or any Subsidiary's lenders in connection with the incurrence, renewal or maintenance of indebtedness (including funded indebtedness); or (vi) pursuant to the exercise of any warrant, option or other right to acquire Units.  Each Member shall have the right to purchase a portion of the Offered Units proportionate to its Common Unit Ownership.

(b)    Each Member shall exercise his, her or its preemptive rights hereunder within ten (10) days following the receipt of written notice from the Company describing in reasonable detail the total number and terms of the Offered Units, the purchase price, the payment terms for the Offered Units, the period in which the preemptive right hereunder is to be exercised, and such Member's percentage allotment.  If such Member exercises the preemptive right pursuant to this Section 12.1, such Member shall execute all documentation, and take all actions, as may be reasonably requested by the Company in connection therewith.

(c)    Shortly after the expiration of the offering period described above, the Company shall distribute to the Members that elected to purchase the Offered Units (each, a "***Participating Member***") written notice setting forth the number of Offered Units that were not purchased by the other Members (the "***Available Units***").  Within ten (10) days following the receipt of such written notice, each Participating Member may elect to purchase a portion of the Available Units proportionate to such Participating Member's Common Unit Ownership on the same terms and price.  If, after the expiry of the offering period set forth in this Section 12.1(c), any Available Units are not purchased by the Participating Members, then the Participating Members shall have the right to purchase such remaining Available Units in an amount proportionate to each Participating Member's Common Unit Ownership.

(d)    If the Members do not elect to purchase the total amount of the Available Units, then during the ninety (90) day period following the expiry of the final offer period set forth in Section 12.1(c), the Company shall be entitled to allot and issue any remaining Available Units to any Person or Persons at the same or a higher price (in cash) and otherwise upon the same terms and conditions offered to the Members.

(e)      Notwithstanding anything to the contrary contained in this Agreement, the provisions of this Section 12.1 shall terminate upon the consummation of a Public Offering or Sale of the Company.

12.2      **Drag-Along Rights**.  If at any time the Class A Member(s) holding collectively at least a majority of the outstanding Class A Common Units (each such holder, a "***Control Seller***" and collectively the "***Control Sellers***") approve a Sale of the Company (a "***Drag-Along Sale***"), then, without any further action or approval by the Manager, each Class B Member (each, a "***Non-Control Seller***"), shall consent to and raise no objections against the Drag-Along Sale or the process by which the Drag-Along Sale is undertaken, and if the Drag-Along Sale is structured as a sale of Units (the "***Sale Units***"), each Non-Control Seller shall, if requested by the Control Sellers, sell (or otherwise Transfer) such Non-Control Seller's Sale Units (or any portion thereof if requested), on the same terms and conditions approved by and applicable to the Control Sellers (including, if necessary, by converting their Unit Equivalents into the Units to be sold in the Drag-Along Sale) and as set forth in this Article XII.  Each Non-Control Seller shall promptly take all actions deemed necessary or desirable (in the sole judgment of the Control Sellers) in connection with, and to facilitate the consummation of, the Drag-Along Sale, including the execution of all agreements and instruments as requested by, and on the same terms applicable to, the Control Sellers.  Without limiting the foregoing, (i) if the Drag-Along Sale is structured as a merger, consolidation, joint venture or similar transaction, each Non-Control Seller shall vote in favor of such transaction and waive any dissenters' rights, appraisal rights or similar rights in connection with such merger or consolidation and (ii) if the Drag-Along Sale is structured as a sale or exchange of Units, each Non-Control Seller shall agree to sell or exchange its Sale Units on the terms and conditions approved by the Control Sellers and upon which the Control Sellers agree to sell or exchange their Sale Units.  The Company shall use reasonable efforts to notify the Non-Control Sellers in writing not less than fifteen (15) days prior to the proposed consummation of a Drag-Along Sale; provided, however, that each Non-Control Seller agrees not to directly or indirectly (without the prior written consent of the Company) disclose to any other Person (other than to such Non-Control Seller's legal counsel in confidence, as otherwise necessary to protect such Non-Control Seller's rights under this Agreement or as otherwise required by law) any information related to such potential Sale of the Company.

