K55VKDHC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    KDH CONSULTING GROUP LLC,

4                    Plaintiff,

5            v.                              20 CV 3274 (VM)

6    ITERATIVE CAPITAL MANAGEMENT
     L.P., *et al*,
7
                    Defendants.             REMOTE TELECONFERENCE
8    ------------------------------x

9                                           New York, N.Y.
                                            May 5, 2020
10                                          4:02 p.m.

11   Before:

12                      HON. VICTOR MARRERO,

13                                          District Judge

14                          APPEARANCES

15   DILENDORF KHURDAYAN
          Attorneys for Plaintiff
16   BY:  RIKA KHURDAYAN

17   BARNES & THORNBURG
          Attorneys for Defendants
18   BY:  LAWRENCE GERSCHWER
          ROBERT J. BOLLER
19

20

21

22

23

24

25

K55VKDHC

1           (Remote teleconference)

2           THE COURT:  Good afternoon.  This is Judge Victor

3  Marrero.  I thank you all for joining us in this conference by

4  this means.

5           Would the participants identify themselves for the

6  record.  We have a court reporter who is taking the transcript

7  of this conference.  Who's on for plaintiffs?

8           MS. KHURDAYAN:  Good afternoon, your Honor.

9           This is Rika Khurdayan of Dilendorf Khurdayan, counsel

10 for plaintiff.

11          THE COURT:  Thank you.

12          Defendants?

13          MR. BOLLER:  Good afternoon, your Honor.

14          This is Robert Boller from Barnes & Thornburg, counsel

15 for defendants.  One of my partners, Lawrence Gerschwer, is on

16 the phone as well.

17          MR. GERSCHWER:  Good afternoon, your Honor.

18          THE COURT:  Good afternoon.

19          Is the court reporter on?

20          THE COURT REPORTER:  Yes, Judge.  It's Martha Martin.

21          Good afternoon.

22          THE COURT:  All right.  Thank you.

23          So, again, let me express my appreciation for your

24 participation by this means.  This conference is evidence that,

25 despite the difficulties that we're all facing with the health

K55VKDHC

1    emergency that is all around us, the justice system continues

2    and the courts dispense justice.  And we thank all of the

3    people who are -- who enable us to continue to provide judicial

4    assistance services, despite the great number of challenges and

5    difficulties that are involved.

6         This proceeding is scheduled in the matter of *KDH*

7    *Consulting Group LLC v. Iterative Capital Management*.  It's

8    docket number 20 CV 3274.

9         The Court received filing of a complaint and has

10   reviewed that document, along with its memorandum of law and

11   the declaration that was filed with exhibits.  I've also read

12   the response submitted by the defendants in a letter dated May

13   1, and further response from the plaintiffs dated May 4th.  I

14   read the order to show cause that was considered by Chief Judge

15   McMahon sitting in Part 1, and the preliminary injunction that

16   she issued.

17        The Court has reviewed the letters submitted by

18   defendants of May 1.  And the letter, in effect, is, in my

19   view, a motion to dissolve the preliminary injunctive relief

20   and TRO granted by Judge McMahon.  This motion could be and

21   would be properly made under Rule 65(b)(4).  And on that basis,

22   the Court will invite the parties to address the motion,

23   setting forth your arguments as to why the injunction and TRO

24   that the plaintiff requests should or should not be granted,

25   and the legal basis for your arguments.

K55VKDHC

1          If we proceed this way, this proceeding could be

2     considered, in effect, a substitute for the hearing that was

3     scheduled by Judge McMahon to be held on May 11th, with the

4     documents that you have already submitted and the legal

5     arguments that -- and any evidence you may want to put on the

6     record at this proceeding.  It's conceivable that we may

7     need -- we may not need the May 11th hearing, and the Court

8     could rule on the basis of the document and the record that

9     exists as of now, supplemented by your arguments.

10          So let me ask whatever party may have any preliminary

11     thoughts on that way to proceed.

12          MR. BOLLER:  Your Honor, this is --

13          MS. KHURDAYAN:  Your Honor --

14          MR. BOLLER:  Your Honor, this is Robert Boller,

15     counsel to the defendants here.

