UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X

KDH CONSULTING GROUP LLC, directly and      **20 Civ. 3274 (VM)**
derivatively on behalf of ITERATIVE CAPITAL, L.P.,

                             **ECF Case**

                         Plaintiff,

        – against –

                                 <u>**FIRST AMENDED**</u>
                                 <u>**VERIFIED COMPLAINT**</u>

ITERATIVE CAPITAL MANAGEMENT L.P.,
ITERATIVE CAPITAL GP, LLC, ITERATIVE OTC,
LLC (D/B/A "I2 TRADING" AND "ESCHER"),       **JURY TRIAL DEMANDED**
ITERATIVE MINING, LLC, BRANDON BUCHANAN
and CHRISTOPHER DANNEN,

                       Defendants.

------------------------------------------------------------------------- X

      Plaintiff KDH CONSULTING GROUP LLC ("Plaintiff" or "KDH"), by its attorneys,

Dilendorf Khurdayan PLLC, as for the First Amended Complaint against Defendants ITERATIVE

CAPITAL MANAGEMENT L.P, ITERATIVE CAPITAL GP, LLC, ITERATIVE OTC, LLC

(D/B/A "I2 TRADING" AND "ESCHER"), ITERATIVE MINING, LLC, BRANDON

BUCHANAN ("Buchanan") AND CHRISTOPHER DANNEN ("Dannen") (Dannen together with

Buchanan, "Individual Defendants") (collectively, "Defendants"), alleges as follows, upon knowledge

as to Defendants and their conduct, and upon information and belief as to all other matters:

### NATURE AND SUMMARY OF THE ACTION

      1.      This action for, securities fraud arising out of Defendants' brazen conduct, where they

first rushed Plaintiff into subscribing to a "hedge fund-like" cryptocurrency investment and trading

fund by misrepresenting the nature of the fund, risks of investing, prior performance history and

liquidity options; then, intentionally diverted from the fund's stated investment objective and utilized

the fund and its resources as their personal piggybank to build out mining operations and, separately, profit from a related over-the-counter cryptocurrency trading business.

2.      Dannen first met with KDH's principals in late 2017 touting their prior performance and success of two previous investment funds managed by Defendant Iterative Capital Management, L.P. ("Iterative") and offering to invest in a highly liquid new fund with quarterly withdrawal rights focusing primarily on trading cryptocurrencies and participating in token generation events ("ICOs").

3.      Unfortunately for Plaintiff, when raising funds and rushing Plaintiff to invest ASAP in December of 2017, Individual Defendants and Iterative already knew that ICOs and cryptocurrency trading was no longer a viable investment strategy and planned to use Plaintiff's funds for highly illiquid mining operations.

4.      Moreover, Individual Defendants failed to mention that, for the same very reason, they returned funds to investors from the previous fund. To the contrary, they praised their prior success and concealed true performance history and investment intentions.

5.      Defendants' offering documents were similarly misleading and failed to disclose primary investment objective and strategy, properly describe the conflict of interest with affiliated entities, or reflect Iterative's actual prior performance.

6.      Overall, Defendants' offering documents inaccurately represented the risk, of which Defendants were actually aware, associated with investing in mining operations and instead described risks associated with ICOs and cryptocurrency trading.

7.      However, at the time of soliciting Plaintiff's investment and providing the offering documents, Defendants knew that the fund would be focused on mining.[1] Yet, the fund's 75-page Private Placement Memorandum ("PPM") is devoid of any mentioning of risks associated with mining operations.

8.      In the "disclosures" related to the restructuring of the fund into a mining company, Defendants also admit that investing in mining is very different and much riskier than the stated investment objective in the PPM, on which Plaintiff relied when subscribing to the Fund Complex: "[a]s a result, Continuing Investors will be more heavily invested in mining equipment through Mining NewCo, which is a less liquid investment than cryptocurrency and subject to even greater risks than the cryptocurrency that is produced from the mining operations." [Dkt. No 27-12 at 46/C-29.]

9.      Defendants misrepresented the nature of investment to Plaintiff at the time of sale of limited partnership interests, and supported such misrepresentations by misleading marketing materials, including the PPM.

10.     What was disclosed as an ancillary strategy omitted from Defendants' solicitation and hidden in the offering documents, was part Defendant's original plan to spend investors' money on highly illiquid mining equipment and profit from Defendants' separate OTC business.

11.     Plaintiff and its principals had no experience investing in ICOs, tokens or cryptocurrencies. More importantly, neither Plaintiff nor its principals had ever invested in a private fund before, of which they informed Individual Defendants.

---

[1] *See* Dkt. No. 27-7 at 1 ("Our focus, since Iterative's inception, has been on cryptocurrency mining and optimizing around that operation."); *see also* The Block Crypto, *Leo Zhang, Principal at Iterative Capital Management discusses the unseen impact Bitcoin miners have on the overall market* (interview transcript, December 10, 2019) quoted *infra.*

12.     Plaintiff and its principals completely relied on Defendants' experience and representations, did not have other financial advisers in relation to this investment but for Dannen and Buchanan, and pooled funds from several individuals to form Plaintiff specifically for the investment.

13.     Shortly after Plaintiff delivered their investment to Defendants, the cryptocurrency market experienced a crash. Unable to receive any material information about the status of the fund and its activities, Plaintiff immediately reached out to Individual Defendants to request withdrawal.

14.     Buchanan assured Plaintiff that the investment was safe because (a) Defendants had not yet invested Plaintiff's funds, (b) the fund was not going to invest heavily in Bitcoin, which experienced drastic decline in value, and (c) Plaintiff would be able to withdraw its investment later at any time as the fund would maintain the liquidity of its assets investing in and trading other cryptocurrencies. Buchanan also insisted that, since Plaintiff had no experience investing in "*hedge funds*," (a) Plaintiff did not know the proper form and scope of private funds' reporting to investors; (b) Defendants' marginal reporting was the industry standard; and also (c) fund's operational and investment activities were Defendants' proprietary information not subject to disclosure to Plaintiff. Individual Defendants also offered to meet Plaintiff's principals to provide additional details and ensure they felt comfortable about staying in the fund.

15.     However, Individual Defendants never provided any definitive information about operations of the fund, cancelled several meetings with Plaintiff last minute and left New York.

16.     From then on, Defendants employed tactics of delay, misrepresentations and self-dealing in order to build out a mining operation at Plaintiff's expense.