12.3      **Tag-Along Rights**.  If one or more Class A Members propose to sell (collectively, the "***Initiating Sellers***") to a purchaser or related group of purchasers more than fifty percent (50%) of the then outstanding Class A Common Units (the "***Tag-Along Units***") (whether in one transaction or in a series of related transactions) (a "***Tag-Along Sale***"), then each Class B Member (a "***Non-Initiating Seller***") may elect to participate in the Tag-Along Sale by delivering written notice to the Company and the Initiating Sellers within ten (10) days following the receipt by such Non-Initiating Seller of notice of such Tag-Along Sale.  Each Non-Initiating Seller that makes such election shall be entitled to sell, at the same price and on the same terms as the Initiating Sellers, a number of Tag-Along Units equal to the product of (i) the quotient determined by dividing the number of Class B Common Units owned by such Non-Initiating Seller, by the aggregate number of Common Units outstanding at such time and (ii) the aggregate number of Tag-Along Units to be sold by all parties in such Tag-Along Sale.  If a Non-Initiating Seller exercises rights pursuant to this Section 12.3, such Non-Initiating Seller shall be required as a condition of such exercise (and shall be entitled) to sell the same proportionate amount of

any other Tag-Along Units that the Initiating Sellers sell to the purchasers in connection with the Tag-Along Sale.

12.4 **Other Agreements with Respect to Drag-Along and Tag-Along Transactions**.

(a)    With respect to any Drag-Along Sale or Tag-Along Sale in accordance with Section 12.2 or Section 12.3, each Member must, if requested by the Control Sellers or the Initiating Sellers, as the case may be:  (i) execute and deliver all agreements, certificates and instruments as reasonably requested by the Control Sellers or the Initiating Sellers, as the case may be; (ii) give the same representations, warranties, covenants, releases and indemnities as the Control Sellers or the Initiating Sellers, as the case may be, are giving in the transaction; and (iii) irrevocably appoint one or more persons designated by the Control Sellers or the Initiating Sellers, as the case may be, as the Member's agent and/or representative with respect to all aspects of that transaction (including without limitation amendments, new documents, waivers, and the prosecution, defense or settlement of claims, in each case in connection with that transaction) pursuant to a power of attorney (or other writing) in form and substance satisfactory to the Control Sellers or the Initiating Sellers, as the case may be; provided that the liability, if any, of such Member in consummating any transaction in accordance with a Drag-Along Sale pursuant to Section 12.2 is several and not joint with any other Member, and is pro rata in proportion to, and does not exceed, the amount of consideration paid to such Member in connection with such transaction, after taxes and expenses.  The purchase price for any Drag-Along Sale or Tag-Along Sale shall be allocated among the participating Members in the same manner as distributions are allocated under Section 5.1 hereof, subject to any set-off described in Section 5.8 hereof.  So long as such sale is conducted in compliance with this Section, each Member hereby waives any right under the Delaware Act or otherwise to appraisal of Units and agrees to vote in favor of, or otherwise consent to, such sale.

(b)    Upon the failure of any Member to take the actions required by Control Sellers or the Initiating Sellers, as the case may be, under this Article XII, such Member hereby appoints the Control Sellers or the Initiating Sellers, as the case may be, as that Member's attorney-in-fact for the purpose of executing, swearing to, acknowledging, and delivering all certificates, documents, and other instruments as are required to be executed and delivered by that Member pursuant to this Article XII, and upon such Member's receipt of its proportionate share of the purchase price pursuant to this Article XII, such Member shall for all purposes be deemed no longer a Member of the Company with respect to Units sold, shall not be entitled to any distributions with respect to the Units sold by such Member and shall have no other rights or privileges granted to the Members under this Agreement or otherwise with respect to the Units sold.  This power of attorney is irrevocable and is coupled with an interest.  Upon the failure of any Member to take any of the actions required by this Article XII, such Member shall reimburse the Company, the Control Sellers or the Initiating Sellers, as the case may be, and/or the Manager for any costs or expenses (including without limitation reasonable attorney's fees) incurred by any such parties in the enforcement of their respective rights under this Article XII.

(c)    Each Member participating in any transaction pursuant to Section 12.2 or Section 12.3 shall bear his or its pro rata share (based upon the number of Units sold by such Member out of the total number of Units sold by all Persons in such transaction) of the costs of any sale of Units pursuant to Section 12.2 or Section 12.3 to the extent such costs are not

otherwise paid by the Company or the acquiring party. Costs incurred by a participating Member on his or its own behalf shall not be considered costs of the transaction hereunder.