16          We are the ones who made the motion -- submitted the

17     letter and made the motion last week.  I think we are

18     tentatively okay proceeding that way.  I would point out that

19     the letter that we submitted last week was -- while we're proud

20     of it, it was incomplete in the sense that it did not purport

21     to or attempt to raise all of the issues that we believe exist

22     with respect to likelihood of success on the merits here.  I

23     think that we -- you know, we flagged very serious

24     jurisdictional questions for the Court.  I think that we

25     flagged issues around notice and the balancing of the harms,

K55VKDHC

1   particularly given the amount of time that lapsed between when

2   this was announced and when plaintiff came to court.

3           But I would note that our -- for example, our letter

4   did not attach any documents.  We didn't point to any new

5   evidence.  And so while we think -- we think that these claims

6   and this issue can be resolved just based on the documents that

7   the plaintiffs have submitted.  If the Court is not convinced

8   of that, we would ask for the opportunity to fully brief the

9   issue of whether the TRO should remain in place, and to provide

10  the Court with documents.

11          As I said, we haven't provided any, but there are some

12  relevant communications that we would bring to the Court's

13  attention; we just felt that our letter was not the appropriate

14  procedural device to do so.  But I'm happy to proceed in that

15  way, with that caveat.

16          THE COURT:  Understood.

17          Let me acknowledge that I have reviewed other issues

18  beyond the question of the granting of a TRO and the

19  preliminary injunction by Judge McMahon.  There are issues that

20  have been raised concerning venue.  There's dispute as to

21  whether or not the plaintiffs waited until the last moment to

22  file this suit, without giving the defendants an opportunity to

23  respond, and the plaintiffs obtaining *ex parte* relief, I

24  recognize that all of those are legitimate issues.

25          However, overarching those issues is the sessional

K55VKDHC

1    question as to whether or not the plaintiff has made a case

2    under Rule 65 for injunctive relief on the three or so prongs

3    of that test, which is whether or not the plaintiff has shown

4    irreparable harm, the likelihood of success on the merits,

5    and/or whether the merits determinations here would be whether

6    the balance of equities favor either the plaintiff or the

7    defendants.

8           I think that those questions could be addressed as a

9    sessional matter on the basis of what you have already

10   submitted.  I don't believe that I would need much further

11   documentation beyond what you already put in the record.  But

12   if you persuade me otherwise, we can leave open the question as

13   to what additional documentation may be necessary.

14          Plaintiff?

15          MS. KHURDAYAN:  Your Honor, this is --

16          THE COURT:  Plaintiff, you have the floor.

17          MS. KHURDAYAN:  Thank you, your Honor.

18          Your Honor, we would like to direct your Honor's

19   attention to the fact that this mostly addressed in our

20   response letter, the issue of setting aside the existing TRO,

21   which we think is impermissible and does not set aside in any

22   case the requirement for Rule 60.  And we have not addressed

23   the merits of our motion for preliminary injunction, just

24   because we thought it was outside of the scope of defendants'

25   request via letter motion.

K55VKDHC

1          THE COURT:  All right.  Again, coming back, I don't

2     see the vehicle that is appropriate here to be Rule 60.  I am

3     invoking as the appropriate rule 65(b)(4), which addresses

4     precisely what is happening here.  And defendant is essentially

5     asking for the Court to dissolve the preliminary injunction

6     that was granted *ex parte* to the plaintiff by Judge McMahon in

7     Part 1, sitting in Part 1, on the basis of the submission made

8     by the plaintiff then, including a memorandum of law, a

9     declaration.

10          The plaintiff has supplemented that submission by your

11     letter dated May 4th.  I don't see necessarily that there's

12     more that this Court would need in order to make a

13     determination as to whether or not the plaintiff has carried

14     its burden of establishing the elements for injunctive relief

15     under Rule 65.

16          MR. BOLLER:  Your Honor -- sorry, this is -- I

17     apologize.  It's an awkward medium, and I didn't mean to talk

18     over the Court.  So again, for the record, this is Robert

19     Boller from Barnes & Thornburg.

20          The point I would make to the Court here is I believe

21     the plaintiff addressed their position with respect to Rule 65

22     and whether or not they are entitled to the injunction in their

23     moving papers.  There's an entire memo of law dedicated to this

24     point that was provided in connection with the complaint.