17.     Despite Defendants' further misleading representations and omissions concerning the investment fund's goals, risks and activities focusing on trading and liquidity, Defendants quickly

turned the whole portfolio illiquid by intentionally and substantially deviating from stated investment strategy, including spending additional $6,500,000 out of the fund's remaining assets on rapidly depreciating mining equipment. Plaintiff never invested or was interested in investing in mining business. Plaintiff invested in a liquid cryptocurrency trading fund with quarterly withdrawals and stellar trading team. Now, Defendants claim that the main strategy was mining to begin with and hold themselves out to the public as mining experts. That is very far from what was promised to investors when Individual Defendants were raising capital for their fund.

18.     The boilerplate disclosures that the investment is highly speculative and that an investor can lose all of its investment should not absolve Defendants from fraud.

19.     While continuing to make promises of immediate liquidity and opportunity to withdraw funds, Defendants locked most of the funds in the mining "side-pocket" not subject to withdrawal.

20.     In the meantime, while locking investors in a highly illiquid fund that was rapidly running out of money, Defendants continued profiting from affiliated entities, including Iterative OTC, LLC (previously doing business as i2 Trading and currently doing business as Escher) ("Escher") and Iterative Mining LLC [2] As a result, value of Plaintiff's and other limited partners' investment dropped by 80%[3], while Defendants' OTC trading business grew, and while Defendants built out successful mining business at Plaintiff's and other investors' expense.

21.     Eventually, in December of 2019, Defendants notified KDH and other investors that Defendants decided "to convert the Fund from an investment fund structure to a corporate structure

---

[2] In the course of this action, Defendants on several occasions offered to produce documents conclusively showing that (a) Escher was not directly or indirectly profiting from the fund's mining operations and, thus, should not be a defendant in this action and (b) Iterative Mining LLC belonged to the fund and should not be a defendant in this action either. Yet, to-date, Defendants have not shared a single document.
[3] And potentially completely, as Defendants refused to return the balance to Plaintiff.

and consolidate it with [Defendant's] other flagship business, [Escher]".  The fund is supposed to become an operating "company with mining as the core tenet" and "[a]fter combining the entities, [Defendants] will look to raise a Series A financing to recapitalize the business." [Dkt. No. 27-11 at 1.]

22.     Defendants sought restructuring "consent" from Plaintiff and other investors offering an illiquid stake in the new venture with the significantly increased Defendants' equity share – or a refund – all based on an undisclosed residual value of the initial investment, less pro rata share of the significant restructuring and auditing expenses. Alternatively, if the consent was not signed, Defendants promised to ship Plaintiff's share of the outdated mining hardware, at Plaintiff's expense.

23.     Upon Plaintiff's attempt to clarify the terms of the restructuring, timeline and amount of the refund, Defendant Buchanan stated in an e-mail: "*This opportunity to liquidate is not a negotiation. We can keep the assets in a side pocket* [locked and depreciating rapidly]." [Dkt. No. 27-13 at 1.]

24.     Plaintiff attempted to obtain relevant material information about the current state of affairs of the Fund Complex, historic operations and the proposed restructuring by serving a formal demand for books and records.

25.     However, Defendants refuse to provide key information and records.

26.     As the Defendants' ultimatum was set to expire on April 28, 2020 at midnight, Plaintiff had no other choice but to bring this action by emergency order to show cause to freeze the restructuring and complete dissipation of Plaintiff's investment with a request for a temporary restraining order to preserve the status quo.

27.     Defendants were able to proceed with the restructuring and expelling Plaintiff from the Partnership, yet holding the balance of Plaintiff's investment account which has lost its value, as most recently declared by Defendants, from $318,522.32 to $126,352.42 in the meantime.

28.     Plaintiff also brings this action for various false and misleading representations and material omissions that induced Plaintiff to subscribe to Defendant's fund and to forebear redemption rights. The misrepresentations and material omissions were made in the Defendants' verbal statements to Plaintiff, in the fund's PPM and quarterly summaries, on which Plaintiff relied, and concerned the fund's investment strategy, disclosure of the magnitude and nature of the fund's risks, its investments, and its risk management controls as related to the fund's dealings with affiliated entities.

## PARTIES

29.     Plaintiff KDH Consulting Group LLC is a New York limited liability company with a principal place of business in the state of New York, New York county and a limited partner in Iterative Capital L.P. ("U.S. Feeder Fund" or "Partnership") through which Plaintiff invested in Iterative Capital Master, L.P. ("Main Master Fund") and Iterative Mining Master, L.P. ("Mining Master Fund") (collectively with the Partnership, "Fund Complex"). The Fund Complex also includes an offshore feeder fund, Iterative Capital, Ltd. ("Cayman Feeder").

30.     Defendant Iterative Capital Management L.P. is a Delaware limited partnership with a principal place of business in the state of New York, New York county. Iterative is the investment manager of the Partnership, managing member of Escher and, upon information and belief, managing member of Iterative Mining LLC, and an unregistered investment adviser.

31.     Defendant Iterative Capital GP, LLC is a Delaware limited liability company with a principal place of business in the state of New York, New York county. Iterative GP is the general partner of the Partnership.

32. Upon information and belief, Defendant Iterative OTC, LLC (d/b/a "i2 Trading" and "Escher") is a Delaware limited liability company with a principal place of business in the state of New York, New York county.

33. Upon information and belief, Defendant Iterative Mining, LLC, is a Delaware limited liability company with a principal place of business in the state of New York, New York county.

34. Defendant Brandon Buchanan is a principal of Iterative, upon information and belief, residing in New York.

35. Defendant Christopher Dannen is a principal of Iterative, upon information and belief, residing in New York.

36. Upon information and belief, at all relevant times and until present, Individual Defendants owned, managed and controlled both Iterative Capital GP, LLC and Iterative Capital Management L.P.

37. Upon information and belief, at all relevant times and until present, Individual Defendants also owned, managed and/or controlled Escher and Iterative Mining LLC.

## JURISDICTION AND VENUE

38. This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78aa), Section 214 of the of the Investment Advisers Act of 1940 ("Advisers Act") (15 U.S.C. §80b-14), 28 U.S.C. § 1391(b) and principles of supplementary jurisdiction (28 U.S.C. §1367).

39. The venue is proper in this District by virtue of 28 U.S.C. § 1391(b), 28 U.S.C. § 1401 and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The Defendants, directly and indirectly, made

use of the means and instrumentalities on interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. A substantial portion of the acts and omissions giving rise to this Verified Complaint took place in this district. The Partnership, General Partner and Iterative maintained an office in Manhattan, where Dannen and Buchanan conducted business, made telephone calls to solicit investments, promote fictitious profits, and received and transferred investor monies on behalf of the Partnership and the Fund Complex. Defendants purposely availed themselves of the privilege of conducting activities within this district and, therefore, invoked the benefits and protection of its laws and its courts. Certain of the defendants are headquartered here, are residents of New York, reside here or have frequently traveled here on the Fund Complex's business and otherwise.