(d)     It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of any provision of this Article XII by any party, that this Article XII shall be specifically enforceable, and that any breach or threatened breach of any provision of this Article XII shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

(e)     Notwithstanding anything to the contrary contained in this Agreement, the provisions of this Article XII shall terminate upon the consummation of a Public Offering or Sale of the Company.

12.5    **Initial Public Offering**.

(a)     Initial Public Offering. Notwithstanding any other provision of this Agreement, if at any time the Manager desires to cause (i) a Transfer of all or a substantial portion of (x) the assets of the Company or (y) the Units to a newly organized corporation or other business entity (an "*IPO Entity*"), (ii) a merger or consolidation of the Company into or with a IPO Entity as provided under § 18-209 of the Delaware Act or otherwise, or (iii) another restructuring of all or substantially all the assets or Units of the Company into an IPO Entity, including by way of the conversion of the Company into a Delaware corporation as provided under § 18-216 of the Delaware Act (any such corporation also herein referred to as an "IPO Entity"), in any such case in anticipation of or otherwise in connection with an initial Public Offering of securities of an IPO Entity or its Affiliate whether in the United States or a foreign country (an "*Initial Public Offering*"), each Member shall take such steps to effect such Transfer, merger, consolidation, conversion or other restructuring as may be reasonably requested by the Manager, including, without limitation, executing and delivering all agreements, instruments and documents as may be reasonably required and Transferring or tendering such Member's Units to an IPO Entity in exchange or consideration for shares of capital stock or other equity interests of the IPO Entity, determined in accordance with the valuation procedures set forth in Section 12.5(d).

(b)     Fair Market Value. In connection with a transaction described in Section 12.5(a), the Manager shall, in good faith but subject to the following sentence, determine the Fair Market Value of the assets and/or Units Transferred to, merged with or converted into shares of the IPO Entity, the aggregate Fair Market Value of the IPO Entity and the number of shares of capital stock or other equity interests to be issued to each Member in exchange or consideration therefor. In determining Fair Market Value, (i) the offering price of the Initial Public Offering shall be used by the Manager to determine the Fair Market Value of the capital stock or other equity interests of the IPO Entity and (ii) the distributions that the Members would have received with respect to their Units if the Company were dissolved, its affairs wound up and distributions made to the Members in accordance with Section 11.2 shall determine the Fair Market Value of the Units. In addition, any Units to be converted into or redeemed or exchanged for shares of the IPO Entity shall receive shares with substantially equivalent economic, governance, priority and

other rights and privileges as in effect immediately prior to such transaction (disregarding the tax treatment of such transaction).

(c)    Appointment of Proxy. Each Member hereby makes, constitutes and appoints the Company, with full power of substitution and re-substitution, its true and lawful attorney, for it and in its name, place and stead and for its use and benefit, to act as its proxy in respect of any vote or approval of Members required to give effect to this Section 12.5(c), including any vote or approval required under § 18-209 or § 18-216 of the Delaware Act. The proxy granted pursuant to this Section 12.5(c) is a special proxy coupled with an interest and is irrevocable.

(d)    Lock-up Agreement. Each Member hereby agrees that in connection with an Initial Public Offering, and upon the request of the managing underwriter in such offering, such Member shall not, without the prior written consent of such managing underwriter, during the period commencing on the effective date of such registration and ending on the date specified by such managing underwriter (such period not to exceed 180 days in the case of an Initial Public Offering or 45 days in the case of any registration other than an Initial Public Offering), (i) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any Units or Unit Equivalents (including any equity securities of the IPO Entity) held immediately before the effectiveness of the registration statement for such offering, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Units or Unit Equivalents (including equity securities of the IPO Entity) or such other securities, in cash or otherwise. The foregoing provisions of this Section 12.5(d) shall not apply to sales of securities to be included in such Initial Public Offering or other offering if otherwise permitted. Each Member agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriter which are consistent with the foregoing or which are necessary to give further effect thereto.

## ARTICLE XIII
## ADDITIONAL AGREEMENTS

13.1    **Representations and Warranties**.  In connection with the acquisition of Units pursuant to this Agreement, each Member represents and warrants to the Company and agrees and acknowledges, that:

(a)    The execution, delivery and performance of this Agreement by such Member do not and shall not conflict with, violate or cause a breach of any agreement, contract or instrument to which such Member is a party or any judgment, order or decree to which such Member is subject.