25          So it seems to me that per the Court's, kind of,

K55VKDHC

1    indication of the direction that you want to go, that we've

2    heard from the plaintiff with respect to why they feel Rule 65,

3    you know, has been met here, the requirements have been met,

4    and they are entitled to the TRO.  I'm happy to address our

5    position with why we think that that is not the case.

6         THE COURT:  All right.  Since the plaintiff has raised

7    some concern about the procedure, I ask the plaintiff to make

8    your presentation as to why you believe that the plaintiff is

9    entitled to injunctive relief here under Rule 65, and address

10   any issue that you believe not adequately addressed in your

11   complaint and your memorandum of law and your letter of May

12   4th.  If there's something beyond that that you think is

13   compelling and conceivably could change or determine the

14   outcome, make your presentation now, and then I'll give the

15   opportunity to the defendants to respond.

16        MS. KHURDAYAN:  Sure.  Thank you, your Honor.

17        If I may start with giving a brief factual background

18   of the case and what actually brought us to the point of

19   commencing litigation via emergency relief/preliminary

20   injunction with a temporary restraining order.

21        As plaintiff alleged in the verified complaint, when

22   plaintiff initially invested and was approached by fund

23   managers to invest into the funds, the funds were described to

24   plaintiff as a highly liquid hedge-fund-like vehicle, with

25   several liquidity options and quarterly withdrawals.  And

K55VKDHC

1    plaintiff was assured that they would be able to withdraw from

2    the funds at any point.

3         And the funds documents, the offering documents, also

4    supported this position by saying that 70 percent of the fund

5    assets would be invested in the highly liquid cryptocurrency.

6    And only after 30 percent of the fund's asset would be devoted

7    to very, very liquid creditors that involved cryptocurrency

8    mining.  It is in reliance on this representations and the

9    nature of the funds and the nature of the investment that

10   plaintiff KDH decided to invest money and subscribe to the

11   fund.

12        Now, coincidentally, almost at the same time as

13   plaintiff invested into the fund, the cryptocurrency market

14   experienced a crash.  And within weeks of investing, plaintiff

15   reached out to defendants asking to withdraw the funds.

16   Plaintiff was convinced that there was no reason for the

17   withdrawal; that most of the funds were not yet invested in the

18   cryptocurrency that crashed; and that plaintiff should remain

19   in the fund, the fund would continue to provide quarterly

20   withdrawals and opportunities to liquidate to investor at any

21   point, and to basically rely on the manager's experience and

22   expertise in the cryptocurrency trading debate.

23        What happened in reality is that after -- shortly

24   after managers and sponsors of the fund received withdrawal

25   requests from plaintiff -- and we can only view this from many

K55VKDHC

1    out (ph) investors as well -- they substantially deviated from

2    the investment strategy, and they essentially turned what was

3    supposed to be a highly liquid cryptocurrency trading fund into

4    a mining operation.

5          At some point in 2018 -- and they are not sure where,

6    because proper disclosures were never provided to investors --

7    they expended six and-a-half million dollars on just purchasing

8    the mining equipment.  Now, they've only raised close to $15

9    million.  And after the value of the funds was already

10   declining, they spent almost half of it on mining equipment,

11   never updated investors.

12         When plaintiff KDH tries to obtain any information on

13   mining and what was happening with the funds, they -- really

14   defendants used every known tactic or delay to avoid answering

15   the question.  And this all culminated really in December of

16   2019, when defendants sent a notice update to investors saying

17   that they've decided to turn an investment vehicle, the fund,

18   into operating mining business; and that they would be provided

19   information -- providing information in the coming months about

20   the proposed restructuring.

21         Now, interestingly enough, in the update in December,

22   they stated that cryptocurrency mining was always the focus of

23   the fund from day one.  It is easily disputed by the offering

24   documents themselves.  This was supposed to be a cryptocurrency

25   trading fund, not a mining business.