## FACTUAL BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

40.     Individual Defendants and Iterative organized a series of transactions raising $14,885,444 from several investors, through the Partnership and Cayman Feeder, to invest into the Main Master Fund and the Mining Master Fund ("Fund Complex").

41.     Plaintiff, among several other U.S. investors, invested in the Partnership as a limited partner. The Partnership is controlled and managed by Iterative Capital GP, LLC as the general partner ("General Partner") and Iterative Capital Management L.P. as the investment manager ("Iterative"). The Fund Complex also conduct business with affiliated entities – Escher and, upon information and belief, Iterative Mining LLC. The General Partner, Iterative, Escher and Iterative Mining LLC are owned and controlled by the same individuals – Buchanan and Dannen.

## I. Defendants Made Several Material Misrepresentations to Induce Plaintiff to Invest in the Fund Complex and Stalled Early Withdrawal Requests

42.     In late 2017, Plaintiff's principals were first introduced to Buchanan and Dannen through a mutual acquaintance. Dannen personally visited Plaintiff's office in Manhattan to solicit the investment and rushed Plaintiff to invest ASAP before, according to Dannen, the opportunity for the investment into the Fund Complex closed at the end of 2017 - beginning of 2018.

43.     Plaintiff had zero investment history and was specifically formed for the investment into the Defendants' fund.

44.     Plaintiff's principals lacked any experience investing into cryptocurrency trading funds, mining business, ICOs, tokens or any private investment or hedge funds. Plaintiff did not consult any financial advisors trusting Defendants' represented history and expertise.

45.     Dannen knew about Plaintiff's complete lack of experience in the cryptocurrency, ICOs, tokens or private investment funds and touted Defendants' prior performance history and success of two previous funds - Iterative Instinct Fund I, L.P. and i2 Storj SPV, LP.

46.     Dannen personally represented to Plaintiff's principals in December of 2017 that the Fund Complex was a highly liquid investment opportunity with quarterly liquidity and immediate opportunity to withdraw. Dannen further represented that the Fund Complex would be focusing on investing in liquid digital assets, such as cryptocurrencies and network tokens.

47.     In reality, at the time when they were making these representations to KDH, Defendants already knew that such investment strategy was unsound. Yet, soliciting Plaintiff's investment, Dannen or any of Defendants omitted to even mention the planned mining investment strategy, which they now refer to as the "core" one.

48.    On or about December 10, 2019, Leo Zhang, a principal at Iterative, made the following public statement referring to Defendants' investment strategy shaped in 2016-2017, <u>before</u> Plaintiff made its investment in 2018:

> 'So it Iterative started in 2016. So the first fund was a venture fund. And so the first fund generated about 13x return from 2016 to 2017. And, obviously, there was ICOs wave. **And so in mid-2017 we quickly realized that there's something wrong with this much money going on in this space. And so we made the conclusion at that time that this token mania is likely not going to continue. So we closed the fund, returned the capital to investors, everyone's happy, and we started a second fund that's dedicated to mining, which is the fund we're operating now**. So Iterative Capital, the investment center--the reason people, you know, our peers, other investors in the cryptocurrency space, don't hear much from us or about us is because we only focus on mining."[4] (Emphasis added.)

49.    Dannen's verbal misrepresentations and omissions were supported by the PPM and limited partnership agreement ("LPA") provided to Plaintiff, which, among other things, set forth the Fund Complex's main investment strategy – "[t]he primary investment strategy of each Master Fund is to purchase and hold Coins [cryptocurrencies and digital tokens]." [PPM at 37, Dkt. No 27-3.]

50.    Only in 2020, long after Defendants solicited Plaintiff's investment and after Defendants had initiated the restructuring of the Fund Complex into a mining business, they retrospectively started portraying the Fund Complex's primary investment strategy being mining from the fund's inception. In a February 18, 2020 investor update, defendants admitted that "[o]ur [Defendants'] focus, since Iterative's inception, has been on cryptocurrency mining and optimizing around that operation." [Dkt. No. 27-7 at 1.] Similarly, on April 14, 2020, addressing KDH's demand

---

[4] The Block Crypto, *Leo Zhang, Principal at Iterative Capital Management discusses the unseen impact Bitcoin miners have on the overall market* (interview transcript, December 10, 2019) available at https://www.theblockcrypto.com/post/49789/leo-zhang-principal-at-iterative-capital-management-discusses-the-unseen-impact-bitcoin-miners-have-on-the-overall-market (last accessed on April 24, 2020).

for books and records, Buchanan reiterated Defendants' explanation of the change in liquidity strategy, which was new to Plaintiff or any reasonable investor having subscribed to Defendants' offering documents: "Offering materials made reference to cryptocurrency mining being the core activity of the Fund, which it continues to be." [Dkt. No. 6-3 at 1.]

51.     Yet, the boilerplate disclosures of the PPM only described very general risks associated with cryptocurrency trading and failed to mention the actual risks related to the "core" mining strategy of the Fund Complex, as Defendants are portraying it now, which would be material to any reasonable investor. Specifically, Defendants omitted to mention the actual risk, known to them, of changing the fund's primary cryptocurrency trading and investment strategy to the mining operations and the resulting illiquidity. Also, the PPM omitted disclosing the true drastic degree of the Fund Complex's actual and anticipated affiliation with Defendants' OTC or mining businesses or a risk thereof.

52.     Under the PPM, the Fund Complex's goals were to invest 70% of the assets in purchasing and trading liquid digital assets, namely cryptocurrencies and network tokens, via the Main Master Fund. As a minor side strategy, the Fund Complex was also to invest up to 30% of the assets in "mining" operations, including equipment relating to the generation of the similar digital assets via the Mining Master Fund.

53.     At the time of raising investments for the Fund Complex, on December 6, 2017, Individual Defendants set up Escher, owned and managed by Iterative and Individual Defendants. Escher is an "over-the-counter" cryptocurrency dealer and exchange platform for trading digital tokens, including the cryptocurrencies and other digital assets generated and owned by the Partnership through Mining Master Fund.

54. Defendants stated in the PPM that Escher would have an exclusive right to purchase all the digital assets produced and owned by the Mining Master Fund in exchange for more favorable pricing terms as compared to other clients, as well as a percentage of profits:

> "In exchange for [Escher's] right of first refusal to purchase the Mining Master Fund's Coins, the Mining Master Fund will be entitled to more favorable pricing terms than those offered to other buyers and sellers of Coins. The Mining Master Fund may also receive additional consideration from [Escher], to potentially include a percentage of [Escher's] profits on the sale of Coins purchased from the Mining Master Fund should [Escher's] sale price exceed the price it purchased the Coins from the Mining Master Fund by more than a specific amount" [PPM at p.7].