(b)    Such Member has no and shall not grant any proxy or become party to any voting trust or other agreement which is inconsistent with, conflicts with or violates any provision of this Agreement.

(c)     If such Member is a corporation, partnership, limited liability company, trust, custodianship, estate or other entity, this Agreement has been duly executed by a duly authorized person on its behalf and constitutes the legally binding obligation of such Member, enforceable against such Member in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights generally and by the availability of injunctive relief, specific performance and other equitable remedies).

(d)     With respect to the tax consequences of acquiring, receiving, owning, holding, and disposing of the Units and the income and proceeds thereof, Member is relying solely on such Member's own tax advisor and is not relying on the Company, or any person other than such Member's own tax advisor.

(e)     The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with.

(f)     Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof.

(g)     Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company for such purpose.

(h)     The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company that may have been made or given by any other Member or by any agent or employee of any other Member.

(i)     Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto.

(j)     Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time.

## ARTICLE XIV
## GENERAL PROVISIONS

14.1     **Remedies**.  In any action to enforce this Agreement or to seek damages on account of any breach hereof, the prevailing party shall be entitled to reimbursement for its costs of collection (including reasonable attorneys' fees and expenses).  No remedy conferred upon any party to this Agreement is intended to be exclusive of any other remedy herein or by law

provided or permitted, but each such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

14.2   **Waiver**.   None of the terms of this Agreement shall be deemed to have been waived by any party hereto, unless such waiver is in writing and signed by that party.   The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or any further breach of the provision so waived.

14.3   **Notices**.  All notices and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, by facsimile, overnight courier or by certified mail (return receipt requested) and addressed, if to a Member, to such Member or his or her personal representative at his or her last address known as disclosed on the records of the Company, or to such other address as any of the above shall have specified by notice hereunder.  Any notice under this Agreement shall be deemed to have been given, (a) if delivered in person or sent by confirmed facsimile or overnight courier, one (1) business day following delivery to recipient, facsimile transmission or delivery to the courier (as the case may be) or (b) if mailed, three (3) business days following deposit in the U.S. mail.

14.4   **Entire Agreement**.   This Agreement contains the entire agreement, and supersedes all prior agreements and understandings and arrangements, oral or written, among the parties hereto with respect to the subject matter hereof.

14.5   **Amendments and Modifications**.  An affirmative vote of the Class A Members holding two-thirds (2/3) of the then-outstanding Class A Common Units shall be required to approve any amendment, modification or change to this Agreement; provided that the Manager may, without the consent of any of the Members, amend this Agreement at any time or from time to time:  (a) to cure any ambiguity, to correct or supplement any provisions herein which may be inconsistent with any other provision herein or to add other provisions with respect to matters arising under this Agreement which will not be inconsistent with the provisions of this Agreement, (b) to amend this Agreement to reflect any action that the Manager is authorized to take under the Agreement if such action requires amendment of this Agreement, including any amendments to the Member's Schedule, (c) to delete or add any provision to this Agreement required to be so deleted or added by any federal or state agency deemed to be for the benefit or protection of the Members, or (d) to enable the Company to comply with the requirements of the "safe harbor" election within the meaning of the Proposed Revenue Procedure of Notice 2005-43, 2005-24 IRB 1, Proposed Treasury Regulation Section 1.83-3(e)(1) or Proposed Treasury Regulation Section 1.704-1(b)(4)(xii) at such time as such Proposed Procedure or Regulations are effective and to make any other related amendments as may be required by similar or revised pronouncements or Treasury Regulations after the date hereof; provided, further, however, that the consent of the holders of at least seventy-five percent (75%) of the outstanding Class B Common Units shall be required for any amendment to this Agreement that shall have a disproportionate material adverse economic impact on the holders of Class B Common Units. The Members hereby specifically consent to the amendment of this Agreement from time to time in such manner as is determined by counsel to the Company to be necessary or reasonably helpful to ensure that the allocations of profits, losses and individual items thereof are given effect for federal income tax purposes, including any amendments determined by such counsel to

be necessary to comply with the Treasury Regulations promulgated under Section 704 of the Code.

14.6    **Binding Effect; Benefits**.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.

14.7    **No Third Party Beneficiaries**.  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise, and none of the provisions of this Agreement shall be construed as existing for the benefit of any creditor of any of the Members or of the Company; provided, however, that nothing in this Section 14.7 shall be deemed to limit the rights of any Indemnified Party under Section 8.2.