K55VKDHC

1          Now, mining equipment is subject to very, very rapid

2     depreciation.  We know, again, based on very limited investor

3     updates that were received from the sponsors that only in 2019,

4     the mining equipment accumulated 3.4 million in depreciation.

5     So the equipment that they spend six and-a-half million in 2018

6     is virtually worth nothing by now, in 2020.

7          In February, defendants sent another update saying

8     that they are thinking of consolidating the fund with their

9     related affiliated business, Iterative OTC.  That is a separate

10    issue, because during the past two years, when the value of the

11    funds was depreciating rapidly, by now investors lost over 80

12    percent of the fund as that they've invested.  Interestingly

13    enough, related business of the sponsor Iterative OTC has been

14    driving in the past year.

15         In the offering document, defendants provided that the

16    minor mining strategy would decide that the mining operation

17    would be mining cryptocurrency, and then selling the

18    cryptocurrency through a related business of the sponsor,

19    Iterative OTC.

20         Up until March of this year, it was really unclear

21    what this proposed restructuring would look like.  The only

22    thing that was -- the only information that was provided to

23    investors was that we will be restructuring -- we will be

24    consolidating with our flagship business, Iterative OTC, which

25    is a trading platform, and their other mining operation, that's

K55VKDHC

1    defendant Iterative Mining, LLC.

2              In March, investors received requests for consent, but

3    essentially it looks like just a fourth -- fourth Securities

4    Exchange offer.  Basically, what the sponsors are saying now

5    is, All right, you're investors.  You have three options:

6              Option number one.  You can consent to our

7    restructuring, acknowledge that you've received all the

8    material information, acknowledge that you raised any conflict

9    of interest between the fund, the new operating entity, and the

10   affiliated entities, acknowledge that you understand the

11   restructuring, and pay for the expenses of the restructuring.

12   And whatever remaining funds are left, we will basically let

13   you access the funds.

14             Option number two.  Investor consents to the

15   restructuring (unintelligible) if you receive all the material

16   information, waive any conflict of interest, and we will pay

17   for the restructuring.  And we will let you continue in the new

18   operating business on the terms that will be substantially

19   different from the terms that you were participating in the

20   fund with; but, nonetheless, please acknowledge you have all

21   material information about the transaction.

22             Or option number three:  Don't consent, and then we

23   will ship you -- essentially they say, We will do a

24   distribution in kind.  But what they are saying is, We will

25   ship you outdated -- the prorated share of outdated mining

K55VKDHC

1    equipment, minus the shipping and handling fees.

2              So this offer was initially supposed -- was always

3    provided to plaintiff on March 1st, and was initially supposed

4    to expire on March 27.

5              After reviewing the offering documents, plaintiff sent

6    very basic questions to defendants about the timeline of the

7    transactions, the payout they would be entitled to after the

8    transaction, the anticipated restructuring expenses, really

9    four very basic questions.

10             Defendants couldn't provide a definitive answer.  They

11   said that there was no such timeline for restructuring.

12   They've also said that this opportunity to liquidate is not a

13   negotiation, and basically essentially saying, We can keep you

14   locked with an illiquid vehicle if we want to.

15             For the end of the month in March, defendants extended

16   the deadline for receiving consent by one more month to April

17   28th.  On April 14, plaintiff served a demand for books and

18   records because, once again, defendants did not provide really

19   material and necessary information in order for plaintiff to

20   evaluate this investment and make a decision.

21             When defendants refused to provide material (ph) of

22   the documents requested, which was on April 21st, plaintiff

23   really had no choice but to ask the Court to intervene so that

24   the restructuring does not proceed and plaintiff has an

25   opportunity to understand what happened to the funds, what

K55VKDHC

1    happened to the money, and what is it that they are being

2    forced into.

3            Despite what counsel for defendants claims, there was

4    no transaction scheduled to close on April 28.  In fact,

5    defendants on many occasions refused to provide the timeline

6    for the actual restructuring and closing of the transaction.