55. Moreover, the "Investment Manager [was] expected to focus on meeting the demand for specific Coins from [Escher]." [PPM at p.4].

56. As the Mining Master Fund's investment activities were supposed to involve only up to 30% of the total assets that was expected to generate additional income for the fund, and Plaintiff was promised the information rights, Plaintiff agreed to subscribe to the Fund Complex.

57. However, Defendants never disclosed to Plaintiff such "more favorable pricing terms," "additional consideration," and any information on dealings with "other buyers and sellers of Coins."

58. On or about January 5, 2018, due to constant and increasing pressure from Individual Defendants to subscribe ASAP not to forego a promising investment opportunity, principals formed KDH and signed the subscription documents investing $1,000,000 in exchange for limited partner interest in the Partnership. Plaintiff's principal personally delivered the investment check for the full amount to Defendants' Manhattan office as Plaintiff was constantly rushed to invest.

59. Little did Plaintiff know that Defendants would intentionally make most of Plaintiff's investment illiquid, without notice, any additional disclosures or amendment to the PPM, and use the funds to build and grow Individual Defendants' mining operations, while profiting through Escher.

60.     Once Defendants received the $1,000,000 check, their attitude towards Plaintiff changed drastically. Defendants adopted a tactic of unresponsiveness, delays and promises of personal meetings, liquidity and buyouts that never materialized.

61.     Coinciding with the Plaintiff's investment into the Defendants' cryptocurrency investment fund, in early 2018, cryptocurrency market began to plummet. For example, price of one of the most popular cryptocurrencies, Bitcoin ("BTC"), dropped more than twice from about $17,000 per BTC on January 5, 2018, when Plaintiff made the investment to about $7,600 per BTC a month later on February 6, 2018 (and to less than $4,000 in the end of 2018).

62.     Plaintiff immediately contacted Individual Defendants to request accounting and withdraw the funds. Plaintiff was particularly concerned with Defendant's lack of reporting of the Fund Complex's operations and investments, which Plaintiff or its principals had never experienced in the professional business dealings.

63.     During a phone call with one of KDH principals, Buchanan reassured Plaintiff that Defendants kept the situation under control and had not yet made substantial investments in the volatile market using Plaintiff's funds, nor planned to invest into BTC that crashed. Buchanan also convinced Plaintiff not to withdraw the funds, once again, touting their experience in trading cryptocurrencies and promising fund's liquidity. Buchanan and Dannen proposed to meet with Plaintiff's principals personally in New York to provide full accounting on the fund's activities, use of Plaintiff's investment and investment strategy in the changing market that would keep the Plaintiff's expected liquidity, so that Plaintiff would not withdraw the funds from the Fund Complex.

64.     Convincing Plaintiff not to withdraw from the Fund Complex but stay and expect implementation of Defendants' liquidity strategy, Buchanan also stated that (a) Plaintiff's principals are unexperienced in the matters of "*hedge funds*" operation and reporting; (b) Defendants 3 lines of

reporting was the industry standard; and (c) Plaintiff should fully rely on Defendants' expertise and judgment without asking for details, which were part of Defendants' know-how and proprietary information.

65.     Notably, Defendants did not mention the mining strategy of the Fund Complex or their upcoming investment into mining equipment via the Fund Complex at any time soliciting the investment or during the relevant conversations post-investment, which took place between April and June of 2018.

66.     Having no experience in cryptocurrencies, hedge funds or any private funds, Plaintiff relied on Buchanan's and Dannen's expertise and agreed to postpone the withdrawal.

67.     From then on, Individual Defendants took every opportunity to delay the promised meeting, which never materialized.

68.     Buchanan cancelled two scheduled meetings on behalf of Individual Defendants via text messages last minute on April 11th and 12th, 2018. After Buchanan proposed to set the third meeting "in stone" for the next week, Individual Defendants stopped responding, left New York and, after another week, on April 27, 2018, Buchanan informed Plaintiff that Individual Defendants had "no immediate plans" to be back in New York.

II.     **Defendants Substantially Deviated from Stated Investment Strategy Changing the Nature of the Fund and Engaged in Destructive Self-Dealing**

69.     Realizing that Plaintiff, and most likely other investors, would insist on withdrawals despite Defendants' continuing misrepresentations and omissions, Defendants rapidly changed the investment strategy to the mining operations, which Defendants now admit was their core plan from the beginning.

70.     Upon information and belief, at some point between April and June 2018, Defendants materially deviated from the strategy for the Fund Complex disclosed in the PPM and assumed risks far greater and different in nature than disclosed in the PPM, rendering a large portion of the assets illiquid and haltering Plaintiff's requested withdrawal opportunities.

71.     Upon information and belief, at some point between April and June 2018, Defendants spent additional $6,500,000 on highly illiquid mining equipment subject to rapid depreciation. As disclosed to Plaintiff in the May 2019 investor update, as of March 31, 2019, the mining equipment already accumulated $1,800,000 in depreciation. And as of the end of 2019, a loss of "approximately $3.4M came in the form of depreciation to the [mining equipment]." On February 18, 2020, Defendants reported that the Fund Complex's activities related to the illiquid mining investments "absorbed approximately $4.5M in expenses in 2019."

72.     Importantly, to fund this major deviation from the Fund Complex's initially disclosed investment strategy, Defendants set aside a substantial amount of the Partnership's funds in what Defendants referred to as a "side pocket" and locked these funds, so that Plaintiff and other investors could not redeem them.

73.     Based on the predetermined or highly probable fundamental change in the fund's investment strategy and  liquidity, Defendants had a duty to make adequate risk disclosures in the original PPM or update the PPM, so that the investors could become aware of the drastic change as to the way their money was being invested.

74.     Defendants proceeded concealing their investment activities from Plaintiff and kept changing fund auditors and administrators while undergoing audits, the details of which Defendant also withheld.

75.     Instead, Defendants' reporting consisted for the most part of emailing Plaintiff 3 lines with unsubstantiated valuation numbers, each time showing a steep decline in value of the Partnership's assets.

76.     On or about June 12, 2018, after finding out about exorbitant expenditures on mining equipment, Plaintiff's principals called Buchanan asking about the effect on such expenditure on their withdrawal rights and liquidity options. Being on the speakerphone with KDH's principals, Buchanan represented to KDH that, if necessary, Defendants would raise additional funds and buy out Plaintiff's share as an alternative guaranteed option for Plaintiff's exit from the fund, thus, again promising to maintain liquidity of KDH's investment.

77.     Defendants' promises never materialized. The fund continued to lose money and Defendants continued to withhold material information about the business.