14.8    **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be unenforceable or invalid under applicable law, such provision shall be ineffective only to the extent of such unenforceability or invalidity, and the remaining provisions of this Agreement shall continue to be binding and in full force and effect.

14.9    **Headings**.  The section and other headings contained in this Agreement are for convenience only and shall not be deemed to limit, characterize or interpret any provisions of this Agreement.

14.10   **No Strict Construction**.  The parties hereto jointly participated in the negotiation and drafting of this Agreement.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their collective mutual intent, this Agreement shall be construed as if drafted jointly by the parties hereto, and no rule of strict construction shall be applied against any Person.

14.11   **Interpretation**.  As used in this Agreement, the masculine, feminine or neuter gender shall be deemed to include the others whenever the context so indicates or requires. Terms defined in the singular have a comparable meaning when used in the plural and vice versa. Terms defined in the current tense shall have a comparable meaning when used in the past or future tense and vice versa.  Terms defined as a noun shall have a comparable meaning when used as an adjective, adverb, or verb and vice versa.  Whenever the term "include" or "including" is used in this Agreement, it shall mean "including, without limitation," (whether or not such language is specifically set forth) and shall not be deeded to limit the range of possibilities to those items specifically enumerated.  Unless otherwise limited, the words "hereof", herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision.  The parties intend that, in the interpretation and enforcement of this Agreement, Sections 18-1101(b) and (c) of the Delaware Act shall be given full force and effect.

14.12   **Counterparts**.  This Agreement may be executed in any number of counterparts, and by facsimile, each of which shall be effective only upon delivery and thereafter shall be

deemed to be an original, and all of which shall be taken to be one and the same instrument with the same effect as if each of the parties hereto had signed the same signature page.

14.13   **Governing Law**.  This Agreement and the rights of the parties hereunder shall be construed and interpreted in accordance with the laws of the State of Delaware applicable to agreements made and to the performance wholly within that jurisdiction.

**[SIGNATURE PAGE FOLLOWS]**

     **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**MEMBERS:**

**CLASS A MEMBER:**

Iterative Capital Management, L.P.

By: Iterative Instinct UGP, LLC,
    its General Partner

By: _____
    Name: Brandon Buchanan
    Title: Managing Member

**CLASS B MEMBERS:**

Iterative Capital GP, L.L.C.

By: _____
    Name:
    Title:

**CLASS B MEMBERS:**

[Each Investor participating as a Continuing Investor]

By: _____
    Name:
    Title:

## SCHEDULE A

MEMBERS SCHEDULE

| Name | Number of Common Units |
|---|---|
| CLASS A COMMON UNITS: | |
| Iterative Capital Management, L.P. | 2,000 Class A Common Units |
| | |
| CLASS B COMMON UNITS: | |
| Iterative Capital GP, L.L.C. | [ ] Class B Common Units |
| [Each Investor participating as a Continuing Investor] | [ ] Class B Common Units |
| **Total Class B Common Units** | **8,000** |

**SCHEDULE B**

CAPITAL CONTRIBUTIONS

| Name | Capital Contribution |
| --- | --- |
| Iterative Capital GP, L.L.C. | [ ] |
| [Each Investor participating as a Continuing Investor] | [ ] |

# EXHIBIT A

## FORM OF JOINDER

The undersigned is executing and delivering this Joinder Agreement (this "***Agreement***") pursuant to the Limited Liability Company Agreement of [I2 DCR SPV, L.L.C.], a Delaware limited liability company (the "***Company***"), effective as of [__], 2020, as the same may be amended from time to time (the "***LLC Agreement***").

By executing and delivering this Agreement, the undersigned hereby acknowledges that the undersigned has reviewed the LLC Agreement and accepts all terms and provisions of the LLC Agreement and agrees to be bound thereby as a Member (as defined in the LLC Agreement) as if the undersigned were an original signatory to the LLC Agreement.  The undersigned hereby specifically represents and warrants to the Company that the representations and warranties contained in Sections 13.1 of the LLC Agreement are true and correct with respect to the undersigned as of the date hereof.

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Agreement effective as of _____, 20__.

Units Owned: _____

By: _____
Name: _____
Title: _____

ACKNOWLEDGED AND ACCEPTED:

**[I2 DCR SPV, L.L.C.]**

By: _____
Name: _____
Title: _____