7    April 28 was the deadline for receiving consent from investors.

8            And in fact, after the temporary restraining order was

9    signed the very next day, on April 28th, defendants sent

10   another letter to investors saying that we will basically wait

11   for the TRO to expire or released it; and after, we are not

12   restrained any longer from proceeding with this transaction, we

13   will proceed with the restructuring, and we will proceed with

14   the restructuring based on the consent that we receive today on

15   April 28th.  And this is exactly the kind of harm that we were

16   trying to enjoin and prevent by moving for preliminary

17   injunction/temporary restraining order.

18           Essentially, your Honor, this is a cause of action for

19   securities fraud.  And right now, plaintiff is being forced to

20   exchange the limited partnership interest into ownership

21   interest in a new business venture in which they were never

22   planning to invest to begin with, and is not being provided any

23   material information about the transaction or its soft chang

24   (ph) or the possibility of the funds to -- you know, to make no

25   firm decisions.

K55VKDHC

1          So it is our position that the relief is of an

2    emergency nature; that the harm the plaintiff will sustain will

3    be irreparable because, as provided in the documents, the terms

4    of the new company and of the new business venture will be

5    substantially different to the terms that were provided to

6    investors in the cryptocurrency fund.  Or if we don't consent

7    to the transaction, basically, the investor will be shipped

8    outdated hardware and the fund will be dissolved.

9          And we also maintain that the balance of equities

10   raised in our favor in this case because, once again, we don't

11   see how defendants would be harmed by the TRO, as they had no

12   set schedule for closing the transaction, and a delay in

13   exercising some stance (ph) would not prejudice or harm

14   defendants in any way.

15          THE COURT:  All right.  Thank you.

16          One question that bears on your last argument

17   concerning the irreparable harm:  There's a provision of the

18   PPM that says that investments should "not be made by any

19   person that cannot afford a total loss of its principal or by

20   anyone with a need for liquidity in their investments."

21          In light of that provision, was plaintiff not on

22   notice that these were very risky ventures, and that there

23   could have been -- circumstances could arise under which

24   plaintiff could lose its total investment?

25          MS. KHURDAYAN:  Your Honor, plaintiff was aware that

K55VKDHC

1    this was a risky investment.  However, the nature of the

2    investment and the fund changed drastically, without notice to

3    plaintiff.  Had plaintiff known that defendants would engage in

4    mining operations, which is completely different risk level and

5    rigidity (ph) level from cryptocurrency trading, they would not

6    have invested into the fund to begin with.

7              THE COURT:  Let me address that for a moment as well.

8              The PPM also says that concerning this issue of the

9    investment in the mining operations, that mining operations and

10   equipment and participating in transactions on over-the-counter

11   cryptocurrency, and then it says:  "Is expected to make up

12   approximately 30 percent of the master fund's combined assets."

13             I read that language to be qualifying, and I don't

14   read it as rigidly and absolute as you may suggest that somehow

15   there is a mandatory limit of 30 percent.

16             MS. KHURDAYAN:  Your Honor --

17             THE COURT:  Go ahead, finish.  And then I will ask

18   defendants to weigh in.

19             MS. KHURDAYAN:  Sure.

20             Your Honor, what we ask the Court to do is to move at

21   the fatality of defendants' action in what we allege is really

22   a fraudulent scheme.  Because it's not one action that

23   defendants took the gort (ph) at into court today, it's

24   actually all the different circumstances.  It's them switching

25   from a fund that was supposed to fall for its own

K55VKDHC

1  cryptocurrency trading into mining, when they had an

2  over-the-counter trading platform set up that has exclusive

3  price to buy all the cryptocurrency that was mined by the

4  mining master fund.

5       In the PPM it says that this over-the-counter trading

6  business was supposed to be to the fund that are more favorable

7  than any other buyers or sellers of cryptocurrency that work

8  with the OTC counter.  We don't know if that was the case

9  because it never send the documents.

10      But now what we have is a separate -- but related --

11 business of defendants, Iterative OTC, that is profiting

12 substantially from the cryptocurrency that is being mined by

13 the fund.  But they are not care (ph) if the profit with the

14 fund.

15      So what defendants did is they took investors' money,

16 they bought mining equipment, and then they mined

17 cryptocurrency and sold it to an affiliated entity without

18 profiting from it and caused substantial damages to investors;

19 because investors did not profit from those trades.  Instead,

20 investors were locked in a highly illiquid investment vehicle,

21 and by now lost over 80 percent of their investment.