78.     On February 26, 2019, in an attempt to make sense of the fund's current operations, Plaintiff sent Defendants a list of specific basic questions relating to the status of the mining strategy and financial condition of the Partnership, specifically:

1. what are our assets and liabilities to this date;
2. what is the life span for the mining cycle? can we get a detailed lay-out for 6 mo, 12 mo and etc.?
3. the state where the mining farms are located;
4. do we have our own actual miners you are buying the hash power from third parties?
5. the electricity price per KW you are using;
6. the amount of miners and the exact models;
7. what crypto-currencies they are mining and at what rate per date;
8. how much have been mined so far
9. where these crypto-currencies are located, on cold wallet, on crypto exchanges?
10. As per portfolio - who makes the executive decision when and where to relocate the funds...etc.
11. what is the real picture of what we can return at today's date;
12. Provide us with a detailed report on how our invested money were spent;

79.     On the same date, Defendants promised to provide Plaintiff with a "detailed model showing most of what you've asked (and probably the only detail we're willing to share), so please standby for that document which will be delivered in a week or so."

80.     On March 7, 2019, having received no answers, Plaintiff sent Defendants another notice to withdraw the remaining funds.

81.     In response, Defendants advised Plaintiff that the promised "detailed model" was not ready and that "all of the Fund's mining assets are in a side pocket and so won't be distributed until the Fund has liquidated those assets," which Defendants "estimated" to be in 18 months.

82.     On March 31, 2019, instead of a promised "detailed model" answering Plaintiff's questions, Defendants sent out an investor update containing a market overview with Defendants' general projections. Defendants provided no details about their mining business or the Partnership's financial transactions.

83.     On May 9, 2019, Defendants again emphasized to Plaintiff that the amount of Plaintiff's refund would not include "the mining assets [which] were side-pocketed last year."

84.     In June 2019 Defendants stated that they would be moving to quarterly communications about the Fund Complex's activities and performance as there was not much to share in the way of operational updates.

85.     At the end of summer of 2019, Defendants' time estimate about the side-pocketed funds not to be released to Plaintiff stayed the same as 5 months before in March of 2019 – yet another 18 months.

86.     Had Plaintiff and other investors known that the Fund Complex was not a cryptocurrency investment hedge fund but, instead, was a fund that had over-loaded on mining

equipment and dealings with Defendants' affiliates to the point of prospective integration under Defendants' ownership, and that it lacked the investment restrictions and risk controls stated in the PPM, or that the Fund Complex had risks and liabilities far beyond the level disclosed and expected, they would have refrained from investing in the Fund Complex or immediately sought to withdraw and/or redeem the investment. Defendants also failed to provide Plaintiff and other investors with the information that they needed in order to determine the Fund Complex's true investment strategy, objectives, risks and risk level. As a result, Plaintiff and the other investors lost over 80% of their investments, and Plaintiff continues losing the remaining investment as Defendants refused to return it.

### III.     Conflict of Interest and Self-Dealing with Affiliated Businesses

87.     While Defendants' new investment strategy and investments in the rapidly depreciating mining equipment left the Fund Complex on the brink of "dissolution and liquidation," upon information and belief, the Defendants' related over-the-counter ("OTC") trading and mining businesses thrived.

88.     Defendants never disclosed the insurmountable risk of the Fund Complex's dealings with the Defendants' OTC trading and mining business to the degree of complete consolidation of the fund into such businesses. The only mentioning of Iterative Mining, LLC in the PPM is: "The Investment Manager has successfully raised capital for 3 vehicles, Iterative Instinct Fund I, L.P., i2 Storj SPV, LP and Iterative Mining, LLC." [PPM at 5.]

89.     According to the PPM, (1) Iterative would focus on the demand from Escher in deciding which digital assets to mine through the Mining Master Fund; (2) Escher would be entitled to buy all digital assets mined through the Mining Master Fund in exchange for providing "more

favorable terms" as compared to other clients of Escher; and (3) the Mining Master Fund may generate additional profit through Escher transactions.

90.     What was disclosed as a minor ancillary strategy to mine cryptocurrency and derive benefit from dealings with Escher (either through favorable pricing terms or potential additional profit) was really the overall scheme to expend investors' money on highly illiquid mining equipment, while selling such mined coins and making profits separately through Defendants' OTC business to the exclusion of Plaintiff and other investors.

91.     Upon information and belief, since the inception, Escher facilitated transactions in both virtual currencies and digital securities in exchange for transaction-based compensation, both on behalf of the Fund Complex and other clients.

92.     However, to-date, Defendants kept any information about Escher's operations and regulatory compliance vague at best.

93.     Upon information and belief, Defendants on behalf of the Fund Complex, agreed to supply digital assets to Defendants' separate business without ensuring Escher's full regulatory compliance with applicable regulations.

94.     Moreover, upon information and belief, no profits were ever distributed to the Fund Complex, nor any of the "more favorable pricing terms than those offered to other buyers and sellers" disclosed or explained.

95.     By virtue of owning, managing and/or controlling Escher, Iterative Capital and Individual Defendants knew all the details about Escher's ongoing operations and necessary compliance measures. Yet, Defendants omitted to disclose the actual risks of the Fund Complex's

contracting with Escher, continuing to do business with Escher and, ultimately, retrofitting the whole Fund Complex's operations to be a part of Defendants' operational business, including Escher.

96.    Upon information and belief, Iterative, the General Partner, Dannen and Buchanan were planning to and indeed profited from such transactions far beyond the disclosed risks and conflicts of interest.

97.    Moreover, as alleged in detail herein, Defendants materially deviated from the investment strategy by turning most of the investment illiquid and instead started building an operating mining business at the expense of Plaintiff and the investors in the Fund Complex. Such mining business, upon information and belief, is trading through various entities affiliated with Defendants.

98.    Defendants' conduct left the Partnership and its limited partners invested in a distressed illiquid fund, all while Individual Defendants and Iterative were successfully growing their over-the-counter crypto trading business, as originally planned.

## IV.    Defendants' Coercive Restructuring, Continued Self-Dealing and Forced Sale of Plaintiff's Limited Partnership Interests

99.    On December 20, 2019, Defendants wrote to Plaintiff: "[t]he current Fund structure has handcuffed us and prevented us from being able to scale our mining operation. As such, during Q1 2020, we will embark on an effort to convert the Fund [Complex] from an investment fund structure to a corporate structure and consolidate it with our other flagship business, [Escher]." [Dkt. No. 27-11 at 1.] Defendants also stated that "one of the key features" desired by the Fund Complex's investors – "quarterly liquidity ended up being infeasible" and "suspend[ed] the right of all investors to withdraw or redeem from the Fund in accordance with the applicable governing documents of the Fund." [Dkt. No. 27-11 at 1-2.]