22      THE COURT:  All right.  Thank you.

23      What I find in your presentation is a very detailed

24 narrative of factual and evidentiary issues; but I don't find

25 sufficient indication of where you have made a case for

K55VKDHC

1   irreparable harm or for damage that could not be addressed by

2   monetary means.

3           Let me ask defendants to respond.

4           MR. BOLLER:  Thank you, your Honor.

5           And again, for the record, this is Robert Boller.

6           Taking your last point first, I agree, I think, you

7   know, we noticed that in that entire presentation, the

8   irreparable harm standard, you know, was not addressed.  And

9   the fact that what the plaintiffs are seeking here is money

10  damages was not addressed.  The fact that, you know, that very

11  clearly they want to leave this partnership, they want to seek

12  damages in connection with their departure.

13          But money damages, while potentially available, are

14  not sufficient to, you know, to provide for a TRO.  They've

15  cited a number of cases that stand for the proposition that if

16  a potential judgment debtor is likely to be insolvent, that

17  that might create an exception.  But as we pointed out in our

18  letter, the partnership is not a potential judgment.  There are

19  no claims asserted against the partnership.  The partnership

20  is, in fact, the nominal plaintiff here, right.  So the idea

21  that the partnership should be enjoined from undergoing its

22  restructuring and to remain in a state of stateness (ph)

23  doesn't make much sense to us, especially when you put this

24  into the broader context.

25          And I was glad that counsel brought up the letter that

K55VKDHC

1    she addressed to the Court yesterday, because it's worth

2    looking at that letter and the letter that is attached to it,

3    which was our communication with our investors the other day,

4    to get a sense of what the context is here, which is this

5    transaction was announced months ago.  The deal documents were

6    mailed, as counsel concedes, were sent to everyone on March

7    1st, which is over two months ago at this point.  It was 100

8    some-odd pages of disclosures around the transaction and the

9    structure.  There were different options afforded to all the

10   investors.

11            And so when we communicated the other day, one of the

12   things that the general partners' letter pointed out was, Look,

13   there are 60 limited partners in this fund.  Two-thirds of them

14   would like to go into the new vehicle; they believe in this

15   asset class and this investment methodology.  A third can't

16   stand the volatility, for whatever reason they want out.

17            So of the 60 limited partners, 59 of them have made a

18   determination about where they want to go.  One, KDH, the

19   plaintiff here, is not only refusing to participate in the

20   restructuring, has brought this litigation, and ground the

21   whole thing to a halt.  So we now have 59 limited partners

22   frozen and waiting on the resolution of what happens here with

23   respect to this individual limited partner, right.  And so

24   that's the broader context here.

25            The claim was filed a week ago.  And this letter was

K55VKDHC

1    sent to investors a week ago.  No one else has joined this

2    litigation.  It's not like there's a parade of limited partners

3    coming down into the court and saying, Yes, we were lied to.

4         I think, as the Court correctly pointed out, the PPM

5    includes reams of disclosures around liquidity and the lack

6    thereof, around the mining operations, around public (ph)

7    ventures and relationships with related parties, you know,

8    counsel did not address, but they put into the record as

9    Exhibit 1 to the Hatami declaration, the subscription

10   agreement, wherein they acknowledged receiving all of this.

11   And they acknowledged specifically that they have been advised

12   of the liquidity issue; that they have been advised of what the

13   investment strategy was; that they might be side-pocketed; that

14   there was a chance that their ability to withdraw, you know,

15   would be hamstrung given market conditions.  They acknowledged

16   receiving all of that, being sophisticated enough to make the

17   decisions, and wanting to make the decision notwithstanding

18   these risks.

19        And then the only other thing I would point out in the

20   documents, your Honor, is page 4 of the PPM -- which is right

21   in the beginning, when they are explaining what are the

22   high-level risks -- the manager says to them, Look, the

23   discussion that we are having of investment strategy is subject

24   to market conditions.  This will change.  And of course it

25   would.