100.     On February 18, 2020, Defendants reported that the Fund Complex's activities related to the illiquid mining investments "absorbed approximately $4.5M in expenses in 2019." [Dkt. No. 27-7 at 2.] Defendants also stated that "[o]ur focus, since Iterative's inception, has been on cryptocurrency mining and optimizing around that operation," which apparently was Defendants' original strategy, yet they failed to disclose it to Plaintiff and other investors while raising the funds for the Fund Complex. [Dkt. No. 27-7 at 1.]

101.     On March 1, 2020, Defendants provided new "disclosures" for the offering of equity interests in the new mining venture, where they admitted that investing in mining is very different and much riskier than the stated investment objective in the PPM, on which Plaintiff relied when subscribing to the Fund Complex: "[a]s a result, Continuing Investors will be more heavily invested in mining equipment through Mining NewCo, which is a less liquid investment than cryptocurrency and subject to even greater risks than the cryptocurrency that is produced from the mining operations". [Dkt. No 27-12 at 46/C-29.]

102.     These are the disclosures that should have been provided to Plaintiff when Defendants solicited investment into the Fund Complex, as Defendants knew they would engage in mining operations to service their separate business, Escher.

103.     As part of the restructuring plan, Defendants have presented a take-it-or-leave-it offer ("Take-It-Or-Leave-It Offer") to Plaintiff and other investors outlining three options for proceeding:

> (a) sign an "exiting investor" consent approving the restructuring and withdrawing from the Fund Complex in exchange for a minor portion of Plaintiff's investment based on the undisclosed value of the remaining assets with the deduction of significant restructuring expenses;

(b) sign a "continuing investor" consent approving the restructuring and receiving a de minimis illiquid stake in the Defendants' new company based on based on the undisclosed value of the remaining assets with the deduction of significant restructuring expenses; or

(c) receive pro rata share of the Fund Complex's assets in-kind (consisting of digital assets and outdated mining equipment) minus shipping expenses and be forcefully redeemed from the Fund Complex prior to the proposed restructuring so that such investor's consent to restructuring would not be required[5].

104. Essentially, Defendants offered Plaintiff to consent to and accept "as-is" the terms "substantially and materially" different from those contained in the LPA and the PPM, or be expelled from the Fund Complex and receive outdated mining hardware, minus the shipping costs.

105. More importantly, lost somewhere in the middle of 109 pages of legalese of the new "disclosures", and not once described directly, was the fact that Defendants lowered the hurdle rate for performance allocation by almost 80%. Now, Iterative "will receive a 20% profits interest in distributions made by Mining NewCo following such time as all the Investor members … have received a return of their capital, *based on the fair market value of the Master Fund assets contributed in-kind to Mining NewCo*," which is over 80% less than the return of the initial investment in the Fund Complex. [Dkt. No 27-12 at 46/C-29.]

106. Defendants offered no definitive figure of the proposed refund or contribution into the Mining NewCo, did not provide any information on two businesses the Fund Complex was to consolidate and/or continue doing business with (Escher and Iterative Mining LLC), yet required the

---

[5] Pursuant to the Partnership documents, any adjustments to the structure of the Partnership that would result in material adverse change to limited partners' rights requires consent of limited partners.

investors to acknowledge that they had "sufficient opportunity to (i) review and understand the materials relating to … risk factors, conflicts of interest, expenses (including, but not limited to, associated transaction expenses), and tax consequences of the [restructuring], (ii) ask questions of, and receive answers … relating to all materials provided in connection with the [restructuring], and (iii) obtain any additional information."

107.    Defendants' pattern of continuing misleading conduct is completely in line with their overall fraudulent scheme involving material disclosure omissions.

108.    When presented with very basic questions about the restructuring, like the timeline for receiving distributions if consent is provided, the amount of distributions and the upper-floor estimate on restructuring expenses that Plaintiff would need to cover – Defendant Buchanan responded on March 19, 2020 that "This opportunity to liquidate is not a negotiation. We can keep the assets in a side pocket." [Dkt. No. 27-13 at 1.]

109.    Initially, Defendants informed Plaintiff that their NAV value for the purposes of restructuring would be calculated as of December 31, 2019, which for Plaintiff was $318,522.32, minus uncapped [what is the other word for undefined- restructuring expenses. [Dkt. No. 27-13 at 2.] Later, Defendants updated the Take-It-Or-Leave-It Offer to base the calculation on the NAV as of March 31, 2020, which further dropped the Plaintiff's share to $225,120.18. [Dkt. No. 27-14]. However, on May 8, 2020, when Defendants informed Plaintiff that it has been forcibly removed from the Partnership as of April 28, 2020, they sent a statement of Plaintiff's account in the total amount of $126,352.42, which was also dated as of March 31, 2020, plus a list of unvalued "mining equipment."

110.    By forcibly removing Plaintiff from the Fund Complex, Defendants forced Plaintiff to completely forgo its initial investment. While Defendants claim that Plaintiff has been removed

from the Partnership, they continue to hold on to Plaintiff's remaining assets, which somehow dropped in valuation as of the same date from $225,120.18 to $126,352.42 without any explanation.

111. So what did Defendants achieve via this coercive restructuring?

    (a) Under the terms of the original Fund Complex documents, the General Partner had to return investors' initial investments' first ($1,000,000 in Plaintiff's case) before they could take out performance allocation of 20% from any profit generated by the Fund Complex. By forcing investors into the new mining structure based on substantially depleted capital accounts and after deducting all expenses, Defendants essentially lowered the hurdle rate for receiving performance allocation by almost, if not higher than, 80%.

    (b) By forcing investors to provide extensive consents to restructuring at the risk of receiving outdated mining hardware, as well as acknowledge Defendants statements that the Fund Complex was always meant to pursue primarily mining strategy, Defendants shielded themselves from liability and potential lawsuits, like this one.

    (c) The coercive consent requirements allowed Defendants to evade the requirement for obtaining limited partners' consents before making any adjustment to the fund's structure that could adversely affect such limited partners' rights.

    (d) Instead of dissolving the depleted Fund Complex, Defendants are "restructuring" the hedge fund into an ancillary operating business while keeping Defendants' performance history intact and portraying themselves as saviors for investors. In reality Defendants raised investors' money for a cryptocurrency investment trading hedge fund, built out their own mining operations depleting the fund's assets and

increased their equity stake in the company that was built exclusively from Plaintiff's and other investors' funds from 1.5% to 20%. Defendants are still growing and benefiting from the related OTC trading business, the demands of which were serviced by the Fund Complex, and now – by the "new" mining venture.

112.     Realizing that Plaintiff was defrauded and, also as a result of fraud, was farced to forgo its interest in the Fund Complex, Plaintiff commenced this action.