K55VKDHC

1          Because if you're the general partner of an investment

2     firm, you have to have the fluidity and the flexibility to

3     adapt to what's going on in the market.  So they acknowledge

4     that the market for these cryptocurrencies went down 80 or 90

5     percent during 2018.  Well, then, of course, we weren't just

6     going to keep throwing investor money into a fire pit,

7     because -- you know, because they think that's where we're

8     going.  The management needs the flexibility, and the documents

9     gave the management the flexibility to do these things.  So

10    it's a bit like sour grapes to come back now and claim fraud,

11    when this was all fully disclosed and they disclaimed their

12    reliance on anything outside of the documents.

13          I have some additional points; but, your Honor, if

14    that's sufficient, you tell me.

15          THE COURT:  All right.  Thank you.

16          MS. KHURDAYAN:  Your Honor, if I may, since counsel

17    for defendants raised a new argument about, you know, us being

18    the only limited partner preventing this whole transaction from

19    moving forward, and having 59 limited partners that consented

20    to the transaction and are eager to go forward with the

21    restructuring, if I may address this point.

22          THE COURT:  You may.

23          MS. KHURDAYAN:  Thank you, your Honor.

24          THE COURT:  And then (unintelligible) the hearing.

25          MS. KHURDAYAN:  Thank you, your Honor.

K55VKDHC

1          That is really not the case, because we filed this

2     action very recently.  Plaintiff felt like they had no choice

3     and they were forced into the transaction.

4          And then since then, at least two other groups of

5     investors indicated that they also felt like they had no choice

6     and they were forced into the transaction, and they had no

7     other choice but to consent to the restructuring or risk

8     getting hardware shipped.  So I just want the point that

9     characterization of plaintiff as being the only one who's

10    holding 59 limited partners hostage is very far from reality.

11         There was no transaction that was supposed to close

12    come April 28, so we are really not damaging any

13    (unintelligible) preventing this transaction from closing.

14              THE COURT:  All right.  Well, let me thank you again.

15              I'm going to close the proceeding at this point.

16         And on the basis of my reading of the complaint and

17    the memorandum of law of the plaintiff and the declarations, as

18    well as the letter exchanges that have taken place in the

19    letters of May 1 and May 4th, I am not persuaded that the

20    plaintiff has made a sufficiently compelling case of

21    irreparable harm, which is the most significant element of

22    injunctive relief.

23         I am persuaded that this issue that plaintiff has

24    raised in this proceeding is fundamentally a dispute over money

25    damages; and I don't see that the plaintiffs could not be made

K55VKDHC

1    whole or in whatever form there may be monetary relief.

2              And also I believe that the balance of equities tilt

3    in favor of defendants.  Plaintiff is one of multiple partners

4    in this transaction.  And to derail the entire transaction on

5    the basis of the interests of one party I believe is not

6    appropriate.

7              So on that basis, I am going to rule that the

8    injunction that was issued by Judge McMahon will be dissolved.

9    And I will direct the parties to meet and confer and develop a

10   proposed case management plan to guide the proceedings from

11   this point forward.

12             Is there anything else?  If not, I thank you.

13             And we will issue a ruling memorializing the bench

14   determination that I have made at this point.

15             Thank you.

16             MS. KHURDAYAN:  Your Honor, if I may address

17   (unintelligible).  This was filed also request to -- letter

18   motion to request filing of certain exhibits under seal,

19   because those were confidential offering documents.  And I

20   understand that initially it was granted, from what I

21   understood from communication with the clerk.  But then there

22   was an additional guidance issued and docketed saying that the

23   request to file documents under seal would be lifted, I

24   believe, tomorrow, unless extended by the Court.

25             THE COURT:  I will ask the parties to develop an

K55VKDHC

1    appropriate protective order that will determine the question

2    of what documents should be filed under seal.  Upon receipt of

3    that draft protective order, I will endorse it.  And the

4    parties can then submit under seal whatever they deem subject

5    to the protective order.

6                 MS. KHURDAYAN:  Thank you, your Honor.

7                 MR. BOLLER:  Thank you, your Honor.

8                 THE COURT:  Thank you.

9                          *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25