## *FIRST CLAIM FOR RELIEF*

### **(for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder)**

113.     Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

114.     Defendants omitted to state material facts necessary to make statements made not misleading in selling partnership interest in the Fund Complex to Plaintiff in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5(b). In particular, each of Defendants knowingly or recklessly failed to disclose to Plaintiff and other investors that the securities were issued pursuant to Defendants' new strategy of investing heavily in mining operations and building Defendants' own mining and over-the-counter trading business, as alleged in detail above. Defendants also failed to disclose that they did not genuinely believe that the Fund Complex would have a realistic chance of success as a cryptocurrency investment and trading fund.

115.     Among other relevant material misrepresentations and omissions, Defendants made the following oral and written statements regarding the management, performance, nature and value of the Fund Complex, as well as the related risks, to Plaintiff:

a. The Fund Complex will be a cryptocurrency trading investment fund with certain features of a hedge fund, such as quarterly liquidity and indefinite life. (As represented by Dannen at personal meetings with KDH in late 2017 – early 2018.)

b. Iterative had a continuous successful history managing similar investments in different similar funds, including x12 returns. (As represented by Dannen at personal meetings with KDH in late 2017 – early 2018.)

c. The Defendants will provide investors with ability to redeem their investment in the Fund Complex on a quarterly basis. (As represented by Dannen at personal meetings with KDH in late 2017 – early 2018 and by Buchanan during phone calls between January and April of 2018.)

d. Despite the cryptocurrency market crash, Plaintiff will be able to withdraw all the value of its investment in the Fund Complex, including in the Mining Master Fund; and, if necessary, Defendants will buy out Plaintiff's investment. (As represented by Buchanan during phone calls in April and June of 2018.)

e. The three out of four components of the Fund Complex's investment strategy would be "(i) cryptocurrency and network token accumulation (i.e., buy-and-hold); (ii) algorithmic and human initiated trading based on research, fundamental analysis and technical trends; … ; and (iv) strategic acquisition and disposition activity involving crypto-networks." (As represented by Defendants in the PPM at 3.)

f. "*Concentration.* The primary investment strategy of each Master Fund is to *purchase and hold Coins.* Thus, each Master Fund may be subject to more rapid changes in value than would be the case if the Master Funds were required to maintain a diversification among various assets. No assurance can be given that the Master

Funds' investments will appreciate in value or that the Master Funds will ever be able to achieve liquidity on, or otherwise to recover, its investment in Coins." (As represented by Defendants in the PPM at 37.)

g. "The principal objectives of the Master Funds will be (a) acquiring the Investments on favorable terms; and (b) managing, trading and holding such Investments for income producing purposes." (As represented by Defendants in the PPM at 3.)

h. The Fund Complex would invest 70% of the assets in purchasing liquid digital assets, namely cryptocurrencies and network tokens, via the Main Master Fund and only invest up to 30% of the assets in "mining" operations and equipment via the Mining Master Fund. (As represented by Defendants in the PPM at 3.)

i. "In exchange for [Escher's] right of first refusal to purchase the Mining Master Fund's Coins, the Mining Master Fund will be entitled to more favorable pricing terms than those offered to other buyers and sellers." (As represented by Defendants in the PPM at 4.)

j. "The Mining Master Fund may also receive additional consideration from [Escher], to potentially include a percentage of [Escher's] profits on the sale of Coins purchased from the Mining Master Fund should [Escher's] sale price exceed the price it purchased the Coins from the Mining Master Fund by more than a specific amount." (As represented by Defendants in the PPM at 4.)

k. The proposed restructuring of the Fund Complex into an operating company consolidated with Defendants separate mining-related business is "in the best interests of all stakeholders." (As represented by Defendants in a letter dated December 20, 2020.)

l.   That Defendants will "provide opportunities for liquidity to current investors that have either requested to be withdrawn (but remain in the Fund due to the side pocket) or would like to withdraw." (As represented by Defendants in a letter dated December 20, 2020.)

m.   "Investors have the choice to redeem and withdraw at a market value of their capital account" in the Fund Complex. (As represented by Buchanan in an email dated April 14, 2020.)

n.   Defendants were unable to provide proper accounting and reliable reports because Defendants had to hire additional service providers for the fund (auditors, tax team, etc.). (As represented by Defendants in the Q4 Investor Update, dated February 18, 2020.)

o.   Defendants will provide Plaintiff with a "detailed model" answering most of Plaintiff's questions about the Fund Complex's substantial unsolicited investment into the digital-asset mining equipment and operations. (As represented by Defendants in an email, dated February 26, 2019.)

p.   "There is no relation, overlap, or otherwise connection between the proposed new entity and the OTC business other than the management team being the same." (As represented by Buchanan in an email, dated April 14, 2020.)

116.   Defendants also generally stated in the PPM that:

a.   "Certain Investments may be or become non-marketable or illiquid investments ('Special Situation Investments')" [PPM at 18]

b.  "Cryptocurrencies and network tokens represent a speculative investment and involve a high degree of risk. Cryptocurrencies and network tokens are part of a new and rapidly evolving industry." [PPM at 38.]

c.  "*Illiquidity.* The investments made by the Fund (through the Master Funds) may be very illiquid, and consequently the Master Funds may not be able to sell such investments at prices that reflect the General Partner's assessment of their value or the amount paid for such investments by the Master Funds. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by the Master Funds and other factors. …" [PPM at 42.]

d.  "Situations *may* occur where the Fund or the Master Funds could be disadvantaged because of the investment activities conducted by the Investment Manager for Other Accounts due, among other things, to the limited availability of an investment opportunity. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Manager in accordance with its fiduciary duties to Other Accounts, the Investment Manager *may* take, or be required to take, actions which adversely affect the interests of the Fund or the Master Funds." [PPM at 49.]

117.    However, these general disclosures served only to conceal the true risks associated with the then-existing and known Defendants' real goals and objectives that:

a.  Defendants issued the Fund Complex's interest as a part of their predetermined illiquid mining strategy and the investment was in fact very likely to become illiquid for reasons not disclosed in the PPM;

b. While cryptocurrencies and network tokens are speculative investment and involve a high degree of risk, Defendants' sponsored enterprise involved special high risks related to their mining strategy and OTC trading business;

c. The Fund Complex not "could" but would be disadvantaged because of Defendants' related party purchase, sale and investment activities.

d. The Fund Complex's and Defendants' related-party transactions were planned to be of a significant degree and could extend to complete consolidation of the Fund Complex with Defendants' operating business, under Defendant's major ownership.

e. Defendants did not even genuinely believe that the Fund Complex would have a realistic chance of being a liquid investment opportunity for investors like Plaintiff.

118.    Moreover, while stating that Defendants were negotiating a sale of mining equipment in the PPM, Defendants omitted the details and significance of such sale that would make a large portion of Plaintiff's investment illiquid.

119.    The acts, misrepresentations, and intentional material omissions made by or on behalf of Defendants were committed in connection with the purchase and sale of securities within the meaning of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, namely, the partnership interests in the Partnership.

120.    As alleged above, each of these representations and omissions was false when made and made Plaintiff and other investors ignorant about the purchased and held securities because, among other things, from at least as early as mid-2017, half a year before Plaintiff made its investment, Defendants already knew that cryptocurrency trading was no longer a viable investment strategy and planned to use Plaintiff's funds for highly illiquid mining operations, which were also related to

Defendants' separate business; Defendants had returned funds to investors in Defendants' prior cryptocurrency investment fund; and Defendants knew they would not be providing the promised liquidity and withdrawals to Plaintiff and other investors in the Fund Complex. These misrepresentations and omissions were repeated in the PPM, marketing materials, e-mails, numerous meetings, telephone calls, and other communications.

121.    Defendants made such misrepresentations and material omissions knowing they were false and/or with the intent not to perform or honor them, and to deceive and defraud Plaintiff, and to induce Plaintiff to agree to make the above-described investments.

122.    Defendants also failed to disclose properly to Plaintiff the material details of Defendants' self-dealing and grave conflict of interest involving Defendants' side businesses, Escher and Iterative Mining LLC, or that, upon information and belief, Defendants took no due diligence or compliance measures dealing with Escher on behalf of the Fund Complex.

123.    Defendants made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing Plaintiff to purchase and retain securities in reliance thereon, and Plaintiff did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said securities.

124.    Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon Plaintiff, all in connection with the purchase or sale of a security.

125.    Plaintiff has been damaged by these Defendants' wrongful conduct in that the Defendants' wrongful conduct caused Plaintiff to purchase and hold limited partnership interests in

the Partnership investing in the Fund Complex, and to retain those partnership interests until present day, causing Plaintiff to lose a substantial portion of its investment in the Fund Complex.

126. Defendants' fraudulent conduct, as alleged herein, was done purposefully, maliciously, and without regard for the rights and interests of Plaintiff.

127. Plaintiff would not have agreed to invest said monies had it known the true facts about the Fund Complex, its purpose, extent of dealings with Defendants' affiliates, Defendant's prior performance, and other material misrepresentations and omissions alleged herein.

128. By reason of the foregoing, Plaintiff is entitled to judgment against Defendants, jointly and severally, awarding Plaintiff compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SECOND CLAIM FOR RELIEF

### (against Individual Defendants for Violation of Securities Exchange Act § 20(a))

129. Plaintiff repeats, realleges, and incorporates herein by reference, all preceding and succeeding paragraphs as if set forth in their entirety herein.

130. At all relevant times, Individual Defendants controlled Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P.

131. Individual Defendants, directly and through their affiliated entities, provided the Fund Complex with marketing and distribution services, risk management services, strategic planning and administration services, and back-office support and systems services. Individual Defendants also allowed Escher to use Iterative's website, participated in the audits of the Fund Complex, monitored the Fund Complex's portfolio, and met with Plaintiff to discuss all aspects of Fund Complex's business.

132.     Individual Defendants could hire and fire any Fund Complex's administrators and service providers.

133.     Individual Defendants culpably participated in Iterative Capital Management L.P.'s and Iterative Capital GP, LLC's violations of Section 10(b) and Rule 10b-5. Individual Defendants received all the information from the Fund Complex's administrators, auditors and other service providers. Based on the information they had, Individual Defendants knew or should have known that the Iterative Capital Management L.P.'s and Iterative Capital GP, LLC were deviating from the Fund Complex's stated investment objectives and were providing scarce and insufficient accounting to Plaintiff and other investors.

134.     Obviously, Individual Defendants had the knowledge, opportunity, and power to quash the fraud at its inception and return Plaintiff's investment upon Plaintiff's timely request. Individual Defendants had a duty to disclose any shift in the Funds Complex's investment strategy made in lieu of honoring Plaintiff's withdrawal requests.

135.     By virtue of the foregoing, at the time of the wrongs alleged herein, Individual Defendants had the ability to supervise and control the activities of Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P., did in fact exercise such control, culpably participated in the primary violations of Section 10(b) and Rule 10-b5 alleged herein, and were therefore controlling persons of Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P. within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)).

136.     Plaintiff has been damaged by the wrongful conduct of Individual Defendants through their control of Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P., in that Individual Defendant's wrongful conduct caused each of Plaintiff to purchase limited

partner interest in the Partnership as a part of the Fund Complex and to remain invested in the Fund Complex upon fraudulent and other material misrepresentations and omissions.

137.    Individual Defendant's fraudulent conduct, through their control of Iterative Capital, L.P., Iterative Capital GP, LLC and Iterative Capital Management, L.P., as alleged herein, was done purposefully, maliciously, and without regard for the rights and interests of Plaintiff.

138.    By reason of the foregoing, Plaintiffs is entitled to a judgment against Individual Defendants awarding Plaintiff compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**WHEREFORE**, Plaintiff demands a judgment as follows:

a) For compensatory and punitive damages to Plaintiff against Defendants, jointly and severally, in an amount to be determined at the trial of this action, but no less than the entire consideration paid Plaintiff for its interest in the Fund Complex;

b) For the costs, expenses, and disbursements incurred in the prosecution of this action, including attorneys' fees;

c) For interest on any award at the appropriate statutory or other rate; and

d) For such other and further relief as this Court deems just and proper.

Plaintiffs further demands a trial by jury of all claims set forth in this Verified Complaint.

DILENDORF KHURDAYAN PLLC

Dated: July 20, 2020
New York, New York

*Rika Khurdayan*

by: Rika Khurdayan, Esq.
federal bar number AK9122

*Attorneys for Plaintiff*
60 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 457-9797
rk@dilendorf.com

# VERIFICATION

STATE OF NEW YORK       )
                                 ) ss.:

COUNTY OF NEW YORK    )

      FELIKS KOGAN, being duly sworn, deposes and says that deponent is the Member and Manager of Plaintiff, the limited liability company described in the within action; that he has duly read the foregoing First Amended Verified Complaint and knows the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true. This verification is made by deponent because Plaintiff is a New York limited liability company and deponent is the Member and Manager thereof.

_____
                                     Feliks Kogan

Sworn to before me this

20th day of July , 20 20

_____
Notary Public

MASHA BAIKOFF
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BA6146626
Qualified in Kings County
My Commission Expires May 22, 2022